**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) **Civil Action No. 16-cv-3885** ) |
| **v.** | ) **Jury Trial Demanded** ) |
| **DANIEL C. USTIAN,** | ) ) |
| **Defendant.** | ) ) |

## <u>COMPLAINT</u>

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), brings this action against Daniel C. Ustian ("Ustian" or the "Defendant") and alleges for its complaint against him as follows:

## <u>SUMMARY OF ALLEGATIONS</u>

1.      From late 2010 through 2012, Defendant Ustian, the then-President and Chief Executive Officer of Navistar International Corporation ("Navistar") led a campaign of deception.  The deception was manifested in Ustian's and Navistar's fraudulent statements to the public about Navistar's ability to meet the Environmental Protection Agency's ("EPA") deadline to comply with rigorous emission standards for heavy-duty diesel truck engines.

2.      These emission standards were not news to Navistar, a publicly-traded truck, bus and diesel engine manufacturer headquartered in Lisle, Illinois.  The EPA had issued the standards in 2001 to ultimately limit the discharge of nitrogen oxide or "NOx"

emissions from on-road heavy-duty truck engines to 0.20 grams per brake horsepower hour (the "0.20 NOx standard"). The EPA, recognizing that the new standards would require reconfigured engines, delayed compliance with the 0.20 NOx standard until 2010, and allowed engine manufacturers to gradually step down NOx emissions levels over the intervening years.

3. Under Ustian's direction, Navistar sought to meet this challenge by developing engines that utilized only "exhaust gas recirculation" or "EGR" technology. EGR-only technology reduced NOx emissions by capturing a portion of exhaust gas, which it cooled and blended with fresh air before returning the gas back into the engine's cylinder.

4. Within the company and publicly, Ustian trumpeted EGR-only technology as important to Navistar's financial success while relentlessly criticizing the alternative technology adopted by Navistar's competitors. And he put Navistar's money and resources where his mouth was. Under his watch, Navistar staked $700 million and tens of thousands of hours of its engineers' time on EGR-only technology.

5. By 2010 when the 0.20 NOx standard went into effect, Navistar had not certified an EGR-only engine at the 0.20 NOx standard. However, Navistar was able to continue selling engines by using emission credits that Navistar had banked from its previous sales of earlier generations of engines.

6. But as its limited stockpile of credits began to dwindle in 2011 and 2012, Navistar was encountering significant engineering roadblocks in receiving EPA certification of an EGR-only engine at the 0.20 NOx standard without compromising fuel economy and performance.

7.      Given how critical EGR-only technology was to Navistar's long-term success, and Ustian's professional reputation, Ustian needed more time to continue development of a commercially viable 0.20 NOx EGR-only engine.  If the truth about the increasingly difficult development and EPA certification process came to light, serious consequences were likely to follow.  Navistar's customers could defect, its stock price could suffer, and it could be forced to abandon EGR-only technology altogether.

8.      Rather than tell the public the truth and face these consequences, Ustian engaged in a progressively desperate and fraudulent scheme to deceive the investing public into believing that EPA certification of a competitive EGR-only engine that met the 0.20 NOx standard was right around the corner.   The deception was manifested in Ustian's and Navistar's statements in conference calls with analysts, in press releases, and in reports filed with the SEC.

9.      With Ustian's knowledge, during 2011 and 2012 Navistar submitted three applications to the EPA for certification of a heavy-duty diesel EGR-only engine at the 0.20 NOx standard.   Unknown to the investing public, the first such application included an engine that Ustian knew Navistar could never sell — even if it were certified by the EPA.  Ustian and Navistar filed this application anyhow to deceive the public about Navistar's progress in developing a certifiable and commercially competitive EGR-only engine that met the 0.20 NOx standard.

10.      Once it became clear that the EPA would not approve this first application, Navistar followed up with two additional applications in 2012.  As Ustian and Navistar knew, the EPA quickly made clear that these applications were also deficient and unlikely to receive approval without significant modifications.

11.     As was well known to Ustian and Navistar, Navistar's engineers were having difficulty developing and certifying an EGR-only engine that could meet the 0.20 NOx standard without sacrificing fuel economy and other performance features, discussions with the EPA were at an impasse, and Navistar's applications were going nowhere.

12.     Nonetheless, from 2010 through 2012, instead of coming clean with the public regarding the difficulties Navistar was experiencing in developing and certifying a competitive EGR-only engine, Ustian engaged in a coverup.  During this period, Ustian and Navistar made false and misleading public statements that led investors to believe that Navistar's efforts to produce a commercially competitive EGR-only engine meeting the 0.20 NOx standard were proceeding without major engineering or EPA roadblocks.

13.     By mid-2012, the costs and difficulties of development and certification of the 0.20 NOx EGR-only engine became too great, Navistar's stockpile of emissions credits was running out, and the truth could no longer be suppressed.  In July 2012, Navistar announced it was abandoning its EGR-only technology and adopting the alternative technology used by Navistar's competitors.  Navistar's stock price plummeted, and shortly thereafter its Board of Directors sought and secured Ustian's resignation.

14.     Through the activities alleged in this Complaint, Ustian, directly or indirectly, has engaged in transactions, acts, practices or courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

15.     Ustian also, directly or indirectly, has engaged in transactions, acts, practices, and courses of business which constitute violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

16.     Additionally, Navistar directly or indirectly, has engaged in primary violations of Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11 and 13a-13 promulgated thereunder, and Ustian aided and abetted and was a control person for Navistar's violations of these provisions.

17.     Additionally, Navistar, directly or indirectly, has engaged in primary violations of Section 17(a) of the Securities Act, and Ustian aided and abetted Navistar's violations of these provisions.

18.     The SEC brings this action to restrain and enjoin such transactions, acts, practices and courses of business pursuant to Sections 21(d) and 20(e) of the Exchange Act [15 U.S.C. § 78u(d) and § 78t(e)] and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

19.     The SEC seeks permanent injunctive relief against Ustian to enjoin him from future violations of the federal securities laws, the imposition of disgorgement, with prejudgment interest, civil penalties against Ustian, and an officer and director bar against him.

## JURISDICTION

20.     The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)], seeking to restrain and enjoin permanently the Defendant from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other relief as may be appropriate.

21.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa]. The Defendant, directly or indirectly, singly or in concert, has made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Some of these transactions, acts, practices and courses of business occurred in the Northern District of Illinois, where the Defendant transacted business and resided during the relevant period.

22.     Defendant has, directly and indirectly, made use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

23.     There is a reasonable likelihood that Defendant will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

**THE DEFENDANT**

24.     **Daniel C. Ustian**, age 65, was Navistar's President and CEO from 2003 through August 2012; Chairman of the Board of Directors from 2004 through August 2012; and a director from 2002 through August 2012. Ustian also was the President of Navistar's Engine Group from 1999 through 2002 and Group Vice President and General Manager of the Engine & Foundry Group of Navistar from 1993 through 1999.

**RELATED PARTY**

25.     **Navistar International Corporation** is a Delaware corporation that maintains its principal executive offices in Lisle, Illinois.  Navistar is an international manufacturer of commercial and military trucks, buses and diesel engines and a provider of service parts for trucks and trailers.  The Company's stock is listed on the New York Stock Exchange under the ticker symbol "NAV."

**FACTS**

**I.     Navistar Develops an "EGR-Only" Technology Different from Its Competitors' Technologies**

26.      In 2001, pursuant to the Clean Air Act, the EPA enacted a rule requiring new heavy-duty diesel engines to meet the 0.20 NOx standard by 2010.  NOx is a pollutant and reacts in the atmosphere to create smog and acid rain.  By delaying the effective date of the rule requiring emissions at the 0.20 NOx standard until 2010, the EPA gave the industry nine years to innovate the necessary new technologies.

27.     To comply with the 0.20 NOx standard, Navistar and Ustian chose to rely on EGR-only technology, which recirculates exhaust into the engine's cylinders before release, to reduce NOx emissions. This approach also was referred to as "in-cylinder" technology.

28.     All of Navistar's major competitors adopted an alternative technology known as selective catalytic reduction ("SCR"), which involves chemically treating exhaust before its release.

29.     From 2001 through 2012, Navistar devoted tens of thousands of employee hours and approximately $700 million to the development of its EGR-only technology. As Navistar disclosed in its fiscal year 2010 annual report filed on Form 10-K, "[f]ocusing on engine research and development in order to have a competitive advantage using Exhaust Gas Recirculation ('EGR') and other technologies for compliance with 2010 emissions standards" was a key part of its long-term strategy.

30.     Navistar's decision to rely on EGR-only technology was a high-stakes bet for the company and Ustian. Although EGR-only technology offered the possibility of significant advantages over SCR technology, successful commercial implementation of EGR-only technology posed significant engineering challenges.

31.     Nonetheless, at Ustian's direction, Navistar did not prepare a back-up plan in case it was ultimately unsuccessful in using EGR-only technology to meet EPA emissions standards. As Ustian stated at a September 15, 2009 conference attended by, among others, securities analysts, "Plan B is we're going to make Plan A work."

32.     To make that plan work, Navistar needed EPA approval of its EGR-only engines. A manufacturer of heavy-duty diesel engines in the United States, such as Navistar, must obtain a certificate of conformity ("Certificate") from the EPA each year for each model of engine family that it sells.

33.     Using SCR technology, Navistar's competitors had obtained Certificates from the EPA by 2010 indicating that the engines they manufactured met the 0.20 NOx

standard.  By 2010, Navistar had not even submitted an application for certification of a heavy-duty diesel engine at the 0.20 NOx standard.

34.     Navistar's ability to develop and certify a commercially competitive engine at the 0.20 NOx standard was important to Navistar's customers and to Navistar's investors.

35.     Ustian was actively involved in Navistar's efforts to develop and obtain certification of an EGR-only engine at the 0.20 NOx standard, including picking the engineering team to work on the engine development, receiving updates from the engineers and certification team on the engine's development status and certification status with the EPA, helping the team solve problems, and motivating the team.  From 2010 through 2012, Ustian regularly received updates from the engineering team, the certification team and Navistar executives regarding both the status of development work on Navistar's EGR-only technology and Navistar's communications with the EPA about its applications for certification of an EGR-only engine at the 0.20 NOx standard.

## II.     Navistar Relies on Emissions Credits to Sell Engines While It Attempts to Obtain EPA Certification

36.     Prior to 2010, Navistar had produced engines with emissions that were cleaner than required by the EPA.  This allowed Navistar to generate a "bank" of emissions credits.  Under the EPA's emissions credits system, Navistar could use these emissions credits to sell engines at levels higher than the 0.20 NOx standard and, in turn, gained more time to develop and certify an EGR-only engine at the 0.20 NOx standard.

37.     Because Navistar did not have a Certificate for a 0.20 NOx engine when the 0.20 NOx standard went into effect on January 1, 2010, Navistar continued to sell its

engines certified at a NOx level higher than 0.20 NOx and used emissions credits to offset the difference in NOx.

38. Once the 0.20 NOx standard went into effect, however, Navistar could no longer generate additional emissions credits on engines with emissions higher than 0.20 NOx. Thus, its bank of emissions credits was limited.

39. Navistar planned to seek EPA certification of its 13-liter EGR-only engine at the 0.20 NOx standard first. Once it obtained a Certificate for its 13-liter EGR-only engine, Navistar then planned to apply that same technology to seek certification of its other engines at the 0.20 NOx standard, including its 11-liter and 15-liter engines. The company planned to focus on certifying its 11-liter, 13-liter and 15-liter engines, known at Navistar as the "big bore" engines, before moving onto other engine families because it expected its emissions credits for the big bore engines to run out first.

40. While using its limited emissions credits, Navistar continued to try to develop its EGR-only technology and obtain a Certificate for an engine at the 0.20 NOx standard. Navistar's goal was to develop an EGR-only engine that emitted 0.20 NOx or less and offered improved fuel economy, acceleration and power compared to the 0.50 NOx EGR-only engines Navistar was currently selling using emissions credits. As of late 2010, Navistar engineers and executives had informed Ustian that this 0.20 NOx EGR-only engine with competitive performance features was not predicted to be ready for production until at least the end of 2012.

### III.    Navistar's 2010 Registration Statement and Ustian's 2011 Stock Sale

41.    From 2010 through 2012, Navistar common stock was registered and traded on the New York Stock Exchange.

42.    Navistar filed a registration statement on April 23, 2010 to register shares of common stock under its equity compensation plan.  Form S-8 registration statements incorporate by reference certain prior filings and all subsequently filed periodic reports until the company files a post-effective amendment terminating the offering, which Navistar never did.  Navistar's offering pursuant to this registration statement was ongoing through the end of 2012.

43.    Pursuant to this registration statement, Navistar issued stock-based compensation to Ustian and its other executives, directors, and non-executive officers between late 2010 and the summer of 2012.  Ustian sold Navistar stock on April 5, 2011.

### IV.    Ustian and Navistar Make Fraudulent Statements and Engage in Other Deceptive Conduct

44.    Beginning in late 2010, as investors, analysts, Navistar's customers and Navistar's competitors questioned whether Navistar could ever develop and certify a commercially competitive EGR-only engine at the 0.20 NOx standard, Ustian and Navistar engaged in a fraudulent scheme to conceal from the public the significant challenges Navistar was facing in developing and certifying a commercially competitive EGR-only engine at the 0.20 NOx standard before its emissions credits ran out.  Through his misstatements, Ustian repeatedly tried to reassure the public that Navistar's EGR-only engines could meet the 0.20 NOx standard while offering competitive performance features, and that certification would occur before Navistar was at risk of running out of emissions credits.  Ustian's and Navistar's fraudulent scheme was intended to hide from

the public the serious issues Navistar was encountering in developing and certifying its EGR-only engines. This fraudulent scheme included the following:

**A.** **November 2010 Press Release**

45. On November 3, 2010, Navistar issued a press release regarding a facility tour for media and securities analysts at the company's Huntsville, Alabama engine plant (the "November 2010 Press Release").

46. Ustian reviewed, approved, and provided a quote for the November 2010 Press Release.

47. The November 2010 Press Release stated in pertinent part:

Navistar also advised that it has submitted certification to the EPA for its MaxxForce 15 and plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required.

48. The "MaxxForce 15" that Navistar and Ustian referred to in the press release was a 15-liter engine that Navistar was submitting for certification above 0.20 NOx. Navistar had developed this engine to the point that it had competitive fuel economy and other performance features compared to other 15-liter engines being sold in the marketplace. Because the MaxxForce 15 engine was competitive with other 15-liter engines in the marketplace, Navistar and Ustian intended to, and ultimately did, sell this engine upon certification from the EPA.

49. The "MaxxForce 13 at 0.2g NOx" that Navistar referred to in the press release was a 13-liter engine that Navistar still was developing for certification at the 0.20 NOx standard using EGR-only technology.

50. This 13-liter engine lacked competitive fuel economy and other performance features compared to other 13-liter engines being sold in the marketplace.

51.     Because the MaxxForce 13 lacked performance features competitive with other 13-liter engines, Ustian knew that even if the EPA issued a Certificate for the engine, Navistar could not sell the engine in the marketplace.

52.      In the context of a discussion otherwise devoted to engines being sold, or intended to be sold, in the marketplace, the November 2010 Press Release referenced a certification application for a 13-liter engine at the 0.20 NOx standard.  In fact, Navistar and Ustian knew, but did not disclose, that unlike the other engine referenced in the press release, Navistar could not produce and sell that 13-liter engine in the marketplace even if the EPA issued a Certificate for it because Navistar had not yet developed its EGR-only technology to the point that in the next few months it could obtain certification at the 0.20 NOx standard while also offering competitive performance features.

**B.     December 2010 Analyst Conference Call**

53.     On December 22, 2010, Ustian and other Navistar executives conducted a conference call with securities analysts (the "December 2010 Analyst Call") in conjunction with Navistar's filing of its fiscal year 2010 annual report on Form 10-K.

54.     It was Navistar's general practice to conduct conference calls with securities analysts in conjunction with Navistar's filing of its quarterly and annual reports with the SEC.  As a general matter, the securities analysts participating in these calls periodically made recommendations to clients and others about whether to buy or sell Navistar stock. Further, although Navistar directed the contents of these calls towards securities analysts, Navistar permitted the investing public to listen to the calls by dialing the number that Navistar published for the calls.

55.     During the December 2010 Analyst Call, a securities analyst asked in pertinent part: "[O]n the 13 liter in terms of certifying that at 0.2, what kind of timeline do you think we are looking at there?" Ustian responded in pertinent part:

> [W]e will submit that over the next couple of months I believe. . . . [W]e would be able to show you the data that it meets 0.2 and show you how we are able to meet it. But as far as the customers, he is not going to know the difference. Nothing looks any different.

Later during the call, another securities analyst asked Ustian in pertinent part: "Dan, can you talk about the fuel efficiency of your 13-liter 0.2 NOx versus an equivalent SCR 0.2 NOx engine? Do you anticipate running those comparisons?" Ustian responded in pertinent part:

> The fuel economy of the 0.2 will be better and there will be no change in heat rejection at the same time. So this product will be even better.

When the analyst followed up with a question about whether this engine would be "better than an equivalent SCR 0.2 NOx," Ustian responded:

> Well, our strategy has been we will be equal to any SCR – the best of any SCR product that is out there. So we are assuming the SCR product gets a little better too, and that is what we are going to be able to do with getting to 0.2.

56.     Ustian deceived investors through his statements that the EGR-only engine that Navistar planned to submit to the EPA in the next few months offered better fuel economy and performance features than either Navistar's current 0.50 NOx engines or its competitors' SCR engines.  Ustian knew, but did not disclose, that as of the time he made these statements on December 22, 2010, Navistar's 13-liter engine was not yet capable of limiting emissions to 0.20 NOx while also offering "better" fuel economy and other performance features than Navistar's competitors' SCR engines or even fuel economy and other performance features equal to Navistar's existing 0.50 NOx engines

such that the customer would not "know the difference." Ustian also knew, but did not disclose, that Navistar would not be able to offer these advancements in fuel economy and performance in "the next couple of months" and thus would not be able to submit a certification application to the EPA in the next couple of months for a 13-liter 0.20 NOx EGR-only engine with competitive performance features that could be produced and sold in the marketplace.

### C.    2011 Certification Application

57.    On February 21, 2011, Navistar submitted an application to the EPA for certification of a 13-liter engine at the 0.20 NOx standard using Navistar's EGR-only technology (the "2011 Application"). Ustian was aware of Navistar's 2011 Application to the EPA and was regularly updated on the development and certification work for the 2011 Application both before and after it was submitted to the EPA. Internally at Navistar, this application was associated with Ustian and was referred to at Navistar as "D-cert," for "Dan-certification."

58.    At the time the 2011 Application was submitted to the EPA, Ustian knew that the 13-liter engine described in the 2011 Application could not be sold in the marketplace even if the EPA issued a Certificate for it. Ustian knew that this engine required further development work to attain the fuel economy and performance features necessary to make it a usable, competitive engine when installed in a truck and to make it an engine Navistar could sell.

59.    It was unusual, if not unprecedented, for Navistar to submit a certification application to the EPA knowing that the engine that was the subject of the application could not be sold in the marketplace even if a Certificate were granted.

60.     In fact, at the time the 2011 Application was submitted to the EPA, the engine described in the application could run only in the testing laboratory.  In a February 9, 2011 email regarding the engine covered by the 2011 Application, a Navistar Senior Technical Specialist working on certification matters told other engineers in the certification group:

> I asked a bigger question. Would this engine ever be drivable in a truck and I got laughs in response. . . .  Translation you have a[n] underpowered 13 liter engine that is coughing, sputtering and wheezing like some terminal cancer patient on a respirator.

61.     At the time the 2011 Application was submitted to the EPA, Ustian also knew that the Application was incomplete and that the EPA told Navistar it would not issue a Certificate without Navistar providing additional test results.  In the months before the 2011 Application was submitted to the EPA, the EPA told Navistar it would not accept Navistar's use of test results from its current 0.50 NOx engine to satisfy durability testing requirements, known as Deterioration Factor testing, for its proposed 0.20 NOx engine because significant differences existed between the two engines.

62.     Despite the EPA expressly stating that it would not accept Navistar's use of its 0.50 NOx engine Deterioration Factor test results in its 2011 Application, Navistar submitted the 2011 Application without conducting new Deterioration Factor testing.  As Navistar's Chief Certification Engineer stated in a February 21, 2011 email that was forwarded to Ustian the same day that the 2011 Application was submitted to the EPA, "Durability data and results from the current [0.50 NOx] engine were used in the submittal despite EPA disallowing that version of durability demonstration."

63.     Ustian knew that the D-cert engine described in the 2011 Application lacked performance features to be a competitive, usable engine in a truck and that the

engine could not be put into production even if certified. For example, Navistar's

Director of Advanced Technology told Navistar executives in a March 1, 2011 email,

> [I]t has been made very clear in the reviews that I have been in that the D-Cert power curve is not drive-able or saleable so we need to be very careful in how things are described to the reporter.

When Navistar's Vice President of Powertrain Product Development forwarded this

email to Navistar's Vice President of Integrated Product Development and suggested he

talk with Ustian about these issues with the D-cert engine, the Vice President of

Integrated Product Development responded that Ustian "totally knows it" and advised

him to "[t]ell these guys to not worry about this sh[--] and not keep sending emails to

each other."

64.     Navistar submitted the 2011 Application to the EPA despite the fact that

Navistar never intended to sell the engine described in the application and the fact that

the 2011 Application did not have new Deterioration Factor testing results, which the

EPA told Navistar were required for a Certificate. Because the 2011 Application lacked

new Deterioration Factor testing, Ustian knew the EPA was unlikely to issue a

Certificate. Further, because the D-cert engine described in the 2011 Application was

not even drivable in a truck, Ustian knew that Navistar would never sell this engine. In

spite of these issues, Navistar submitted the 2011 Application because Ustian wanted to

use it as a marketing tool to convince investors of Navistar's supposed progress in

developing an EGR-only engine at the 0.20 NOx standard while it continued to work on

developing an engine with competitive performance features that it could put into

production.

65.     In the weeks after Navistar submitted the 2011 Application, the EPA responded to the 2011 Application and advised Navistar that the application did not meet the EPA's certification requirements.  Among other concerns, the EPA continued to insist that Navistar run new Deterioration Factor testing.  During spring 2011, Navistar engineers questioned whether they could run a Deterioration Factor test on the engine that was the subject of the 2011 Application without the engine experiencing component failure.

66.     By submitting the 2011 Application to the EPA for certification of an engine that could not be driven or sold and through Navistar's and Ustian's public statements about it described in paragraphs 47, 55, 70, 73 and 75 through 76, Ustian and Navistar created the misleading impression that Navistar had successfully developed an EGR-only engine that met the 0.20 NOx standard while attaining competitive performance features.  In fact, as Ustian knew, Navistar's EGR-only engine was not drivable if installed in a truck, lacked competitive performance features, could not be sold in the marketplace even if certified by the EPA and did not meet the EPA's certification requirements.

67.     Analysts and investors were misled by Navistar's submission of the 2011 Application because they understood Navistar's and Ustian's statements regarding the engine covered by the 2011 Application, and the fact that Navistar had submitted the application, to mean that Navistar currently had a 13-liter EGR-only engine with competitive fuel economy and other performance features that could meet the 0.20 NOx standard and that Navistar could sell the engine in the marketplace if the EPA certified it. Analysts and investors did not know that the engine described in the 2011 Application

was not drivable when installed in a truck and could not be put into production even if the EPA certified it.

68.     Analysts and investors were also misled because they believed that the 2011 Application was a complete application that included the information necessary for the EPA to approve it.  Analysts and investors did not know that the 2011 Application was incomplete and lacked necessary testing, including new Deterioration Factor testing that the EPA expressly told Navistar was required before the 2011 Application was submitted.

**D.     March 2011 Analyst Conference Call**

69.     On March 9, 2011, Ustian and other Navistar executives conducted a conference call with securities analysts (the "March 2011 Analyst Call") in conjunction with Navistar's filing of its first quarter 2011 quarterly report on Form 10-Q.

70.     During the March 2011 Analyst Call, before taking any questions from securities analysts, Ustian addressed Navistar's 2011 Application, stating in pertinent part:

> Now let's talk about in-cylinder 0.2. One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder. Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over.

> We want to get in front of the 0.2 now, because we can anticipate there is a next one coming out that 0.2 can't be done. So what we did is we submitted to the EPA a certification of 0.2 to take that argument away. We don't plan on using this for awhile, but we are going to have it out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well. So [t]hat's what we have done. When you hear about that, it's not that it's coming into production tomorrow. It's just to get it out there and take all that argument away.

71.     Ustian's statement that that the engine covered by the 2011 Application would be "out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well" was false.  Ustian knew, but did not disclose, that the engine covered by the 2011 Application (the engine that was "on the shelf") did not meet the EPA's certification requirements and did not yet offer competitive performance features.  In fact, Ustian knew, but did not disclose, that the engine covered by the 2011 Application not only lacked competitive performance features, it was not drivable or sellable.

72.     Additionally, Ustian deceived investors through his misleading statements, "When you hear about that, it's not that it's coming into production tomorrow.  It's just to get it out there and take all that argument away."  Ustian knew, but did not disclose, that Navistar could not put the engine covered by the 2011 Application into production even if certified because it was not drivable and did not offer competitive fuel economy and other performance features that would allow Navistar to sell the engine in the marketplace.

**E.     April 2011 Press Release**

73.     On April 5, 2011, Navistar issued a press release (the "April 2011 Press Release") with the headline "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine at 0.39g NOx" and the sub-headline "With EPA and CARB [California Air Resources Board] Certification of MaxxForce® 15, Submission of MaxxForce® 13 at 0.2g NOx, Company Continues to Make Strides in its In-Cylinder Emissions Technology Path."

74.     Ustian reviewed and approved the April 2011 Press Release before Navistar issued it.

75.     In the April 2011 Press Release, Navistar announced that it had received certification for two engines at levels higher than the 0.20 NOx standard: a mid-range diesel engine and a 15-liter engine, the "MaxxForce 15."  Navistar intended to, and did eventually, sell both of these engines in the marketplace upon certification from the EPA using emissions credits.

76.     In the April 2011 Press Release, Navistar then addressed its 2011 Application, stating:

> In addition, Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technologies. The company intends to phase-in its engines at progressively lower emissions levels (0.4g NOx, 0.35g NOx, 0.3g NOx, 0.25g NOx, etc.) in the years ahead in an effort to make emissions compliance as seamless as possible to its customers.

77.     In the context of a discussion otherwise devoted to applications and Certificates for engines being sold, or intended to be sold, in the marketplace, the April 2011 Press Release referenced the 2011 Application for certification of a 13-liter engine. In fact, Navistar and Ustian knew but did not disclose that, unlike the other engines referenced in the press release, the engine described in the 2011 Application did not meet the EPA's requirements for certification and could not be put into production even if certified because it needed extensive development work before it would be drivable or could offer competitive performance features to be sold.

78.     The EPA never approved the 2011 Application.  Later in 2011, Navistar, with Ustian's input and approval, abandoned efforts to gain approval of the 2011 Application.

79.     It was unusual, if not unprecedented, for Navistar to abandon a certification application to the EPA after the EPA failed to approve the application, as Navistar did with the 2011 Application.

**F.      Navistar's Projected Depletion of its Emission Credits**

80.     By fall 2011, Navistar and Ustian learned that Navistar's emissions credits for its big bore engines could be depleted as early as February 2012.  Without emissions credits or an engine certified at the 0.20 NOx standard, Navistar would be unable to legally sell engines from its big bore line unless the EPA instituted rule-making to allow Navistar to pay non-conformance penalties ("NCPs").

81.     NCPs are monetary penalties that allow a vehicle or engine manufacturer to sell engines that do not meet the emissions standards.  When the EPA institutes rule-making for NCPs, manufacturers unable to comply with the applicable standard may choose to pay NCPs, which are assessed on a per-engine basis.

82.     Only 40 states permit the use of NCPs.  If the EPA instituted rule-making to allow Navistar to pay NCPs, Navistar could do so in those 40 states but would have to use its emissions credits in the other 10 states.  This would allow Navistar to conserve its emissions credits for its big bore engines and extend the anticipated depletion date beyond the February 2012 projection.

83.     In fall 2011, Navistar communicated with the EPA about its credit status for its big bore engines and its timing for development of a 0.20 NOx big bore EGR-only

engine.  Ustian was aware of these communications and participated in some of them.
Navistar and Ustian informed the EPA that Navistar would be unable to obtain
certification of a big bore 0.20 NOx engine by the time it expected to use its remaining
emissions credits in February 2012.

84.    As an alternative to paying NCPs, Navistar proposed that the EPA allow it
to recalibrate the software on its current 0.50 NOx engine to reduce emissions to 0.20
NOx in a testing laboratory.  Navistar explained that this recalibration would only reduce
emissions to 0.20 NOx in a lab; when the engine was driving in a truck on the highway,
its emissions would be higher than 0.20 NOx.  The EPA rejected this proposal.

85.    Consequently, the EPA continued to work on an interim NCP rule, which
ultimately went into effect in January 2012, to allow Navistar to pay NCPs while it
continued to try to obtain a Certificate for an EGR-only engine at the 0.20 NOx standard.
Ustian was aware that the EPA was promulgating an interim NCP rule because the EPA
understood that Navistar could not obtain certification of a big bore EGR-only engine at
the 0.20 NOx standard before Navistar expected its big bore emissions credits to run out.

86.    Navistar engineers continued to encounter significant obstacles in
developing a 0.20 NOx EGR-only engine with improved performance features.  As of fall
2011, Navistar's engineers projected, and Ustian knew, that it would take until at least
fall 2013 before a 0.20 NOx EGR-only engine with improved performance features
would be ready to go into production.

**G.    Navistar Develops a Bridge Program Engine**

87.    In late 2011, Navistar began work on certifying another 13-liter EGR-only
engine at the 0.20 NOx standard that would bridge the gap between when Navistar's big

bore emissions credits ran out and its 0.20 NOx big bore EGR-only engines with improved fuel economy and other performance features were expected to be ready for production in the fall of 2013. Ustian knew this.

88. This second engine for certification at the 0.20 NOx standard, the bridge program engine, involved no hardware changes and no goals to improve fuel economy, acceleration or other performance features. Instead, Navistar engineers planned to recalibrate Navistar's current 0.50 NOx EGR-only engines to reduce emissions in the testing laboratory to 0.20 NOx. This recalibrated engine would include only software changes. Ustian was aware of this bridge program to achieve certification of an EGR-only engine at the 0.20 NOx standard.

89. This bridge program engine used a technology known as dual mapping. In the dual mapping technology used in the bridge program engine, the engine would operate under one calibration, called Map A, while in emissions testing in a laboratory, and would switch to another calibration, called Map B, when it sensed that the vehicle was in motion (anything above 0.1 miles per hour). The engine could meet emissions requirements while operating in Map A but had severely reduced fuel economy and performance. To address this problem, the engine would switch to Map B as soon as the vehicle was out of idle, which improved fuel economy and performance but resulted in emissions significantly above 0.20 NOx.

### H. December 2011 Annual Report

90. On December 20, 2011, Navistar filed its annual report for its fiscal year 2011 on Form 10-K (the "December 2011 Annual Report") through the SEC's publicly-available EDGAR document filing system.

91.     Ustian reviewed and approved the December 2011 Annual Report before Navistar filed it.  He also signed and certified the December 2011 Annual Report in his capacity as Navistar's President and CEO.

92.     Navistar employees met with the EPA on December 16, 2011, four days before Navistar filed its December 2011 Annual Report.  During that meeting, Navistar discussed its plans to submit in early 2012 a second application for certification of a 13-liter engine at the 0.20 NOx standard using Navistar's EGR-only technology.   Navistar engineers described how this proposed 0.20 NOx engine operated, including its dual mapping technology.  During the meeting, the EPA told Navistar that an engine using a dual mapping strategy in the manner described by Navistar would not meet EPA standards.

93.     On December 16, 2011, immediately after meeting with Navistar, an EPA official emailed Navistar's Vice President of Government Relations, who attended the meeting, with "important takeaways from the meeting," including:

> First as we discussed, under the Clean Air Act and our regulations EPA can not [sic] issue a certificate (conditional or otherwise) unless the engine meets the [three certification] requirements.  The engine described today by the Navistar team for certification in February [2012] does not appear to meet these requirements.

94.     Ustian received a copy of this email on December 16, 2011.

95.     In Navistar's December 2011 Annual Report, which Navistar filed on December 20, 2011, just four days after its December 16, 2011 meeting with the EPA, Navistar stated in pertinent part:

> We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both agencies' certification requirements. We are engaged in ongoing discussions with officials from both EPA and CARB regarding potential regulatory solutions that would

permit us to continue uninterrupted production of all of our engines. We cannot predict the outcome of these discussions nor the effect they may have on our business or financial condition, results of operation or cash flows.

96.     When Navistar discussed in the December 2011 Annual Report its plans to submit a certification application to the EPA, Navistar was referring to the certification application for the 13-liter engine that Navistar had described to the EPA in the meeting on December 16, 2011.

97.     The December 2011 Annual Report deceived investors through its misleading statement, "We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both agencies' certification requirements."  Navistar and Ustian knew, but did not disclose, that just four days earlier, the EPA had informed Navistar that it took the opposite view:  the engine for which Navistar was preparing to submit its new certification application did not appear to meet the EPA's certification requirements.  They also knew, but did not disclose, that Navistar would not be able to make all the changes the EPA said were required before submitting a new application.  For example, Navistar's engine would continue to use dual mapping technology to keep emissions below the 0.20 NOx standard during emissions testing in a laboratory but above the 0.20 NOx standard when a vehicle was in motion.  Navistar's statements in the December 2011 Annual Report conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its certification proposal just four days earlier.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

98.     Additionally, the December 2011 Annual Report stated in pertinent part, in its "Risk Factors":

> Our solutions for meeting U.S. federal and state emissions requirements
> may not be successful or may be more costly than planned.

In light of Navistar's difficulties in developing a 0.20 NOx engine that offered

competitive performance features, the EPA's failure to approve Navistar's 2011

Application, and the EPA's expression to Navistar of the agency's concerns about

Navistar's proposed second application, Ustian knew that Navistar already had

experienced a lack of success with its EGR-only technology.  Navistar's statements in the

December 2011 Annual Report conflicted with what the EPA had told Navistar, and

Navistar had conveyed to Ustian, regarding its certification proposal just four days

earlier.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly

unreasonable.

### I.      Navistar Submits a Second Certification Application to the EPA

99.      On January 31, 2012, Navistar submitted a second application to the EPA

for certification of a 13-liter engine at the 0.20 NOx standard using EGR-only technology

(the "January 2012 Application").

100.     Ustian was aware of Navistar's submission of the January 2012

Application and was regularly updated on the development and certification work for the

January 2012 Application both before and after it was submitted to the EPA.

101.     The EGR-only engine described in the January 2012 Application included

dual mapping technology that required the engine to switch between Map A and Map B

while in operation.   During testing or in idle, the engine operated in Map A.  When the

speed increased to 0.1 miles per hour (whenever it was in motion), an Auxiliary

Emissions Control Device ("AECD"), which Navistar called the Safe Operating Mode

AECD, would engage and switch the engine to Map B, during which the engine would operate with emissions above 0.20 NOx.

102.    On February 1, 2012, the day after Navistar submitted its January 2012 Application, during an analyst conference, Ustian compared the fuel economy and other performance features of Navistar's 13-liter EGR-only engine for certification at the 0.20 NOx standard to the 0.50 NOx EGR-only engines Navistar was already selling, stating in pertinent part:

> But, as far as the customer sees on 0.2, he will not know the difference. That has always been the plan, and we are able to produce that now. Invisible.  No impact on fuel economy, no impact on performance.

103.    On February 17, 2012, the EPA provided Navistar with a written response to Navistar's January 2012 Application.  The EPA's written response included an email from the EPA to Navistar and a five-page attachment to the email with the EPA's preliminary concerns on the January 2012 Application.

104.    Ustian was aware of the EPA's February 17, 2012 response on or about the date on which Navistar received it.

105.    The EPA's February 17, 2012 email in response to Navistar's January 2012 Application stated in pertinent part:

> After reviewing your application, our preliminary view is that Navistar's application for a certificate of conformity raises several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application.

106.    A five-page attachment to the email outlined the EPA's concerns and set forth what additional information and changes to the engine or testing protocol the EPA likely would need from Navistar before it could approve the January 2012 Application.

107.    One of the concerns identified by the EPA in its February 2012 response was whether Navistar met the 0.20 NOx standard on two certification tests.  The EPA told Navistar:

> [These two certification tests] appear to have been conducted without the Safe Mode Operation AECD active.  However, based on our understanding of this AECD, it would be active in-use . . . . When activated, this AECD switches to a high NOx calibration which exceeds the [Not To Exceed] limit over the entire engine operating map. Therefore, this engine family could not possibly comply with the NOx standard over the [two tests]. . . .  We should discuss whether and how the procedures should appropriately be changed to result in more representative measurements.  For example, Navistar could demonstrate that the engine complies over all test cycles with the AECD active as it would be under operating conditions typical of the cycles.

108.    The EPA also expressed concern that Navistar's Safe Operating Mode AECD might be a "defeat device," or a prohibited strategy that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  The EPA asked Navistar to justify why its Safe Operating Mode AECD was not a defeat device, given that "the only time the strategy would not be active is in the emissions test cell," and "[i]n effect the AECD appears to largely disable the emission control system during almost all in-use operation."

109.    Additional concerns that the EPA outlined in this email attachment related to some of the same issues, such as the lack of new Deterioration Factor testing, that the EPA had raised with Navistar in 2011 when the EPA told Navistar that it believed that Navistar's 2011 Application did not meet the EPA's certification requirements.

**J.    Navistar Engages Lobbyists and Contacts Elected Officials to Pressure the EPA to Approve Its Certification Application**

110.    Shortly after receiving the EPA's response, Ustian directed his staff to reach out to elected officials and their staffs regarding the challenges Navistar was facing in obtaining EPA certification of an EGR-only engine at the 0.20 NOx standard.   Ustian directed his staff to reach out to the elected officials and their staffs because he thought the EPA certification process in which Navistar was engaged was proving to be a lot tougher than it had been for Navistar in the past and was requiring more time and resources.

111.    On February 27, 2012, Navistar provided the EPA with an eight-page written reply and asked that its application be approved immediately.   Navistar's reply included challenges to the EPA's interpretation of its regulations.   Navistar submitted no new testing results and made no changes to its certification testing protocol or to the engine covered by the January 2012 Application in response to the EPA's February 17, 2012 response.

112.    After receiving Navistar's reply, the EPA never indicated to Navistar that it agreed with any of Navistar's arguments or that its positions on Navistar's January 2012 Application had changed from those it set forth in its February 17, 2012 response.

113.    On March 6, 2012, a Navistar employee in Government Relations contacted an elected official's staff to schedule a meeting to discuss Navistar's efforts to gain certification of an EGR-only engine at the 0.20 NOx standard.

114.    Navistar and Ustian also engaged lobbying firms and public relations firms to assist with their efforts to obtain certification of an EGR-only engine at the 0.20 NOx standard.   On March 7, 2012, a public relations firm consultant sent Navistar's

Chief Communications Officer "our ideas on how to put on a full court press for the U.S. EPA to approve our .2 engine." The list included outreach to numerous elected officials at the state and federal levels "to encourage EPA certification of the .2 engine."

115.    Navistar had never hired lobbyists or public relations firms to contact elected officials or their staff members regarding EPA certification of any other pending certification application prior to its January 2012 Application.

**K.    March 2012 Quarterly Report and Press Release**

116.    On March 8, 2012, Navistar filed its quarterly report for its first fiscal quarter of 2012 on Form 10-Q (the "March 2012 Quarterly Report") through the SEC's publicly-available EDGAR document filing system.

117.    Ustian reviewed and approved the March 2012 Quarterly Report before Navistar filed it. He also signed and certified the March 2012 Quarterly Report in his capacity as Navistar's President and CEO.

118.    The March 2012 Quarterly Report stated in pertinent part:

> We reached a number of key milestones during the quarter that we believe will contribute to our long-term, strategic profitability goals. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. We formally submitted our 0.2g NOx in-cylinder engine certification data for our 13L engine to the United States Environmental Protection Agency ("EPA") on January 31, 2012, and to the California Air Resources Board ("CARB") on February 17, 2012 (collectively, our "0.2g NOx Engine Submission"). These submissions are under review by EPA and CARB and we are engaged in ongoing discussions relating to our engine certification.

119.    On March 8, 2012, Navistar also issued and filed a press release regarding its results for its first fiscal quarter of 2012 (the "March 2012 Press Release").

120.    Ustian also reviewed and approved, and provided a quote for, the March 2012 Press Release before Navistar issued and filed it.

121.    In Ustian's quote for the March 2012 Press Release, he stated:

Strategically, we achieved a number of key milestones in the first quarter, including our submission of a 0.2 NOx engine for EPA certification . . . .

122.    The March 2012 Quarterly Report and the March 2012 Press Release deceived investors when they stated that Navistar's January 2012 Application was among the "milestones" that Navistar had achieved in the first quarter and when the March 2012 Quarterly Report stated that this application would "contribute" to Navistar's "long-term strategic profitability goals."  In fact, Navistar and Ustian knew, but did not disclose, that Navistar already had experienced a lack of success regarding its EGR-only solution for certification of an engine at the 0.20 NOx standard.  They also knew, but did not disclose, that the EPA did not approve the 2011 Application and had told Navistar it would not accept aspects of the engine described in the January 2012 Application, such as the way Navistar's dual mapping technology operated and Navistar's lack of new Deterioration Factor test results.  Additionally, Ustian's assessment was that the EPA certification process was proving to be a lot tougher for Navistar and was requiring more time and resources than it had in the past.  Navistar's statements in the March 2012 Quarterly Report and Ustian's quote in the March 2012 Press Release conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its January 2012 Application.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

**L.    March 2012 Analyst Conference Call**

123.    On March 8, 2012, Ustian and other Navistar executives conducted a conference call with securities analysts and the investing public (the "March 2012

Analyst Call") in conjunction with Navistar's filing of its first quarter 2012 quarterly report on Form 10-Q.

124.     Before taking questions from analysts during the call, Navistar disclosed that as part of Navistar's revised fiscal year 2012 earnings guidance, Navistar now was estimating that it would pay $25 million in NCPs during the fiscal year and that certain warranty charges would impact Navistar's financial performance.

125.     Later during the call, an analyst asked: "[T]hanks for the clarification on the $25 million NCP hit. Dan, could you . . . let us know how many months you are assuming the NCP payments continue for that $25 million hit?" Ustian responded:

> [H]ere's maybe a way to look at it. We have submitted for the .2 and that goes through a process of – typically, that's about three months, I think, is about the average of that. When we get the certification, it still takes some time for us to get to production on this. So what we are doing right now is getting ready to go to production, and it will be about June before we can get into production with that particular engine. So that kind of gives you a framework of where it would be. As for the preciseness of it, we can't tell you, but our objective is to be in production on that in June.

126.     In Ustian's response, he was referring to Navistar's January 2012 Application for certification of a 13-liter EGR-only engine at the 0.20 NOx standard and Navistar's anticipated production of that engine after receiving a Certificate from the EPA.

127.     Later during the call, another analyst asked: "[S]o it sounds like most of these warranty issues are all engine calibrations. Is it reasonable to assume that as you launch out the .2 engine that this [sic] potential for this to reoccur?" Ustian responded:

> Well, I think that is a good question ... This is why we are taking until June to go to production with it so that won't happen, but I think that's a fair question and we are doing the actions to prevent that from happening.

128.    Ustian misled investors and analysts through the March 2012 Analyst Call by stating that Navistar was "taking until June" to go to production of a 13-liter EGR-only engine that would be certified at the 0.20 NOx standard and aimed "to be in production on that in June," based on a "typical" certification process timeline of "about three months" from the date the certification application was submitted.  In fact, Ustian knew, but did not disclose, that the certification process for the January 2012 Application was not typical, that the EPA had raised serious concerns about the application that Navistar had not yet resolved despite devoting more time and work than usual to the development and certification processes, and that Navistar and Ustian had concerns that certification might not occur in time for production in June.  Ustian's statements during the March 2012 Analyst Call conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its January 2012 Application.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

129.    Following Navistar's March 2012 Analyst Call and March 2012 Quarterly Report, Ustian and Navistar received analyst reports showing that investors were in fact misled by their statements and demonstrating that their misstatements were highly material.  For example, one analyst noted in a March 9, 2012 report:

> The company expects to get the EPA 13L certification sometime in April-May 2012, and further expects the 13L engine production to begin by June 2012. . . . Our expectation is that NAV should be able to get the EPA certifications for 13L shortly . . . .

130.    Similarly, another analyst noted in a March 9, 2012 report:

> The company is targeting June for a switch over to producing fully compliant 13L engines.  We expect the current fine guidance is protecting against (normal) delays in the certification process. . . . We expect the catalysts to drive the shares to begin in 2Q (with EPA certification) . . . .

## M.     Ustian's Lobbying Efforts

131.    In March 2012, Navistar executives arranged for Ustian to meet with an elected official to ask the elected official to assist Navistar in obtaining EPA certification of Navistar's EGR-only engines. Ustian's meeting with the elected official was part of a broader effort by Navistar and Ustian to lobby public officials for assistance in obtaining a Certificate from the EPA for an EGR-only engine at the 0.20 NOx standard.

132.    On March 28, 2012, Ustian met with the elected official. Ustian told the elected official that Navistar had "struggled" to get an engine certified at the 0.20 NOx standard and that it was at a "stalemate" with the EPA.   Ustian also told the elected official that as a result of the EPA's failure to certify a Navistar engine at the 0.20 NOx standard, Navistar was "getting to the point where we can't ship product."

## N.     The EPA Continues to Raise Concerns Regarding Navistar's Certification Application

133.    Throughout March and April 2012, the EPA advised Navistar that it continued to have concerns about Navistar's January 2012 Application.  The EPA repeatedly reiterated that it could not certify Navistar's engine if it was designed to meet the 0.20 NOx standard only in a testing laboratory and not in-use on the road.  For example, in a March 23, 2012 email that Ustian received, the EPA reiterated that "[y]ou cannot have one emissions control configuration for taking an EPA compliance test and a different emission control configuration for installation in a vehicle, if the differences result in measurements that are not representative of the in-use configuration."

134.    Navistar engineers expressed skepticism that Navistar's EGR-only engine could ever limit emissions to 0.20 NOx while in-use and also offer the competitive performance features that would make it a marketable engine.  Following an April 5,

2012 meeting with the EPA discussing Navistar's efforts to certify an EGR-only engine at the 0.20 NOx standard, Navistar's General Manager of Powertrain Product Development, who was the lead engineer for the 0.20 NOx development programs, described the engine in the January 2012 Application as "FUBAR forget about it!" based on the EPA's feedback.

### O. Navistar Engineers Begin Work on a New Engine for Certification, and Navistar Withdraws Its January 2012 Application

135.    Following the April 5, 2012 EPA meeting, Navistar engineers worked on technical changes to the EGR-only engine described in the January 2012 Application that would result in a new certification application.  One such change was a new feature to replace the Safe Operating Mode AECD.  While different from the Safe Operating Mode AECD, this new feature continued to use dual mapping technology that resulted in the engine's NOx emissions being higher when it was in a vehicle in motion on the road than when it was stationary in a laboratory.  The technical changes to lower emissions came at the expense of fuel economy and other aspects of the engine's performance, such as acceleration.

136.    Navistar employees and the EPA met on April 27, 2012 to discuss Navistar's changes to its EGR-only engine to receive certification at the 0.20 NOx standard.  During this meeting, Navistar informed the EPA of the technical changes it made to the engine and the resulting decrease in fuel economy and performance in this engine.

137.    As of May 2012, Ustian knew that any additional changes to the engine that the EPA might require to certify it at the 0.20 NOx standard would result in unacceptable performance trade-offs or require so much time for additional development

work that Navistar would run out of emissions credits before it could receive certification.

138.    On May 10, 2012, Navistar withdrew its January 2012 Application.  It was unusual, if not unprecedented, for Navistar to formally withdraw an application for EPA certification of an engine.

   **P.    Navistar Engages More Lobbyists and Public Relations Firms to Pressure the EPA to Certify its Engine**

139.    In early May 2012, Navistar engaged additional lobbyists and public relations firms to provide messaging advice and to contact federal and state elected officials and their staffs regarding Navistar's efforts to obtain certification of an EGR-only engine at the 0.20 NOx standard.

140.    In a May 10, 2012 phone call with one of the public relations firms assisting with Navistar's efforts to obtain certification of an EGR-only engine at the 0.20 NOx standard, according to notes from one of the public relations consultants on the call, Navistar's Vice President of Government Relations stated in pertinent part:

> In response to feedback from [an EPA official], our engineers completely revised the calibrations for our engine and it drastically reduced emissions, but it requires that we take a hit in fuel economy.  We need certification for our engine in May.  We will be announcing our second quarter earnings on June 5th, and we need to be able to say by then what the agency is doing, so we need the go-ahead from the EPA this month.

141.    On May 10, 2012, Navistar's Chief Communications Officer emailed two public relations firms talking points that were being prepared for the lobbyists to use when contacting elected officials and their staff members.  The talking points identified a "devastating chain of events [that] will unfold – starting immediately" if the EPA did not grant certification, including,

> It is likely that a denial of certification would become immediate news. Additionally, Navistar will report 2nd quarter earnings the first week of June and its 10K [sic] financial filing MUST include a description about the status of .2 certification. ***The reaction of the financial marketplace will be swift and deep, exposing the company to myriad financial crises.***

(Emphasis in original). Other predicted consequences of Navistar not receiving certification of an engine at the 0.20 NOx standard included the inability to sell its products in certain states, significant employee layoffs, and the possibility that "[t]he company either disappears or is acquired by one of its FOREIGN competitors." (Emphasis in original). The talking points proposed as the "specific ask" that elected officials use "your immediate influence to have higher-level EPA officials assist [an EPA official] with granting Navistar .2 certification."

142.     Throughout May 2012, lobbyists and public relations firms engaged by Navistar contacted numerous elected officials at the state and federal levels and their staff members regarding Navistar's efforts to certify an EGR-only engine at the 0.20 NOx standard.

### Q.     Navistar Submits a Third Certification Application to the EPA

143.     On May 21, 2012, Navistar submitted another application for certification of a 13-liter EGR-only engine at the 0.20 NOx standard (the "May 2012 Application").

144.     Ustian was aware of Navistar's submission of the May 2012 Application to the EPA and was regularly updated on the development and certification work for the May 2012 Application both before and after it was submitted to the EPA.

145.     Navistar estimated internally that its May 2012 Application engine had worse fuel economy than its January 2012 Application engine. Further, the May 2012 Application engine had worse fuel economy than 13-liter engines employing SCR

technology that were already being sold in the marketplace by its competitors. Ustian knew these facts.

146. As of May 2012, Ustian knew based on updates from the engineers that Navistar's EGR-only engine with improved fuel economy and other performance features — the engine Navistar had been developing for years and that pre-dated the bridge program engine that was the subject of the January 2012 Application and the May 2012 Application — was not expected to be ready for production until at least late 2013. Navistar projected it would run out of big bore emissions credits before then, however.

147. In May 2012, Navistar also was projecting that the engine covered by its May 2012 Application would not be ready for production for several more months. On May 24, 2012, Navistar's Vice President of Government Relations sent the EPA a letter justifying Navistar's continued need for NCPs. In the letter, Navistar informed the EPA:

> Even were EPA to approve Navistar's one 13 liter application tomorrow, it would still take Navistar **several months** to be able to ship road-ready engines covered by the application.

(Emphasis in original.)

148. Navistar employees met with the EPA on May 30, 2012 and June 4, 2012 to discuss the May 2012 Application. Between these meetings, Navistar sent the EPA requested testing data and information on the engine described in its May 2012 Application, including data showing the engine's NOx emissions when it operated in Map A and when it operated in Map B.

149. During the June 4, 2012 meeting, the EPA told Navistar that the EPA continued to have serious concerns about Navistar's May 2012 Application. The concerns the EPA discussed included some of the same concerns that the EPA had raised

with Navistar regarding the January 2012 Application, such as the concern that this engine limited emissions to 0.20 NOx during testing in a laboratory but operated above the 0.20 NOx standard when in-use on the road.

150.    At the June 4, 2012 meeting, the EPA discussed Navistar withdrawing the May 2012 Application and NCPs being Navistar's only option going forward.   As the meeting took place, Navistar's lead engineer on the project, who was in attendance at the meeting, sent emails to both his supervisor and a colleague stating that the EPA's response was "unequivocally NO!" to Navistar's May 2012 Application.

151.    Immediately after leaving the June 4, 2012 EPA meeting, Navistar's Vice President of Government Relations, who attended the June 4, 2012 EPA meeting, called Ustian to update him on what happened at the meeting.   After he finished talking to Ustian, Navistar's Vice President of Government Relations updated other attendees at the June 4, 2012 EPA meeting about his call with Ustian.   After that update, Navistar's lead engineer sent an email (in the same e-mail chain discussed in paragraph 150) to his supervisor and a colleague informing them:

> Dan put the gag order on us.  We are only allowed to say "the agency has heard everything and will reply with a written summary."   Please disregard my previous communication.

152.    Following the June 4, 2012 meeting, the Navistar attendees sent emails summarizing the EPA's feedback at the meeting.  On the night of June 4, 2012, Navistar's Chief Certification Engineer sent an email to his colleagues describing their discussions with the EPA earlier that day, including that the EPA's "major concern is the .2g design does not follow CfR [sic] part 1065.10.  In-use must produce emissions same as regulatory test cycles."  Navistar's lead engineer on the 0.20 NOx engine development

sent an email to his colleagues on June 5, 2012 indicating that the EPA viewed the engine described in Navistar's May 2012 Application as a "blatant attempt to circumvent the regulations."

153.    On June 5, 2012, Navistar's Vice President of Government Relations, who attended the June 4 meeting, emailed an EPA official, stating in pertinent part:

> [W]e appreciated the opportunity to review with you and satisfactorily answer the remaining questions that you had on our certification yesterday. At the conclusion of the meeting we were surprised by your comments. We would like to submit questions to you based on yesterdays [sic] dialogue and request that you not take any further action on our .2 certification request until we receive a response to these questions.

154.    Within hours of receiving the email, the EPA official responded in an email, stating in pertinent part:

> As I said yesterday, based on the information provided, I believe that your engine is unlikely to receive a certificate of conformity as it is currently designed . . . As we made clear previously, 40 CFR 1065.10 requires that engines be tested in a manner that would result in emissions rates equivalent to those that would result using the same engine configuration installed in a vehicle.   For this engine [described in the May 2012 application], that emission result is 0.42g/hp-hr not 0.20g/hp-hr.

155.    Ustian received a copy of this email from the EPA on June 5, 2012.

**R.    June 2012 Quarterly Report**

156.    On June 7, 2012 — two days after Navistar and Ustian received the June 5, 2012 email from the EPA — Navistar filed its quarterly report for its second fiscal quarter of 2012 on Form 10-Q (the "June 2012 Quarterly Report") through the SEC's publicly-available EDGAR document filing system.

157.    Ustian reviewed and approved the June 2012 Quarterly Report before Navistar filed it.  He also signed and certified the Quarterly Report in his capacity as Navistar's President and CEO.

158.    The June 2012 Quarterly Report stated in pertinent part:

We submitted to the EPA an application for a 0.20g NOx engine certificate for one 13L engine family on January 31, 2012 and we submitted a similar application to CARB on February 17, 2012, but later withdrew both applications. In response to certain concerns raised by the EPA, on May 21, 2012, we submitted a revised application to the EPA and plan to submit a revised application to CARB. Certain issues raised by the revised application are under review by the EPA, and we are engaged in ongoing discussions relating to certification of this engine family at 0.20g NOx.

159.    The June 2012 Quarterly Report deceived investors by stating that "in response to certain concerns raised by the EPA" Navistar submitted the May 2012 Application and that certain "issues" raised by the revised application merely were "under review."   In fact, just days earlier, in response to the May 2012 Application, the EPA had informed Navistar and Ustian that Navistar's engine was unlikely to receive certification based on the engine's current design.  Navistar and Ustian knew that any additional changes to the engine to address the EPA's concerns would result in unacceptable performance trade-offs or require so much time for additional development work that Navistar would run out of emissions credits before it could receive certification.  Navistar's statements in the June 2012 Quarterly Report conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its May 2012 Application.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

**S.    June 2012 Analyst Conference Call**

160.    On June 7, 2012, Ustian and other Navistar executives conducted a conference call with securities analysts and the investing public (the "June 2012 Analyst

Call") in conjunction with Navistar's filing of its second quarter 2012 quarterly report on Form 10-Q.

161.    Before taking questions from analysts, Ustian stated in pertinent part:

We have submitted, as we spoke to you before about, an application for certification on our Class 8 engine family, and we are continuing to work with the EPA on that. EPA is at – for those of you that have followed us – also has an NCP rule that they are finalizing. Frankly, we don't want to use that. We want to get our 0.2 certification behind us and not use the NCP, but that is a backup that the EPA is working on. On the other hand, we are also getting ready as soon as that certification is approved we can go to instant production within 30 days. So, we have all the mechanisms in place to respond quickly once we get that certification approved.

162.    When Ustian referred to "an application for certification on our Class 8 engine family," he was referring to the May 2012 Application for certification of a 13-liter EGR-only engine at the 0.20 NOx standard.

163.    Later in the call, an analyst asked: "[W]e will start with EPA engine certification. You said in your Q that you resubmitted that, I think, in May. Do we have any idea what the difference [is] between what you submitted in February and what you submitted in May? And what are your views on when and if this thing gets approved? And how much of that is built into your second-half forecast, which is just a massive sequential improvement?"  Ustian responded:

Let's define what we did there. In working with the EPA, they asked us if there was some spots that they wanted us to modify, and so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. So there's where that stands. Of course, it's hard for us since it is somewhat out of our control to tell you exactly the timing of any of that so I hope you can appreciate that. But that's the process we're in right now.

The analyst followed-up with another question: "Last time we were talking about this you said it would be three to four months for the approval process. Does that clock start again now in May?"  Ustian responded in pertinent part:

> No, of course not. Again, it's somewhat out of our control. But no, there is plenty of background out there now that it shouldn't take nearly as long. I could argue we should have been done with this, but we are not. So we have to go forward and get it done expeditiously. And we're all over the top of this every minute of every day, as you can imagine. And so now we are in that process.

164.    Ustian deceived investors through his misleading statements on the June 2012 Analyst Call that "[i]n working with the EPA, they asked us if there was some spots we wanted to modify, and so we did that. . . . And so we resubmitted that back to them and we're in the process now of working with them on getting that certified.  So that's where that stands."   Ustian's statements indicated that Navistar had made all of the modifications the EPA said were required for certification and that he was unaware of any facts indicating that the EPA would not approve its application.  In fact, the EPA had just told Navistar and Ustian days before the June 2012 Analyst Call that the May 2012 Application was unlikely to be approved based upon the current design of the engine. Ustian knew, but did not disclose, that Navistar had not made all of the changes the EPA said were required for certification.  Ustian also knew, but did not disclose, that that any additional changes to the engine to address the EPA's concerns would result in unacceptable performance trade-offs or require so much time for additional development work that Navistar would run out of emissions credits before it could receive certification.  Ustian's statements in the June 2012 Analyst Call conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its May 2012

Application.  Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

165.    Ustian also deceived investors through his misleading statements during the June 2012 Analyst Call that "we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera." Ustian knew, but did not disclose, that Navistar had made technical changes to the engine that sacrificed fuel economy and other performance features in the engine, making the engine's fuel economy and other performance features worse than Navistar's existing 0.50 NOx engines.  By telling investors that Navistar was running tests to make sure the engine met not only the EPA's requirements but "our own requirements on performance, et cetera," Ustian misled investors into believing that the engine described in the May 2012 Application was commercially competitive when Ustian knew it had a degradation in fuel economy and performance compared to Navistar's current EGR-only engines.  His statement was particularly misleading given the company's previous statements, including those on February 1, 2012, about the fuel economy and other performance features that its 0.20 NOx engines would have.

166.    Ustian also deceived investors through his misleading statements on the June 2012 Analyst Call regarding the timing of certification, such as "as soon as that certification is approved we can go into instant production within 30 days," his assertion that the certification clock did not restart in May — "No, of course not" —, "there is plenty of background out there now that it shouldn't take nearly as long" and "we have to go forward and get it done expeditiously.  And we're all over the top of this every minute of every day, as you can imagine."  In fact, Ustian knew, but did not disclose, that the

EPA would not approve the engine described in the May 2012 Application as it was currently designed, and he was aware that any additional changes to the engine to address the EPA's concerns would either result in unacceptable performance trade-offs or require substantial time for additional development work. Ustian's statements in the June 2012 Analyst Call conflicted with what the EPA had told Navistar, and Navistar had conveyed to Ustian, regarding its May 2012 Application. Any interpretation to the contrary by Ustian of the EPA's feedback was highly unreasonable.

167. Ustian's statement, "We want to get our 0.2 certification behind us and not use the NCP, but that is a backup that the EPA is working on. On the other hand, we are also getting ready as soon as that certification is approved we can go into instant production within 30 days" was false. Ustian knew, but did not disclose, that if certification were granted immediately, Navistar could not go into production on the engine covered by the May 2012 Application within 30 days. In fact, his statement directly contradicted Navistar's representation to the EPA on May 24, 2012 that it would "still take Navistar **several months** to be able to ship road-ready engines" even if certification happened the next day. Thus, his statement that Navistar "can go into instant production within 30 days was false." Additionally, he also deceived investors by tying the "instant production" claim directly to concerns about the company's continued payment of NCPs. His statement that Navistar wanted to "not use the NCP" and that it was only "a backup" was misleading. As the company stated in its May 24, 2012 letter to the EPA, even if certification were awarded the next day, Navistar still would need to pay NCPs while it prepared its engines for production.

168.    Following Navistar's June 2012 Analyst Call and June 2012 Quarterly

Report, Ustian and Navistar received analyst reports showing that investors were in fact

misled by their statements and demonstrating that their misstatements were highly

material.  For example, one analyst noted in a June 12, 2012 report:

> We believe that . . . the 13L 2010 EPA certification should happen soon. . . .  We are maintaining our OUTPERFORM rating due to NAV's low valuation.  The year 2012 will likely continue to be a messy period due to uncertainty and delay in the transition to EPA compliance.  However, EPA compliance should soon get resolved. . . .  Management commented that due to some concerns raised by the EPA, NAV "resubmitted data" for certification of its 13L engines to the EPA again on May 21, 2012.  Management expects to get the certification soon, however, the expected delay is still unclear.

**T.    Navistar Discusses Switching to SCR and Continues to Receive Negative Feedback from the EPA**

169.    In the days immediately following the June 2012 Conference Call,

Navistar engineers and Navistar senior executives advocated for Ustian to agree to

transition to an emissions solution that used SCR technology to meet the 0.20 NOx

standard.   On June 8, 2012, Navistar's Director of Finance in Global Product

Development sent Navistar's Chief Financial Officer an analysis of the financial

ramifications of using SCR technology to meet the 0.20 NOx standard.   On June 10,

2012, Navistar's Vice President of Integrated Product Development emailed other

Navistar executives:

> *Please don't forward* I talked to [Navistar's Vice President of Government Relations] at length this AM.  He wants to use our political clout to convince EPA to give us time/break so that we can do SCR.  He does not think that EPA will give us a cert on [the May 2012 application].  He is very very concerned and thinking the same way as the rest of the team.

170.    During a meeting with the Executive Committee of Navistar's Board of Directors held on June 11, 2012, Ustian discussed a "Plan B" for an emissions solution, including the use of SCR technology to meet the 0.20 NOx standard.

171.    On June 15, 2012, the EPA provided Navistar with a written response to Navistar's May 2012 Application.

172.    The EPA's written response included an email from the EPA to Navistar and an eight-page attachment to the email.

173.    Ustian received a copy of the EPA's written response on June 15, 2012.

174.    The EPA's June 15, 2012 response to Navistar's May 2012 Application stated in pertinent part:

> After reviewing your application, our view is that Navistar's application for a certificate of conformity raises several serious concerns that would prevent EPA from being able to grant a certificate of conformity.

175.    The eight-page attachment to the email outlined the EPA's concerns and set forth what additional information the EPA believed it likely would need from Navistar regarding the application.  The concerns set forth in the EPA's June 15, 2012 response were the same concerns raised by the EPA at the June 4, 2012 meeting.

176.    One concern identified by the EPA in its June 15, 2012 response related to Navistar's test results on the two tests that the EPA had raised concerns about in response to the January 2012 Application.  In its June 15, 2012 response, the EPA stated in pertinent part:

> With Map B active, NOx emissions over both test cycles exceed the applicable NOx standard by 60 to 115 percent. . . .  In this case, it appears that testing without Map B active results in unrepresentative emissions measurements [on these two tests and on a third laboratory test].   The current Map A and Map B design results in compliance with the applicable NOx emission standard only in the test cell and not in-use.  The

> Map B emissions appear to be very similar to Navistar's calibration for [its 0.50 NOx engines].

The EPA also informed Navistar that it was assessing whether the feature that switched the engine from Map A to Map B when the engine was moving "raises potential concerns with regard to the prohibition on defeat devices."

177. Another of the concerns raised by the EPA in its June 15, 2012 response related to the lack of new Deterioration Factor testing.

## V. Navistar's Transition to SCR Technology and Ustian's Departure

178. By July 2012, Navistar had failed to obtain an EPA Certificate for an EGR-only engine that met the 0.20 NOx standard. On July 6, 2012, Navistar announced that it would transition to a new emissions solution that incorporated SCR technology to meet the 0.20 NOx standard.

179. On the day of Navistar's announcement of its transition to SCR technology, its stock price closed more than 15 percent lower than its closing price on the previous day.

180. In August 2012, Navistar asked Ustian to resign from the company after the company's failure to obtain EPA certification at the 0.20 NOx standard for an engine using the EGR-only technology that Ustian had so aggressively championed. The Board of Directors asked Ustian to resign because they did not believe Ustian was capable of leading Navistar in the development of products using SCR technology.

## COUNT I

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder**

181.    The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

182.    By virtue of the conduct alleged herein, Ustian, directly or indirectly, singly or in concert with others, by use of the means or instrumentalities of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

183.    In engaging in the conduct described herein, Ustian acted knowingly or with a reckless disregard for the truth.

184.    By reason of the foregoing, Ustian violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]**

185.    The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

186. By virtue of the conduct alleged herein, Navistar committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

187. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Ustian aided and abetted, and is therefore liable for, the primary violations committed by Navistar of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5], because Ustian knowingly or recklessly provided substantial assistance to Navistar's violations of these provisions. Unless enjoined, Ustian will likely again aid and abet violations of these provisions.

## COUNT III

### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(1), (2) and (3)]

188. The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

189. By virtue of the conduct alleged herein, Ustian, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

190. In engaging in the conduct described herein, Ustian acted knowingly and/or with a reckless disregard for the truth.

191.    In engaging in the conduct described herein, Ustian acted negligently.

192.    By reason of the foregoing, Ustian has violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

## COUNT IV

### Aiding and Abetting Violations of Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)]

193.    The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

194.    By virtue of the conduct alleged herein, Navistar committed primary violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act.

195.    By reason of the foregoing and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Ustian aided and abetted, and is therefore liable for, the primary violations committed by Navistar of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)] because Ustian knowingly or recklessly provided substantial assistance to such entity's violations of these provisions.  Unless enjoined, Ustian will likely again aid and abet violations of these provisions.

## COUNT V

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. 78m(a)] and Exchange Act Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R. § 240.13a-13]**

196.    The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

197.    Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder, require issuers of registered securities to file with the SEC factually accurate annual and quarterly reports (Form 10-K and Form 10-Q) and certain current information with the SEC (Form 8-K).  Rule 12b-20 further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

198.    By virtue of the conduct alleged herein, Navistar committed violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

199.    By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Ustian aided and abetted, and is therefore liable for, the primary violations committed by Navistar of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, because Ustian knowingly or recklessly provided substantial assistance to Navistar's violations of these provisions.  Unless enjoined, Ustian will likely again aid and abet violations of these provisions.

## COUNT VI

**Violations of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]**

200.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

201.     As the principal executive officer of Navistar, Ustian was required to, and did, sign and certify Navistar's annual report on Form 10-K for 2011, and its quarterly reports on Form 10-Q for its 2012 fiscal quarters.  Among other things, Ustian certified that the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading.  The certifications were materially false.

202.     By virtue of the conduct alleged herein, Ustian violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## COUNT VII

**Control Person Liability**
**Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]**

203.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 180 above.

204.     By virtue of the conduct alleged herein, Navistar committed violations of Sections 10(b) [15 U.S.C. §78j(b)] and 13(a) [15 U.S.C. 78m(a)] of the Exchange Act and Rules l0b-5 [17 C.F.R. § 240.10b-5], 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], 13a-11[17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R. § 240.13a-13] thereunder.

205.     As set forth above, during the relevant period, Ustian directly or indirectly, controlled Navistar.

206.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Ustian is liable as a control person for Navistar's violations of Sections 10(b) [15 U.S.C. §78j(b)] and 13(a) [15 U.S.C. 78m(a)] of the Exchange Act and Rules l0b-5 [17 C.F.R. § 240.10b-5], 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], 13a-11[17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R. § 240.13a-13] thereunder.

207.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Ustian is liable jointly and severally with and to the same extent as Navistar for Navistar's violations.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.
## Injunctive Relief

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Ustian, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13a-14 [17 C.F.R. § 240.13a-14] thereunder, and from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## II.
## Disgorgement with Prejudgment Interest

Issue an Order requiring Ustian to pay disgorgement of ill-gotten gains that he received, directly or indirectly, as a result of his wrongful conduct set forth in this Complaint, including prejudgment interest.

## III.
## Civil Penalty

Issue an Order imposing an appropriate civil penalty upon Ustian pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## IV.
## Officer and Director Bar

Issue an Order imposing an officer and director bar pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.
## Retention of Equitable Jurisdiction

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable submission or motion for additional relief within the jurisdiction of this Court.

## VI.
## Other Relief

Grant such orders for further relief the Court deems appropriate.

## JURY DEMAND

The Commission requests a trial by jury.

Dated: March 31, 2016                              Respectfully submitted,

**UNITED STATES SECURITIES
AND EXCHANGE
COMMISSION**

/s Anne Graber Blazek
_____

By:      One of its Attorneys

Eric M. Phillips
Jonathan S. Polish
Amy Flaherty Hartman
Anne Graber Blazek
Timothy Stockwell
**United States Securities and Exchange Commission**
175 West Jackson Boulevard
Ninth Floor
Chicago, Illinois 60604
Telephone: (312) 353-7390