# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES SECURITIES AND )
EXCHANGE COMMISSION, )
                 )
         Plaintiff, )
                 )      No. 16 C 3885
      v. )
                 )      Judge Sara L. Ellis
DANIEL C. USTIAN, )
                 )
         Defendant. )

## <u>OPINION AND ORDER</u>

Navistar International Corporation ("Navistar"), whose stock is listed on the New York

Stock Exchange (ticker symbol NAV) produces, among many things, diesel engines regulated by

the Environmental Protection Agency ("EPA"). The United States Securities and Exchange

Commission ("SEC") alleges that Defendant Daniel C. Ustian, Navistar's former Chief

Executive Officer ("CEO") and President, was so driven by a desire to produce an engine that

the EPA would approve and customers would buy, he engaged in securities fraud and misled

investors to think that Navistar had such an engine despite knowing that Navistar could not

produce an engine that could satisfy both the EPA and Navistar's customers, violating Section

17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and its Rule 10b-5 [17

C.F.R. § 240.10b-5]; and Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14]. Ustian

moves to dismiss the SEC's complaint [26] and asks the Court to consider exhibits he attaches to

his motion to dismiss [28]. Ustian attaches many exhibits, of which the Court can take judicial

notice or that are incorporated by reference in the complaint, so the Court grants in part Ustian's

motion to consider his extra exhibits. Because the SEC sufficiently alleges that Ustian's

statements were misleading and material to the investing public and that Ustian knew this, the SEC sufficiently states a claim for securities fraud. The SEC also sufficiently alleges that Navistar violated the securities laws and that Ustian is liable for Navistar's violations. But the SEC fails to support its allegation that Ustian is liable for February 2012 statements at an analyst conference call or that Ustian aided and abetted Navistar's violations of Section 13(a) or Rules 12-b20, 13a-1, 13a-11, or 13a-13; thus, the SEC cannot proceed on those claims. Therefore, the Court grants in part and denies in part Ustian's motion to dismiss, dismissing with prejudice the SEC's claim that Ustian's February 2012 statements are actionable and Count V of the complaint.

## BACKGROUND[1]

Navistar makes trucks, buses, and diesel engines. Between 2010 and 2012, Ustian served as President and CEO of Navistar. He first served as Navistar's Group Vice President and General Manager of its Engine & Foundry Group from 1993 to 1999. He then was President of Navistar's Engine Group from 1999 through 2002. In 2002, he joined Navistar's board of directors and became chairman of the board in 2003, a position he held until 2012.

Navistar's engines must meet EPA regulations, including regulations on engine emissions such as the discharge of nitrogen oxide ("NOx"). As the EPA tightened NOx discharge rules, requiring engines to emit less and less NOx during operation, Navistar worked to produce truck

---

[1] The facts in the background section are taken from the SEC's complaint and are presumed true for the purpose of resolving Ustian's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). Where a document is referenced in the complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.* The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

engines that met the EPA's tightening standards. Navistar's solution for engine emissions were unique in the market—while competitors treated exhaust with chemicals to reduce the amount of NOx emitted from their engines using selective catalytic reduction ("SCR"), Navistar used exhaust gas recirculation ("EGR") to reduce NOx emissions by capturing some of the engine's exhaust, mixing it with fresh air, and then recirculating that air mixture back into the engine (hence EGR's other common name, "in-cylinder" technology).

In 2001, the EPA issued a rule that pushed its requirements for NOx emissions further towards 0.00 grams per brake horsepower hour,[2] requiring NOx emissions of 0.20g ("0.20 NOx") or less by January 1, 2010 (the "0.20 NOx Rule"). Navistar's major competitors again chose to use SCR in their engines to meet the 0.20 NOx Rule by the EPA's 2010 deadline. Navistar decided to design another EGR engine. Ustian was actively involved in this decision and development process his entire time at Navistar: he picked the engineering team to design the engine, received updates on the project, helped the development team solve problems, and motivated the team.

By 2010, the EPA had granted certificates of conformity to Navistar's competitors' engines, indicating that the engines met the 0.20 NOx Rule. At the same point, Navistar had yet to submit an application for a certificate of conformity for a diesel engine that produced emissions of 0.20 NOx or less. But even though 2010 had arrived, and the 0.20 NOx Rule along with it, Navistar was still receiving regulatory credit for its prior engines that had exceeded older emissions standards (the "Emission Credits") and did not yet need to produce an engine that met the 0.20 NOx Rule. Navistar, however, could no longer accrue new Emission Credits with its

---

[2] This standard measures the emissions of nitrogen gasses in proportion to the amount of energy expended by the engine and is often notated as "X.XX g," "X.XX g/bhp-hr," or "X.XX g/hp-hr."

older engines, but it could begin using the Emission Credits to continue producing the older engines.

Navistar's plan for developing an engine that met the 0.20 NOx Rule started with a 13-liter diesel engine (a "13-liter 0.20 NOx engine"). Navistar planned to produce various 0.20 NOx-capable diesel engines, but it focused on its "big bore" engines—11-liter, 13-liter, and 15-liter engines—because the Emission Credits for those engine sizes would come to an end first. After developing and receiving a certificate of conformity for a 13-liter 0.20 NOx engine, Navistar planned to apply the same development technology to11-liter and 15-liter engines. Navistar wanted to produce a 13-liter engine that met the 0.20 NOx Rule and offered improved fuel economy, acceleration, and power compared to the 13-liter 0.50 NOx engine it would replace. In late 2010, Navistar engineers and executives informed Ustian that Navistar could not produce a competitive engine complying with the 0.20 NOx Rule until the end of 2012. It appeared that, under conservative estimates, Navistar might exhaust its Emission Credits by February 2012.

**The First 13-Liter 0.20 NOx Engine Prototype**

On November 3, 2010, Navistar issued a press release (the "November 2010 Press Release"), quoting and approved by Ustian, stating that Navistar had a submitted certification to the EPA for a 15-liter 0.50 NOx engine and "plan[ned] to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required." Doc. 1 ¶ 47. The 15-liter engine described by the press release, which emitted NOx above 0.20g, was competitive with other 15-liter engines sold by competitors, and Navistar intended to and did sell the engine after the EPA granted a certificate of conformity to the engine. The 13-liter engine described in the

announcement met the 0.20 NOx Rule but was still under development and, at the time of the announcement, "lacked competitive fuel economy and other performance features compared to other 13-liter engines being sold in the marketplace." *Id.* ¶ 50. At the time of the press release, Ustian knew that even if the 13-liter 0.20 NOx engine received a certificate of conformity, Navistar would not be able to sell the engine in the marketplace.

On December 22, 2010, Navistar conducted a conference call with securities analysts to report on its annual report for the 2010 fiscal year (the "December 2010 Analyst Call"). Ustian and other Navistar executives participated, and the investing public was allowed to listen on a phone line. An analyst asked for Navistar's timeline for certifying a 13-liter 0.20 NOx engine, and Ustian replied:

> . . . [Navistar] will submit that over the next couple of months I believe. We will show you that product, by the way in Melrose Park on the 25th. We will show you the modifications. It won't be a great drama to you because you won't be able to see anything other than -- we would be able to show you the data that it meets [the 0.20 NOx Rule] and show you how we are able to meet it. But as far as the customers, he is not going to know the difference. Nothing looks any different.

Doc. 27-20 at 21; *see also* Doc. 1 ¶ 55. Asked by another analyst about the fuel efficiency of a 13-liter 0.20 NOx engine versus a competitor-SCR engine, Ustian said, "[t]he fuel economy of the [13-liter 0.20 NOx] will be better and there will be no change in heat rejection at the same time. So this product will be even better." Doc. 1 ¶ 55. Asked by a third analyst whether Navistar's 13-liter 0.20 NOx engine would be better than a comparable SCR engine, Ustian said, "Well, our strategy has been we will be equal to any SCR – the best of any SCR product that is out there. So we are assuming the SCR product gets a little better too, and that is what were are going to be able to do with getting to 0.2." *Id.* When Ustian spoke during the call, he knew Navistar did not yet have a 13-liter engine that both met the 0.20 NOx Rule and also (1) offered

better fuel economy than and comparable performance features to competitor-SCR engines or (2) fuel economy and performance that matched Navistar's existing engines that produced a 0.50g NOx. Ustian also knew that in the coming months, Navistar would not be able to submit a certification application to the EPA for a 13-liter 0.20 NOx engine that offered competitive performance features and could be produced and sold.

On February 21, 2011, Navistar submitted an application to the EPA for a certificate of conformity (the "February 2011 Application") for a 13-liter EGR engine that met the 0.20 NOx Rule (the "first prototype engine"). The first prototype engine could only run in a testing lab, and when a Navistar senior technical specialist asked other engineers "[w]ould this engine ever be drivable in a truck," he received "laughs in response." Doc. 1 ¶ 60. The engineer described the first prototype engine as "a[n] underpowered . . . engine that is coughing, sputtering and wheezing like some terminal cancer patient on a respirator." *Id.*

Despite critical flaws in the first prototype engine, Navistar submitted the February 2011 Application because "Ustian wanted to use it as a marketing tool to convince investors of Navistar's supposed progress in developing an EGR-only engine at the 0.20 NOx standard while it continued to work on developing an engine with competitive performance features that it could put into production." *Id.* ¶ 64. Navistar had not typically, and may never before have, submitted a certification application to the EPA knowing that the engine that was the subject of the application could not be sold in the marketplace if the EPA approved.

Ustian was well-informed about the February 2011 Application, had received updates on the first prototype engine's development, and was so involved with the application that it was internally named "D-cert," short for "Dan-certification." Doc. 1 ¶ 57. Ustian knew at the time of the application that the first prototype engine could not be sold even if approved by the EPA

and that further development was needed to attain the fuel economy and performance features to create a "usable, competitive engine when installed in a truck" that Navistar could sell. *Id.* ¶ 58.

Ustian knew that the February 2011 Application was incomplete. In the application, Navistar used prior durability test results for a 0.50 NOx engine, despite the EPA previously telling Navistar that it would not accept the other engine's results for the first prototype engine. Internally, Navistar employees acknowledged that Navistar had used impermissible test results in the February 2011 Application. The same day that Navistar filed the application for the certification, its Chief Certification Engineer wrote that the "[d]urability data and results from the current [0.50 NOx] engine were used in the submittal despite EPA disallowing that version of durability demonstration." *Id.* ¶ 62. Ustian received this email the same day.

In a March 1, 2011 email, Navistar's Director of Advanced Technology warned Navistar executives to be careful how they described the first prototype engine to a reporter because it was clear to him that "the D-Cert power curve is not drive-able or saleable." *Id.* ¶ 63. When Navistar's Vice President of Powertrain Product Development asked its Vice President of Integrated Product Development if Ustian should be consulted on the engine issues, the Vice President of Integrated Product Development "responded that Ustian 'totally knows it' and advised [the Vice President of Powertrain Product Development] to '[t]ell these guys to not worry about this sh[--] and not keep sending emails to each other.'" *Id.*

"[W]eeks" after Navistar submitted the February 2011 Application, an EPA official responded and told Navistar that the application did not meet the EPA's certification requirements. *Id.* ¶ 65; *see also* Doc. 27-22 (February 18, 2011 email from Gregory Orehowsky of EPA to Tom M. Kramer of Navistar re: "Navistar 0.20 g DF"). The EPA again told Navistar that it needed to run new durability testing for the engine. Internally, Navistar engineers

questioned whether they could perform such a durability test on the first prototype engine without component failure.

On March 9, 2011, Navistar executives, including Ustian, held a conference call with securities analysts (the "March 2011 Analyst Call"). Ustian spoke about the February 2011 Application:

> Now let's talk about in-cylinder 0.2. One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder. Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over.
>
> We want to get in front of the 0.2 now, because we can anticipate there is a next one coming out that 0.2 can't be done. So what we did is we submitted to the EPA a certification of 0.2 to take that argument away. We don't plan on using this for awhile, but we are going to have it out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well. So [t]hat's what we have done. When you hear about that, it's not that it's coming into production tomorrow. It's just to get it out there and take all that argument away.

Doc. 1 ¶ 70; Doc. 27-4 at 5. Asked if the first prototype engine was already certified, Ustian responded that "[i]t takes a period of time, two or three months, before we will hear back . . . We aren't in a hurry, we just want to have it out there so we can take the argument away that it can't be done." Doc. 27-4 at 16.

On April 5, 2011, Navistar issued a statement (the "April 2011 Press Release"), which Ustian had previously reviewed, headlined "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine at 0.39g NOx" and sub-headlined "With EPA and CARB [California Air Resources Board] Certification of MaxxForce® 15, Submission of MaxxForce®

13 at 0.2g NOx, Company Continues to Make Strides in its In-Cylinder Emissions Technology Path." Doc. 27-23; Doc. 1 ¶ 73. Navistar intended to, and later did, sell the two engines identified in the headline as receiving EPA certification, the mid-range diesel engine and the 15-liter 0.50 NOx engine.

At some point in 2011[3] Navistar abandoned the February 2011 Application, with Ustian's input and approval. It was unusual for Navistar to abandon a certification application.

**The Second 0.20 NOx 13-Liter Engine Prototype**

In fall 2011, Navistar and Ustian learned that internal projections predicted Navistar could run out of Emission Credits for its big bore engines by February 2012. Navistar's engineers projected that they could not develop an engine that met the 0.20 NOx Rule and that had improved performance features until fall 2013. At the same time, the EPA was working on a rule that would allow Navistar to pay monetary non-conformance penalties assessed on a per-engine basis ("NCPs"), which would allow Navistar to sell engines that did not comply with emissions standards if it paid the NCP. The NCPs would allow Navistar to sell engines and pay fines in the 40 states that accepted NCPs while Navistar simultaneously used its Emission Credits in the other 10 states that did not accept NCPs.[4] Using the NCPs in this way would extend the effective expiration date of Navistar's Emission Credits.

Navistar began to work on a new 13-liter engine that could meet the 0.20 NOx Rule. Without any hardware changes or any goal to improve engine performance, Navistar intended to recalibrate its current production engine's software to reduce emissions to meet the 0.20 NOx Rule in a testing lab only, a technology tweak called "dual mapping" because the engine operates

---

[3] It is unclear from the complaint when Navistar decided to abandon the application, but the complaint implies that this likely occurred between April 2011 and September 2011.

[4] It is unclear from the complaint whether Washington D.C. and other territories accepted NCPs.

under two calibrations, or "maps." Under "Map A," used when the second prototype engine was lab tested, the engine's emissions would meet the 0.20 NOx Rule but have severely reduced fuel economy and performance. Under "Map B," triggered when the second prototype engine moved the vehicle it powered more than 0.1 miles per hour—essentially once the vehicle was in motion—the fuel economy and performance would improve but the engine's emissions would exceed 0.20 NOx. Navistar talked to the EPA about big bore engine production, through communications of which Ustian was aware and sometimes a participant, telling the EPA that Navistar would not develop a big bore engine that met the 0.20 NOx Rule and could be certified by the EPA by February 2012 when Navistar expected to run out of Emission Credits.

On December 16, 2011, four days before Navistar was supposed to file its 10-K annual report for fiscal year 2011 (the "December 2011 Annual Report"), Navistar employees met with the EPA and discussed plans to submit a new application for a certificate of conformity for the second prototype engine. The engineers told the EPA that they planned to use dual mapping to meet the 0.20 NOx Rule, and the EPA responded that an engine using dual mapping would not meet EPA standards. After the meeting, an EPA official emailed Navistar's Vice President of Government Relations, who had been at the meeting to reiterate that "as we discussed, under the Clean Air Act and our regulations EPA [cannot] issue a certificate (conditional or otherwise) unless the engine meets the [three certification] requirements. The engine described today by the Navistar team for certification in February [2012] does not appear to meet these requirements." Doc. 1 ¶ 93; *see also* Doc. 27-24. The EPA official indicated the EPA would continue to work on NCP rulemaking. Ustian received a copy of the EPA email the same day.

Navistar filed its 10-K annual report four days later, on December 20, 2011 (the "December 2011 Annual Report"), writing that:

We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both agencies' certification requirements. We are engaged in ongoing discussions with officials from both EPA and CARB regarding potential regulatory solutions that would permit us to continue uninterrupted production of all of our engines. We cannot predict the outcome of these discussions nor the effect they may have on our business or financial condition, results of operation or cash flows.

Doc. 1 ¶ 95. Navistar also noted "Risk Factors" in the report, including that "[Navistar's] solutions for meeting U.S. federal and state emissions requirements may not be successful or may be more costly than planned." *Id.* ¶ 98. Ustian reviewed and approved the annual report before filing, and he signed and certified the report in his capacity as President and CEO.

Navistar submitted its second application to the EPA for a certificate of conformity for a 13-liter EGR engine with emissions meeting the 0.20 NOx Rule (the "second prototype engine") on January 31, 2012 (the "January 2012 Application"). For testing purposes and when idling, the engine operated in Map A and its emissions met the 0.20 NOx Rule. When the engine moved the vehicle, however, its Auxiliary Emissions Control Device ("AECD") engaged "Safe Operating Mode" and moved the engine to Map B and emissions that did not satisfactorily meet the 0.20 NOx Rule. The day after, Ustian participated in an analyst conference call (the "February 2012 Analyst Call") and compared the fuel economy of the second prototype engine to the engines Navistar was currently producing and selling (which produced 0.50g NOx emissions), saying "as far as the customer sees on 0.2, he will not know the difference. That has always been the plan, and we are able to produce that now. Invisible. No impact on fuel economy, no impact on performance." Doc. 27-27 at 27; Doc. 1 ¶ 102.

On February 17, 2012, the EPA responded to Navistar's January 2012 application for a 13-liter engine, in writing, including an email attaching five pages of the EPA's preliminary

concerns about the application. The EPA informed Navistar that the EPA's primary concern after reviewing the application was that "[the January 2012 Application] raises several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application." Doc. 1 ¶ 105; *see also* Doc. 27-29. The EPA further stated that:

> [These two certification tests] appear to have been conducted without the Safe Mode Operation AECD active. However, based on our understanding of this AECD, it would be active in-use. . . . When activated, this AECD switches to a high NOx calibration which exceeds the [Not To Exceed] limit over the entire engine operating map. Therefore, this engine family could not possibly comply with the NOx standard over the [two tests]. . . . We should discuss whether and how the procedures should appropriately be changed to result in more representative measurements. For example, Navistar could demonstrate that the engine complies over all test cycles with the AECD active as it would be under operating conditions typical of the cycles.

Doc. 1 ¶ 107. The EPA was concerned that Navistar's engine was using a "defeat device," intended to "reduce[ ] the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and the EPA asked Navistar to show why the engine was not using a defeat device when "the only time the strategy would not be active is in the emissions test cell" and appeared to "largely disable the emission control system during almost all in-use operation." *Id.* ¶ 108. The EPA also expressed concern about the same lack of durability testing data it had raised about Navistar's February 2011 Application.

Ustian saw the EPA's communication close to the day that Navistar received it and directed Navistar employees to contact elected officials and their staff to discuss Navistar's EPA certification because Ustian thought the EPA certification process was taking more time and resources than it had in the past. On February 27, 2012, Navistar responded to the EPA, challenging the EPA's regulatory interpretations, explaining that it was following prior EPA

guidance and offered additional data.  On March 6, 2012, a Navistar employee scheduled a

meeting with an elected official's staff to discuss Navistar's EPA certification.  On March 7,

2012, a public relations firm sent Navistar's Chief Communications Officer ideas "on how to put

a full court press for the U.S. EPA to approve [Navistar's] .2 engine," listing elected officials

who could encourage the EPA to certify the second prototype engine.  *Id.* ¶ 114.

On March 8, 2012, Navistar filed its 10-Q quarterly report (the "March 2012 Quarterly

Report"), which Ustian reviewed and approved and then signed and certified as Navistar's

President and CEO.  The report stated that:

> We reached a number of key milestones during the quarter that we
> believe will contribute to our long-term, strategic profitability
> goals.  Advanced Exhaust Gas Recirculation ("EGR"), combined
> with other strategies, is our solution to meet ongoing emissions
> requirements.  We formally submitted our 0.2g NOx in-cylinder
> engine certification data for our 13L engine to the United States
> Environmental Protection Agency ("EPA") on January 31, 2012,
> and to the California Air Resources Board ("CARB") on February
> 17, 2012 (collectively, our "0.2g NOx Engine Submission").
> These submissions are under review by EPA and CARB and we
> are engaged in ongoing discussions relating to our engine
> certification.
> ***
> In January 2012, EPA adopted an Interim Final Rulemaking (the
> "Interim Rule") on [NCPs] for heavy heavy-duty diesel engines
> that could be sued by manufacturers of heavy-duty diesel engines. .
> . Some of our competitors petitioned EPA for a stay of the Interim
> Rule.  EPA denied the competitor's petition.  The competitors
> challenged the Interim Rule in the Court of Appeals for the D.C.
> Circuit, and we filed a motion to intervene in support of the
> Interim Rule, and we filed a motion to intervene in support of the
> Interim Rule.  Also in January 2012, EPA published a Notice of
> Proposed Rulemaking [and] . . . once final, these rules would
> supersede the Interim Rule.  If our 0.2g NOx Engine Submission is
> not approved, or if the challenge of the Interim Rule succeeds, or if
> the Proposed Final Rule, once final, is materially different from the
> Interim Rule, our business, financial condition, results of
> operations, or cash flows could be materially and adversely
> affected.
> ***

> We continue to invest in our EGR technology to meet current
> global emission requirements, and we believe that coupling EGR
> with our other emission strategies will provide a significant
> competitive advantage over our competition's products.

Doc. 27-10 at 36–37; *see also* Doc. 1 ¶ 118.  Navistar also issued a press release on March 8 (the

"March 2012 Press Release"), reviewed and approved by Ustian, quoting him that Navistar

"achieved a number of key milestones in the first quarter, including [the January 2012

Application] [.]"  Doc. 22-28; Doc. 1 ¶ 121.

Navistar also held a conference call with analysts and investors about the March 2012

Quarterly Report (the "March 2012 Analyst Call").  Ustian confirmed that Navistar estimated

that it would pay $25 million in NCPs during the 2012 fiscal year, Doc. 27-6 at 6, and asked by

an analyst during the analyst call "how many months you are assuming the NCP payments

continue for that $25 million hit," Ustian responded by saying:

> [H]ere's maybe a way to look at it.  We have submitted for the .2
> and that goes through a process of – typically, that's about three
> months, I think, is about the average of that.  When we get the
> certification, it still takes some time for us to get to production on
> this.  So what we are doing right now is getting ready to go to
> production, and it will be about June before we can get into
> production with that particular engine.  So that kind of gives you a
> framework of where it would be.  As for the preciseness of it, we
> can't tell you, but our objective is to be in production on that in
> June.

*Id.* at 9; Doc. 1 ¶ 125.  Ustian also explained that he expected the planned use of NCPs and

Emission Credits "to take us through the year" and "quiet down" uncertainty that Navistar could

not sell a useable engine in 2012.  Doc. 27-6 at 6.  Ustian also explained that "[t]his is why we

are taking until June to go to production" to eliminate any problems with the proposed engine.

*Id.* ¶ 127.  A day later, an analyst wrote, "[t]he company expects to get the EPA 13L certification

sometime in April–May 2012, and further expects the 13L engine production to begin by June

2012. . . .  Our expectation is that [Navistar] should be able to get the EPA certifications for 13L shortly." Doc. 1 ¶ 129.  Another analyst wrote, "The company is targeting June for a switch over to producing fully compliant 13L engines. We expect the current fine guidance is protecting against (normal) delays in the certification process. . . .  We expect the catalysts to drive the shares to begin in 2Q (with EPA certification)." *Id.* ¶ 130.

On March 23, 2012, the EPA sent an email to Navistar informing them that "[y]ou cannot have one emissions control configuration for taking an EPA compliance test and a different emission control configuration for installation in a vehicle, if the differences result in measurements that are not representative of the in-use configuration." *Id.* ¶ 133.  Ustian received a copy of the email, and Navistar arranged for Ustian to meet with an elected official to discuss EPA certification on March 28, where he said that Navistar was in a "stalemate" with the EPA and "getting to the point where we can't ship product." *Id.* ¶ 132.

In April 2012, Navistar continued to react to the EPA's response to the January 2012 Application.  Navistar met with the EPA on April 5, 2012, a meeting that led Navistar's lead engineer to exclaim that the second prototype engine was "FUBAR forget about it!" *Id.* ¶ 134.  Navistar engineers worked on technical changes to the engine, including a new dual-mapping system that lowered laboratory NOx emissions below street emissions but that also decreased the engine's fuel economy and performance.  Ustian knew that the changes "would result in unacceptable performance trade-offs or require so much time for additional development that Navistar would run out of emissions credits before it could receive certification." *Id.* ¶ 137.  Navistar met with the EPA again on April 27 to discuss the new technical changes.

On May 10, 2012, Navistar's Vice President of Government Relations ("VP-GR") noted that Navistar's engineers had "completely revised the calibrations for our engine and it

drastically reduced emissions, but . . . require[d] . . . a hit in fuel economy." *Id.* ¶ 140. The VP-GR noted that Navistar would be announcing its second quarter earnings on June 5 and that Navistar needed to be able to say that the EPA was going to approve the second prototype engine by the June 5 announcement. Navistar's Chief Communications Officer noted that if the EPA did not certify the engine, then a "devastating chain of events" was imminent, predicting "myriad financial crises." *Id.* ¶ 141.

Navistar withdrew the January 2012 Application on May 10, 2012.

**The Third 0.20 NOx 13-Liter Engine**

Navistar submitted a third application for certification of a 13-liter engine meeting the 0.20 NOx Rule on May 21, 2012. Internally, Navistar estimated that the May 2012 Application's engine (the "third engine prototype") had worse fuel economy than the second engine prototype from the January 2012 Application and worse fuel economy than competitor's SCR engines that were already EPA-certified. Ustian was knowledgeable about the development and work on the May 2012 Application and knew about the fuel economy issue with the third prototype engine. He also knew that Navistar now predicted that it would take until late 2013, after the Credits were set to expire, to develop a 13-liter engine that met the 0.20 NOx Rule and that provided improved fuel economy and other performance features.

The VP-GR wrote the EPA asking for NCPs, justifying the request because if the EPA approved the May 2012 Application, it would still take several months to ship a road-ready version of the certified engine. Navistar continued to meet with the EPA and respond to the EPA's requests for more information about the May 2012 Application's engine, which still used a Map A and a Map B for emissions testing.

At a June 4, 2012 meeting, the EPA expressed continuing concerns, including concerns that the EPA had previously raised about the January 2012 Application. The EPA mentioned withdrawing the May 2012 Application and relying only on NCPs in the future. After attending the meeting, Navistar's lead engineer characterized the EPA's feedback as "unequivocally NO!" *Id.* ¶ 150. The VP-GR, who had also been at the meeting, spoke with Ustian and then spoke with the other Navistar employees who attended the EPA meeting. The lead engineer reacted to the vice president's description of Ustian's reaction by retracting his previous exclamation the next day and saying, "Dan put the gag order on us. We are only allowed to say 'the agency has heard everything and will reply with a written summary.' Please disregard my previous communication." *Id.* ¶ 151.

On June 5, 2012, the VP-GR emailed an EPA official, expressing surprise and requesting that the EPA pause considering the May 2012 Application and allow Navistar to submit questions. The EPA official responded that "I believe that your engine is unlikely to receive a certificate of conformity as it is currently designed" because as the EPA "made clear previously, 40 CFR 1065.10 requires that engines be tested in a manner that would result in emissions rates equivalent to those that would result using the same engine configuration installed in a vehicle." Doc. 1 ¶ 154. The EPA official said the May 2012 Application engine's true NOx emissions were "0.42g/hp-hr not 0.20g/hp-hr." *Id.* Ustian received a copy of the EPA official's email the same day it was sent.

Two days later, on June 7, 2012, Navistar filed its 10-Q second fiscal quarter report (the "June 2012 Quarterly Report"), which Ustian reviewed, approved, signed, and certified. The quarterly report acknowledged that Navistar had withdrawn the January 2012 Application, and a subsequent application for California's Air Resource's Board ("CARB") and, in "response to

certain concerns raised by the EPA," had "submitted a revised application to the EPA." Doc. 27-11 at 32; Doc. 1 ¶ 158. Navistar acknowledged that "[c]ertain issues raised by the [May 2012 Application] are under review by the EPA" and that Navistar was "engaged in ongoing discussions relating to certification of this engine family at 0.20g NOx." Doc. 27-11 at 32; Doc. 1 ¶ 158. The same day, Ustian participated in a conference call with securities analysts and investors (the "June 2012 Analyst Call"). Before the questions began, he talked about the May 2012 Application, noting, "EPA . . . has an NCP rule that they are finalizing. Frankly, we don't want to use that. We want to get our 0.2 certification behind us and not use the NCP, but that is a backup that the EPA is working on. On the other hand, we are also getting ready as soon as that certification is approved [so that] we can go to instant production within 30 days. So we have all the mechanisms in place to respond quickly once we get that certification approved." Doc. 27-33 at 4; Doc. 1 ¶ 161.

Later an analyst asked Ustian about the May 2012 Application, including (1) "Do we have any idea what the difference [is] between what you submitted in February and what you submitted in May?" (2) "[W]hat are your views on when and if this thing gets approved . . . [a]nd how much of that is built into your second-half forecast, which is just a massive sequential improvement." Doc. 1 ¶ 163. Ustian responded to explain "what [Navistar] did there." *Id.* He said that "[i]n working with the EPA, they asked [Navistar] if there was [sic] some spots that they wanted us to modify, and so we did that" and that Navistar was "running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera." *Id.* Then he said "so we resubmitted that [the May 2012 Application] back to them and we're in the process now of working with them on getting that certified." *Id.* He then remarked "it's hard for us since it is somewhat out of our control to tell you exactly the

timing of any of that so I hope you can appreciate that." *Id.* When an analyst asked if the certification process would take the same "three to four months" that Navistar had predicted for approval of the January 2012 Application, Ustian remarked "No, of course not" because "there is plenty of background out there now that it shouldn't take nearly as long I could argue we should have been done with this, but we are not. So we have to go forward and get it done expeditiously. And we're all over the top of this every minute of every day, as you can imagine." *Id.*

Navistar engineers and executives then began to advocate for a transition from EGR to SCR technology to meet the 0.20 NOx Rule. Ustian discussed SCR technology with the Executive Committee Navistar's Board of Directors, including it in discussion of a Plan B for emissions. On June 15, the EPA responded in writing to the May 2012 Application, informing Navistar that the May 2012 Application raised serious concerns that would prevent receiving a certificate of conformity for the third engine prototype. The EPA's concerns "were the same concerns" discussed in the June 4, 2012 meeting, *id.* ¶ 175, including concerns about using prohibited defeat devices. It noted that Navistar's chosen dual mapping emissions approach "result[ed] in unrepresentative emissions measurements" and that the third prototype engine produced emissions during use that were "very similar to Navistar's calibration for [0.50 NOx engines]." *Id.* ¶ 176 (alteration in original).

In July 2012, Navistar did not have a certificate of conformity for a 0.20 13-liter EGR engine. On July 6, 2012 Navistar announced that it would use SCR technology to develop a 0.20 NOx engine, and Navistar's stock dropped more than fifteen percent. Ustian previously had sold Navistar stock on April 5, 2011. Navistar asked Ustian to resign in August 2012.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

The SEC alleges that Ustian and Navistar concealed Navistar's struggle to develop a market competitive engine with statements and omissions that misled the public, violating a

plethora of securities laws.  Ustian moves to dismiss the SEC's complaint, arguing that (1) the

SEC has "shotgun" pleaded facts; (2) the SEC's Section 10(b), Sections 17(a), and Rule 10b-5

claims fail because the SEC does not sufficiently allege falsity, deception, or materiality; (3) the

SEC's Section 10(b), 10b-5, and Section 17(a)(1) claims fail because SEC does not sufficiently

allege scienter; (4) the SEC did not sufficiently plead its Section 17(a)(2) claim; (5) the SEC's

Section 13a-14 and Section 20(a) claims cannot be brought as standalone claims; and (6) the

SEC fails to sufficiently state a claim that Ustian aided and abetted Navistar.[5]  He also requests

that the Court consider the exhibits he attaches to his motion to dismiss.

## I.     Ustian's Motion for Consideration of Documents Not Attached to the Complaint

Ustian attaches 40 exhibits (39 original documents and a summary appendix),

authenticated by one of his attorneys and asks the Court to consider the exhibits because they are

either incorporated into the complaint by reference or subject to judicial notice.  "[D]ocuments

attached to a motion to dismiss are considered part of the pleadings if they are referred to in the

plaintiff's complaint and are central to his claim.  Such documents may be considered by a

district court in ruling on the motion to dismiss."  *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730,

735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)).

"[T]his is a narrow exception" to the general rule that when additional evidence is attached a

motion to dismiss, "the court must either convert the 12(b)(6) motion into a motion for summary

judgment under Rule 56 . . . or exclude the documents attached to the motion to dismiss and

continue under Rule 12."  *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).  The SEC

challenges the consideration of the exhibits or, alternatively, moves to strike eighteen of the

---

[5] Ustian also sought to dismiss certain claims based on statute of limitations defenses.  Ustian withdrew
those arguments, admitting that he and SEC agreed to toll any statute of limitations defenses applicable to
the complaint.  *See* Doc. 48 at 2 n.1.

exhibits.  The SEC admits that many of the exhibits are incorporated by reference or proper for judicial notice, and the Court agrees, so the Court turns to the SEC's arguments for striking exhibits that it argues are outside the bounds of judicial consideration.

### A.    Analyst Reports

Ustian attaches financial analyst reports on Navistar published contemporaneously with the events described in the complaint, including financial analyst reports that the SEC describes in the complaint.  Courts routinely consider analyst reports during motions to dismiss securities fraud claims to resolve questions about the materiality of alleged misrepresentations and omissions.  *See, e.g.*, *Reinschmidt v. Zillow, Inc.*, No. C12-2084 RSM, 2014 WL 5343668, at *3 (W.D. Wash. Oct. 20, 2014) (noting that "[c]ourts routinely take judicial notice of analyst reports . . . to determine what may or may not have been disclosed to the public" (quoting *In re Century Aluminum Co. Sec. Litig.*, C 09–1001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011))). The SEC references other financial analyst reports to describe the reaction to Navistar and Ustian's action, so the Court will consider Ustian's additional financial analyst reports to determine the "'total mix' of information available to investors" during the relevant time period, but not the truth of the matters asserted within the reports.  *Id.*

### B.    Emails and other Communications

Ustian also asks the Court to consider emails that, he argues, the complaint incorporates by reference.  The SEC disputes judicial consideration of five of these exhibits.[6]  The first challenged exhibit is a February 27, 2012 Navistar email to the EPA attaching Navistar's February 26, 2012 response to the EPA.  Doc. 27-5; *see also* Doc. 1 ¶ 111 (On February 27, 2012, Navistar provided the EPA with an eight-page written reply and asked that its application

---

[6] Docs. 27-5, 27-22, 27-24, 27-25, 27-26.  The Court sealed the first three exhibits.  Doc. 36.

be approved immediately.").  The SEC admits that the paragraph 111 of the complaint describes the email and attachment, but disputes its importance to the complaint.  The SEC relies on Navistar's communication to the EPA to allege Ustian's wrongdoing, so the Court will consider the exhibit.

The second challenged exhibit contains an internal December 16, 2011 Navistar internal email that the parties agree is not incorporated by the complaint.  Doc. 27-24.  The internal Navistar email follows a December 16, 2011 EPA email to Navistar that the SEC concedes is incorporated by reference.  Ustian concedes that the internal Navistar email is not incorporated in the complaint, and he subsequently revised the exhibit to reflect only the EPA email to Navistar. *See* Doc. 34 at 6 n.6 ("Ustian does not offer that portion of the Exhibit [the internal Navistar email] for the Court's consideration, and has provided a redacted under seal version of this Exhibit for the Court's consideration.").  Therefore the Court will only consider the amended exhibit and the EPA email, not the internal Navistar email.

The third challenged exhibit contains February 18, 2011 EPA email communications with Navistar about the use of engine durability data in the February 2011 Application.  Doc. 27-22. Ustian argues that the complaint references the email by alleging the EPA informed Navistar that it would not consider other engine durability data for the certification of a 0.20 13-liter engine and that Ustian knew, based on this advice, that the February 2011 Application would not meet the EPA's certification requirements.  The SEC responds that the complaint "generally mentions the concepts discussed in [the exhibit]" but "does not mention, let alone rely upon, the email string."  Doc. 32 at 6.  Comparing the allegations of the complaint and the exhibit, both of which discuss the EPA's position on durability data use, the Court finds that these email discussions, the authenticity of which the SEC does not dispute, are referenced in the complaint and central to

the SEC's claim that Ustian and Navistar ignored EPA positions on Navistar's use of other engines' durability data, so the Court will consider them when considering Ustian's motion to dismiss. *See, e.g.*, *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1217–18 (D.N.M. 2013) (considering extrinsic email communications that were referenced in complaint, central to the SEC's claim, and not disputed as to authenticity).

The fourth and fifth challenged exhibits are May 8, 2015 email communications between the EPA and an attorney representing Navistar regarding Navistar's FOIA request for EPA documents, Doc. 27-25, and a June 25, 2015 letter from the EPA to Navistar's attorney denying the request, Doc. 27-26. The Court takes judicial notice of the EPA's denial letter, which is properly the subject of judicial notice. *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHX), 2008 WL 2676364, at *2 n.3 (C.D. Cal. July 1, 2008) (taking judicial notice of agency decision letter, the authenticity of which was not challenged). But the Court will not take judicial notice of the email communications articulating Navistar's request because they are informal communications whose only permissible purpose would be to duplicate the official letter's determination that the EPA was denying the FOIA request. *Cf. id.* (refusing to take judicial notice of the truth of the content of communications filed with agency).

C.      **EPA Fact Sheet**

Ustian asks the Court to take judicial notice of the EPA's Air Pollution Control Technology Fact Sheet, which is available on the EPA's website. Doc. 27-3; *see also* EPA Air Pollution Control Technology Fact Sheet EPA-452/F-03-032, *available at* https://www3.epa.gov/ttncatc1/dir1/fscr.pdf). The Court takes judicial notice of the fact sheet and considers it only for Ustian's arguments regarding his own alleged scienter and not for the truth of the matters asserted in the fact sheet. *See, e.g.*, *Gubala v. CVS Pharmacy, Inc.*, No. 14 C

9039, 2016 WL 1019794, at *6 & n.10 (N.D. Ill. Mar. 15, 2016) (collecting cases, taking judicial notice of FDA information available on FDA's website).

### D. Form 10-Q

Ustian asks the Court to take judicial notice of an excerpt of Navistar's 10-Q quarterly report, filed by Navistar on March 8, 2016, which Ustian cites to describe the length and breadth of the SEC's investigation of Ustian in order to argue that the SEC could not uncover more facts to amend that would allow it to sufficiently amend its complaint and state a claim. Because the complaint is not the SEC's "second bite at the apple," the Court does not consider the unusual step of dismissing the SEC's first complaint with prejudice so the Court need not yet consider the depth and the scope of the SEC's investigation to determine the futility of a future amendment. *Cf. S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 436 n.26 (S.D.N.Y. 2010) (after dismissing the SEC's allegations against the defendant for the second time, noting that the SEC conducted a lengthy investigation so further amendment against dismissed defendant would be futile). Therefore the Court denies Ustian's motion as to the 2016 10-Q report as premature.

### E. Appendix A

Ustian also includes Appendix A, a summary chart, prepared by his counsel, of the information contained in some of the other exhibits to the motion to dismiss. "Rule 1006 of the Federal Rules of Evidence provides that a party submitting 'voluminous' data to a court may present that data 'in the form of a chart, summary, or calculation,' so long as the originals or duplicates of the originals are made available for inspection." *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440 MMM SHX, 2015 WL 1775221, at *17 (C.D. Cal. Apr. 14, 2015) (quoting Fed. R. Evid. 1006). "Because defendants have submitted the underlying documents for consideration, the court declines to disregard the summaries, tables and charts, but will not

consider them without reference to underlying documents," but only to the extent the underlying documents are incorporated by reference in the complaint or permissibly considered under judicial notice. *See id.* (collecting cases).

The Court therefore grants in part and denies in part Ustian's motion for consideration of documents and declines the SEC's request to convert Ustian's motion to dismiss into a motion for summary judgment.

## II.    Ustian's Motion to Dismiss

The SEC alleges that Ustian committed securities fraud by issuing misrepresentations— and then subsequently covering up those misrepresentations with acts that either reinforced, extended, or hid the earlier misrepresentations—about Navistar's ability to meet the EPA's 0.20 NOx Rule, alleging that when Navistar struggled to produce a capable engine, Ustian and Navistar covered up its struggles in order to prevent financial harm to Navistar, which would manifest through lost customers and a stock price decline.

### A.    Misleading statements, omissions and deceptive conduct violating anti-fraud provisions of Rule 10b-5 and Sections 10(b) and 17(a) (Counts I and III)

The SEC alleges that Ustian's statements over the course of 2011 and 2012 misled investors in violation of the securities laws, specifically Rule 10b-5 and §§ 10(b) and 17(a). Congress' objective in passing securities laws was "to [e]nsure honest securities markets and thereby promote investor confidence." *S.E.C. v. Zandford*, 535 U.S. 813, 819, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002) (quoting *United States v. O'Hagan*, 521 U.S. 642, 658, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997)). The securities laws also generally encourage "full disclosure" above "the philosophy of *caveat emptor*" and promote "a high standard of business ethics in the securities industry." *Id.* (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972)). Rule 10b–5 and § 10(b) prohibit fraudulent

conduct in connection with the purchase or sale of a security. 17 C.F.R. §§ 240.10b–5(a), (b) &

(c); 15 U.S.C. § 78j(b). Section 17(a) prohibits fraud in the offer or sale of securities, using the

mails or the instruments of interstate commerce. 15 U.S.C. § 77q(a). Courts use "identical"

standards for determining liability under §§ 17(a) and 10(b) and Rule 10b-5. *S.E.C. v. Sentinel*

*Mgmt. Grp., Inc.*, No. 07 C 4684, 2012 WL 1079961, at *14 (N.D. Ill. Mar. 30, 2012); *see also*

*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530–32 (7th Cir. 1985)

(noting that a § 17(a) claim has similar elements to a Rule 10b-5 claim and "adds nothing to

plaintiff's arsenal" and § 17(a) claims "should proceed as if only a Rule 10b-5 claim had been

raised").

To establish a violation under these anti-fraud provisions, "the SEC must allege that the

defendants (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in

connection with the purchase or sale of securities." *S.E.C. v. Sys. Software Assocs., Inc.*, 145 F.

Supp. 2d 954, 957 (N.D. Ill. 2001); *Searls v. Glasser*, 64 F.3d 1061, 1065–66 (7th Cir. 1995)

("[O]ne must prove that in connection with a securities transaction, the defendant either made a

false statement of material fact or failed to make a statement of material fact thereby rendering

the statements which were in fact made misleading [;] . . . that the misleading statement caused

an injury [;]. . . [and] that there is a substantial likelihood that disclosure of the information

[withheld] would have been viewed by the reasonable investor to have significantly altered the

total mix of information[.]"). The SEC must prove scienter—intent or recklessness—for the

alleged § 17(a)(1), § 10(b), and Rule 10b–5 violations, and, for the §§ 17(a)(2) and (3)

violations, that Ustian acted negligently. *Aaron v. S.E.C.*, 446 U.S. 680, 701–02, 100 S. Ct.

1945, 64 L. Ed. 2d 611 (1980). *S.E.C. v. Shanahan*, 646 F.3d 536, 543, 545 (8th Cir. 2001)

(analyzing scienter for 17(a)).  Ustian argues that the statements and omissions targeted by SEC were not materially misleading and that Ustian lacked scienter.

### 1. Materially misleading statements and omissions

The SEC must allege a statement which is false or misleading due to an omission of a material fact.  *S.E.C. v. Santos*, 355 F. Supp. 2d 917, 920 (N.D. Ill. 2003)**.**  "An omission renders a statement materially misleading when it creates an 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Kelsey v. Allin*, No. 14 C 7837, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  But if a statement had a reasonable basis when made, it is not fraudulent.  *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir. 1989) (analyzing private litigant's claims under the Securities Act); *S.E.C. v. Falor*, No. 1:09-CV-5644, 2010 WL 3385510, at *3–4 (N.D. Ill. Aug. 19, 2010) (finding claims actionable where defendant allegedly made investment promises that he "lacked any reasonable basis to assume . . . would materialize"); *see also Searls*, 64 F.3d at 1066 ("[P]redictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b-5.").

"It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).  "A fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact."  *U.S. S.E.C. v. Staples*, 55 F. Supp. 3d 831, 838 n.6 (D.S.C. 2014); *Basic*, 485 U.S. at 231–32 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available").

Materiality is "an inherently fact-specific finding." *Matrixx Initiatives, Inc. v. Siracusano*, ---

U.S. ----, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011) (quoting *Basic*, 485 U.S. at 236).

Management cannot be expected to "bury the shareholders in an avalanche of trivial

information," either. *Id.* (quoting *Basic*, 485 U.S. at 231). Because materiality requires

assessments of how a reasonable investor would interpret facts and the significance the investor

would afford the inferences she reaches, assessing materiality is for the trier of fact and "rarely

appropriate at the summary judgment stage, let alone on a motion to dismiss." *S.E.C. v.*

*Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *4–5 (N.D. Ill. May 25, 2004) (collecting

cases). Therefore, the Court considers whether the "allegations suffice to raise a reasonable

expectation that discovery will reveal evidence satisfying the materiality requirement, and to

allow the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Matrixx Initiatives, Inc.*, 131 S. Ct. at 1323 (alteration omitted) (citations omitted)

(internal quotation marks omitted).

> **a.      The November 2010 Press Release (announcement of plan to certify a 13-liter 0.20 NOx engine)**

The SEC alleges that when Navistar issued the November 2010 Press Release and

claimed that Navistar had "plans to submit for EPA certification of its MaxxForce 13 at 0.2g

NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-

certified MaxxForce 13 would be required," Doc. 1 ¶ 47, Navistar knew that it could not produce

or sell the 13-liter engine it was announcing. Ustian argues that the November 2010 Press

Release could not have been misleading because it was announcing future plans. "[P]redictions

and forecasts which are not of the type subject to objective verification are rarely actionable

under § 10(b) and Rule 10b-5." *Searls*, 64 F.3d at 1066. But the SEC alleges that by

announcing the plan to certify a 13-liter 0.20 NOx engine and by doing so while also announcing

the successful certification of another market-competitive engine, the announcement inferred that

the 13-liter 0.20 NOx engine was already ready for the market. The SEC alleges that in late

2010, Navistar's competitors had already certified their SCR engines and that investors and

analysts "questioned whether Navistar could ever develop and certify a commercially

competitive" 0.20 NOx engine using EGR. Doc. 1 ¶ 44. The SEC also alleges that before the

events in question, Navistar did not attempt to certify engines that it did not intend to sell. Doc.

1 ¶ 59. In this context, the SEC plausibly alleges that the press release misled investors into

thinking that Navistar had a 0.20 NOx engine ready for the market.[7] *See Kelsey v. Allin*, No. 14

C 7837, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016) ("An omission renders a statement

materially misleading when it creates an 'impression of a state of affairs that differs in a material

way from the one that actually exists.'" (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d

997, 1006 (9th Cir. 2002))).

Ustian also argues that any misleading aspect of the press release was not material

because he had previously told investors in June 2010 that Navistar would "need two plus years

before we launch these." Doc. 27-19 at 2. But Ustian highlights only a small portion of his

previous statement, and there is a question of whether the statement in June 2010 was predicting

that Navistar would develop an engine in two or more years (and what type of emissions

technology that engine would use) or if he was acknowledging that Navistar's Emission Credits

would expire in approximately two years, necessitating an engine that met the 0.20 NOx Rule.

---

[7] The Court notes that previously, in another case, *Construction Workers Pension Fund – Lake County and Vicinity v. Navistar International Corporation*, Case No. 13 C 2111 (the "Navistar Class Action"), the Court ruled that a similar statement, made by Navistar a day later and published in a news article, could not support a PSLRA claim. *See* Navistar Class Action, Doc. 146 at 17–21. The Court's decision in that case was based on the PSLRA's law regarding safe harbor for forward-looking statements, *see id.*, and is not binding on the Court's analysis here.

*See id.* ("[S]o what we need is to have an answer that is ready for [the 0.20 NOx Rule] in two plus years.").  Ustian can make this materiality argument after discovery is complete, but the Court will not dismiss the SEC's claim now.

> **b.** **The December 2010 Analyst Call (discussion of plan to certify a 13-liter 0.20 NOx engine)**

Next, the SEC alleges that the December 2010 Analyst Call was misleading because when Ustian promised that Navistar would soon ask the EPA to certify a 13-liter EGR engine that (1) met the 0.20 NOx Rule and (2) could compete with SCR engines, he implied that the subject-engine of the planned application was capable of doing both.  Ustian first argues that he was previewing a future engine not yet in existence and made that clear by blanketing every word with the future tense in order to make sure that he did not represent that Navistar had a competitive, market-ready engine at the time of his statements.  Again, future hopes are generally not actionable if they are based on a genuine belief or good faith basis.  *Searls*, 64 F.3d at 1066.  But "an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under [the securities laws]."  *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 194 (3d Cir. 2000) (emphasis omitted) (citation omitted).  The SEC plausibly alleges that Ustian's statement lacked any reasonable basis to support his belief because on December 22, 2010, he knew that his statement would not come true within the timeframe that he set.  In late 2010, Navistar engineers and executives had already told Ustian that Navistar could not produce a competitive 0.20 NOx engine until the end of 2012.[8]  The SEC plausibly alleges that the statement was materially misleading.[9]

---

[8] Further, the SEC alleges that the future application Ustian was describing in December 2010, the February 2011 Application, relied on an engine that could not be sold because it did not meet critical performance standards.

### c. The March 2011 Analyst Call (discussion of the first prototype engine and the February 2011 Application)

The SEC alleges that Ustian knew, but did not disclose in the March 2011 Analyst Call, that the first prototype engine submitted in the February 2011 Application could not be driven in the real world, so he misled investors by stating that the engine met the 0.20 NOx Rule and contained all necessary performance features for the market. Ustian argues that his statements at the March 2011 Analyst Call are not actionable because they were forward-looking. Again, the forward-looking nature of Ustian's statement does not shield him from liability because the SEC alleges that the statements were false and lacked a reasonable basis of support. *E.g.*, *S.E.C. v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *4–5 (N.D. Tex. Aug. 19, 2008) (noting that even if they are forward-looking, statements that are false are actionable). Further, while Ustian characterizes the statements as predicting a potential future action, the statements do not appear to be forward-looking because they describe Navistar's past act, the February 2011 Application. Doc. 27-4 at 5 ("So what we did is we submitted to the EPA a certification . . . to take that argument away."). Misrepresentations "framed in the present tense" are not "forward looking." *S.E.C. v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 324 (D.D.C. 2014). Ustian stated that the first prototype engine was not going to be sold in the short term upon certification ("[w]e don't plan on using this for a while"), but his statements can be reasonably read to claim that the first prototype engine, already submitted to the EPA at the time of the statement, was currently saleable and just needed certification ("we are going to have it out there on the shelf") and could

---

[9] Again, the Court notes that in the Navistar Class Action, the Court held that a portion of the statement targeted by the SEC here ("we'll be able to show you the data, that it meets 0.2, and show you how we're able to meet it") was not actionable under the PSLRA. *See* Navistar Class Action Doc. 146 at 21–24. In addition to analyzing a narrower statement with different contextual allegations, the Court also found that the plaintiff's allegations surrounding the statement failed to meet the pleading standards for the PSLRA because it was a forward looking statement that could not violate the PSLRA. *See id.* That past decision is not binding on the Court here.

produce 0.20 NOx emissions with competitive performance capabilities ("that says it can be done and we can meet the standards and get all of the performance features, as well").  Doc. 1 ¶ 70.

Ustian also argues that while the SEC alleges that the EPA had told Navistar that Navistar could not use old durability data to support the February 2011 application, in reality an EPA staffer had merely recommended to Navistar that, in his view, the older durability data from the 0.50 NOx engine would be insufficient for the first prototype engine and, even then, was willing to discuss questions that Navistar had about his opinion.  *See* Doc. 27-22.  This is a fact issue that the Court cannot resolve at the motion to dismiss stage without discovery into the import of the advice from the EPA employee and the significance that it held at both Navistar and the EPA.  It is uncontested that Navistar chose to break tradition and provide durability testing from a different engine.  Beyond the durability data, the SEC alleges that the first prototype engine was just "a marketing tool to convince investors of Navistar's supposed progress in developing an EGR-only engine at the 0.20 NOx standard," Doc. 1 ¶ 64, with performance derided internally, and was not intended for certification.  At the motion to dismiss stage, additional facts from Ustian do not eclipse the SEC's allegation that Navistar already knew that the EPA was not going to certify the engine.  The Court can reasonably infer from the decision to source durability data from a 0.50 NOx engine rather than the submitted engine, which could not run outside of a test lab, that Ustian and Navistar knew, but did not disclose, that there was a strong risk, if not absolute certainty, that the February 2011 Application would fail. While failing to disclose interim regulatory problems is not securities fraud, in itself, failure to disclose knowledge that there was a material risk involved in the application could be actionable. *Compare Jasin v. Vivus, Inc.*, No. 14-CV-03263-BLF, 2016 WL 1570164, at *17 (N.D. Cal. Apr.

19, 2016) (allegation of securities violation failed because plaintiff's alleged omission was only a failure to disclose information that regulatory body had raised concerns about drug that needed to be further justified or discussed before approval), *with In re Nuvelo, Inc.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (allegations of fraud were sufficient where the defendant failed to disclose that its application could not meet regulatory body's statistical standard and therefore that there was a material risk that the regulatory review would fail), *and Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016) (same, where plaintiff alleged that the defendant knew that the regulator would not approve the product).

Finally, Ustian argues that the statements could not be materially misleading because analyst reactions showed they did not believe the 13-liter engine was market-ready. But at least one analyst did appear to be swayed by Ustian, reporting a month after the call that Navistar would be capable of selling the engine submitted to the EPA because the analyst reported that "the company will not likely produce all of its 13 liter engines to compliance at this time," instead of reporting that the company would not produce any 13-liter engines to compliance. Doc. 27-36 at 3 (Northcoast Research, April 26, 2011, "Diesel Engine Survey: Transitioning to 13L Across the Board, NAV Accelerates"). The SEC sufficiently alleges that Ustian's statements were materially misleading.

### d. The April 2011 Press Release (discussion of first prototype engine and February 2011 Application)

The SEC alleges that the April 2011 Press Release misled investors to think that Navistar was capable of producing and selling a 13-liter 0.20 NOx engine because it headlined the February 2011 Application simultaneously with the announcement of certification of two other engines. Ustian argues that the April 2011 Press Release is not actionable because no investor would have understood the press release to say that Navistar was ready to sell the first prototype

34

engine.  While Navistar did not explicitly state that the first prototype engine was ready for the market, it announced that it submitted the engine for EPA approval while also announcing the certification of two other engines.  The SEC alleges these engines were market-ready because Navistar "intended to, and did eventually, sell both of these engines."  Doc. 1 ¶ 75.  In fact, the press release explicitly tied the certified, higher-emission 0.39 NOx engine to the first prototype engine, suggesting that the certification showed that Navistar could build a 0.20 NOx engine with EGR technology.  Doc. 27-23 at 1 ("This certification . . . demonstrates progress to achieving the 0.20g/bHpHr standard[.]").  But the SEC alleges that unlike the two certified engines, the first prototype engine, could not run on its own outside a test lab and did not have market-competitive performance.  The SEC also alleges that unlike the certification applications for the two certified engines described in the press release, which were sold upon certification, it was unusual (and possibly unprecedented) for Navistar to submit a certification application for an engine that it knew it could not sell in the marketplace upon certification.  The SEC's allegations are sufficient to state a claim that the press release misled the public to understand that the first prototype engine was market-competitive, and thus capable of sale, at the time of the press release.

Ustian correctly points out that the April 2011 Press Release made clear that Navistar intended to sell engines with higher emissions before selling 0.20 NOx engines, Doc. 27-23 at 1 ("The Company intends to phase-in its engines at progressively lower NOx emissions levels[.]").  But this statement could certainly be read as one intended to inform the public that the 0.20 NOx engine would be sold immediately after the higher emissions engines, which is in line with the SEC's allegation that Navistar estimated that it might exhaust its Emission Credits in February

2012, at which point Navistar would need to sell the 0.20 NOx engine.[10]  The Court is not convinced that the statement cured its alleged misleading nature by including the sales timeline for Navistar's engines because the timeline did not discuss whether the first prototype engine was market-competitive at the time of the press release.  At the pleading stage, the SEC plausibly alleges that Navistar included the 13-liter application in the same announcement as the approved engines, which were ready for competitive sale in the market upon certification, because Navistar wanted its customers, competitors, and investors to think that the 13-liter engine was also market-competitive already, pending EPA approval.

Further, the SEC alleges that the April 2011 Press Release omitted any warning that the EPA was not going to certify the first prototype engine.  Ustian argues that the SEC's allegation is implausible because there was no evidence that the February 2011 Application was doomed.  But as discussed, the SEC sufficiently alleges that Navistar knew there was a substantial risk that the EPA would reject the February 2011 Application submission because of the durability data that Navistar submitted.  *See In re Nuvelo, Inc.*, 668 F. Supp. 2d at 1230 (holding defendant's failure to acknowledge that regulatory disapproval was a material risk was actionable because the defendant knew that its application would not meet the regulator's standard).  Nor can the Court say at the pleading stage that the press release was not material in light of Ustian and Navistar's past statements about its emissions strategy and production schedule.  The SEC plausibly alleges that the April 2011 Press Release was materially misleading.

---

[10] The April 2011 Press Release preceded Navistar's focus on using NCP's to extend the deadline to begin selling 0.20 NOx engines, which the SEC alleges began in late 2011.

The SEC alleges that the December 2011 Annual Report misled investors because, when Navistar wrote that it planned to submit a second, new certification application for the revamped, second prototype engine, Navistar knew that four days earlier the EPA told Navistar that it would not certify such an engine. Ustian argues that Navistar did not need to disclose the EPA's concerns about the second engine because any concerns were just interim feedback from an EPA official. But as discussed, while it was an EPA official who noted that the engine specifications appeared to be unsatisfactory, the SEC alleges that this was much more than interim feedback.[11] At the motion to dismiss stage the Court cannot resolve the importance of communications from the EPA and its employees and the importance of the individual who was actually doing the communicating.[12] Further, the SEC alleges that the EPA official's warnings were not interim at

---

[11] Ustian implies that EPA officials did not speak for the EPA. Each time an EPA official warned that Navistar's application was insufficient—advice to which Navistar employees strongly reacted at the time but that Ustian tempers now—the EPA issued a written response to the application noting the same significant concerns. *Compare* Doc. 1 ¶ 92 (alleging that before submitting the January 2012 Application, EPA officials "told Navistar that an engine using a dual mapping strategy in the manner described by Navistar would not meet EPA standards), *with id.* ¶¶ 103–108 (alleging that EPA written response to January 2012 Application expressed concerns about dual mapping, including whether it was a defeat device used to cheat the emissions test); *compare id.* ¶ 149 (alleging that EPA officials meeting with Navistar after May 2012 Application expressed concerns about dual mapping used in engine), *with id.* ¶ 175 (alleging that EPA's written response to May 2012 Application raised "the same concerns raised by the EPA at the June 4, 2012 meeting"); *see also id.* ¶ 62 (Navistar executive writing that "[d]urability data and results from the current [0.50 NOx] engine were used in the submittal [of the February 2011 Application] despite EPA disallowing that version of durability demonstration").

[12] Ustian argues that the EPA wanted to keep its communications with Navistar out of the public eye because the EPA previously refused to produce certification communications in response to FOIA requests by characterizing the EPA official's discussions as part of the deliberative privilege, which protects against the early release of deliberation on policy before it is set. But it appears that the EPA was only refusing to produce documents that were not already in Navistar's possession, not communications to Navistar. *See* Doc. 27-25 ("You correctly understand our request to pertain to what you have identified as deliberative documents, rather than documents already in Navistar's possession."); Doc. 27-26 ("[Y]ou requested copies of all documents related to the consideration by the US EPA of applications for

all, raising "several serious concerns" that were, for all practical purposes, impossible to address because they required fundamental changes to the engine. Doc. 1 ¶ 105.

Ustian next argues that the statement was not misleading because Navistar also hedged on its ability continue production of "engines uninterrupted," Doc. 1 ¶ 95, and because, after withdrawing the first application, Navistar's second application broadly communicated the risk of pursuing EGR technology. But the SEC alleges that Navistar was not disclosing the degree of the risk, alleging that while Navistar publicly stated there was potential risk of not producing a 13-liter engine, there was virtual certainty that they would not at the stage of the application announcement and that the certifications were intended to hide the risk by implying things were moving forward when they were not. In fact, Navistar had told the EPA in fall of 2011 that Navistar would not develop a big bore engine that met the 0.20 NOx Rule and could be certified by the EPA by February 2012, the time Navistar expected to run out of Emission Credits. The SEC alleges there was a greater risk than "interruption" and that Navistar hid the magnitude of the risk from investors. *See In re Nuvelo, Inc.*, 668 F. Supp. 2d at 1230 (failure to acknowledge to investors that regulatory application would fail was actionable).

Ustian's argument that the annual report was just asserting opinions also fails. "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view," but "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, --- U.S. ----, 135 S. Ct. 1318, 1328, 191 L. Ed. 2d 253 (2015). The SEC alleges that Navistar did not have a reasonable basis to make the statement, and the factual

certification . . . in calendar year 2012."). The parties can resolve the significance of the EPA's refusal to produce documents to Navistar after discovery.

allegations in the complaint support this assertion.  The SEC states a claim that the December

2011 Annual Report is actionable.

>     **f.**     **The February 2012 Analyst Call (response to questions about the second prototype engine)**

Ustian challenges whether his statements at the February 2012 Analyst Call are

actionable.  The SEC does not respond to his challenge, which the Court interprets as waiver of

any allegation that Ustian's comments at the conference violated the securities laws.  *E.g.*, *Jones*

*v. Connors*, No. 11 C 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012) ("A party's

failure to respond to arguments the opposing party makes in a motion to dismiss operates as a

waiver or forfeiture of the claim and an abandonment of any argument against dismissing the

claim.").  The Court therefore grants Ustian's motion as to these statements.

>     **g.**     **The March 2012 Quarterly Report, March 2012 Press Release, and March 2012 Analyst Call (discussing the January 2012 Application and the second prototype engine)**

The SEC alleges that the March 2012 Quarterly Report and March 2012 Press Release

deceived investors by trumpeting the January 2012 Application because Navistar knew but did

not disclose that (1) Navistar was still struggling with a market-viable 13-liter 0.20 NOx engine,

(2) the January 2012 Application faced serious obstacles that made its approval tenuous, and (3)

the EPA certification was going to drag out much longer than the announcements suggested.

The SEC also alleges that Ustian's statements during the March 2012 Analyst Call were

misleading because while Ustian championed production of a 13-liter 0.20 NOx engine in June

2012, he knew that the 13-liter certification would not meet that schedule.

Ustian argues that the specific word choices made in the March 2012 Quarterly Report

and the March 2012 Press Release were mild puffery rather than materially misleading.  Puffery

is the opposite of a concrete statement, *Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001). "[S]tatements that constitute only mildly optimistic, subjective assessments hardly amount to a securities violation. Indeed, professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Knox v. Yingli Green Energy Holding Co. Ltd.*, No. 215CV04003ODWMRWX, 2016 WL 6609210, at *13 (C.D. Cal. May 10, 2016) (alterations omitted) (citation omitted) (internal quotation marks omitted) (collecting cases). Courts have found general predictions of success containing words like "milestone" and "profitability" to be puffery, *see, e.g.*, *id.* at *14 (assertion that product would positively impact "profitability level of . . . sales" was inactionable puffery); *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1355–56 (N.D. Ga. 2001) (assertion of achieving "growth milestones" was inactionable puffery). But the context in which these statements were made is significant, and the context can add concreteness to otherwise vague, inactionable statements. *S.E.C. v. Reys*, 712 F. Supp. 2d 1170, 1176 (W.D. Wash. 2010) (refusing to rule that statements were puffery at the motion to dismiss stage because analysis required review of more than just one adverb). The March 2012 Quarterly Report and Press Release both may have used ephemeral words, but they were describing the concrete idea that Navistar's February 2012 Application was going to secure certification of a market-competitive engine, allowing Navistar to stop paying NCPs in the process. At the early stage of these proceedings, the Court will not rule that the statements are not actionable. *See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (declining to dismiss claims where the significance of potentially material statements was in question).

Ustian argues that the statements in March 2012 were not misleading because the statements did not predict certification of the January 2012 Application. But the EPA had

already seriously questioned dual-mapping before and after the January 2012 Application. Doc.

1 ¶¶ 92, 107–08. The EPA had also questioned other aspects of the January 2012 Application

that were not new to Navistar, including its continued use of questionable durability testing data.

*Id.* ¶ 109. While Ustian argues that the EPA's position on dual-mapping was interim feedback

that Navistar did not need to disclose, especially in light of Navistar's February 2012 responses

to the EPA's questions, the SEC plausibly alleges that at the time, Ustian and Navistar did not

have a reasonable basis to predict certification and subsequent production where the EPA raised

serious questions about dual mapping and re-raised other issues with prior applications that the

January 2012 Application did not address. Ustian also argues that Navistar and Ustian both

hedged on the accuracy of any predictions they were making regarding production. The SEC

alleges, though, that Ustian and Navistar were implying much more precision than Ustian wants

to take credit—Ustian predicted a June production date that implied imminent certification by

referencing normal approval and production cycles, and Navistar championed the certification

application as the fiscal quarter's big moment, implying profitability was soon to follow.

Finally, Ustian argues that his supplemental analyst reports indicate that the statements

were not materially misleading. Ustian's supplemental exhibits do not wipe out the alleged

confusion that the SEC alleges Ustian and Navistar's statements and actions caused. Rather the

supplemental analyst reports create fact issues regarding materiality at the motion to dismiss

stage. It is an impossible task for the Court to determine materiality of the alleged

misrepresentations and omissions here at the motion to dismiss stage, and "it will likely take

months of discovery" before anyone can do so. *Buntrock*, 2004 WL 1179423 at *5. The Court

cannot say at this time that the investors were in fact not misled.

### h. The June 2012 Quarterly Report and June 2012 Analyst Call (discussing May 2012 Application and third prototype engine)

The SEC alleges that Navistar's June 2012 Quarterly Report and Ustian's statements at the June 2012 Analyst Call were materially misleading because they failed to adequately inform investors about the threat of non-certification of the third prototype engine and because they misrepresented Navistar's ability to work with the EPA to approve the May 2012 Application. Ustian attacks the SEC's allegations, arguing that he and Navistar only provided true statements. But while Ustian argues that what he said was technically true, the SEC's allegations still paint a picture of deception. Days before the quarterly report, Navistar's lead engineer believed the EPA to have rejected the May 2012 Application. Only after Ustian "put the gag order" on his team did the engineer feel otherwise. Doc. 1 ¶ 151. Navistar's Chief Certification Engineer had noted that the third prototype engine's dual-mapping was the EPA's "major concern," and the lead engineer noted that the EPA described it as a "blatant attempt to circumvent the regulations." *Id.* at 152. An EPA official told the VP-GR that he "believe[d] that [the] engine is unlikely to receive a certificate of conformity" because the engine produced test emissions that doubled the maximum allowable emissions.[13] *Id.* ¶ 154. Further, while Ustian argues that the EPA's warnings were interim and not final, a month before the June 2012 Quarterly Report and June 2012 Analyst Call, Navistar had turned its focus to extending the longevity of 13-liter engines with emissions that exceeded the 0.20 NOx Rule and selling them with Emission Credits

---

[13] Ustian presents evidence that the market knew the second prototype engine was producing two different emissions rates. *See* Doc. 27-15 at 4 ("It is our understanding that NAV's engine is under the 0.2 NOx g/hp-hr emissions limit at some points in the duty cycle, and above 0.2 at others, but that over the duty cycle, the engine is at 0.2 or better (weighted average)."). The analysts also noted that competitor SCR engines were also over 0.20 NOx at points during their use, but that the EPA had "granted exceptions as the diesel exhaust fluid (DEF) warms up or cools down, or when DEF runs out." But this suggests that analysts expected the NOx emissions fluctuation to result from engine cooling and warming during the duty cycle. It does not suggest that the analysts knew that Navistar was intentionally creating the fluctuations with dual mapping.

and NCPs.  The SEC alleges that in late May, Navistar had asked the EPA to extend NCP's because Navistar knew that it could not produce a market-ready 0.20 NOx 13-liter engine until more than a year later.  So Navistar may have spoken the technical truth when it wrote that "certain issues are under review" and that it was engaged in "ongoing discussions" with the EPA, but it was implying that the review process for the third engine prototype was going to result in a market-ready engine, which the SEC alleges was not true.  And given the context of Ustian's statements during his call with financial analysts, the SEC sufficiently alleges that Ustian's statements during the call were misleading because he implied that the engine supporting the May 2012 Application was commercially viable, would be approved in less than three months, and would be ready for production 30 days after that.  At the pleading stage, the SEC sufficiently alleges that the June 2012 Quarterly Report and Ustian's statements at the June 2012 Analyst Call materially misled investors by masking the truth, known internally at Navistar, that the EPA was virtually assured to reject the May 2012 Application.

## 2. Scienter

Ustian argues that the SEC has not adequately alleged scienter, so the § 10(b), Rule 10(b)-5, and § 17(a)(1) claims fail.  Scienter encompasses either a mental state embracing an "intent to deceive, manipulate or defraud," *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 616 (N.D. Ill. 2011), or reckless acts that are "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it," *S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (quoting *Meadows v. S.E.C.*, 119 F.3d 1219, 1226 (5th Cir. 1997)).  In SEC enforcement actions, Rule 9(b) allows mental states to be "alleged generally," yet there must still be "some basis for

believing the plaintiff could prove *scienter.*" *Steffes*, 805 F. Supp. 2d at 618 (2011) (emphasis in

original) (quoting *Mason v. Medline Indus., Inc.*, 731 F.Supp.2d 730, 740 (N.D. Ill. 2010)).  The

SEC alleges that Ustian knowingly or recklessly misled investors about the development and

production of a 13-liter engine that could meet the 0.20 NOx Rule, omitting key information that

things were not as rosy as described, supporting these allegations with its factual allegations

about Ustian's actions.  The Court finds that the SEC's allegations are sufficient to support its

allegations of Ustian's scienter.

### B.      Scheme to Defraud (Counts I and III)

The SEC alleges that Ustian is liable under subparts (a) and (c) of Rule 10b-5 and

subparts (1) and (3) of § 17(a) for engaging in a scheme to defraud.  The SEC must allege that

Ustian engaged in "acts that created a false appearance of fact in furtherance of the scheme,

including making false statements." *S.E.C. v. Coddington*, No. 13-CV-03363-CMA-KMT, 2015

WL 1401679, at *7 (D. Colo. Mar. 23, 2015) (noting allegations of using corporate documents,

false statements, and lulling statements were sufficient to allege a scheme to defraud).  "A

scheme is a plan or program of something to be done; an enterprise; a project; as, a business

scheme, or a crafty, unethical project.  The scheme, in other words, is the plan or design, not the

ultimate result. *S.E.C. v. Familant*, 910 F. Supp. 2d 83, 94 (D.D.C. 2012) (quoting *Aaron*, 446

U.S. at 696 n. 13) (internal quotation marks omitted).  The SEC cannot premise its Rule 10b-5(a)

and (c) claims and Section 17(a)(1) and (3) claims solely on Ustian's alleged misrepresentations

or omissions that form the basis of its Rule 10b-5(b) claims, but "the same set of facts may give

rise to scheme allegations 'if [the SEC] alleges that the [Ustian] undertook a deceptive scheme or

course of conduct that went beyond the misrepresentations.'" *S.E.C. v. Loomis*, 969 F. Supp. 2d

1226, 1237 (E.D. Cal. 2013) (citation omitted).  Ustian argues that the SEC has not alleged

conduct to perpetrate the scheme separate from his alleged misrepresentations, but the SEC

details an entire narrative where Ustian engaged in acts that furthered his alleged overarching

scheme, making it look like Navistar developed and would release a 13-liter 0.20 NOx engine.

By alleging that Navistar filed applications with the EPA for certificates of conformity for

engines that Navistar knew it could not sell or knew that the EPA would not certify, the SEC

alleges that Ustian's conduct went beyond the alleged misrepresentations and sufficiently alleges

scheme liability. *See id.* ("Here, the SEC has provided evidence that Loomis misrepresented the

solvency of the Naras Funds while simultaneously accepting new investors to make payments to

older investors. Because this deceptive conduct went beyond mere misrepresentations, the SEC

has established that Loomis is liable for these additional violations.").

### C. 17(a)(2) Claim (Count III) and Disgorgement Remedy (Remedy II)

Ustian also argues that the SEC's § 17(a)(2) claim fails because there is no allegation that

he obtained money or property because of an untrue statement. Section 17(a)(2) prohibits using

untrue statements to obtain money "directly or indirectly." 15 U.S.C. § 77q(a)(2). The SEC

alleges that Ustian sold Navistar stock on April 5, 2011, before Navistar's stock fell 15% on July

6, 2012 after Navistar announced that it would abandon an attempt to build an EGR engine

meeting the 0.20 NOx Rule, Doc. 1 ¶¶ 178–79. There is no rule that a defendant cannot be liable

if he obtains money in "a highly roundabout manner." *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 639

(S.D.N.Y. 2013). But there still must be money obtained by the defendant, not just lost by the

investor or gained by the defendant's employer. *See id.* at 638–40 (rejecting the SEC's theories

that defendants obtained money or property through misrepresentations that inflated their

employer's stock offerings because there was no allegation that defendants themselves benefitted

because of the stock offerings). The depth of the allegations necessary to allege obtaining money

to satisfy a § 17(a)(2) claim is up for debate. *S.E.C. v. Spinosa*, 31 F. Supp. 3d 1371, 1378–79 (S.D. Fla. 2014) (collecting cases, discussing sufficiency of allegations that defendant received compensation or benefitted employer with fraud while employed and allowing claims to proceed). The SEC does not directly allege that by April 2011 Navistar had benefitted from Ustian's alleged misrepresentations (only that its stock price corrected in July 2012), that Ustian's stock sale resulted in a windfall, or even that Ustian "receiv[ed] increased compensation based on the volume of business enlarged by the alleged fraudulent activity." *Id.* at 1379. But the Court can draw the reasonable inference, however, that when Ustian sold Navistar stock in April 2011, he believed that Navistar would be unable to produce a 13-liter 0.20 NOx engine that he had promised beginning in December 2010. At the time of Ustian's stock sale, the SEC alleges that Ustian knew that Navistar would be unable to sell the first prototype engine that was submitted to the EPA for certification. *See* Doc. 1 ¶ 51 (explaining that Ustian knew the first prototype engine was not market-competitive during its development); *id.* ¶ 58 (explaining that Ustian knew the first prototype engine was not market-competitive when it was submitted with the February 2011 Application). In January 2011, Ustian championed the engine Navistar was developing for the February 2011 Application, claiming it would be comparable to and better than competitors' SCR engines in material aspects, including fuel economy. The SEC alleges that instead of applying for certification of such an engine, Navistar's February 2011 Application sought certification of an engine that could not run outside a testing lab. And the same day Ustian sold Navistar stock, April 5, Navistar issued a press release tying the first prototype engine to other Navistar engines that had just received EPA-certification and were "being sold, or intended to be sold," *id.* ¶ 77, which the SEC alleges was materially misleading. At some point in 2011 after the stock sale, Navistar "abandoned efforts to gain approval of the [February]

2011 Application." Doc. 78. The Court has already found that these allegations support the SEC's claims that Ustian materially misled investors. Despite Ustian's natural request for more information, the Court finds that the SEC's allegations are sufficient to allege that when Ustian championed the first prototype engine and its development, he positively influenced Navistar stock, which allowed him to obtain benefits from the stock when he sold it in April 2011.

Similarly, Ustian also argues in a sentence at the bottom of a footnote that SEC cannot seek disgorgement because it fails to allege Ustian profited from his alleged wrongdoings. The Court declines to strike the SEC's disgorgement request because the SEC sufficiently pleads that Ustian wrongly profited from his alleged wrongs.

### D. Aiding and Abetting Claims (Counts II, IV, and V)

The SEC alleges that Ustian aided and abetted Navistar's own securities law violations.[14] "Aider and abettor liability requires that: (1) there is a primary violation of securities law; (2) the aider and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted in the primary violation." *S.E.C. v. Nutmeg Grp., LLC*, No. 09 C 1775, 2011 WL 5042094, at *2 (N.D. Ill. Oct. 19, 2011) (citing *Monetta Fin. Serv., Inc. v. S.E.C.*, 390 F.3d 952, 956 (7th Cir. 2004), and 15 U.S.C. § 78t(e)); *Benger*, 931 F. Supp. 2d 908, 910 (N.D. Ill. 2013). Ustian argues that the SEC does not allege that Navistar violated any security law.[15] The SEC alleges that Navistar often engaged in the same alleged reckless or knowing misconduct that the Court has found states a

---

[14] The SEC has not filed suit against Navistar. The same day the SEC filed suit against Ustian, it announced charges against and a settlement with Navistar for securities violations. *See* Press Release, "SEC: Navistar International and Former CEO Misled Investors About Advanced Technology Engine," (Mar. 31, 2016), *available at* https://www.sec.gov/news/pressrelease/2016-62.html.

[15] Ustian asks the Court to strike fraud-related allegations in the complaint that do not form the basis of a securities law violation against him. The Court will not strike the allegations because they do relate to and support the SEC's allegations that Ustian violated the securities laws.

claim for a violation for the securities laws against Ustian.  *See, e.g.*, Doc. 1 ¶ 52 ("Navistar and Ustian knew, but did not disclose . . . Navistar could not produce and sell that 13-leter engine[.]"); *id.* ¶ 67 ("Analysts and investors were misled by Navistar's submissions of the 2011 Application[.]"); *id.* ¶ 159 ("Navistar and Ustian knew that any additional changes to the engine to address the EPA's concerns would result in [unacceptable results].  Navistar's statements in the June 2012 Quarterly Report conflicted with what the EPA had told Navistar[.]").

Ustian also argues that the SEC fails to state a claim for aiding and abetting a securities violator because the SEC has not alleged that Ustian knew that he was substantially assisting Navistar's unlawful conduct, or was recklessness enough to do so.  But when analyzing the SEC's allegations, the Court finds that the complaint plausibly describes conduct demonstrating that Ustian was aware that he was substantially assisting Navistar to violate the securities laws.  The Court finds that the SEC sufficiently states a claim and has placed Ustian on notice that he aided and abetted Navistar's unlawful conduct.

The Court notes, however, that while Ustian challenged Count V, which claims that Ustian aided and abetted Navistar's violation of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 by allowing Navistar to file factually accurate annual and quarterly reports, the SEC did not mention Count V in its response.  *Compare* Doc. 27 at 30 (Ustian's memorandum in support of his motion to dismiss, attacking Counts II, IV, and V), *with* Doc. 44 at 30 (the SEC's response to Ustian's motion, referring only to "Counts II, IV").  Therefore, the Court finds that the SEC has waived its right to pursue this claim, which was challenged by Ustian as lacking sufficient allegations of an underlying violation.  *Jones*, 2012 WL 4361500, at *7 (holding that failure to respond to argument against claim at the motion to dismiss stage was waiver and an effective dismissal of the waived claim).

48

Therefore, Ustian sufficiently states a claim for aiding and abetting in Counts II and IV, but the Court dismisses Count V due to the SEC's waiver.

### E.    Rule 13a-14 (Count VI)

The SEC alleges that Ustian wrongly signed and certified Navistar's quarterly 10-Q and annual 10-K filings that the SEC claims contained materially false information. Ustian challenges whether the SEC can bring a standalone claim that, by signing and certifying the quarterly and annual report, he violated Rule 13a-14. Another court in this District has held that "a false Sarbanes–Oxley certification does not state an independent violation of the securities law." *S.E.C. v. Black*, No. 04 C 7377, 2008 WL 4394891, at *17 (N.D. Ill. Sept. 24, 2008) (dismissing Rule 13a-14 claim for failure to state a claim). Subsequently, courts outside of this District have distinguished *Black*, noting that it stated the law regarding private securities litigation. *See, e.g.*, *S.E.C. v. Brown*, 740 F. Supp. 2d 148, 165 (D.D.C. 2010). In *Brown*, the court pointed out that in SEC enforcement actions, § 21(d)(1) of the Exchange Act gives the SEC authority to use a federal lawsuit to "'to enjoin' any 'acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder.'" *Id.* (quoting 15 U.S.C. § 78u(d)(1)). The Court breaks with the other case from this District and follows the modern trend of following the specific statutory authority allowing the SEC to enforce violations of Rule 13a-14. *See id.*; *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 86 (D.D.C. 2014) (allowing 13a-14 enforcement claim to proceed past motion to dismiss); *S.E.C. v. Retail Pro, Inc.*, No. 08CV1620-WQH-RBB, 2011 WL 2532501, at *7 n.4 (S.D. Cal. June 23, 2011) (collecting case, and noting that "[§ 21(d)(1)] enables the SEC to bring a claim to enforce Rule 13a–14"). The Court thus denies Ustian's motion to dismiss Count VI.

## F. Control Person Liability (Count VII)

For the same reasons that the Court will not dismiss the Rule 13a-14 claim or the aiding and abetting claims in Counts II and IV, Ustian's arguments that the SEC cannot pursue a "control person" claim (Count VII) under Section 20(a) fail. "In order to state a Section 20(a) claim, the SEC must allege: (1) a primary securities violation; (2) that [Ustian] exercised general control over the operations of [Navistar]; and (3) that [Ustian] possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Buntrock*, 2004 WL 1179423, at *9 (citation omitted) (internal quotation marks omitted). Although the SEC did not charge Navistar, the SEC sufficiently alleges that Navistar violated the securities laws and that Ustian, its CEO at the time of those violations, was the motivating party for the violations. *See, e.g.*, Doc. 1 ¶¶ 16, 122, 204.

## G. Shotgun Pleading

Finally, Ustian challenges the sufficiency of the entire complaint because of its format, arguing that the SEC engages in "shotgun pleading." Shotgun pleading is an impermissible tactic in which a plaintiff spews facts into a complaint but fails to connect the factual allegations to each of the claims, often using hundreds of fact paragraphs and "incorporat[ing] every antecedent allegation by reference into each subsequent claim for relief." *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1354 (S.D. Fla. 2013) (quoting *Wagner v. First Horizon Pharma. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006)). Although the SEC's claims are all based on the same 180 fact-paragraphs alleging Ustian's actions, as demonstrated above, the complaint does not prevent the Court from reviewing the sufficiency of each count. "There was no need to repeat [the] paragraphs under each count heading in order to include these allegations in each count." *S.E.C. v. Black*, Case No. 04 C 7377, Doc. 61 at 9 (N.D. Ill. June 17, 2005). Therefore,

the Court will not dismiss the complaint simply for its format.  *See id.* at 9–10 ("No count of the

Amended Complaint will be dismissed based on its incorporating factual allegations placed

under different headings of the Amended Complaint."); *City of Miami*, 988 F. Supp. 2d at 1355

(declining to dismiss complaint containing 115 factual paragraphs supporting claims against two

defendants because there was "no difficulty in reviewing the sufficiency of each count of the

SEC's Complaint").

## CONCLUSION

For the above stated reasons, the Court grants in part Ustian's motion to consider

documents [28] and the Court grants in part and denies in part Ustian's motion to dismiss [26],

dismissing Count V with prejudice.  Ustian shall answer the complaint by February 24, 2017.


Dated: January 24, 2017

                                        _____
                                        SARA L. ELLIS
                                        United States District Judge