**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) | |
|  Plaintiff, | ) ) | Case No. 1:16-cv-03885 |
|  **v.** | ) ) ) | Judge Sara L. Ellis |
|  **DANIEL C. USTIAN,** | ) ) ) | Magistrate Judge Sidney I. Schenkier |
|  Defendant**.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**DANIEL C. USTIAN'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................. 1

II. LEGAL STANDARDS ..................................................................................... 6

    A. The SEC's Burden to Survive Summary Judgment .................................... 6
    B. The SEC's Burden to Prove Fraud, Materiality, and State of Mind ............ 7
    C. The SEC's Burden to Prove Scheme Liability .......................................... 10
    D. The SEC's Burden to Prove a Causal Connection Between Receipt of Money or Property and Fraudulent Conduct ............................................ 11
    E. The SEC's Burden to Establish Control Person Liability ......................... 12

III. STATEMENT OF UNDISPUTED FACTS ...................................................... 12

    A. Dan Ustian and Navistar ......................................................................... 12
    B. The 0.2g NOx Standard and the EPA Certification Process. .................... 13
    C. The Interplay Between EGR Technology and SCR Technology ............... 15
    D. Navistar's Certification Applications ....................................................... 19

IV. ARGUMENT ................................................................................................. 26

    A. The Alleged Omissions Were Not Misleading, Not Material, and Not Made With the Required State of Mind (Counts I-VII) ............................ 27

        1. Ustian's Statements Related to the February 2011 Application Do Not Support Liability ......................................................................... 27

            a. The Statements Were True and Not Misleading ............................... 27
            b. The Alleged Omissions Were Not Material .................................... 30
            c. Ustian Did Not Act With the Requisite State of Mind .................... 31

        2. Ustian's Statements Related to the January 2012 Application Do Not Support Liability ......................................................................... 33

            a. The Statements Were Not Misleading ............................................. 33
            b. The Alleged Omissions Were Not Material .................................... 37
            c. Ustian Did Not Act With the Requisite State of Mind .................... 39

        3. Ustian's Statements Related to the May 2012 Application Statements Do Not Support Liability ....................................................... 40

            a. The Statements Were True and Not Misleading ............................... 41
            b. The Alleged Omissions Were Not Material .................................... 43
            c. Ustian Did Not Act With the Requisite State of Mind .................... 44

    B. The Evidence Is Insufficient to Create a Genuine Issue of Material Fact as to the SEC's Scheme Liability Claims (Counts I - IV) ..................... 46
    C. The Section 17(a)(2) Claim Fails Because No Evidence Links Any Statement to the Acquisition of Money or Property (Counts III and IV) ...................... 47
    D. The Aiding And Abetting & Control Person Claims Fail Because Ustian Was Not Aware Of Any Improper Or Illegal Conduct and Acted in Good Faith (Counts II, IV, and VII) ....................................................... 49

V. CONCLUSION ............................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC*, 446 U.S. 680 (1980) ............................................................. 10

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................... 8, 31, 38

*Bonhomme Inv. Partners, LLC v. Hayes*, 2015 WL 6702257 (E.D. Mo. Nov. 2, 2015) ............... 6

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) ................................. 7

*Donohoe v. Consol. Operating & Prod. Corp.*, 833 F. Supp. 719 (N.D. Ill. 1993) ............... 33, 50

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ......................................... 10

*Flannery & James D. Hopkins*, SEC Release No. 3981, 2014 WL 7145625 (Dec. 15, 2014) ..... 11

*Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015) ........................................... 11, 12

*Greenhouse v. MCG Capital Grp.*, 392 F.3d 650 (4th Cir. 2004) ................................. 7

*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y.) ....................... 8

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873 (7th Cir. 1992)......................... 12

*In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991)................................. 37

*In re Plavix Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 2017 WL 3531684 (D.N.J. Aug. 17, 2017) ........................................ 31

*Insolia v. Philip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000)..................................... 6

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)................................................ 11, 47

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ................................... 26

*Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013)...................................... 6, 7, 47

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) ........................................... 34, 35

*Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841 (N.D. Ill. 2017) ......................... 9

*Sailors v. Northern States Power Co.*, 4 F.3d 610 (8th Cir. 1993)................... 8, 30, 38

*Sanchez v. IXYS Corp.*, 2018 WL 4787070 (N.D. Cal. Oct. 2, 2018) ................... 8, 37

*Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989)................................. 9

*SEC v. Bauer*, 723 F.3d 758 (7th Cir. 2013)........................................ 4, 8, 9

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ............................................................ 8

*SEC v. Familant*, 910 F. Supp. 2d 83 (D.D.C. 2012) ........................................... 11, 46

*SEC v. Ferrone*, 2014 WL 5152367 (N.D. Ill. Oct. 10, 2014) ............................... 8, 9, 10

*SEC v. Forman*, WL 2367372 (D. Mass. June 9, 2010) ............................................ 48

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ............................................ 11, 47

*SEC v. Loomis*, 969 F. Supp. 2d 1226 (E.D. Cal. 2013) .......................................... 11

*SEC v. Lyttle*, 538 F.3d 601 (7th Cir. 2008) ........................................................ 6

*SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ............... 11, 47

*SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011) ............................... 10, 32, 40, 46

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D. Colo. 2014) ......................................... 46

*SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013) ........................................... 11

*SEC v. Ustian*, 229 F. Supp. 3d 739 (N.D. Ill. 2017) ..................................... passim

*SEC v. Webb*, No. 11 C 7152, 2019 WL 1454532 (N.D. Ill. Apr. 2, 2019) ............... 6, 10

*Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033 (7th Cir. 1977) ..................... 9

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) .............................................. 34, 35

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ..................................... 8

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) ......................... 7

## STATUTES

15 U.S.C. § 77q(a) ............................................................................... 12

40 CFR § 1065.10(c)(1) ......................................................................... 42

40 CFR § 86.1803-01 ............................................................................ 18

## OTHER AUTHORITIES

EPA Advisory Circular AR 24-3 ................................................................ 15

## I.    INTRODUCTION

From 2010 to 2012, Navistar International Corp. and its former CEO, Daniel Ustian, made eleven public statements concerning applications for EPA certification of three different engines the SEC contends were misleading.  Contrary to the impression created by the Amended Complaint, Ustian's statements were neither rosy nor optimistic.  They were measured.  They were true.  And they tracked the facts reported to him by the Senior Engineering Group he relied upon.  UF 5.  Also contrary to the impression created by the Amended Complaint, all of the material risks the SEC alleges were omitted actually were disclosed.  These facts are undisputed, as the Joint Statement of Undisputed Material Facts demonstrates.

On August 7, 2019, the Court queried why summary judgment would be appropriate when (i) "there will be an issue about what was publicly available," (ii) the public information might not "get rid of everything," and (iii) there "seems to be a factual issue around intent" because some engineers were "gung ho" and "other people at Navistar ... were saying" that certification never was going to happen.  Aug. 7, 2019 Hr'g Tr. (Dkt. 249) at 1:15; 4:14-5:3.  This is why summary judgment should be granted.

First, the SEC must prove the challenged statements were false or misleading [*see infra* Part II.A.-B.], and Plaintiff cannot carry this burden.  That means summary judgment regardless of any question about what was public and regardless of Ustian's intent.  It is easy to buy into the SEC's misconception that this case is about whether EPA would certify the engines – no application was approved and none was denied [UF 39] – but this case is only about the accuracy of Ustian's statements and what he knew.  And Ustian never said the applications were approved, nor did he promise success.

What Ustian did say was that applications had been "submitted."  *See* UF 71, 93, 184, 234.  The SEC's allegations of a "fraudulent scheme" and "cover up" (Am. Compl. (Dkt. 67)

1

¶¶ 8, 12, 44) either ignore what Ustian actually said or rest on calculated conjecture that the applications were so patently deficient a reasonable juror could find that it was misleading for Ustian to say little more than that they had been filed and discussions with EPA were ongoing. There is no jury question or genuine issue of material fact. The Senior Engineering Group uniformly concluded the applications met EPA requirements. UF 38, 39, 86, 141, 217, 219. And if the applications were so far beyond the pale that they could not be called "applications" without misleading investors, then EPA would have rejected them out of hand. UF 10. EPA did the opposite. It engaged in iterative information exchanges and meetings [UF 10, 70, 108, 111, 114, 136, 147, 154, 156, 201, 204, 229] and sent letters outlining a "preliminary view," inviting "supplemental information," and proposing to "schedule a meeting to discuss this matter." *See, e.g.*, UF 147. This continued even **after** the final alleged misstatement. UF 244.

The myth of "sham" applications was born of misrepresentations in the Amended Complaint concerning a dual mapping strategy that Navistar affirmatively disclosed to EPA. UF , 142, 143, 202(b) (citing Tab 203). "Dual mapping" refers to the common practice of using electronic controls to calibrate an engine using different maps in different conditions. UF 48. Navistar's map-switching increased emissions but was functionally no different than the competitors' technology (SCR), which frequently stopped dosing the diesel emissions fluid ("DEF") necessary for SCR to function. UF 25, 51. Indeed, Navistar's Map B emissions were **lower** than SCR's no-dose emissions. UF 51, 52. Because EPA routinely certified SCR engines [UF 13–15, 26], and because EPA regulations are technology-neutral and apply the same requirements regardless of which technology a manufacturer chooses [UF 32], Navistar's dual

mapping strategy was authorized by EPA.[1]  The Senior Engineering Group all reached that conclusion.  UF 38.  Ustian's statements were true and not misleading.

Second, the SEC also must prove that alleged omissions made Ustian's statements **materially** false or misleading [*see infra* Part II.B.], and Plaintiff cannot carry this burden either. The risk the SEC claims was omitted – namely, the "serious issues" encountered developing and certifying an engine that complied with EPA standards using solely exhaust gas recirculation ("EGR") (Am. Compl. ⁋ 44) – was repeatedly disclosed in ways that clearly were "publicly available."[2]  Every quarter, Navistar International Corp. (with its subsidiaries, "Navistar") disclosed in SEC filings that its technology to meet emissions standards "may not be successful," that Navistar may "no longer be able to sell trucks" in some states, and that it had withdrawn an application in response to "concerns raised by the EPA."  UF 47, Decl. Ex. C at 14–15.

"Serious issues" were also added to the total mix of information by the mainstream and trade press.  *See, e.g.*, UF 6, Decl. Ex. A at 8 (*Truckinginfo* article, "In today's rule, EPA says: 'We believe it is a reasonable possibility that [Navistar] may not be able to comply for technological reasons with respect to the 2010 NOx standards for heavy heavy-duty diesel engines in the 2012 and 2013 model years.'"), 9 (*Dow Jones News Service* article, "Navistar has struggled more than other truck makers to meet the EPA's 2010 nitrogen-oxide standard.").

---

[1]  From the Amended Complaint, the Court previously understood that EPA approved higher emissions from SCR engines only "during engine cooling and warming" as opposed to "intentionally creating the fluctuations with dual mapping."  Jan. 24, 2017 Order (Dkt. #63), at 42 n.13.  That understanding is incorrect.  The exhaust from SCR engines frequently is not hot enough for SCR to work.  UF 25.  SCR engines had higher emissions than Navistar's Map B in a variety of conditions that continued indefinitely.  UF 25, 51.  And the high emissions intentionally were **programmed** by SCR manufacturers.  UF 25.

[2]  Ustian's counsel presumes that the issue "about what was publicly available" refers to the letter from EPA that Navistar filed on the docket of the D.C. Circuit on March 1, 2012.  At the August 7, 2019 hearing, however, the Court found it was undisputed that the letter "was public."  UF 168.  And the letter disclosed "that EPA has **substantial concerns** regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level based on the information currently available to EPA," and also that "EPA's initial view is that there are **several significant problems** with Navistar's application ..."  UF 165.

"Serious issues" also were noted in reports by analysts who covered Navistar.  UF 186

(Barrington Research report, Navistar's "maverick engine strategy, prior legal suits against the

EPA and technical problems related to engine calibrations, could result in continued delays and

near terms market share declines"); *id.* (J.P. Morgan report that Navistar's "issues" getting

certified "may be more than EPA ... dragging its feet"); *id.* (RBC Capital Markets report that

there are "questions marks" surrounding Navistar's January 2012 Application).

Because the risk of "serious issues" and "challenges" was known to the market, it was

part of the "total mix of information."  Therefore, the public disclosures really do "get rid of

everything."  Ustian's economics expert, Professor Paul Gompers, concluded from his "analysis

of contemporaneous, publicly-available materials" that at the time of every alleged misstatement,

the "allegedly omitted information was available to investors prior to Ustian's alleged omissions.

Because this information was publicly-available prior to the alleged omissions, it was already

incorporated into Navistar's stock price."  [UF 170][3]  That means the alleged omissions were not

material, and summary judgment is appropriate on this basis alone.  *See SEC v. Bauer*, 723 F.3d

758, 773 (7th Cir. 2013); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577

(S.D.N.Y. 2013) ("Because the substance of the alleged omissions was already in the public

domain, the alleged omissions could not have altered 'the total mix of information available' to

the public and were also immaterial as a matter of law.") (citation omitted).

Third, there is no jury question regarding Ustian's intent, even though the Court noted the

SEC claims that some Navistar engineers were "gung ho" and "other people at Navistar … were

---

[3] There is no battle of the experts for the jurors to weigh here because the SEC's proffered expert, Mr.
Mayer, did not evaluate whether the information allegedly omitted from the eleven statements was
already "out there" publicly at the time of the alleged misstatements [UF 170], and thus he did not rebut
Professor Gompers' findings or conclusions with respect to information that was publicly available.

saying" that certification was not going to happen. As the Court observed regarding intent, "what was going on in the mind of Mr. Ustian is the primary issue, and really the only way to ... get to that is what information did he know during the relevant time period and from whom." Aug. 7, 2019 Hr'g Tr. (Dkt. 249) at 6:17–20. It is undisputed "from whom" Ustian was getting information – the Senior Engineering Group. UF 5. And it also is undisputed what Ustian knew from the Group. They repeatedly told him all three applications should be approved. UF 43, 86, 92, 217. Critically, Navistar's engineers made their judgments based on the regulations as applied to the applications, not based on emails or snippets of testimony after the fact. As a result, Ustian believed that EPA should approve the applications Navistar submitted [UF 38], believed that Navistar's engineers would address any EPA concerns [UF 116], and believed that Navistar's engineers complied with EPA and California standards [UF 125].

The "other people at Navistar" who were saying certification was not going to happen were not "people" but one person, Dave Piech. The SEC's naysayer paragraphs in the Joint Statement are littered with cherries picked from two days of Piech's investigative testimony (neither Ustian nor Navistar was present) and a third day of deposition testimony. But Piech is not a person whose opinion matters. Piech stopped working on the applications before the first alleged misstatement. UF 90. Tom Kramer, not Piech, was responsible. *Id*. Piech agrees Kramer was qualified to lead the certification effort. *Id*. And with a single exception, Piech did not participate in the meetings with EPA concerning the applications. *Id*. The opinion testimony of an undeclared "expert" who did not prepare the certification applications or participate in EPA meetings about the applications simply does not create a genuine issue of fact.

Further, there is no evidence that Piech **told** Ustian his opinions regarding certification. Piech testified to only one fact that does speak to Ustian's intent. He met personally with Ustian

5

in 2012 and concluded that Ustian "*believed wholeheartedly that the EPA was going to certify the engine*." UF 219(n) (citing Tab 36 at 300:20–302:12). Summary judgment is appropriate where, as here, there is a complete "failure of proof concerning scienter." *Bonhomme Inv. Partners, LLC v. Hayes*, 2015 WL 6702257, at *5 (E.D. Mo. Nov. 2, 2015); *SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) ("Even when a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment.").

For these three independent reasons, none of the alleged misstatements supports any of the alleged claims. But there is more. There is no evidence of an inherently deceptive act beyond the alleged misstatements, and for this **additional** reason there is no scheme liability under Rule 10b-5(a) or Section 17(a)(1) (Counts I–IV). Also, Ustian did not receive any money by means of any fraudulent or misleading statement, and for this **additional** reason there is no liability under § 17(a)(2) (Count III). **Also**, Ustian's good faith negates the aiding-and-abetting and control person claims (Counts II, IV, VI). The Court should enter summary judgment in Ustian's favor.

## II.    LEGAL STANDARDS

### A.    The SEC's Burden to Survive Summary Judgment

Because Ustian does not bear the burden of persuasion, he "may move for summary judgment by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (citation omitted). In response, the non-moving party (the SEC) "cannot rest on mere pleadings alone but must use the evidentiary tools listed [in Rule 56] to identify specific material facts that demonstrate a genuine issue for trial." *SEC v. Webb*, No. 11 C 7152, 2019 WL 1454532, at *2 (N.D. Ill. Apr. 2, 2019) (Ellis, J.); *see also Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Where (as here) the moving party does not bear the burden of

persuasion, Rule 56 "does not require the moving party to support its motion" with evidence that negates the opponent's claim. *Modrowski*, at 1168. If "the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (emphasis in original).

### B.     The SEC's Burden to Prove Fraud, Materiality, and State of Mind

To prove securities fraud, the SEC must point to evidence that Ustian "(1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *SEC v. Ustian*, 229 F. Supp. 3d 739, 764 (N.D. Ill. 2017) (quotations omitted). If one of those elements lacks evidentiary support with respect to any statement, that statement is not a violation of the securities laws. "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Each of the live counts of the Amended Complaint (the Court dismissed Count V) requires the SEC to prove that Ustian made an untrue statement of material fact or omitted to state a material fact necessary to make a statement not misleading.[4] This standard applies to subparts IV.A.1.a, IV.A.2.a, and IV.A.3.a.

The SEC must also demonstrate that the allegedly omitted information was material. *See Greenhouse v. MCG Capital Grp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("even lies are not actionable unless the lie is something that alters the total mix of information available to a reasonable investor") (internal quotation marks and citation omitted). An omission is material

---

[4] Count VI alleges that Ustian falsely certified NIC's Form 10-K for 2011 and Form 10-Q for "its 2012 fiscal quarters." The SEC must show these specific filings contained material misstatements.

7

when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). "Defendants cannot be held liable for failing to disclose ... publicly available information." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 576 (citation omitted); *see also Sailors v. N. States Power Co.*, 4 F.3d 610, 612 (8th Cir. 1993) (omission not material where "[m]uch of what the plaintiff argues was hidden from public view is actually part of the regulatory process and upon reasonable inquiry was available to the public"); *Sanchez v. IXYS Corp.*, 2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018) ("Publicly available information cannot be a material omission under federal securities laws."); *SEC v. Ferrone*, 2014 WL 5152367, at *6 (N.D. Ill. Oct. 10, 2014) ("[I]t is impossible to determine the extent to which nonpublic information may alter the 'total mix' without first examining the information that was already in the market.") (quoting *Bauer*, 723 F.3d at 773).

The importance of a fact to any particular investor, even a "reasonable" investor, does not establish materiality. "[D]efining a 'material fact' as any 'fact which a reasonable shareholder might consider important' – would lead corporations to 'bury the shareholders in an avalanche of trivial information ....'" *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 396 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976)); *see also SEC v. DiBella*, 587 F.3d 553, 565 (2d Cir. 2009) ("It is not sufficient to allege that the investor might have considered the misrepresentation or omission important.").[5] The materiality standard described here applies to Counts I-IV, VI, and VII. *See* subparts IV.A.1.b, IV.A.2.b, and IV.A.3.b.

---

[5] Respectfully, a portion of the Court's prior order cited an incorrect standard for materiality in deciding Ustian's motion to dismiss. The Court stated that a fact "is material if there is a substantial likelihood that

In addition, each of the SEC's theories of liability also requires the SEC to prove a state of mind other than good faith. Though not necessary to decide this motion in Ustian's favor, if Ustian acted reasonably and in good faith, the SEC cannot establish the required state of mind element for *any* of its claims. First, the SEC must establish that Ustian acted with scienter in connection with its Section 10(b) (Count I) and Section 17(a)(1) (Count III) allegations. Scienter requires evidence of an "intent to deceive, manipulate, or defraud .... as well as reckless disregard of the truth." *Bauer*, 723 F.3d at 775. "[R]eckless conduct is 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 854–55 (N.D. Ill. 2017) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

The proof required to establish recklessness "is quite high in the Seventh Circuit. Recklessness 'should be viewed as the functional equivalent of intent' because it requires 'something more egregious than even white heart/empty head good faith.'" *Ferrone,* 163 F. Supp. 3d at 569 (quoting *Sundstrand*, 553 F.2d at 1045.). The SEC cannot prove scienter with evidence that the defendant knew "of the undisclosed facts; rather, it is the 'danger of misleading buyers [that] ***must be actually known or so obvious that any reasonable man would be legally bound as knowing***.'" *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) (quoting *Sundstrand*, 553 F.3d at 1045) (alteration original; emphasis added here and to all others by

---

a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security *or* (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Ustian*, 229 F. Supp. 3d at 765. This disjunctive is contrary to the law because importance alone is insufficient to establish materiality.

bolding and italicizing).  Reliance on others to ensure the accuracy of public disclosures " – even if inexcusably negligent – is not severely reckless conduct that is the functional equivalent of intentional securities fraud."  *SEC v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011).  Actions taken in good faith do not violate Section 10(b).  *Ferrone*, 163 F. Supp. 3d at 569 ("There is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith." (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976))).

Second, the SEC's Section 17(a)(2) and (3) claims (Count III) require a finding that Ustian acted negligently.  *SEC v. Webb*, 2019 WL 1454532, at *3 (N.D. Ill. Apr. 2, 2019) (Ellis, J.) (citing *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980)).  To survive summary judgment, the SEC must establish the standard of care for a reasonable person in Ustian's position and that Ustian breached that standard.  "Absent this basic framework" the finder of fact "would be left to speculate as to whether a duty existed on the part of [Ustian], and, if it did, whether he failed to perform that duty."  *See Shanahan*, 646 F.3d at 546 (affirming grant of judgment as a matter of law on 17(a)(2) and (3) claims because SEC did not present evidence of standard of care).  Here, the record contains no evidence of the applicable standard of care that a jury could apply.  The Court should grant summary judgment in Ustian's favor on the Section 17(a)(2) and (3) claims.

Third, Counts II and IV of the Amended Complaint allege that Mr. Ustian aided and abetted Navistar's primary violations of Section 10(b), Rule 10b–5, and Section 17(a), which require the SEC to establish that Ustian "was generally aware that his actions were part of an overall course of conduct that was improper or illegal."  *Ustian*, 229 F. Supp. 3d at 776.  The state of mind standards discussed here apply to subparts IV.A.1.c, IV.A.2.c, and IV.A.3.c below.

### C.    The SEC's Burden to Prove Scheme Liability

To survive summary judgment on "scheme liability" under Rule 10b–5 (a) and (c) and Section 17(a)(1) (Counts I-IV), the SEC must provide evidence that Ustian engaged in a "a plan

or program of something to be done; an enterprise; a project; as, a business scheme, or a crafty, unethical project." *Ustian*, 229 F. Supp. 3d at 774 (quoting *SEC v. Familant*, 910 F. Supp. 2d 83, 94 (D.D.C. 2012)); *see also SEC v. Loomis*, 969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) (requiring evidence of a scheme "***beyond*** the misrepresentations"); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (scheme liability "hinges on the performance of an inherently deceptive act that is ***distinct from an alleged misstatement***"). This remains true after *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), which the SEC has cited to Ustian as support for its scheme liability claim. *See SEC v. SeeThruEquity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (applying *Lorenzo* to find complaint pleaded 10b–5 violation because SEC alleged "that the defendants' entire business model, ***beyond any misstatements or omissions***, is deceptive"). The scheme liability standard discussed here applies to subpart IV.B. below.

### D. The SEC's Burden to Prove a Causal Connection Between Receipt of Money or Property and Fraudulent Conduct

Section 17(a)(2) of the Securities Act requires the SEC to establish that Ustian "directly or indirectly ... obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ... not misleading." 15 U.S.C. § 77q(a). The SEC must show "a causal link between the misrepresentation and the acquisition of money." *Flannery*, Release No. 3981, 2014 WL 7145625, at *25 (Dec. 15, 2014), *vacated on other grounds*, *Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015); *see also SEC v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013) ("the plain text of the [17(a)(2)] statute ... requires the defendant to have obtained money 'by means of' a material misrepresentation [which] seems to require a closer causal relationship."). In order to establish this causal relationship, the SEC must show "more than a mere temporal connection between a

misrepresentation and the acquisition of money or property." *Flannery*, 2014 WL 7145625, at *34. The standard discussed here applies to subpart IV.C. below.

### E. The SEC's Burden to Establish Control Person Liability

To establish liability under Section 20(a), the SEC must come forward with evidence establishing: (1) a primary violation of the securities laws; (2) the exercising of general control over the operations of the company; and (3) possession of "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Even on such a showing, Ustian can prevail by showing that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Harrison*, 974 F.2d at 881 (quoting 15 U.S.C. § 78t). This standard applies to subpart IV.D.

## III. STATEMENT OF UNDISPUTED FACTS

In 2011, Navistar submitted an application for certification as a demonstration of the ability of its control technology to achieve 0.2g NOx and made clear the engine was not intended for customers. UF 79. In 2012, Navistar submitted two more 0.2g NOx applications [UF 142, 202], and for six months Navistar engineers engaged in a dialogue with EPA engineers concerning those applications. UF 147, 148, 154, 244. EPA never denied the applications. UF 39. The dialogue continued until a June 12, 2012, D.C. Circuit ruling in a lawsuit brought by Navistar's competitors called into question EPA's plan to allow the continued sale of Navistar engines (and therefore trucks) during the pendency of the iterative certification process. UF 243.

### A. Dan Ustian and Navistar

Ustian was the CEO and Chairman of the Board of Navistar [UF 1], a manufacturer of trucks, buses, and military vehicles, as well as the diesel engines that power these vehicles. UF 2. The lead outside director during Ustian's tenure testified that he was an "outstanding"

leader, adhered to high ethical standards, and was motivated to make "Navistar a viable, successful company." UF 4. The "last thing in [Ustian's] head" was his own compensation. *Id.*

Ustian's degree is in commerce; he has no training as either an engineer or lawyer. UF 1. Ustian relied on a team of Navistar engineers and certification experts to provide him with information (i) about the status of development of an engine and (ii) about whether that engine met the EPA certification requirements. UF 5. That team included engine engineering experts (Ostarello, Bedi, Kapur, Younessi, Zukouski), product development experts (Younessi, Ostarello), and government/regulatory experts (Charbonneau, Kramer) (collectively, the "Senior Engineering Group"). *Id.* The Senior Engineering Group updated Ustian on the status of Navistar's programs to develop an engine at 0.2g of NOx and information on the status of the iterative process to certify that engine with EPA. *See, e.g.*, UF 41.

### B. The 0.2g NOx Standard and the EPA Certification Process.

Before introducing a diesel engine into commerce, manufacturers seek a "certificate of conformity" from EPA. UF 10. Navistar was required to get EPA certification on an annual basis for its engines because each certificate of conformity lasts one model year. UF 9. Among other things, EPA regulates NOx emissions. UF 8. The EPA engine certification process is a collaborative, iterative dialogue between EPA engineers and engineers employed by engine makers. UF 10. For the applications at issue, there was extensive dialogue. UF 70, 108, 111, 114, 136, 147, 154, 156, 201, 204, 229. EPA could have, but never did, stop the dialogue by rejecting any of the certification applications out of hand. UF 10, 39.

To prove compliance with the 0.2g NOx standard, EPA required engines to demonstrate 0.2g on a dynamometer in lab tests referred to as FTP and SET. UF 11. EPA regulations also required the applicant to attest that its engines will meet the applicable not-to-exceed ("NTE") limits in the event EPA chooses to run "a confirmatory test." 40 CFR § 86.007-21(p)(1); UF 15,

15(c) (citing Tab 11 at 50:9-50:10). A manufacturer has discretion to use whatever due diligence it feels appropriate to make that attestation, including using vehicle in-use emission data. UF 15. The FTP and SET tests differ from NTE in four important respects. First, the former are pre-certification "in lab" tests, while the latter is a post-certification "in use" test "during engine and vehicle operation." 40 CFR § 86.007-11(a)(4)(i)(A); *see also* UF 11, 16. Second, for purposes of meeting the NTE during the certification process, an attestation of compliance is enough. EPA Advisory Circular AR 24-3, "Questions and Answers Regarding Application of the NTE to Engine Certification" (March 24, 2003) (the NTE rule does not require manufacturers to "obtain or submit different or additional certification test data … beyond the manufacturer's statement of compliance with the NTE"); UF 15. Third, the NTE actual test requirement for the 0.2g NOx limit, counterintuitively, is **not** 0.2g, nor is it 0.3g. Rather, the pass/fail NTE threshold says the engine submitted should "not exceed 1.5 times the applicable" NOx limit of 0.2g **plus**, an "in-use" margin of at least "0.10g", and an additional "accuracy margin" of "0.15" NOx." 40 CFR § 86.007-11(a)94(i)(A); *id.* § 86.1912(a)95(iii); UF 16. Fourth, if an applicant cannot attest that its engine will meet NTE in use, EPA can **still** certify the engine because EPA's regulations authorized EPA to "allow up to three deficiencies per engine family. In determining whether to allow the additional deficiencies, the Administrator may consider any relevant factors." UF 18; 40 CFR. § 86.007-11(a).

The 0.2g NOx standard became effective in 2010, but EPA rules allowed a manufacturer to certify an engine family that exceeded 0.2g at the tailpipe by using "credits" earned with engines that beat the prevailing emission standards in earlier years. UF 9. EPA also had statutory power to allow manufacturers who did not meet 0.2g NOx at the tailpipe and did not

have credits to pay nonconformance penalties ("NCPs") and continue to sell engines.  UF 161.

EPA established NCPs on Navistar's behalf with public rulemaking in January 2012.  *Id.*

Navistar used emissions credits to comply with the 0.2g standard and also took advantage

of NCPs when its credits ran low.  UF 162.  Navistar disclosed that it intended to certify engines

with credits for years.  UF 47, Decl. Ex. C at 2, 6–16.  For example, in December 2010, Navistar

disclosed in its SEC Form 10-K that its "engines were certified to be compliant with 2010

emissions standards through the use of credits" and, in December 2011, disclosed that it expected

"to use [its] remaining emissions credits some time in 2012."  *Id.* at 2,7.

### C.     The Interplay Between EGR Technology and SCR Technology

Navistar's engine-control-technology strategy to meet 0.2g NOx was called exhaust gas

recirculation, or "EGR."  UF 23.  EGR controls NOx during combustion in the engine's

cylinders.  *Id.*  Ustian believed EGR-only technology was better for the environment and

customers.  UF 24.  Controlling NOx using only EGR technology had advantages because an

EGR-only engine is lighter than an SCR engine with after-treatment, allowing the customer to

haul more freight.  *Id.*  The SCR technology Navistar's competitors used also shifted

responsibility for emissions compliance from manufacturer to customers because SCR requires

drivers to refill a tank with DEF to keep the SCR system functioning.  *Id.*

Most importantly, Ustian believed that the in-cylinder control developed by Navistar was

better for the environment because SCR simply did not work to control NOx in the real world.

UF 24, 25.  For example, SCR did not control NOx emissions at all when the catalyst was not

activated during extended idle, at low-speed, and when the DEF did not dose because the tank

was empty, contained water or because the temperature was too low.  UF 24, 25, 29.  SCR also

allowed high levels of NOx to be produced by the engine while relying on an unreliable catalyst

installed in the exhaust to clean up the NOx on the back end.  UF 25(a) (citing Tab 47).  In

contrast, Navistar's technology did not rely on SCR after-treatment, and it prevented high levels of NOx from leaving the engine in the first place. UF 23, 24. This is significant because "SCR engines can operate, and often do, with engine out NOx values that are greater than those using total in-cylinder controls [*i.e.*, EGR-only]." UF 24(a) (citing Tab 9 at 87:8-12).

Long before Navistar filed any 0.2g NOx application, it was apparent to the public that EPA certified SCR-controlled engines at the 0.2g standard even though EPA and SCR engine makers knew SCR would emit much higher NOx under conditions that were certain to occur in the real world but not in the certification lab test cycles. UF 14. Allen Duncan, the Director of EPA's Diesel Engine Compliance Center, agreed that engineers working for companies that did not use SCR – like Navistar – would know how EPA applied its lab-only regulations and certification procedures to SCR engines. UF 29(e) (citing Tab 9 at 175:3–10). Duncan also confirmed that references to reflecting in-use operation in regulations such as 40 CFR § 1065.10(c)(1) were not applied literally, and interpreted by EPA as **not** requiring the agency to take into account the real-world conditions in which SCR engines exceed emissions standards. UF 26. EPA admitted the same in connection with Navistar lawsuits about its test procedures. UF 35. In its briefing in September 2011, EPA stated that it had certified several engine families that use SCR technology without requiring the engines to be tested without DEF. *Id*. Navistar also commissioned an independent testing entity to test SCR trucks in the real world, and that entity, Ensight, Inc., found that although the SCR engines were certified at 0.2g NOx, SCR-equipped trucks frequently operated on the road emitting NOx well in excess of 0.2g NOx. UF 25(m) (citing Tab 263). The results of that testing was depicted in a video made public in 2010. "License to Pollute," https://www.youtube.com/watch?v=BOJ1rLgEj9I. UF 25(a).

Navistar engineers knew that what was good for SCR was good for EGR because EPA applied certification testing procedures neutrally regardless of the technology. UF 32, 38, 158. What EPA approves for one technology must be applied to all to provide a level playing field. UF 32(b) (citing Tab 9 at 175:12–176:3). EPA witnesses testified uniformly that such a policy existed, including the witness that EPA designated as its Rule 30(b)(6) witness. He agreed that EPA remains "neutral on technology." UF 32(a) (citing Tab 11 at 147:9–20); *see also* UF 32(c) citing Tab 15 at 53:15-17), 32(d) (citing Tab 38 at 30:1-16), 32(e) (citing Tab 16 at 63:15-18). EPA witnesses agreed that applying "one set of testing requirements ... to whatever technology is going to be used" was a "level playing field." UF 32(b) (citing Tab 9 at 175:12–176:3).

In 2012 and for years previously, Navistar engineers incorporated a strategy known as "dual mapping" into its engines. UF 48, 48(b) (citing Tab 21 at 305:12-18), 51, 52. Map changes that affect emissions need to be identified to EPA in certification applications and are considered an auxiliary emissions control device ("AECD"). UF 48. During the relevant time, all certification applications for heavy-duty diesel engines, whether EGR-only or SCR, included AECDs. *Id.* For Navistar's January and May 2012 Applications (but not for the February 2011 Application), Navistar engineers designed the engines to switch to a higher NOx "map" when the trucks began to move; Navistar identified this dual mapping strategy to EPA. *See* UF 52, 54, 142–43. Dual map AECDs are not considered defeat devices (and are thus legally certifiable) if, among other things, "such conditions are substantially included" in the FTP. 40 CFR § 86.1803-01. In certification tests conducted to support Navistar's applications, the higher NOx map was included and "active" during a portion of the FTP; this was conveyed to Ustian. *See* UF 148, 149. In January 2012, Zukouski twice said that the higher emissions map was substantially included: "We have met the requirements for the Cert. test on the 783 0.2 engine … The data

17

includes the first 512 seconds of the .5 cal of the [FTP] cold cycle this constitutes that it is 'significantly included as with our competition.'" UF 139. When asked in that same email whether the 0.5g map was substantially included, Zukouski replied "Yep it did." *Id.*

That Navistar's Map B operated in the real world above the 0.2g NOx dyno test standards was functionally no different than the certification procedures EPA allowed for SCR. UF 51. SCR systems do not reduce NOx emissions except when they dose DEF, yet in the real world SCR-equipped engines operated in a variety of scenarios where the system did not dose. UF 25. Though Navistar included Map B in FTP testing [UF 139], the absence of DEF dosing is not substantially reflected in SCR certification testing, and a certification test with no DEF dosing would not meet the 0.2g NOx standard. UF 50. Among other things, EPA's Dr. Duncan testified a driver driving an SCR-controlled engine could drive "1,000 miles…with no NOx control" and that was "okay as far as the EPA [was] concerned." UF 27.

Navistar's engineers and Ustian knew that EPA interpreted the 0.2g NOx standard this way. UF 34. The testing requirements applied equally to SCR and EGR technology, including real world NOx emissions. UF 32. As Ostarello put it, "based on the way EPA had certified heavy duty diesel engines in prior years, EPA should have certified Navistar's EGR only engines as well." UF 34. Navistar's map switching under certain operations was functionally no different than SCR being disabled when DEF dosing is stopped, except that at 0.5g NOx the Navistar engine had much lower levels of NOx than the 1.0-2.0g NOx released from SCR engines when SCR was not functioning. UF 51.

As for the NTE test, the Senior Engineering Group believed Navistar's 2012 applications met EPA's NTE regulations and told Ustian that. UF 141,217, 219. Regarding the January 2012 Application, EPA's NTE deficiency regulations allowed "up to three deficiencies per engine

family." UF 18. Navistar engineers and counsel believed the 2012 0.2g NOx applications qualified for an NTE deficiency, if an allowance was required, and they told Ustian that. *Id.* For the May 2012 Application, Zukouski told Ustian that the engine Navistar submitted would pass the NTE "in use audit;" other Navistar engineers believed that as well and informed Ustian. UF 16. Confidence in an in-use audit was all a manufacturer needed to attest that the engine in question will comply with the applicable NTE limits. 40 CFR § 86.007-21(p)(1); UF 15. Chief Certification Engineer Kramer attested that the engine in the May 2012 Application would "meet the NTE screening limits … " UF 202. Kramer had "frontline responsibility for certification of the .2-gram NOx" engines and was qualified for the role. UF 90. The NTE threshold that is the regulatory criterion for deciding NTE compliance was at least 0.55g NOx. UF 16. The May 2012 Navistar engine was 0.34g NOx, well under that limit. UF 160(f) citing Tabs 253, 255.

### D. Navistar's Certification Applications

Navistar sought to certify three 13-liter EGR engines at 0.2g NOx. The Amended Complaint breaks this down into three distinct phases, which correspond with the three Navistar certification applications (depicted in timelines for the Court's ease of reference): (i) November 2010 to mid-2011, involving an engine Navistar did not plan to sell for years (the "February 2011 Application"[6]); (ii) December 2011 to early May 2012, involving a certification application submitted in January 2012 (the "January 2012 Application"[7]); and (iii) May 21, 2012, through June 7, 2012, involving a certification application (the "May 2012 Application"[8]) Navistar filed after withdrawing the January 2012 Application. *See* Am. Compl. ¶¶ 57, 99, 149.

---

[6] February 2011 Application Timeline, Ex. 1 hereto.

[7] January 2012 Application Timeline, Ex. 2 hereto.

[8] May 2012 Application Timeline, Ex. 3 hereto.

Ustian had no expertise and no first-hand knowledge of the intricacies of the engineering and the related EPA engineering dialogue. UF 1, 5, 40. Ustian has no training in engineering. UF 1. Though Ustian did receive high-level summaries of some of Navistar engineers' interactions with EPA, there is no evidence that Ustian communicated with anyone from EPA regarding the details of any application. UF 40, 219. Navistar engineers told Ustian that EPA certification staff posited questions and that they, the Navistar engineers, could answer those questions. UF 39, 39(e), 116, Tab 26 at 232:11–15; 39(g) (citing Tab 33 at 402:5–412:9), 39(h) (citing Tab 33 at 360:9–361:12). Indeed, it is undisputed that when Ustian asked Kramer and Navistar's Senior Engineering Group whether EPA should approve the 0.2g NOx applications, in all cases the answer was yes. UF 38. It is also undisputed Ustian believed that to be true. *Id.* Ustian also understood from members of the Senior Engineering Group that EPA should grant Navistar's applications based on EPA's approval of SCR certification applications. *Id.* Everything Ustian reported to analysts was consistent with the reports he received from those engineers. *See, e.g.*, UF 61, 61(c) (citing Tab 63), 220. That Navistar's engine applications met EPA requirements is underscored by contemporaneous documents, clearly apparent from the timelines attached as Exhibits 1–3 to this memorandum. *See* Exs. 1-3. Before the February 2011 Application, Ustian received reports that independent test laboratory Southwest Research Institute ("SWRI") (a lab also used by EPA) determined Navistar's engines were "in the box" and met FTP and SET emission limits. "Touch Down," Mr. Zukouski informed Mr. Ustian, "We achieved D-Cert Emissions on 2/11/11 @ 10:45 PM." And Mr. Ustian replied, "Incredible accomplishment Russ." UF 79(c) (citing Tab 89).

The purpose of the February 2011 Application was only to show that EGR could meet the 0.2g NOx standard, not to sell the 0.2g NOx engine that was the subject of the application.

UF 65, 93.  Ustian said the technology would be "on the shelf," or available for commercialization in the future.  *Id.*  EPA's Director of Compliance used the phrase "on the shelf" the same way in his deposition.  UF 97.  Based on his experience at Cummins, Bunker used "on the shelf" to refer to technology available for commercialization.  *Id.*  Multiple statements by Navistar and Ustian made clear that the 2011 application was not a product Navistar would be selling, and improved performance features were years away.  UF 63 93; *see infra* Part IV.A.I.a.  And media and analyst coverage through at least April 2011 evinced the understanding that the February 2011 engine was not intended to go into production and was primarily a marketing tool.  UF 65, 94.

Before and after the February 2011 Application, Navistar and EPA exchanged proposals concerning application of a deterioration factor or "DF."  UF 84, 88.  Navistar proposed, and EPA initially rejected, application of a "carryover" DF testing from prior Navistar engine families.  UF 83, 89.  Kramer understood that the initial exchange was the start of "a dialogue and exchange [of] information about the DF and about [EPA's] concerns."  UF 88.  And those discussions occurred.  On March 18, 2011, Kramer wrote that  EPA "gave thoughtful insight and even suggestion of what Navistar might do, outside of technical dyno durability demonstration, to accomplish certification requirements for DF."  UF 88(b) (citing Tab 98).  These discussions continued past April 2011.  UF 84.  Ustian knew the engineers "felt they had a reasonable chance to get through the EPA" and that Navistar had "a history" of EPA granting requests for carryover DF.  UF 88(c) (citing Tab 44 at 151:2–12), 88(g) (citing Tab 44 at 152:17–153:7).  Ustian was correct that EPA can accept alternatives to a full, expensive DF test.  UF 84.  EPA had approved

alternatives to full DF testing for Navistar engines on many occasions, even after initially rejecting it.[9]  UF 87.

A few months after submitting the February 2011 Application, Navistar engineers commercialized fuel economy and torque on Navistar's 0.2g NOx 13L engine.  UF 41.  That too was communicated to Ustian in an email that trumpeted "Great news" and said that "Transient emission cycles at NOx target with acceleration performance equivalent to current product!"  *Id.*  EPA did not grant or deny the February 2011 Application.  UF 39.  The 2011 model year ended on December 31, 2011, and new certification is needed annually.  UF 9.

On December 16, 2011 (well before Navistar would submit the January 2012 Application or the May 2012 Application), Navistar engineers and EPA certification staff met to try to negotiate a settlement of then-pending litigation related to EPA's certification procedures.  UF 114, 114(d) (citing Tab 46 at 301:10-302:13).  In the course of that meeting, Navistar discussed at a high level a concept for a 0.2g NOx engine with competitive performance features.  At the time of the meeting, the Navistar engineers described an engine with an NTE of approximately 0.7g NOx.  UF 115.  EPA's Bunker stated he "would not consider an NTE deficiency" that would have been necessary for the engine concept described.  UF 114(i) (citing Tab 128).

Following the December 16 meeting, Navistar engineers got to work addressing the concerns EPA expressed during the meeting.  UF 116.  Within one day, they formed plans to achieve 0.2g NOx certification – and described options to do so in an email sent to Ustian.  UF 116(j) (citing Tab 131).  By the time Navistar filed its Form 10-K on December 22, 2011, it had

_____

[9] In 2007, EPA allowed an assigned DF based on the average of DFs from Navistar's other product lines for the MaxxForce 11 and 13 liter engines.  UF 87(f) (citing Tab 52). In June 2010, after having to negotiate with the EPA on the DF for Navistar's new 15 liter engine, EPA permitted Navistar to carry over the DF from Navistar's 13 liter engine family.  *Id.* (citing Tabs 56–58).

a well-founded belief that its technology would meet EPA certification requirements. UF 38, 125–26. And Ustian himself believed Navistar's technology met EPA standards. UF 125.

Ustian also received a report confirming that Navistar had met EPA requirements just before Navistar filed the January 2012 Application. *See* UF 141. "We are in the BOX," Mr. Zukouski emailed to Mr. Ustian. UF 141(d) (citing Tab 143). "We have met the requirements for the Cert. test at SWRI … we are IN!" UF 141(b) (citing Tab 144). On February 17, 2012, EPA provided "preliminary concerns" on the January 2012 Application. UF 147. Navistar submitted a written response on February 27, 2012. UF 154. Ustian was informed that the response had been reviewed by Navistar's engineers and counsel before being submitted to EPA. *Id.* On March 1, 2012, an EPA employee responded to Navistar indicating that EPA had received Navistar's response, was reviewing it, and looked forward to a "fruitful meeting." UF 156(a) (citing Tab 163). Navistar did not receive additional correspondence from EPA before it filed its quarterly report and held a quarterly earnings call on March 8, 2012. UF 156.

Also in late January 2012, EPA promulgated an interim final rule allowing Navistar to pay NCPs so it could continue selling engines certified above 0.2g NOx. UF 161. Documents associated with this rulemaking were public when posted on the public docket, and stock analysts followed the rulemaking. UF 161, 177. Navistar's competitors challenged the NCP rule in the D.C. Circuit Court of Appeals. UF 163. This litigation also was public, and filings in the litigation were available via PACER. *See* UF 146. Stock analysts followed the litigation because it directly implicated Navistar's ability to sell engines, and they testified that they had the ability to look up filings in court cases and read them. UF 169, 177. That is consistent with testimony from the SEC's proffered economics expert, who testified that significant legal disputes are "typically important to investors" and it "certainly would not be unusual for an

analyst to go follow the actual case filings in certain circumstances." UF 172. Navistar's competitors asked EPA to stay the rule's implementation, partly on the theory that Navistar was not truly unable to comply with emissions requirements. UF 165. EPA denied the stay in a February 28, 2012, letter, indicating that NCPs were necessary in part because EPA had "substantial concerns" about the January 2012 Application. *Id.* EPA provided this letter to Navistar on February 29, 2012, and Navistar filed it on the D.C. Circuit docket on March 1, 2012. UF 166, 168. Navistar also added the letter to the public rulemaking docket in April, and incorporated the letter into a public comment. UF 167. Ustian's economic expert testified this letter was available and that analysts were monitoring the NCP rulemaking and associated litigation; therefore, information in the letter would be incorporated into Navistar's stock price within one trading day. UF 170, 177. The SEC's expert agreed news would be reflected in Navistar's stock price "essentially within one day". UF 171, *see also* Tab 268, Expert Report of Michael Mayer (cited at UF 170(d)).

EPA also prepared a "desk statement describing" the resolution of the stay petition. UF 176. A desk statement enables EPA to respond to anticipated questions from the public, and its contents "effectively become public information." *Id.* Calling EPA to obtain information relevant to their research is within the normal scope of stock analysts activities; analysts deposed in this matter testified they contacted EPA in the past. UF 176 (e) (citing Tab 8 at 130:10-20).

On May 10, 2012, Navistar withdrew the January 2012 Application in favor of a revised application believed to address the concerns raised by EPA. UF 202. Navistar submitted that application on May 21, 2012. *Id.* Navistar engineers told Ustian that Navistar could go into production of this engine in 30 days upon certification. UF 220. Navistar engaged in discussions with EPA about the May 2012 Application. UF 218. Members of the Senior

Engineering Group provided Ustian with positive updates about the dialogue, including describing a May 30 meeting with EPA as "great" and "all positive." UF 218. Younessi reported to Ustian during that meeting that he was "sure we'll get the cert." *Id.* Following a June 4, 2012, meeting [UF 219], EPA sent an email on June 5, 2012, indicating that EPA had concerns about the new application about which it would elaborate in a forthcoming letter. UF 229. Members of the Senior Engineering Group did not think that the June 5 email meant that EPA would never certify the engine, but rather that the email was a "typical" part of the process. UF 218; *see also* UF 219, 233. On June 6, 2012, Navistar engineers sent Ustian a presentation outlining next steps with respect to the application, and Ustian continued to believe Navistar and EPA could continue to work towards certification. UF 233. The engineers did not tell Ustian that the 30-day timeline from certification to production changed following the June 4 meeting with EPA, or at any point prior to the June 7 analyst call. UF 220. Ustian continued to believe that EPA would certify the May 2012 Application. UF 217, 233.

Navistar's quarterly earnings call was only two days later, on June 7, 2012. UF 237. Navistar disclosed that discussions with EPA were ongoing, that it had paid $10 million in NCPs during the previous quarter, and that it might be forced to stop selling engines if EPA did not certify its engines and if the D.C. Circuit invalidated the NCP rule. UF 234, 236. EPA sent Navistar supplemental correspondence related to the May 2012 Application on June 15, 2012, eight days **after** the last alleged misstatement in this case, and both before and after this letter, the engineers continued to work on the certification engine. UF 218(q) (citing Tab 33 at 424:5–9), 218(r) (citing Tab 244), 218(s) (citing Tab 245), 218(t) (citing Tab 250), 244.

On June 12, 2012, the D.C. Circuit invalidated the interim final NCP rule EPA had put in place in January and indicated that it might not uphold a final NCP rule. *Mack Trucks, Inc. v.*

*EPA*, 682 F.3d 87, 96 (D.C. Cir. 2012) ("[W]e are highly skeptical that the penalty and upper limit provided for in this NCP satisfy this congressional demand to protect compliant manufacturers."). After that decision, Navistar decided to combine its in-cylinder strategy with the SCR technology that EPA repeatedly had certified. UF 243. After market close on July 3, 2012, Navistar announced it would hold a live webcast on July 6. UF 247. The *Wall Street Journal* reported on July 3, 2012 that Navistar was "expected to announce that it [would] buy SCR components and install them on its own engines," and a Wells Fargo analyst reported that he suspected the webcast would "include an engine strategy reversal to SCR from EGR." UF 247. Navistar's stock closed **up** approximately 7%. UF 247. Navistar announced on July 6, 2012, that it was abandoning its EGR-only strategy and would pursue an SCR-based solution. UF 248. At least four stock analysts issued reports shortly thereafter describing the switch to SCR as "expected." UF 248. In August 2012, Navistar asked Ustian to retire. UF 249.

## IV. ARGUMENT

Ustian's argument proceeds in four parts. First, none of the statements at issue was a misleading omission of material fact, and the SEC does not have evidence to prove either that Ustian acted with scienter or with the state of mind required for the SEC's remaining claims. Either of these grounds is sufficient to defeat ***all*** of the SEC theories of liability. Second, there is no evidence of an inherently deceptive act beyond the alleged misstatements. For this independent reason, there is no scheme liability under Rule 10b–5 (a) or Section 17(a)(1) (Counts I – IV). Third, Ustian did not receive any money or property by means of any fraudulent or misleading statement. For this independent reason, there is no liability under Section 17(a)(2) (Counts III and IV). Finally, to the extent that the Court determines Navistar engaged in primary violations of the securities laws (it did not), Ustian's good faith negates the Section 20(a) control person allegations and the aiding and abetting claims (Counts II, IV, and VII).

26

**A.    The Alleged Omissions Were Not Misleading, Not Material, and Not Made With the Required State of Mind (Counts I-VII)**

Each of the SEC's theories of liabilities centers on a series of statements made between November 2010 and June 2012 related to three certification applications Navistar filed with EPA: (1) the February 2011 Application; (2) the January 2012 Application; and (3) the May 2012 Application.  *See* Exs. 1-3 (timelines).  None of the statements supports liability.

**1.    Ustian's Statements Related to the February 2011 Application Do Not Support Liability**

The SEC alleges that certain statements between November 2010 and April 2011 concealed two major issues related to the February 2011 Application.  *See* Ex. 1.  First, based on its own interpretation of statements that never mention performance, the SEC claims that Ustian touted performance, while hiding that the February 2011 engine submitted for certification lacked competitive performance features and that the engine was not intended for sale.  Second, the SEC claims Ustian and Navistar withheld information about Navistar and EPA's discussions concerning an alternative to full DF testing.  In fact, Ustian and Navistar **disclosed** that Navistar did not intend to sell the engine.  Also, Navistar and EPA continued to discuss alternatives to new DF testing throughout the relevant time period.  None of these statements is actionable.

**a.    The Statements Were True and Not Misleading**

None of the statements related to the February 2011 Application created the impression that Navistar's February 2011 Application was intended to be anything other a demonstration that the NOx standards could be met with EGR-only technology.  The November 3, 2010, press release announcing the future event informed investors that the engine application was "far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required."  UF 58.  At an Alabama plant tour, Ustian told reporters that Navistar would not produce an engine meeting the 0.2g NOx standard for *years* and that Navistar would use those

27

years to improve fuel economy.  UF 63.  Those statements disclosed that any description of

performance attributes, and fuel economy in particular, were addressed to the product coming

out years later, not the marketing strategy of February 2011.  The statements were understood

that way and reported by media the very next day.  *See infra* Part IV.A.1.b.

Nor could Ustian's statements on the December 2010 analyst call reasonably create a

misleading impression about the February 2011 engine's performance characteristics because

Ustian did not say anything about performance.  The SEC misleadingly conflates two separate

discussions.  Analyst David Leiker asked Ustian about a different engine already being sold and

about the timeline for certification of Navistar's 0.2g NOx 13L engine.  Am Compl. ¶ 55.  Ustian

answered truthfully that the application would be submitted in the next few months.  *See* UF 71.

In a separate exchange (seven pages later, but which the SEC put in the same paragraph of its

complaint), analyst Ann Duignan asked whether Navistar "anticipate[d] running" fuel-economy

comparisons of Navistar's future 0.2g NOx engine against comparable SCR engines.  *Id.*  In

response, and in the future tense, Ustian explained Navistar's goal to be "equal to any SCR

product" recognizing that Navistar expected "the SCR product [would get] a little better"

(confirming the exchange with Duignan had nothing to do with February 2011) and that reaching

equivalence with SCR "is what we are going to be able to do with getting to 0.2."  *Id.*  Ustian's

answers were his predictive opinion and consistent with Navistar's public strategy of introducing

a production 0.2g NOx engine years in the future.[10]  When asked about these statements,

Ostarello and Iwaszkiewicz testified that they believed the statements were true and not

misleading and that they were not aware of facts inconsistent with the statements.  UF 73, 96.

---

[10] The SEC does not allege that Ustian's **2010** statements misrepresented the likelihood of EPA
certification.  *See* Am. Compl. ¶¶ 52, 56.  These statements are allegedly misleading only because they
omit information about the engine's performance features and fuel economy.

Ustian's statements **after** Navistar submitted the February 2011 Application also clearly noted Navistar's strategy to delay production to continue to improve fuel economy. He stated on the March analyst call that the point of the February 2011 Application was to confront claims "that 0.2 can't be done" and "to take that argument away." UF 93. The April press release described Navistar's intention to "phase-in" the 0.2g NOx technology over a period of "years," a timeline that put any sale of a 0.2g NOx EGR engine beyond the model year of any certificate Navistar might have received in 2011. *Id.* Thus, the press release again made clear that the "period of years" was for Navistar to develop its engine technology.[11] When it comes to performance, the series of statements did not affirmatively create an impression that differs in a material way from the one that actually existed. *See supra* Part II.B.

The March and April 2011 statements also were not misleading on the prospects for certification. Again, Ustian did not say **anything** beyond that an application had been submitted to EPA. Ustian never suggested EPA had granted the application. The application was genuine, and the engineers who submitted it believed it met EPA rules. *See supra* Part III.D. The SEC's counter is that Ustian omitted his alleged "knowledge" that the application would be denied because Navistar had not done new DF testing. *See, e.g.*, Am. Compl. ¶¶ 71, 77. But EPA and Navistar were actively engaged in discussions about the use of an alternative to new DF testing **after** the alleged misstatements related to the February 2011 Application. UF 84. Ustian had no reason to conclude that the application would be denied. UF 88. At the time of the statements, EPA had not denied the application, and in fact EPA *never* denied the application. UF 39.

---

[11] The market continued to appreciate the fact that the engine described in the February 2011 Application would not be sold, even after the March and April statements. An April 11, 2011 analyst report described the application as "more marketing than anything else." UF 99.

### b. The Alleged Omissions Were Not Material

In any event, any alleged omissions concerning the performance characteristics of the February 2011 engine were not material. That Navistar intended to wait years to sell the engine, and that Navistar would spend that time improving performance and fuel economy, were part of the total mix of information in the marketplace between November 2010 and April 2011. *See supra* Part III.D. These facts were widely reported, and were publicly available. For example, a November 8, 2010 *Truckinginfo* article stated: "***By delaying the commercial launch of the cleaner engine, Navistar engineers have more time to work out the technological solutions*** to deliver low engine out NOx *and fuel economy* at the same time." UF 63(f) (citing Tab 302). Similarly, a November 4, 2010, analyst report described the announcement as "an ingenious PR move toward both customers and competitors." UF 65(a) (citing Tab 311). Another report before the December earnings call described the risk bluntly: "The technology behind NAV's MaxxForce engines, known as 'massive' EGR, cannot simultaneously achieve EPA N[Ox] criterion and customers' needs for fuel efficiency." UF 66(b) (citing Tab 313). The market understood the same risks **after** the December 2010 call, as evidenced by a piece in *The Lockwood Report* that stated Navistar "has yet to get its engines down from the present 0.5 to the required 0.2 grams NOx level.... Enhanced EGR can do it, I believe, but perhaps with an intolerable fuel-economy penalty." UF 78(b) (citing Tab 315). After the April 5, 2011, press release, an analyst at Baird described the February 2011 Application as "more marketing than anything else" UF 99. Wide coverage of the specific risk the SEC claims was hidden establishes the information actually was disclosed. *See Sailors*, 4 F.3d at 613 (omission not material where "the mass media and the specialized press made repeated references to the general concerns and to some of the specific problems about which [the plaintiff] complains").

The certification risks and marketing focus of the February 2011 Application remained well-known through at least April 5, 2011, the date of the final alleged misstatement related to the February 2011 Application. UF 99. Professor Gompers reviewed the information available to investors at the time of each alleged misstatement, and opined that the information alleged to have been omitted from the statements related to the February 2011 Application was available to investors at the time of each alleged misstatement. UF 170; *see also* Tab 406, Expert Report of Paul Gompers ¶¶ 53, 62, 69, 77. This is an unrebutted expert opinion, and is thus appropriate grounds for summary judgment. *See In re Plavix Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, No. CV 13-4521 (FLW), 2017 WL 3531684, at *9 n.7 (D.N.J. Aug. 17, 2017) ("Generally speaking, courts routinely rely on unrebutted testimony, particularly from experts, to grant summary judgment."). In sum, the information supposedly omitted from the statements related to the February 2011 Application could not have "significantly altered the 'total mix' of information" available to the market. *See supra* Part II.B. "Because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 577 (quoting *Basic*, 485 U.S. at 231-32).

### c. Ustian Did Not Act With the Requisite State of Mind

The next independent basis for summary judgment is state of mind. *See supra* Part II.B. There is no genuine dispute that Ustian believed that all of the statements identified by the SEC related to the February 2011 Application were true and not misleading. First, Ustian's statements about performance characteristics had reasonable bases. *See Ustian*, 229 F. Supp. 3d at 765 ("if a statement had a reasonable basis when made, it is not fraudulent"). Ustian made those comments about products two years down the pipeline and had good reason to believe he

31

was being truthful.  *See* Ex. 1 (timeline); UF 63, 86.  For example, engineers presented a slide

deck to Ustian in October 2010 that stated "0.2 in-cylinder NOx is achievable while delivering

improvements in BSFC [fuel consumption] compared to the 2010 Baseline."  UF 61(b) (citing

Tab 65).  Navistar engineer Bedi told Ustian in November 2010 that he had "a terrific session

with the guys yesterday on 0.2" and was "really encouraged we can pull this off, in time and with

quality[.]  Fuel economy 5% better, no increase in heat and on time."  UF 69.  The Navistar

engineers on whom Ustian relied specifically testified that statements related to the February

2011 Application were accurate and consistent with their reports to Ustian at the time.  UF 73.

Similarly, Ustian's statements that Navistar would file an application for 0.2g NOx

certification rested on reasonable bases.  Ustian was told that there was nothing wrong with the

February 2011 Application, and the Navistar engineers were upbeat to Ustian about the prospects

for success.  UF 79, 86.  Tom Kramer, who was in charge of the application [UF 90] and who

was interacting with EPA regarding the use of an assigned DF, would not have submitted it

unless he believed it could be granted.  UF 86. 92.  Ustian did not possess knowledge that a

resolution on the use of an alternative to full DF testing was beyond the reach of Navistar and

EPA.[12]  As demonstrated above, (1) EPA can change (and has changed, *see* UF 87) its position

after negotiation, (2) there were other avenues for achieving an assigned DF, and (3) Kramer

continued to believe certification was possible.  *See supra* at 23-4.  Ustian's reliance on experts

makes summary judgment appropriate because it is evidence of Ustian's good faith, which the

SEC has not rebutted.  *See Shanahan*, 646 F.3d 536 at 544 (reliance on others to ensure the

accuracy of public disclosures "is not severely reckless conduct that is the functional equivalent

---

[12] At the motion to dismiss stage, the Court observed that discovery would disprove or substantiate the
SEC's allegation that Navistar and Ustian knew EPA would deny the application for failure to comply
with DF rules.  *Ustian*, 229 F. Supp. 3d at 768.  The **evidence** shows this allegation to be false.

of intentional securities fraud"); *Donohoe v. Consol. Operating & Prod. Corp.*, 833 F. Supp. 719, 726 (N.D. Ill. 1993), *aff'd*, 30 F.3d 907 (7th Cir. 1994) (person who "lacked the necessary expertise to perform meaningful independent review" was "entirely justified in depending on the opinions of others" and that such reliance on was evidence of good faith).

**2.      Ustian's Statements Related to the January 2012 Application Do Not Support Liability**

The next five alleged misstatements relate to Navistar's second certification application, which it submitted in January 2012.  *See supra* Part III.D, Ex. 2.  The SEC alleges that Ustian misleadingly omitted EPA feedback from public statements, concealed the technical challenges Navistar faced in meeting the 0.2g NOx standard, and continued to pursue a so-called "dual mapping" strategy that Navistar knew to be illegitimate.  In reality, EPA's feedback was a normal part of the iterative certification process, and Navistar addressed the feedback in the course of the discussions.  The market was well-apprised of the EPA feedback and the technical challenges that EGR posed.  Navistar's "dual mapping" strategy was a legitimate attempt to comply with EPA's interpretation of its certification rules.  And Navistar engineers told Ustian throughout this time period that Navistar could – and had – addressed the preliminary concerns raised by EPA.

**a.      The Statements Were Not Misleading**

The SEC alleges the following statement from Navistar's 10-K was misleading:  "We plan to submit certification applications to both EPA and CARB in the near future.  We believe that our engines meet both agencies' certification requirements.... Our solutions for meeting U.S. federal and state emissions requirements may not be successful or may be more costly than planned."  The SEC alleges that this statement was misleading because Ustian knew, but the

33

Form 10-K did not disclose, that the statements conflicted with feedback Navistar had received

from EPA following a litigation settlement meeting on December 16, 2011. Am. Compl. ¶ 98.

With the benefit of discovery, the opinion statements in the 10-K were not misleading. It

is undisputed that Ustian believed that the statements in the December 20, 2011 Form 10-K were

accurate based on his engineers' ability to address EPA's concerns [UF 125], and those

statements "fairly align[ed] with information in [NIC's] possession" at the time of the statement

because they rested on a "meaningful legal inquiry" that involved Navistar's top engineers and

attorneys. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v.*

*Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015)); UF 116.

The SEC takes issue with the purported inconsistency between Navistar's stated belief that its

engines complied with EPA certification requirements and negative settlement feedback an EPA

official gave to Navistar engineers on December 16. But the SEC omitted from its Amended

Complaint the events of December 17 through 20, and the Court therefore did not have any

information about what happened during that time at the motion to dismiss stage.

By the time NIC filed its Form 10-K, Navistar engineers believed they had developed a

plan for an engine that EPA would certify, and they met with Ustian to present multiple options

to address EPA's feedback. Members of the Senior Engineering Group met on December 17 to

prepare multiple options to address EPA's concerns from the December 16 meeting. UF 116.

Later that day, the same engineers informed Ustian and Navistar's general counsel of their

solutions, assuring certification was possible. *Id.* All of this preceded the December Form 10-K,

which Navistar's general counsel assisted in drafting in relevant part. UF 120. All Navistar

engineers who were asked agreed the challenged statement in the 10-K statement was true and

not misleading. UF 126. Navistar **did** believe its solutions complied with EPA regulations, and

Navistar's belief *did* "rest on some meaningful legal inquiry" and not "mere intuition." *Omnicare*, 135 S. Ct. at 1328. The opinion statement in the December Form 10-K "fairly aligned" with information in Ustian's possession at the time of the statement. ***And it is undisputed that <u>Ustian</u> believed the statement in the 10-K was true.***

As of the December 16 meeting and the Form 10-K, Navistar had not filed the January 2012 Application. UF 79. When EPA "ha[s]n't seen [an anticipated certification application] yet, [it] really can't say anything about the likelihood that [it] will be able to approve it." UF 207. This early feedback, which was part of an iterative process and not necessarily indicative of the likelihood EPA would approve the hypothetical application, is the type of preliminary information that reasonable investors do not expect will be disclosed. *See Sanofi*, 816 F.3d at 211–12 (affirming dismissal in part because omission of negative view of FDA during certification not misleading where reasonable investors aware of "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process" and that "inherent in the nature of a dialogue are differing views").[13]

Moreover, EPA has consistently taken the position – in sworn testimony and in formal correspondence, among other places – that publicly disclosing "pre-decisional dialogue" with engine makers relating to their certification applications is inappropriate because doing so would cause public confusion. *See* UF 130-132, 130(b) (citing Tab 180 at 5–29), 131(a) (citing Tab 11 at 63:2–64:8), 131(d) (citing Tab 259). EPA's Bunker testified that EPA cannot release pre-decisional certification communications because public release of that kind of content would

---

[13] That investors might have **wanted** more information about the specifics of discussions with EPA is not relevant to the Court's analysis. The SEC's argument "essentially boils down to an allegation that the statements were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections. But *Omnicare* imposes no such disclosure requirements on issuers." *Sanofi*, 816 F.3d at 212.

cause public confusion.  UF 130.  It cannot be that Navistar was required to clarify facts to investors by disclosing **confusing** information the government itself refuses to divulge.

The March 2012 statements, were not misleading because they did not create an impression that differed from reality.  In its own words, the SEC alleges that "Ustian misled the public on the March 2012 Analyst Call by stating that Navistar was 'taking until June' to go to production of a 13-liter EGR-only engine that would be certified at the 0.20 NOx standard and aimed 'to be in production on that in June,' based on a 'typical' certification process of 'about three months' from the date the certification application was submitted."  Am. Compl. ⁋ 128. Ustian did not say this.  *Compare* Am. Compl. ⁋ 128, *with* Tab 172 (cited in UF 185).  Again, SEC's construction conflates two discrete answers to two discrete questions from two different analysts.  The SEC alleges the statement was misleading because Ustian knew, but did not disclose, that "Navistar and Ustian had concerns that certification might not occur in time for production in June."  Am. Compl. ⁋ 128.  The March 2012 statements do not suggest otherwise.

The statements convey the opinion that Navistar's objective was to be in production by June, but that it could not predict with certainty whether EPA would grant certification in time. The internal goal for putting the 0.2g NOx 13L engine into production **was** June, and Ustian's statement matched Navistar's internal expectations.  Ex. 2 (timeline); UF 181(a) (citing Tab 169), 181(b) (citing Tab 165).  Ustian did not say that Navistar's 0.2g engine certification process was typical, only "typically [a certification process is] about three months, I think, is about the average of that."  He continued that he could not make a projection of the certification timeline with "preciseness" and said only that "our objective is to be in production on that in June," which was true.  Ustian did not omit that "certification might not occur in time for

production in June," as the SEC alleges. His uncertain, forward-looking description of

Navistar's "objective" conveys just that.

### b.  The Alleged Omissions Were Not Material

Any omission of EPA's preliminary concerns was not material because EPA's concerns

were already part of the total mix of information available to investors at the time of the March

earnings call. "Publicly available information cannot be a material omission under federal

securities laws." *Sanchez*, 2018 WL 4787070, at *3 (citing *In re Convergent Techs. Sec. Litig.*,

948 F.2d 507, 513 (9th Cir. 1991)). Information made public by both Navistar and EPA in late

February and early March 2012 echoes near verbatim the information the SEC accuses Ustian of

omitting. In January 2012, EPA promulgated an interim final rule allowing Navistar to pay

NCPs to continue selling engines above the 0.2g NOx standard. UF 161. Navistar's competitors

sought a stay of EPA's NCP rule, which EPA denied on February 28, 2012. UF 165. The letter

with which EPA denied the stay stated the following:

> EPA's initial view is that EPA has substantial concerns regarding the ability of
> Navistar to certify its engine at a 0.20 g/bhp-hr level based on the information
> currently available to EPA, as there are several issues concerning the engine's
> ability to meet the standards and other regulations, ... EPA's initial view is that
> there are several significant problems with Navistar's application. ... While EPA
> has not taken final action regarding certification, and intends to continue
> discussions with Navistar, EPA has substantial concerns regarding the ability of
> Navistar to certify its engine at a 0.20 g/bhp-hr level.

UF 165(a) (citing Tab 398 at 47, 53). On February 29, 2012, EPA shared that letter with

Navistar. UF 166. On March 1, 2012, Navistar made it public, attaching that letter to a filing in

the D.C. Circuit in litigation challenging the NCP rule. UF 168. Navistar **also** posted EPA's

letter on the public NCP docket on April 16, 2012. UF 167. EPA prepared a substantially

similar desk statement on or about February 28, 2012, which was intended to guide EPA's

communications team in responding to questions from the public. UF 176(a) (citing Tab 161).

Analysts covering Navistar called EPA for information about certification, were aware of the NCP litigation, and were capable of reviewing Court filings. UF 169, 172, 177. Contemporaneous analyst reports demonstrate that investors were aware of Navistar's certification risks and technical problems. *See* UF 186 UF 47, Decl. Ex. B. A Deutsche Bank report issued shortly after the call stated that the EPA certification "timeline is not without risk given the unknown timing of EPA certification (which is largely out of Navistar's control)." *Id.*

These analyst reports "made repeated references to the general concerns [at issue] and to some of the specific problems" the SEC alleges were withheld. *See Sailors*, 4 F.3d at 613. EPA's "substantial" concerns about Navistar's certification applications were available to the public upon reasonable inquiry, and therefore part of the total mix of information available to investors. *See Sailors*, 4 F.3d at 612 (no material omission where information was "part of the regulatory process and upon reasonable inquiry was available to the public"). Repeating EPA's concerns would not have changed the total mix of information in the market; the alleged omission is not material. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 577 (quoting *Basic*, 485 U.S. at 231-32). ("Because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law.").

The SEC alleges that statements related to the January 2012 Application omitted Navistar's "lack of success" with the February 2011 Application. This omission is not material because the fact that EPA had not granted Navistar's February 2011 Application was available to the public through a request to the EPA and on EPA's website. UF 127. Moreover, Navistar had announced its intention to file the January 2012 Application in December 2011, and discussed in March 2012 that it was actively pursuing that application. UF 118, 182.

Professor Gompers reviewed the information available to investors at the time of each alleged misstatement and concluded that the information alleged to have been omitted from the statements related to the January 2012 Application was available to investors at the time of each alleged misstatement. *See* UF 170; *see also* Tab 406, Expert Report of Paul Gompers ¶¶ 86, 93, 102. Based on that review, Professor Gompers found there was no economic basis to determine that any of the alleged omissions impacted Navistar's stock price. Professor Gompers's opinions based on this analysis are thus unrebutted. *See supra* at 4.

### c. Ustian Did Not Act With the Requisite State of Mind

The next independent basis for summary judgment is state of mind. *See supra* Part II.B. First, there is no genuine factual dispute that Ustian did not act with scienter. Although the SEC suggests Navistar's "dual mapping" strategy was itself fraudulent, and that Ustian was aware of that fraud, neither is true. UF 54. Ustian believed that all of the statements related to the January 2012 Application were true and not misleading. UF 38, 39, 43, 54, 116, 125. Indeed, based upon assurances from his team, Ustian believed that Navistar's dual mapping strategy was legitimate and compliant. UF 38, 54. It is undisputed that Ustian believed that the statements in the December 20, 2011 Form 10K were accurate based on his engineers' ability to address EPA's concerns. UF 125. And Ustian's sincere belief that EPA would certify Navistar's technology was in sync with EPA's interpretation if its regulations for 0.2g NOx certification. *See supra* at 18. EPA was aware of SCR's real-world limitations at the time it certified and continued to certify SCR engines despite those limitations. UF 14, 26. Ustian (and, testimony in this litigation confirms, EPA) knew that SCR engines NOx emissions levels were quite different in the test cell than they were in the real world and EPA had certified SCR engines. UF 14, 26, 34. Ustian believed, based on advice from the Senior Engineering Group and his understanding of SCR, that Navistar's dual-mapping strategy complied with EPA regulations. UF 38, 54.

The SEC wrongly alleges that Ustian was intentionally, recklessly, or negligently misleading when he did not specifically mention the preliminary feedback received from EPA on February 17, 2012, in any of the March 2012 statements. In truth, Ustian had a good faith, reasonable belief that Navistar had responded fully to the concerns, would be able to address them, and that EPA would certify the engine. UF 141, 150, 154, 160. The lack of an explicit reference to EPA's February 17 letter describing its preliminary concerns was reasonable from Ustian's perspective because he had been informed that Navistar responded fully to the letter and knew that EPA anticipated further discussion. UF 154; Tab 1. Decl. of D. Ustian at ¶ 27. On March 1, 2012, EPA's Justin Greuel responded to Navistar engineers and stated that EPA "will work as quickly as possible to respond to" Navistar's letter, and that "we can then use that information as an agenda for a fruitful meeting in the near future." UF 156. Ustian received that email. *Id.* EPA did not provide any additional substantive response before the March statements. *Id.* Ustian's understanding at the time of the March statements was that Navistar was awaiting an answer from EPA and expecting a fruitful discussion. *See id.*; UF 141(a), Tab 1, Decl. of D. Ustian ¶ 26-27. Ustian's interpretation of the status of discussions with EPA was not "highly unreasonable," but reasonable based on work his engineers had done and documents he had reviewed. Ex. 2 (timeline); *Shanahan*, 646 F.3d 536 at 544 (reliance on others to ensure the accuracy of public disclosures "is not severely reckless conduct that is the functional equivalent of intentional securities fraud.").

### 3. Ustian's Statements Related to the May 2012 Application Statements Do Not Support Liability

The last two allegedly misleading statements were made in early June 2012 and relate to Navistar's third certification application, which was submitted to EPA on May 21, 2012. Am. Compl., ¶¶ 162–174. The SEC challenges statements from the June 2012 earnings call and

June 2012 NIC 10-Q, claiming that Ustian and Navistar omitted information related to the nature of EPA's feedback, the changes to Navistar's technology necessary to satisfy EPA, and Navistar's production schedule, which omissions rendered the statements misleading. In reality, the statements were true, were not misleading, and if anything painted a negative picture of where things stood with respect to certification. Navistar and Ustian pointed to substantial risk of non-certification, and the 10-Q disclosed that the Company had paid $10 million in NCPs during the three months ended April 30, 2012, and that the Company may not be able to sell engines if it lost access to NCPs and its credits ran out, which would not be the case if EPA had granted the pending certification application. Contemporaneous analyst and media coverage showed that investors harbored substantial skepticism about Navistar's emissions strategy and its prospects for certification, both before and after the June statements. UF 45, Decl. Ex. A at 31-35, Decl. Ex. B at 11-14. Investors were also aware that Navistar had been paying NCPs and would likely be able to continue paying NCPs, making 0.2g NOx certification a far less monumental than the SEC would have the Court believe. UF 45, Decl. Ex. A at 14-19. Ustian even stated that EPA was working on a final NCP rule to be issued later [UF 237], which was the alternative to certification, which clearly conveyed certification was not "right around the corner." Am. Compl. ¶ 8.

a.     **The Statements Were True and Not Misleading**

The statements related to the May 2012 Application were not misleading because they did not create an impression of the status of EPA's review of the May 2012 Application that differed from reality. Contrary to the SEC's reading, the June 7, 2012 Form 10-Q and Ustian's statements on the analyst call do not paint an inaccurate picture of Navistar's certification prospects. In fact, EPA's characterization of the status of its discussions with Navistar were consistent with Navistar's 10-Q. EPA prepared a desk statement on June 5, 2012, which was

intended to be the agency's public response if anyone inquired about the status of NIC's application.  UF  222.  That statement read:

> EPA received a new application from Navistar on May 21 and is still reviewing the application.  However, EPA's initial view is that there are several significant problems with Navistar's application.  EPA is not prepared to share publicly these problems at this time, because Navistar has claimed much of their information as confidential.  While EPA has not taken final action regarding certification, and intends to continue discussions with Navistar, EPA has substantial concerns regarding the ability of Navistar to certify its engine at a 0.20g …. [UF 222].

The 10-Q stated that Navistar had withdrawn the January 2012 Application and filed a new application on May 21, that the new application raised issues, that EPA was reviewing those issues, and that Navistar was engaged in discussions with EPA related to those issues.  UF 234.

The SEC points to a June 5, 2012 email from EPA describing concerns with the May 2012 Application following a series of meetings with Navistar engineers.  The email was not a denial, but simply part of the iterative certification process.  *See* UF 10, 39.  The email itself invited additional information and discussion, stating that EPA "intend[ed] to send [Navistar] a more detailed written response delineating all of our concerns.... Once we have shared our more detailed written responses and reviewed your questions, we can discuss next steps with regard to this application."  Tab 230, Dep Ex. 481 (cited at UF 229).  The dialogue continued after June 5, 2012, and when EPA sent additional feedback on June 15, 2012, EPA invited additional dialogue:  "At this time, we invite Navistar to present any information or analysis that would answer these objections and support Navistar's claim of compliance with EPA regulations."  UF 244.  It is undisputed that, as Ustian stated on the call, Navistar was "continuing to work with EPA" on certification, and EPA had not denied the May 2012 Application.  UF 237.

### b.     The Alleged Omissions Were Not Material

The information that the SEC alleges that the June 2012 statements omit information was part of the total mix of information available to investors at the time of the June 2012 statements. The Risk Factors section of the June 2012 Form 10-Q laid out the diverse risks Navistar faced:

> Our business, financial condition, results of operations, liquidity and capital resources or cash flows could be materially and adversely affected based on numerous factors relating to our continued use and development of engines using EGR ..., the outcome of the challenges to the Interim Final [NCP] Rule and our certificates incorporating NCPs, and the timing of promulgation and content of the Final Rule.  If our 0.20g NOx engine certificate applications are not approved, we will be required to use emission credits or NCPs to sell our 13L engines and trucks using such engines.  If the Interim Final Rule is invalidated before the Final Rule is adopted, we may have to rely solely on emission credits to sell our heavy HDD engines and trucks.  If the Final Rule is not promulgated in the form currently proposed or on the timeline currently expected, **we may be required to stop selling medium and heavy HDD engines when our emission credits run out**.  If NCPs are unavailable to us in the future, we will not have sufficient emission credits to continue to sell our heavy HDD engines and trucks with such engines, and if NCPs are available to us, our liquidity and cash flows could be materially and adversely affected by the market impact of such NCPs and the cost of such NCPs as established by the Final Rule.  [UF 234].

Analysts reports following the call further demonstrate that the risk of non-certification was part of the total mix of information available to investors, and the June 2012 statements did not change that.  UF 6, Decl. Ex. A at 31-34.  One analyst reported on June 7 that he did "not see any evidence of progress toward the EPA certification of NAV's EGR-only engines." UF  242(b) (citing Tab 325).  The risk of non-certification and that the market would not accept the performance features of the 0.2g NOx engine described in the June 2012 application were also part of the total mix of information available to investors.  Wells Fargo reported on June 11 that there were "no guarantees that EPA will certify the most [recent] submission, and even with EPA certification, commercial viability is not certain."  UF 242(d) (citing Tab 327).  Far from understanding Ustian to promise certification, Reuters reported on June 7 that the market was aware that "Ustian said he could not predict how long that review [of the May 2012 Application]

would take." UF 242(e) (citing Tab 328). Concerns about the status of EPA's review and the attendant risk of non-certification were part of the total mix of information available to the market, and Navistar adequately disclosed them. Any alleged omission was not material.

As with the alleged omissions related to other certification applications, the information alleged to have been omitted from statements related to the May 2012 Application was available to investors on June 7, 2012. Professor Gompers reviewed the information available to investors at the time of each alleged misstatement and opined that the information alleged to have been omitted from the statements related to the May 2012 Application was available to investors at the time of each alleged misstatement. UF 170, Tab 406, Expert Report of Paul Gompers ¶¶ 109, 114, 116. Therefore, Professor Gompers found there was no economic basis to determine that any of the alleged omissions impacted Navistar's stock price. And again, the SEC's proffered expert did not reach any opinion or try to rebut Professor Gompers' opinions as to whether the allegedly omitted information was available publicly.

### c. Ustian Did Not Act With the Requisite State of Mind

The next independent basis for summary judgment is state of mind. *See supra* Part II.B. It is undisputed that Ustian believed all of the statements identified by the SEC related to the May 2012 Application were true and not misleading because Ustian believed that the May 2012 Application would be certified. UF 217. He said so consistently both internally and externally. UF 237, 239. Ustian's belief was based on information he received from members of the Senior Engineering Group who also thought May 2012 Application met certification requirements. UF 217. To that end, Ustian received information from these engineers leading up to the June 2012 call that EPA was seriously considering the recent submission. *See, e.g.*, UF 219. He was told that the May 2012 Application complied with EPA certification standards, and specifically that it would pass an "in use audit" of the NTE test. *Id.*

The interim feedback from Bunker on June 5 did not materially change this landscape. Patrick Charbonneau forwarded Ustian Bunker's June 5, 2012 email, but Ustian correctly understood that the email was not a denial.  UF 39; Tab 1, Decl. of D. Ustian ¶ 29 ("At all times prior to and including June 7, 2012, I believed the EPA would certify a Navistar 0.2g NOx EGR-only engine because it met the 0.2g NOx standard.").  Even after receiving the June 5 feedback, Ustian and the Senior Engineering Group discussed "next steps" with respect to the May 2012 Application, and none told Ustian that the production timeline changed.  UF 220, 233.[14]

The SEC details facts that it claims Ustian "omitted" from his statements related to the production timeline and performance features of the May 2012 Application.  There is no evidence in the record Ustian was aware of these facts, even assuming for the sake of argument that they were true.  Simply, there is no evidence that Ustian knew that Navistar "had not made all of the changes the EPA said were required for certification" or that "additional changes to the engine to address the EPA's concerns would result in unacceptable performance trade-offs for ready-to-market engines or require so much time for additional development work that Navistar would run out of emissions credits before it could receive certification."  Ustian relied on his engineers to tell him whether Navistar had made all the changes necessary for certification. UF 5.  They uniformly reported to Ustian that Navistar's application could be certified and that Navistar and EPA were continuing to discuss certification following Bunker's June 5 email.

---

[14] Patrick Charbonneau's May 24, 2012 letter to EPA in support of EPA's NCP rule does not contradict this timeline because truck shipment typically occurs months after engine production.  UF 221. Charbonneau wrote, and the Amended Complaint quoted, "Even were EPA to approve Navistar's one 13 liter application tomorrow, it would still take Navistar several months to be able to *ship* road-ready engines covered by the application."  Am. Compl. ¶ 153 (original emphasis deleted).  This is wholly consistent with engine production in June because truck shipment lags.  *See* UF 221.

UF 219, 233.  This reliance on experts is evidence of Ustian's good faith, and make summary

judgment appropriate on the element of scienter.  *See Shanahan*, 646 F.3d 536 at 544.

### B.  The Evidence Is Insufficient to Create a Genuine Issue of Material Fact as to the SEC's Scheme Liability Claims (Counts I - IV)

The SEC alleges that, in addition to making misrepresentations and omissions to

investors, Ustian engaged in a scheme to defraud investors in violation of Section 10(b) of the

Exchange Act, Rule 10b–5(a) and (c), and Section 17(a)(1) and (3) of the Securities Act.  *See*

Am. Compl. ¶¶ 188, 195.  To survive Ustian's motion for summary judgment on this claim, the

SEC must provide evidence on which the jury could find Ustian engaged in a "scheme" or "a

plan or program of something to be done; an enterprise; a project; as, a business scheme, or a

crafty, unethical project."  *Ustian*, 229 F. Supp. 3d at 774 (quoting *Familant*, 910 F. Supp. 2d at

94).  For an act to be inherently deceptive, it must have *both* "the purpose and the effect of

creating a false appearance."  *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1378 (D. Colo. 2014).  The

SEC does not have evidence of **either** for any act.

Evidencing the **absence** of any "scheme," the SEC lays claim to only one act beyond

Ustian's alleged misstatements – namely, Navistar's filing of its February 2011 Application with

EPA to certify a 0.2 NOx 13-liter engine.  *See* Pl.'s Am. Resp. in Opp. to Def.'s Mot. to Dismiss

at 10.  In the SEC's view, Ustian caused Navistar to file the 2011 application to create "the

misimpression that Navistar had successfully developed an EGR-only, 0.2 NOx engine with

competitive performance features and that the application met the EPA's certification

requirements."  *Id.*  To support its allegation, the SEC highlights that Ustian knew the engine

"could not be used in a driveable [*sic*] vehicle, and Navistar could not sell the engine."  *Id.*

But there is no record evidence showing the filing of the February 2011 Application had

either the purpose or the effect of deceiving the public, much less both.  The application was a

legitimate certification application that Ustian and his engineers believed would be certified. UF 86, 92. Fuel economy or competitive performance have nothing to do with certification. UF 21. Even if there were evidence that Ustian and Navistar's statements were misleading as to the February 2011 Application (there is none), no evidence of record exists on which the jury could find Ustian engaged in an "inherently deceptive act" to sustain any claim for liability under Section 10(b), Rule 10b–5(a) or (c), or Section 17(a)(1) or (3), and Ustian is entitled to summary judgment on these claims. *Modrowski*, 712 F.3d at 1167; *Kelly*, 817 F. Supp. 2d at 344.

The Supreme Court's recent decision in *Lorenzo* does not change the analysis in this context. The SEC reads *Lorenzo* to mean that the SEC need not prove conduct separate and apart from the alleged misstatements. But the only question in *Lorenzo* was whether a person who disseminates, but does not "make," a misstatement can be liable under a scheme liability theory. *Lorenzo*, 139 S. Ct. at 1100. The defendant in *Lorenzo* disseminated misleading statements with intent to defraud. *Id.* at 1101. The Supreme Court held that dissemination of statements with fraudulent intent is an "artifice to defraud." *Id.* at 1101. Thus, contrary to the SEC's position, *Lorenzo* did not abandon the longstanding rule that scheme liability requires deceptive conduct; rather, it merely held that disseminating a fraudulent statement **is** deceptive conduct. Even the one district court case the SEC cited in support of its interpretation, *SEC v. SeeThruEquity, LLC*, contradicts the SEC's position. *SeeThruEquity* held the SEC adequately alleged scheme liability where the "complaint allege[d] that the defendants' entire business model, ***beyond any misstatements or omissions***, is deceptive." 2019 WL 1998027 at *5.

## C. The Section 17(a)(2) Claim Fails Because No Evidence Links Any Statement to the Acquisition of Money or Property (Counts III and IV)

Ustian is entitled to summary judgement on the SEC's 17(a)(2) claim alleged in Count III of the Amended Complaint. First, as explained above, the SEC cannot establish that any of the

statements at issue constituted "an untrue statement" under Section 17(a). And even if the alleged misstatements were untrue or misleading, there is no genuine dispute as to whether Mr. Ustian obtained money or property "by means of" the statements at issue here. He did not.

The only allegation in the Amended Complaint that Ustian obtained any money or property is that he "sold Navistar stock on April 5, 2011," long before the 2012 certification applications were submitted and while the February 2011 Application was under discussion with EPA. Am. Compl. ¶ 43. The SEC argued that this sale, coupled with their allegation that "when Navistar disclosed its intention to transition to a new engine technology [15 months later] …Navistar's stock price fell by more than 15 percent," created the "*inference* that Ustian's misstatements artificially inflated Navistar's stock prices and Ustian thereby benefitted." Am. Reply Mot. to Dismiss ¶ 24. At summary judgment, however, such inferences are no longer sufficient as "we are beyond the pleading stage and we need not accept as true statements in ... [the] Complaint." *Benger*, 2013 WL 593952, at *12.

The evidence shows that the inference on which the SEC relied at the motion to dismiss stage is false. The record is devoid of evidence that the alleged misstatements artificially inflated Navistar's stock price on April 5, 2011, and a drop in price fifteen months later cannot support that claim. *See SEC v. Forman*, 2010 WL 2367372, at *8 (D. Mass. June 9, 2010) (summary judgment for defendant on 17(a)(2) claim appropriate where "SEC has produced no evidence" the scheme at issue "caused an increase in share price on the dates [defendants] sold securities").

With the benefit of discovery, the uncontroverted record clearly shows that there was no connection between Mr. Ustian's April 5, 2011 sale and any alleged misstatement; Ustian's financial advisor advised him to make the sale. UF 102. On April 4, 2011, in advance of a financial planning meeting the next day, Ustian's financial advisor Robert Moriarty emailed

48

Ustian suggesting that he exercise his stock options. *Id.* The next day, April 5, 2011, Ustian took Moriarty's advice and exercised his stock options. UF 102. Ustian testified that the sale was "totally no[t] connect[ed]" to the April 5, 2011, press release or any other alleged statements. *Id.* Instead, Ustian understood the sale to be either part of an overall strategy to diversify his portfolio or based on the expiration date of the options. *Id.* There is no contradictory evidence of a causal connection in the record.[15] Because the SEC has failed to establish as a matter of law that Ustian used any of the alleged misstatements to obtain money, Mr. Ustian is entitled to summary judgment on the 17(a)(2) claims. *See Flannery,* 2014 WL 7145625, at \*25 (granting summary judgment to defendant where SEC "failed to show any connection between Defendant's use of the misleading information and ... [the] acquisition of money or property").

### D. The Aiding And Abetting & Control Person Claims Fail Because Ustian Was Not Aware Of Any Improper Or Illegal Conduct and Acted in Good Faith (Counts II, IV, and VII)

The claims that Ustian (i) aided and abetted Navistar's violations of the securities laws and (ii) is liable as a control person fail because the SEC cannot establish a primary violation by Navistar. This is sufficient to grant summary judgment on Counts II, IV, and VII. Even if there were a primary violation, however, summary judgment is appropriate. First, because the facts in the record show that Mr. Ustian was not "aware of any improper or illegal conduct" (*see supra* Parts IV.A.1.c, IV.A.2.c, IV.A.3.c) he is entitled to summary judgement on the aiding and abetting counts. *See Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956-7 (7th Cir. 2004) (vacating finding of aiding and abetting liability where SEC failed to show defendant was

---

[15] What is more, Ustian was a net *acquirer* of Navistar stock through the relevant time period. UF 104. Acquiring *more* Navistar stock is precisely the opposite of how one would profit from a scheme that had already inflated Navistar's stock price.

"aware" the conduct violated any rule – even though the defendant "substantially assisted in [the] primary violation").  Second, Mr. Ustian's reliance on his engineering experts is uncontroverted evidence of his good faith for control person purposes.  *See Donohoe v. Consol. Operating & Prod. Corp.*, 833 F. Supp. at 726–27, (summary judgment appropriate where alleged control person "lacked the necessary expertise to perform meaningful independent review" and "they were entirely justified in depending on the opinions of others").

## V.     CONCLUSION

Mr. Ustian made a business decision informed by a well-qualified group of senior Navistar engineers.  His only "scheme" was to pursue a path he believed would be best for the environment, for the customers, and for Navistar's shareholders.  After the fact, the SEC reached for eleven statements (out of the hundreds of public statements required of a CEO and a public company), ignored the context, ignored the information readily available to the public, skated past the so-called "literal truth" of the statements, and labeled the statement "securities fraud" by omission.  To the contrary, the undisputed facts show that Ustian's statements at all times matched the reality as to performance characteristics and certification prospects.  He said nothing about the engines beyond what the Senior Engineering Group reported to him, and those engineers reported that every certification application met EPA requirements.  The record contains zero evidence that anyone working on the applications told Ustian that they would be denied, much less that they were shams.  The undisputed facts also show that all of the information allegedly omitted from the challenged statements was actually available publicly at the time of the statements.

In short, the record paints a far different picture than the SEC's Amended Complaint.  Ustian did not violate the federal securities laws, and the Court should grant summary judgment in Ustian's favor on all counts of the Amended Complaint.

Dated: August 14, 2019

Respectfully submitted,

**DANIEL C. USTIAN**

*/s/ Sean M. Berkowitz*
By Sean M. Berkowitz

Sean M. Berkowitz (ARDC No. 6209701)
Cary R. Perlman (ARDC No. 6230994)
Robin M. Hulshizer (ARDC No. 6230994)
Eric R. Swibel (ARDC No. 6297743)
Caitlin E. Dahl (ARDC No. 6312614)
Adam L. Rosenbloom (ARDC No. 6317055)
LATHAM & WATKINS LLP
330 N. Wabash Avenue
Suite 2800
Chicago, Illinois 60611
(312) 876-7700

Laurence H. Levine (ARDC No. 1638459)
LAURENCE H. LEVINE LAW OFFICES
189 East Lake Shore Drive
16th Floor
Chicago, Illinois 60611
(312) 927-0625

*Attorneys for Defendant Daniel C. Ustian*