# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-03885 |
| v. | ) ) | Hon. Sara L. Ellis |
| | ) ) ) | |
| DANIEL C. USTIAN, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF SECURITIES AND EXCHANGE
COMMISSION'S RESPONSE IN OPPOSITION TO
DEFENDANT DANIEL USTIAN'S MOTION FOR SUMMARY JUDGMENT**

Eric M. Phillips
Jonathan S. Polish
Anne Graber Blazek
Timothy Stockwell
United States Securities and Exchange
Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. FACTS ............................................................................................................... 3

    A.  Navistar, Its Class 8 Trucks, and the Engines in Those
        Trucks ........................................................................................... 3

    B.  Navistar's "EGR-Only" Strategy for EPA Certification at the 0.20 NOx
        Standard ........................................................................................ 3

    C.  Navistar's and Ustian's Statements About EGR Fuel Economy and
        Performance ................................................................................... 4

    D.  November 3, 2010 Press Release ..................................................... 4

    E.  December 22, 2010 Call ................................................................. 5

    F.  February 2011 Certification Application ......................................... 6

    G.  March 9, 2011 Call ........................................................................ 7

    H.  April 5, 2011 Press Release and Ustian Stock Sale ......................... 7

    I.   Ustian's and Navistar's Late 2011 Meetings With The EPA ............ 8

    J.   December 20, 2011 10-K ............................................................... 9

    K.  Ustian and Navistar Begin Their 2012 Political Pressure On The EPA .. 10

    L.  February 2012 EPA Rejection Of Navistar's January 2012 Application  11

    M. EPA's Interim Rule For NCPs, Which Ustian Says Navistar Does
        Not Plan to Use ........................................................................... 11

    N.  March 8, 2012 and March 22, 2012 Statements ......................... 13

    O.  Ustian And Navistar Prepare For A Late March 2012 Meeting
        With Senator Durbin ................................................................... 14

P.  Ustian Meets With Senator Durbin in Late March 2012 ........................ 15

Q.  Navistar's Certification Struggles Continue in April 2012 and
    May 2012 ............................................................................................ 15

R.  EPA Provides Navistar With A June 2012 Response of
    "Unequivocally No" ........................................................................... 16

S.  June 7, 2012 10-Q and Call .............................................................. 17

T.  Troy Clarke Tells Navistar's Board That EGR Certification
    Is Unlikely ......................................................................................... 18

U.  Navistar's July 2012 Switch To Adopt SCR Technology ...................... 18

III. ARGUMENT ................................................................................................. 19

A.  Summary Judgment Standard .............................................................. 19

B.  Ustian Made Misstatements From November 2010-April 2011 ............. 19

C.  Ustian's November 2010-April 2011 Misstatements Were Material ....... 23

D.  Ustian's Culpable State of Mind for His November 2010-April 2011
    Misstatements ..................................................................................... 25

E.  Ustian Made Misstatements From December 2011-March 2012 ............. 28

    1.  The 2011 10-K Was False And Misleading ...................................... 28
    2.  Ustian Made Misstatements on March 8, 2012 and March 22, 2012 .. 33

F.  Ustian's December 2011-March 2012 Statements Were Material ........... 34

G.  Ustian's Culpable State of Mind For His December 2011-March 2012
    Misstatements ..................................................................................... 38

H. Ustian Made Misstatements in the June 7, 2012 10-Q and Call ............... 41

I.  The Statements in the June 7, 2012 10-Q and Call Were Material ........... 43

J.  Ustian's Culpable State of Mind For His June 7, 2012 Statements .......... 44

K. Recent Supreme Court Precedent Resolves Ustian's
"Scheme Liability" Argument ................................................................. 46

L. Ustian Obtained "Money or Property" Under Securities Act
Section 17(a)(2) ................................................................................ 47

M. Ustian Aided and Abetted Navistar's Violations and Acted as a
Control Person ................................................................................ 49

IV. CONCLUSION ................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................ 19

*Brown v. Brewer*,
   2010 WL 2472182 (C.D. Cal. June 17, 2010) .............................................. 35, 37

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) ...................................................................... 36

*Glickenhaus Co. v. Household Intern., Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...................................................................... 19

*In re American Realty Capital Properties, Inc. Litig.*,
   2019 WL 2082508 (S.D.N.Y. May 10, 2019) ...................................................... 35

*In re Bank of Am. AIG Disclosure Sec. Litig.*
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) .......................................................... 24, 25

*In re Harman Intern. Indus. Inc. Secur. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .................................................................. 29, 43

*In re Time Warner Inc. Securities Litig.*,
   9 F.3d 259 (2d Cir. 1993) .......................................................................... 23

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ............................................................................ 46

*KB Partners I., L.P. v. Pain Therapeutics, Inc.*,
   2015 WL 3794769 (W.D. Tex. June 16, 2015) .................................... 22, 25, 30, 32

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir. 1999) ...................................................................... 37

*Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*,
   2019 WL 3716441 (S.D.N.Y. Aug. 7, 2019) ...................................................... 25

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011) .................................................................. 24, 37

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ............................................................................ 46

*Malouf v. SEC,*
    2019 WL 3788225 (10th Cir. 2019) ................................................................... 47

*McConville v. SEC,*
    465 F.3d 780 (7th Cir. 2006) ............................................................................ 28

*McKenna v. Smart Technologies, Inc.,*
    2012 WL 1131935 (S.D.N.Y Apr. 3, 2012) ...................................................... 37

*McMahan & Co. v. Wherehouse Entertainment, Inc.,*
    900 F.2d 576 (2d Cir. 1990) ............................................................................. 20

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,*
    709 F.3d 109 (2d Cir. 2013) ............................................................................. 24

*Omnicare v. Laborers Dist. Council Const. Indus.,*
    135 S.Ct. 1318 (2015) ...................................................................................... 29

*Sailor v. Northern States Power Co.,*
    4 F.3d 610 (8th Cir. 1993) ............................................................................... 24

*SEC v. Bank of America Corp.,*
    677 F. Supp. 2d 717 (S.D.N.Y. 2010) .............................................................. 24

*SEC v. Bauer,*
    723 F.3d 758 (7th Cir. 2013) ............................................................................ 24

*SEC v. Forman,*
    2010 WL 2367372 (D. Mass. June 9, 2010) ..................................................... 47

*SEC v. ITT Educ. Servs.,*
    303 F. Supp. 3d 746 (S.D. Ind. 2018) ................................................... 22, 47, 49

*SEC v. Jakubowski,*
    150 F.3d 675 (7th Cir. 1998) ...................................................................... 28, 46

*SEC v. Johnston,*
    310 F. Supp. 3d 265 (D. Mass. 2018) ....................................................... passim

*SEC v. Koenig,*
    2007 WL 1074901 (N.D. Ill. Apr. 5, 2007), *aff'd and remanded on other grounds*,
    557 F.3d 736 (7th Cir. 2009) ..................................................................... 28, 38

*SEC v. Monterosso,*
    768 F. Supp. 2d 1244 (S.D. Fla. 2011), *aff'd,* 756 F.3d 1326 (11th Cir. 2014) .................... 38

*SEC v. Mozilo,*
    2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ................................................................ passim

*SEC v. Present,*
    2018 WL 792036 (D. Mass. Feb. 8, 2018) ........................................................................ 28

*SEC v. Roszak,*
    495 F. Supp. 2d 875 (N.D. Ill. 2007) ................................................................................ 48

*SEC v. SeeThruEquity, LLC,*
    2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) .............................................................. 46, 47

*SEC v. Sentinel Management Group, Inc.,*
    2012 WL 1079961 (N.D. Ill. Mar. 30, 2012) .......................................................... 25, 28, 40

*SEC v. Shanahan*
    646 F.3d 536 (8th Cir. 2011) ........................................................................................... 27

*SEC v. Snyder,*
    292 Fed. Appx. 391 (5th Cir. 2008) ................................................................................. 28

*SEC v. Staples,*
    55 F. Supp. 3d 831 (D.S.C. 2014) ................................................................................... 36

*SEC v. Stoker,*
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) ............................................................................. 48

*SEC v. Tecumseh Holdings Corp.,*
    765 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................................ 29, 43

*SEC v. Tourre,*
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ........................................................................ 48

*SEC v. True North Finance Corp.,*
    909 F. Supp. 2d 1073 (D. Minn. 2012) ...................................................................... 29, 43

*SEC v. Ustian ,*
    229 F. Supp. 3d 739 (N.D. Ill. 2017) ................................................................... 19, 31, 47

*Silverman v. Motorola, Inc.,*
    798 F. Supp. 2d 954 (N.D. Ill. 2011) ......................................................................... 22, 40

*Singer v. Reali,*
    883 F.3d 425 (4th Cir. 2018) ........................................................................................... 21

*Strychalski v. Baxter Healthcare Corp.*,
    2014 WL 1154030 (N.D. Ill. Mar. 20, 2014) ...................................................... 19

*Tongue v. Sanofi*
    Tongue v. Sanofi, 816 F.3d 199 (2d Cir. 2016) ................................................ 31

*U.S. v. Garcia*,
    413 F.3d 201 (2d Cir. 2005) .............................................................................. 22

*U.S. v. Martoma*,
    993 F. Supp. 2d 452 (S.D.N.Y. 2014) .............................................................. 25

*United Paperworkers Intern. Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) ........................................................................... 37

*Von Holdt v. A-1 Tool Corp.*,
    2012 WL 13048975 (N.D. Ill. Sept. 29, 2012) ................................................ 48

**Statutes**

Section 17(a)(2) under the Securities Act of 1933 [15 U.S.C. § 77q(a)(2)] ......................... 47, 48

**Rules**

Federal Rule of Civil Procedure 30(b)(6) ................................................................... 3

Rule 10b-5 under the Securities Exchange Act of 1934 [17 C.F.R. § 240.10b5]........................ 46

Rule 13a-14 under the Securities Exchange Act of 1934 [17 C.F.R. § 240 13a-14] .................. 49

## I.   <u>INTRODUCTION</u>

Drawing all reasonable inferences in the SEC's favor, as the Court must, a reasonable jury could conclude that Ustian repeatedly exploited the non-public nature of the EPA certification process to mislead the investing public. Here are four examples.

<u>First</u>, in late 2010 and early 2011, he told analysts and investors that Navistar's 13-liter EGR 0.2 NOx engine would have better fuel economy than the competition's SCR engines. But as he admitted under oath, the fuel economy of the then-existing prototype was unknown.

<u>Second</u>, on December 20, 2011, Ustian approved Navistar's 10-K, which stated: "We believe that our engines meet both agencies' certification requirements." In fact, ***that very day*** he had received a draft presentation for Bill Daley, at the time President Obama's Chief of Staff, complaining the EPA was unfairly imposing requirements Navistar's engines could not meet. Ustian knew that the EPA was holding firm in its position that Navistar's engine was deficient.

<u>Third</u>, in March 2012, Ustian suggested that a Navistar investor relations representative tell an investor that "we have submitted to EPA for approval. That process takes 60 to 90 days normally but we hope for faster[.] We will be ready in June to have this ready for production. So approval maybe [A]pril, production June." He wrote this about ***two weeks*** after the EPA had emailed Navistar its "preliminary view" that "Navistar's application for a certificate of conformity raises several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application." Ustian knew there was no basis to suggest to an investor that the EPA would approve the application within a few months.

Fourth, on June 7, 2012, during an analyst call, Ustian stated the following about Navistar's May 2012 application: "In working with the EPA, they asked us if there was some spots that they wanted us to modify, and so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. So there's where that stands." In fact, Ustian knew that the pending application fell well short of the EPA's requirements for a certifiable engine, because just ***two days earlier*** he saw EPA feedback that "based on the information provided, I believe your engine is unlikely to receive a certificate of conformity as it is currently designed."

***Any one of Ustian's misrepresentations standing alone warrants a jury trial***. Here, the SEC has shown evidence of Ustian's scheme to defraud through repeated misrepresentations.

Ustian's motion for summary judgment is fatally flawed because throughout it, he draws all inferences in a light most favorable to ***him***. He aggressively spins some facts while ignoring others, all in pursuit of his alternative narrative. What were EPA letters detailing "several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application" are now just "iterative information exchanges." Where the evidence shows Ustian as a hands-on CEO actively monitoring and participating in Navistar's certification efforts, he now portrays himself as a figurehead. While the EPA/Navistar back-and-forth occurred in private, now "The market was well-apprised of the EPA feedback[.]" For each of Ustian's misstatements, he myopically focuses on one or two words, disregarding the context.

Ustian's aggressive spin may be proper in a closing argument. But it is not the stuff of summary judgment. Complex, fact-intensive cases like this one are poor candidates for summary judgment. The Court should deny Ustian's summary judgment motion.

## II.    FACTS

### A.    Navistar, Its Class 8 Trucks, and the Engines in Those Trucks

Institutions and individuals own Navistar stock. Navistar made trucks, including "Class 8" trucks. For Navistar's 2010-2012 fiscal years, over half of North American traditional truck net orders were for Class 8 trucks. (Additional Facts ("AF") ¶ 1). As of mid-2011, Navistar's flagship engine for Class 8 trucks was the 13-liter. (Undisputed Facts ("UF") ¶ 2).

### B.    Navistar's "EGR-Only" Strategy for EPA Certification at the 0.20 NOx Standard

As of June 2008, both Navistar and another engine maker, Cummins, Inc. ("Cummins"), planned to use EGR technology to meet the EPA's 0.20 NOx Standard. (AF ¶ 2). However, in August 2008, Cummins announced that it was switching to SCR technology. Cummins explained to Ustian and others at Navistar that Cummins could deliver better performance and fuel economy with SCR. (AF ¶ 3). Navistar executive James Hebe told Ustian that Cummins' CEO said that Cummins did not think it could technologically use EGR to reach 0.20 NOx. (AF ¶ 3).

It has not been the EPA's practice to "deny" certification applications unless asked to do so. It is rare for the EPA to issue formal denials, and the EPA's Rule 30(b)(6) witness is not aware of a single specific instance in which it has done so. Instead, when the EPA finds a certification submission to be deficient, it usually tells a manufacturer that the agency is not taking action to approve the application. (AF ¶ 5). Certification is a "black box." Only Navistar

and the EPA knew details of Navistar's certification applications. (AF ¶ 6). Information about pending applications is not available to the public by contacting the EPA or from the EPA's website. (AF ¶¶ 6, 8). It was unusual for a company to speak publicly about its EPA certification efforts, as Navistar did. (UF ¶ 60; AF ¶ 10).

### C.  <u>Navistar's and Ustian's Statements About EGR Fuel Economy and Performance</u>

During a November 2008 investor conference, Ustian said that the fuel usage, torque, and horsepower of Navistar's 11-liter and 13-liter EGR engines would be superior to engines using SCR technology. (UF ¶ 56). In a January 2010 presentation for analysts, Navistar stated that the "2010 EGR engine will have better performance and lower heat rejection." In a November 1, 2010 presentation at another investor conference, Ustian stated that "we've improved fuel economy on our own product by 4.5%." (AF ¶ 4).

### D.  <u>November 3, 2010 Press Release</u>

In August 2010, Navistar certification director David Piech ("Piech") emailed Ustian and others with Piech's recommendations to give Navistar more time to develop its EGR technology so that it could get down to 0.2 NOx. (AF ¶ 12). Navistar needed more time because Navistar could not produce a commercially viable engine at 0.2 NOx. In early September 2010, Piech made recommendations to Ustian and others including nonconformance penalties ("NCPs"). Ustian responded that Navistar would never pay NCPs. Piech also recommended that Navistar could use SCR. Ustian responded that Navistar would never do SCR. (UF ¶ 57).

A November 3, 2010, press release ("November 2010 Press Release") stated that Navistar "plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months,

far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required." (UF ¶ 58; UF Tab 64). Regarding the 13-liter 0.2 NOx engine submitted for certification in early 2011, Ustian has stated in sworn investigative and deposition testimony: "I don't think anyone knows what the fuel economy was;" it "was never intended to be sellable;" and Navistar "knew it didn't have the other parameters, fuel economy, performance." (UF ¶ 82). When some November 2010 news articles cited Ustian as saying that it could be two years before Navistar would fully produce 0.2 NOx engines, Ustian was representing that Navistar believed that its heavy-duty emissions credits would last until about November 2012. (AF ¶ 15). However, absent NCPs – which only became available as of January 31, 2012 (UF ¶ 161) – Navistar would have exhausted its heavy-heavy credits in early 2012. (AF ¶ 15).

### E. December 22, 2010 Call

In December 2010, a Navistar engineer emailed the EPA about Navistar's proposal for a 13-liter 0.2g NOx engine to include "Limited volume, select customers," "Introduction to service Jan 2011," and "carryover DF." (UF ¶ 70). DF stands for deterioration factor. (UF ¶ 83). During a December 22, 2010 earnings call ("December 22, 2010 Call"), Ustian said: "[W]e will submit that over the next couple of months I believe. . . . [W]e would be able to show you the data that it meets 0.2 and show you how we are able to meet it. But as far as the customers, he is not going to know the difference. Nothing looks any different." (AF ¶ 16). A Jefferies analyst who participated in the call understood from Ustian's statement that Navistar had run comparisons of fuel economy of its EGR engines with SCR engines, as Navistar "had talked about their solution being as fuel efficient or perhaps even a bit more than the competing technology." (UF ¶ 76).

Ustian approved a Navistar attorney's December 23, 2010 draft answer to a reporter's questions stating: "We expect to submit applications for certification of our engines at 0.2g without using credits in the next few months . . .those engines will also have great fuel efficiency." (UF ¶ 77).

## F. **February 2011 Certification Application**

In February 2011, Navistar submitted a 13-liter 0.2 NOx engine – known internally as the "D-Cert" engine – for EPA certification (the "February 2011 application"). (UF ¶¶ 79, 81). On February 18, 2011, an EPA official responded to Navistar's December 2010 email (AF ¶ 17) by stating: "[M]y recommendation is that carryacross of DFs from the 13L 0.50 g/bhp-hr NOx engine to the 13 L 0.20 g/bhp-hr NOx engine should not be approved." The engineer who received the email forwarded it to other engineers and stated: "EPA has officially rejected NAV bid to use the 2010 MF 13 durability DF for the D-Cert." (AF ¶ 17). On February 21, 2011, a Navistar engineer forwarded an email to Ustian that stated: "Durability data and results from the current '11MY MF 13L engine were used in the submittal despite EPA disallowing that version of durability demonstration. I highly recommend that this application formality NOT be portrayed as Navistar has <u>received</u> certification or EPA approval." (UF ¶ 85). The Jefferies analyst understood that Navistar could have sold the engine because "once an engine is approved, you would assume that it's ready to go for sale." (AF ¶ 18).

As of October 2011, Navistar's February 2011 application lacked information including how the engine's emissions controls deteriorated over time. Navistar did not follow up with the EPA on the incomplete items, and the application just withered on the vine. By the time of Navistar's December 20, 2011 Form 10-K, Ustian knew Navistar was no longer working on the

application. The Wells Fargo analyst wanted to know what had happened with that application. He would have found it significant that the EPA had serious concerns and was not going to certify it. According to the Jefferies analyst, it is unusual for the EPA not to certify an engine that has been submitted for certification. (AF ¶ 22).

## G. March 9, 2011 Call

During a March 9, 2011 earnings call ("March 9, 2011 Call"), Ustian said: "We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over. We want to get in front of the 0.2 now, because we can anticipate there is a next one coming out that 0.2 can't be done. So what we did is we submitted to the EPA a certification of 0.2 to take that argument away. We don't plan on using this for a while, but we are going to have it out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well." (UF ¶ 93). Based in part on the call, the Avondale analyst understood that the engine described in the February 2011 application was compliant with EPA standards and competitive regarding fuel economy and performance. (UF ¶ 94).

## H. April 5, 2011 Press Release and Ustian Stock Sale

A Navistar April 5, 2011 press release ("April 5, 2011 Press Release") stated: "Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technology." (UF ¶ 93). Two days later, a Baird analyst stated: "The next important milestones are: Certification of engines as compliant without the use of emissions credits: the 13-liter engine was submitted for certification in February." (AF ¶ 20). On the date of the press release, Ustian

sold Navistar stock (the "April 5, 2011 stock sale") and obtained over $1 million in profits. (UF

¶¶ 102-103). To get permission to make the stock sale, Ustian informed Navistar that he did not

have material non-public information. (AF ¶ 21). But Ustian did have material non-public

information that the 13-liter engine described in the press release failed the EPA's DF testing

requirements and lacked competitive fuel economy and performance. (UF ¶ 82).

### I. Ustian's and Navistar's Late 2011 Meetings With the EPA

In October 2011, Ustian met with EPA official Margo Oge ("Oge"). She testified that the

meeting was "very basic. Mr. Ustian, I understand that your engineers are working on EGR

engines that are not meeting, not even close to meeting the standards." Oge did not want to hear

from him that SCR was not working. Ustian knew that "the EPA would not talk to us about SCR,

period." (UF ¶ 108). As of December 2011, Navistar had been working on EGR for about 10

years and had invested thousands of employee hours and hundreds of millions of dollars on

EGR. But Navistar had still not overcome the manifold challenges with EGR. (AF ¶ 23).

In a December 9, 2011 email, a Navistar executive emailed Ustian: "NCPs continue to be

a big concern. $1000/engine is a non starter." (AF ¶ 24). On that same date, Ustian and Navistar

Vice-President of Government Relations Patrick Charbonneau ("Charbonneau") met with EPA

officials including Oge, Byron Bunker ("Bunker"), and Gina McCarthy ("McCarthy").

Charbonneau emailed Ustian materials in preparation for the December 9, 2011 meeting,

including a slide that had a subheading ".2 cert of current products," underneath which it stated:

"utilizing AECD and NTE deficiency." A NTE deficiency is a waiver from the NTE standard of

.3 NOx. (UF ¶ 112). An AECD is an Auxiliary Emissions Control Device. (UF ¶ 48).

On December 16, 2011, Navistar met with the EPA. (AF ¶ 25; UF ¶¶ 114-15). After the meeting, Bunker emailed Navistar: "EPA cannot issue a certificate (conditional or otherwise) unless the engine meets the FTP, SET(RMC), and NTE requirements. The engine described today by the Navistar team for certification in February does not appear to meet these requirements. Second, we stated that EPA would not consider an NTE deficiency that allows emissions at a rate of 3.5 times the engine's Family Emissions Limit and that operates 60 to 80 percent of the time in-use as 'minor deviations from the NTE requirements.'" Charbonneau forwarded this email to Ustian. (UF ¶ 114). On December 20, 2011, Charbonneau emailed Ustian and others (the "December 20 email") with materials that "might be presented to Bill Daley requesting his assistance." Daley was serving as President Obama's Chief of Staff (UF ¶ 117), but he left the White House shortly thereafter. (AF ¶ 25). The email stated that Bunker "does not want to approve an NTE deficiency that is above .3 NOx (not that he can't, he doesn't want to). He does not want to approve an AECD that is on 100% of the time (not that he can't, he doesn't want to.)" (UF ¶ 117). A slide stated that NCPs would be a "[m]arketing and sales disaster." (AF ¶ 25).

**J.  December 20, 2011 10-K**

On December 20, 2011, Navistar filed its annual report on Form 10-K.[1] The 10-K included a "risk factor" with the heading "Our solutions for meeting U.S. federal and state emissions requirements may not be successful or may be more costly than planned." (UF ¶ 118).

---

[1] The parties' Joint Statement erroneously states that Navistar filed this 10-K on December 22, 2011 (UF ¶ 118; *see* UF Tab 133 at cover page (stating that Form 10-K was filed on "12/20/11 for the Period Ending 10/31/11.")).

It further stated: "We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both agencies' certification requirements." (UF ¶ 118). Navistar's 2008-2010 Forms 10-K also included a "risk factor" with a similar heading. (AF ¶ 26; UF ¶ 44). The language in the "risk factor" in Navistar's 2009-2011 Forms 10-K was similar, except that in the 2011 10-K, Navistar added four sentences to the second paragraph of this "risk factor" relating to the company's usage of emissions credits. (AF ¶ 26; UF ¶ 44). The Wells Fargo analyst believed that the statement that "we believe that our engines meet both agencies' certification requirements" meant that Navistar was close to receiving certification. (AF ¶ 26).

### K. Ustian and Navistar Begin Their 2012 Political Pressure on the EPA

In early 2012, Navistar hired Tyrone Fahner ("Fahner"), a former Illinois Attorney General (UF ¶ 134), and Fahner then called his friend Valerie Jarrett ("Jarrett"), a special assistant to President Obama. (UF ¶ 135). In late January 2012, Fahner, Ustian, and others had a meeting with McCarthy and the EPA, during which Fahner stated that he called Jarrett and wants .2 engine certification. It was unusual for an engine manufacturer to bring an EPA certification issue to the political level. Ustian told McCarthy that she should just order those people in Ann Arbor to issue the certificate. McCarthy responded that she was not going to do anything of the kind. (UF ¶ 136). Charbonneau later wrote: "I believe that our political pressure through Valerie Jarrett to EPA Administrator to Gina helped make this conversation more positive." (AF ¶ 27).

On January 31, 2012, Navistar submitted the application ("January 2012 application") (UF ¶ 142), which included a "Safe Operating Mode AECD." The application stated that the

AECD "operates at all climactic conditions, speeds and loads other than idle." (UF ¶ 143). This AECD's engagement improved engine performance but increased NOx emissions. (AF ¶ 23).

**L. <u>February 2012 EPA Rejection of Navistar's January 2012 Application</u>**

On February 17, 2012, the EPA emailed Navistar, stating "our preliminary view is that Navistar's application for a certificate of conformity raises several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application." (UF ¶ 147). The EPA also stated that a "NTE deficiency is only an allowance for minor deviations under limited conditions. The Safe Mode Operation AECD clearly does not meet the scope of this provision." (UF ¶ 148). Ustian was aware of the email. (UF ¶ 149). According to Piech, the email was atypical because it "was a very formal delineated point by point question or response to the actual submission." (AF ¶ 29). In a February 19, 2012 email, a Navistar engineer called the response a "total bummer." Another engineer stated: "We are getting nowhere with agencies… they just keep digging in even harder the harder we try." In another February 19, 2012 email, Hebe stated: "I guess the sense is that they are going backwards on what we had assumed was ok. Apparently they sent a rejection letter that is quite extensive and have declined any further meetings till we answer the points in that letter." (UF ¶ 152). On February 23, 2012, a Navistar engineer stated: "I just spoke with Dan for 15min. He wants everyone focusing on the 0.2gNox solution and the fact that EPA has done us wrong." (UF ¶ 153).

**M. <u>EPA's Interim Rule for NCPs, Which Ustian Says Navistar Does Not Plan to Use</u>**

On January 31, 2012, EPA promulgated an "interim final rule" ("IFR") for NCPs. The next day, Navistar held its Analyst Day, during which an analyst asked Ustian the following

question, and Ustian gave the following partial answer: Q: "What is Plan B if the EPA certification is not done in time, if for whatever reason they send you back?" A: "We don't have a plan on using Plan B." "Plan B" referred to NCPs. (AF ¶ 30).

On February 7, 2012, Navistar competitors sought to nullify the IFR in the D.C. Circuit, Case No. 12-1077 ("*Mack Trucks v. EPA litigation*"). (UF ¶ 163). On March 1, 2012, Navistar filed an opposition to the Petitioners' Emergency Motion for Expedited Review in that litigation ("March 1 filing"). Navistar's March 1 filing was 80 pages long, including attachments. (AF ¶ 31). One of the attachments was a February 28, 2012 letter from the EPA's McCarthy to counsel for Navistar's competitors (the "McCarthy Letter"). (AF ¶ 31; AF Tab at 69-80 out of 80). On March 5, 2012, the D.C. Circuit granted the motion that Navistar had opposed in its March 1 filing. (AF ¶ 31). On March 8, 2012, Navistar disclosed that it was projecting $25 million in NCPs paid during the remainder of 2012 (UF ¶ 182), which was "somewhat different than what we said on the Analyst Day" February 1, 2012 call. (AF ¶ 31). Of the over 40 analyst reports issued during March 2012, none mentioned the McCarthy Letter. (UF ¶ 175). No deponent in this case testified to seeing the McCarthy Letter (UF ¶ 174).

After the IFR, Navistar paid NCPs. However, California and nine other states did not permit NCPs, so Navistar used credits in those states instead of NCPs. (UF ¶ 162). As a result of the IFR and Navistar's use of NCPs in the approximately 40 states that permitted NCPs, Navistar's estimates about when it would exhaust its heavy-heavy credits extended to beyond February 2012. When Navistar paid NCPs, it paid approximately $2,000 per engine. This was about double the amount that Navistar had told the EPA would be a "non starter." Navistar's use

of NCPs, along with quality issues and the lack of 0.2 NOx certification, brought truck sales to a standstill. (AF ¶ 32). Per Navistar, the EPA had been "warned for months that NCPs (non conformance penalties) would have a devastating impact on the company," and in one month, there had been "dramatic order reductions," and "50% of customer surveyed will not buy Navistar products because of NCPs." (UF ¶ 189).

### N. **March 8, 2012 and March 22, 2012 Statements**

On March 6, 2012, Charbonneau emailed Senator Durbin's office, stating: "I would like to seek your guidance on what steps we should take initiating a meeting with the Senator and our Chairman and CEO Dan Ustian and the UAW Director Dennis Williams who is also on the Navistar Board of Directors. The topic is the EPA." (UF ¶ 179). Also on March 6, 2012, Ustian received an email from an investor. The investor's email stated that an analyst was "saying that dealers don't expect EPA certification until August now . . . and in fairness the few weeks mentioned at the investor day have passed. What is the official company stance now? If/when it starts to impact end customer decisions it's going to be a major problem." Ustian responded in an internal Navistar email that "we have submitted to EPA for approval. That process takes 60 to 90 days normally but we hope for faster[.] We will be ready in June to have this ready for production. So approval maybe april, production June." (UF ¶ 180).

Navistar's March 8, 2012 Form 10-Q and an accompanying March 8, 2012 press release ("March 8, 2012 Press Release") referred to the January 2012 application as a "milestone." (UF ¶ 182). In a March 8, 2012 call ("March 8, 2012 Call"), Ustian stated: "We have submitted for the .2 and that goes through a process of—typically, that's about three months, I think, is about

the average of that. When we get the certification, it still takes some time for us to get to production on this. So what we are doing right now is getting ready to go to production, and it will be about June before we can get into production with that particular engine." (UF ¶ 184).

On March 9, 2012, the Wells Fargo analyst wrote: "NAV has indicated it expects to receive EPA certification by May 1 and begin production of fully compliant engines by June 1, 2012. If the certification is delayed or the EPA does not grant certification, then our estimates may be too high." The source of the analyst's information that Navistar expected certification by May 1 was Mr. Ustian's statements on the March 8, 2012 Call. (AF ¶ 33)

### O. <u>Ustian and Navistar Prepare for a Late March 2012 Meeting With Senator Durbin</u>

On March 9, 2012, Charbonneau emailed to Ustian a draft PowerPoint for a meeting with Senator Durbin. The PowerPoint had a slide titled "EPA's Unfair Bias." Another slide titled "The Solution" stated: "EPA approval of Navistar .2 certification." (UF ¶ 189). In a March 16, 2012 email, Ustian told Charbonneau to ask "byron if this is different methodology. Ask byron....what does he expect navistar to do? This does sound like the epa lawyers are in court and they are the judge and jury." (UF ¶ 190). The next day, March 17, 2012, Ustian told a Navistar engineer about the EPA: "F them. Give them nothing." (UF ¶191).

A March 22, 2012 Navistar press release ("March 22, 2012 Press Release") noted the recent certification application for "its 0.20g NOx MaxxForce 13 big bore diesel engine. Once certified, Navistar will be the only engine manufacturer in the world to achieve urea-free 0.20g NOx emissions through in-cylinder technologies. During the certification process, Navistar is making preparations for launch of that engine this summer." (UF ¶ 184). On the day of the

14

March 22, 2012 Press Release, a Barrington analyst stated in a report: "NAV continues to expect EPA 2010 13L certification sometime in spring 2012, and 13L compliance engine production beginning in June 2012. However, the production could push to July or August should the EPA continue a 'slow walk' with the certification process." (AF ¶ 34).

**P. Ustian Meets With Senator Durbin in Late March 2012**

On March 28, 2012, Ustian, Charbonneau and a third Navistar official met with Senator Durbin and his staff. According to the Navistar official's summary of his notes from the meeting, Ustian told Durbin that Navistar was at somewhat of a stalemate with the EPA, the company was getting to the point where it could not ship product, and it had submitted a 0.2 engine to the EPA but had struggled to get it approved. Ustian cannot recall any other instance in which he met with a public official about Navistar's certification efforts for any engine. (UF ¶ 193).

**Q. Navistar's Certification Struggles Continue in April 2012 and May 2012**

In early April 2012, after meeting with the EPA, a Navistar engineer stated that the 783.2 program (for 0.2 NOx engine certification (UF ¶ 140)) was "FUBAR" because "the conversation with the agency was not going well in my opinion." (UF ¶ 196). In April 2012, the EPA said "NO" to Navistar's January 2012 application. (UF ¶ 197). On May 10, 2012, Navistar withdrew the January 2012 application. On May 21, Navistar submitted its third 13-liter 0.2 NOx application (the "May 2012 application"). Navistar requested approval by June 15, 2012. (UF ¶ 202). About four days after Navistar's May 10, 2012 withdrawal of the January 2012 application, an investment manager, Empyrean, began investing in Navistar stock. Empyrean's investment thesis was "predicated on the approval of NAV's 13L engine by the EPA." (UF ¶ 208).

**R.  EPA Provides Navistar With a June 2012 Response of "Unequivocally No"**

On June 4, 2012, a Navistar engineer responded to an email from his supervisor with the subject line: "How did EPA mtg go??" The engineer wrote: "Despite the cone of silence that Patrick has sworn us to, I will lean forward and share Byrons response. Byron said unequivocally NO! Simply put, it's either < 0.2 or not. Same as it's < 0.30 or less. Binary logic, no room for discretion." The engineer then forwarded his response to another Navistar employee, who responded in part: "I think Dan has accepted the fact that we won't get cert by analyst call." The engineer responded: "He must have another 'surprise' to confuse the analysts . . . NG worked good last time." NG refers to a natural gas program. (UF ¶ 224).

On that same June 4 date, a Navistar engineer sent an email with the subject line: "did you hear any more?" An engineer responded: "I left to talk to Dan . . . he was just using F . . . ." (UF ¶ 226). Asked during his deposition whether an early May 2012 email was "before the June 4th, 2012, meeting with the EPA where the EPA essentially rejected Navistar's pending application," the engineer answered: "That is correct." Then asked: "The same application where I think we saw [Navistar engineer] Titus in an e-mail reflect that the EPA had said unequivocally no to Navistar's application?" He answered: "That is correct, yes." (UF ¶ 227).

On June 5, 2012, Bunker emailed Charbonneau, stating: "I appreciate your team traveling to Ann Arbor yesterday to meet with us. The meeting clarified several important aspects of Navistar's pending application. As I said yesterday, based on the information provided, I believe your engine is unlikely to receive a certificate of conformity as it is currently designed. We intend to send you a more detailed written response delineating all of our concerns. One of the

most important concerns is that the engine will typically operate over FTP conditions at 0.42g/hp-hr in any vehicle with mass less than 140,000 pounds and that starts in any gear less than 5 gear. Since vehicles are rarely heavier than 80,000 pounds and since 140,000 pound vehicles never start in fourth gear or higher, this means that under all in-use circumstances, this engine will have FTP emissions of 0.42 g/hp-hr." Charbonneau forwarded the email to Ustian. (UF ¶ 229). On June 15, 2012, the EPA sent Navistar the "more detailed written response delineating all of our concerns" that Bunker referenced in his June 5, 2012 email. This June 15, 2012 response used the word "preliminary." (AF ¶ 36). The June 15, 2012 date was the date by which Navistar had requested approval of the May 2012 application. (AF ¶ 36; UF ¶ 202).

**S. June 7, 2012 10-Q and Call**

On June 7, 2012, Navistar filed its Form 10-Q ("June 7, 2012 10-Q"), stating that with respect to the May 2012 application, "[c]ertain issues raised by the revised application are under review by the EPA, and we are engaged in ongoing discussions relating to certification of this engine family at 0.20g NOx." (UF ¶ 234). On that same date, Ustian and other Navistar executives conducted a conference call ("June 7, 2012 Call"), where Ustian stated: "In working with the EPA, they asked us if there was some spots that they wanted us to modify, and so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. So there's where that stands." Ustian was asked: "Last time we were talking about this you said it would be three to four months for the approval process. Does that clock start again now in

May?" Ustian responded: "No, of course not. Again, it's somewhat out of our control. But no, there is plenty of background out there now that it shouldn't take nearly as long. I could argue we should have been done with this, but we are not. So we have to go forward and get it done expeditiously." (UF ¶ 237). The Jefferies analyst interpreted Ustian's statements to mean that certification should occur within a time period shorter than three to four months. (AF ¶ 37).

**T. Troy Clarke Tells Navistar's Board That EGR Certification Is Unlikely**

Troy Clarke ("Clarke") is Navistar's current CEO. Up through early June 2012, he had no knowledge of the certification process. In June 2012, Navistar's assigned Clarke with the responsibility to have negotiations and discussions with the EPA. According to Navistar's minutes of a mid-June 2012 Board meeting, Clarke "discussed how it was unlikely that the EPA would certify the company's .20 NOx submission using EGR but of EPA's willingness to work with the company if an alternative emissions strategy were adopted." (UF ¶ 246).

**U. Navistar's July 2012 Switch to Adopt SCR Technology**

In July 2012, Navistar switched to adopt SCR technology and buy engines from Cummins. When Navistar was deciding on the switch, it knew the switch would be painful. In fact, it proved to be extremely painful. This was because when the switch occurred, "all those trucks out there with EGR are semi-orphans. And who wants to buy a semi-orphan engine? And that's, in fact, what happened, is that the valuation, the used – used truck valuation declined precipitously because of the switch over to SCR." Navistar had to assume this cost. (AF ¶ 39).

### III. ARGUMENT

#### A. Summary Judgment Standard

On summary judgment, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where, as here, a case involves numerous facts and issues that are hotly-contested, the case is not ripe for disposition on summary judgment. *Strychalski v. Baxter Healthcare Corp.*, 2014 WL 1154030 at *1 (N.D. Ill. Mar. 20, 2014).

#### B. Ustian Made Misstatements From November 2010-April 2011

Ustian's statements in the November 3, 2010 Press Release,[2] the December 22, 2010 Call, the March 9, 2011 Call, and the April 5, 2011 Press Release were false and misleading. He communicated that Navistar had developed a 13-liter 0.2 NOx engine that had competitive fuel economy and performance features and, accordingly, Navistar could sell the engine if it ever needed to do so. These statements misleadingly suggested that the engine met the EPA's certification requirements. In denying Ustian's motion to dismiss, the Court ruled that the SEC could proceed with these claims. *SEC v. Ustian*, 229 F. Supp. 3d 739, 765-70 (N.D. Ill. 2017).

The Court should not change this ruling now. Analysts and investors have provided sworn testimony, and contemporaneous documentary evidence, establishing that these statements were false and misleading. Three "sell-side" analysts testified that they believed the engine

---

[2] Whether a company's CEO is considered the "maker" of press releases and other company statements is "an inherently fact-bound inquiry." *Glickenhaus Co. v. Household Intern., Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). Ustian has not moved for summary judgment on the issue of whether Ustian was a "maker" of the alleged misstatements in this case. (Ustian Br. at 26). Accordingly, the SEC does not address the issue, which in any event should not be resolved on summary judgment.

submitted for certification in February 2011 could be put into production and sold by Navistar once certified. (AF ¶¶ 18-19; UF ¶¶ 76, 94). Likewise, a "buy-side" analyst from Navistar investor Wellington Management Co. ("Wellington") testified that as of November 2010, he believed the engine would be saleable once certified. (AF ¶ 14). The Avondale analyst wrote that a certification would help Navistar prove that EGR was not just an "interim technology." (UF ¶¶ 64-65, 76).[3] The Wellington witness wrote in November 2010 that a certification would show that Navistar's EGR engine would not end up like "Beta to SCR's VHS once NAV's credits run out." (UF ¶ 68). By contrast, not a single analyst or investor witness has testified that he or she understood that Navistar could not produce and sell the engine once certified. And even if Ustian were able to produce such testimony, that would only create a fact issue for trial.

Although some analysts were skeptical that Navistar could deliver on the fuel economy and performance features it promised, skepticism is the analysts' stock-in-trade. (AF ¶ 9). This skepticism does not determine whether Ustian's statements were false or misleading to a reasonable investor. *Cf. McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (reasonable investor standard determines whether statement is misleading).

The SEC has adduced substantial evidence that the engine announced for certification in November 2010 and submitted for certification in February 2011 lacked competitive fuel economy and performance features and, accordingly, could not be sold even if certified. (UF ¶¶ 80-82). Further, the engine did not meet the EPA's DF testing requirements, and the EPA had

---

[3] Ustian cites language in the Avondale analyst's report that the announcement of 0.2 NOx certification was an "ingenious PR move" (Ustian Br. at 30) but ignores the remainder of the analyst's language in these reports snd the analyst's sworn testimony about these reports (UF ¶¶ 64-66, 76, 94).

"officially rejected" Navistar's proposal for alternative DF testing when Navistar submitted the engine for certification in February 2011. (AF ¶ 17, UF ¶¶ 85, 89). By contrast, Ustian has provided no evidence from which the Court could conclude that the engine had competitive fuel economy and performance features, that Navistar could sell the engine in light of the absence of these features, or that the engine actually met the EPA's DF testing requirements.

Ustian misses the mark by claiming that he only said that Navistar's engines already in production had competitive fuel economy and performance. (Ustian Br. at 28-29). This argument ignores Ustian's statement on the December 22, 2010 Call that a customer is "not going to know the difference" (UF ¶ 71; UF Tab 80 at NAV00455509), which suggested that the 0.2 NOx engine would not have different performance from the 0.5 NOx engine already in production. But even if Ustian did not specifically reference the 0.2 NOx engine's fuel economy and performance, his statements were nonetheless misleading by omission. When Ustian repeatedly touted the fuel economy and performance of EGR engines, both before and after Navistar submitted the February 2011 certification (AF ¶¶ 4, 16, 19; UF ¶¶ 56, 63, 67, 71, 77, 93), he acted misleadingly by failing to clarify that the 0.2 NOx engine submitted for certification in February 2011 lacked those features. *See Singer v. Reali*, 883 F.3d 425, 441 (4th Cir. 2018).

Ustian's statements that Navistar would not fully produce the 0.2 NOx engine for two years (Ustian Br. at 28-29) change nothing. Navistar itself represented to the EPA in December 2010 that Navistar would produce a "[l]imited volume" of the engine and provide it to "select customers." (UF ¶ 70). As this representation shows, a reasonable investor could have understood that Navistar would produce and sell the engine in limited amounts. And even if an

investor only construed Ustian to say that Navistar planned to keep the engine "on the shelf," the fact that Navistar could produce and sell the engines if necessary once certified was significant. (AF ¶¶ 4, 14; UF ¶¶ 56, 62, 64, 66). Ustian's statements that Navistar would take the time between certification and mass production to improve fuel economy only suggested that Navistar would <u>continue</u> to improve fuel economy, not that the engine submitted for certification in February 2011 lacked competitive fuel economy and performance. Finally, Ustian's forecast that full production would not occur for two years was based on an inaccurate premise that Navistar had two years of Big Bore credits left. (AF ¶ 15).

Ustian mistakenly relies on the post-hoc opinion testimony of two Navistar engineers for his argument that his statements were true and not misleading. (Ustian Br. at 28). But there is no evidence that these engineers were involved in drafting or reviewing the statements at issue in this case at the time they were made. And these engineers impermissibly opine on one of the ultimate issues in the case. Therefore, the Court should not give this improper lay opinion testimony any weight. *See U.S. v. Garcia,* 413 F.3d 201, 213 (2d Cir. 2005). Even if the Court credits the testimony, it would only create a fact issue for trial. *See, e.g., Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 972-75 (N.D. Ill. 2011); *SEC v. Mozilo*, 2010 WL 3656068 at *7-*12 (C.D. Cal. Sept. 16, 2010); *KB Partners I., L.P. v. Pain Therapeutics, Inc.*, 2015 WL 3794769 at *8-*10 (W.D. Tex. June 16, 2015); *SEC v. ITT Educ. Servs.*, 303 F. Supp. 3d 746, 767-68 (S.D. Ind. 2018). Further, witnesses within Navistar and within the EPA expressed opinions different from these two engineers about the veracity of Ustian's statements. (UF ¶¶ 74, 138, 188; UF ¶

224 (Ustian "must have another 'surprise' to confuse the analysts"); UF ¶ 241 (Ustian was "not being truthful, based on what I know.")).

**C.  Ustian's November 2010-April 2011 Misstatements Were Material**

Ustian claims that his misstatements surrounding the February 2011 application could not have altered the "total mix" of information available to the market because the market was already "aware" of the omitted information. (Ustian Br. at 31). The evidence shows otherwise.

Ustian cannot dispute that the 0.2 NOx 13-liter engine was important to Navistar. Nor can he dispute the importance of fuel economy and performance. He repeatedly proclaimed the significance of these issues in his public statements. (UF ¶¶ 2, 56; AF ¶¶ 4, 16, 19).

Three "sell-side" analysts, and one "buy-side" analyst employed by an investor, have provided sworn testimony that they believed Navistar could produce and sell the 13-liter 0.2 NOx engine once certified. (AF ¶¶ 14, 18-19, UF ¶¶ 76, 94). In arguing that Ustian's statements were immaterial, Ustian essentially invites this Court to determine on summary judgment that these witnesses are not to be believed. The Court should decline Ustian's invitation. The only evidence Ustian offers to support his argument is the skepticism expressed by some in the media and analyst communities that Navistar already had achieved a 0.2 NOx engine with competitive fuel economy and performance. Importantly, however, this skepticism was based on information from sources other than Navistar or Ustian. (AF ¶ 18).

"[I]nvestors tend to discount information in newspaper articles and analyst reports when the author is unable to cite specific, attributable information from the company." *In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 265 (2d Cir. 1993). Accordingly, courts have

repeatedly rejected materiality arguments similar to Ustian's that rest on purported media or analyst reports. *See, e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 127-28 (2d Cir. 2013); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 719 (2d Cir. 2011); *SEC v. Bank of America Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010); *see also SEC v. Bauer*, 723 F.3d 758, 772-75 (7th Cir. 2013) (reversing grant of summary judgment).

The cases cited by Ustian are distinguishable. In *Sailor v. Northern States Power Co.*, 4 F.3d 610 (8th Cir. 1993) (Ustian Br. at 30), the plaintiffs complained about the alleged omission of facts relevant to the evaluation of the defendant's "chances of obtaining a large rate increase." *Id.* at 612-13. Here, the SEC does not allege that Ustian misled investors about the *chances* of Navistar developing a competitive 0.2 NOx that could be EPA-certified. Instead, the SEC alleges that Ustian falsely communicated that Navistar *already* had developed such an engine. The SEC has backed up its allegations with sworn witness testimony and documentary evidence. (AF ¶¶ 14, 18; UF ¶¶ 64, 68, 76, 94). Meanwhile, the case of *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564 (S.D.N.Y. 2013) (Ustian Br. at 30), involved a bank's alleged failure to disclose the "imminence and amount of" a potential lawsuit. *Id.* at 575-76. The court dismissed the lawsuit because the media and the bank itself disclosed the probability of the lawsuit. *Id.* at 576-78. Here, by contrast, there is no evidence that Navistar, Ustian, or the media disclosed that the engine submitted for certification in February 2011 lacked competitive fuel economy and performance, or that the engine did not satisfy the EPA's DF testing requirements.

Ustian's expert witness, Paul Gompers, erroneously concludes that Ustian and Navistar actually disclosed that the engine submitted for certification in February 2011 lacked competitive

fuel economy and performance (UF Tab 406 at ¶¶ 53, 62, 69, 77); mischaracterizes the SEC's claims to allege misstatements relating to risks of poor engine fuel economy and performance, rather than actual fuel economy and performance (*id.)*; and conflates the skepticism of some analysts *(id.)* with the actual knowledge and understanding of analysts and investors. Not only are Gompers' conclusions contradicted by sworn analyst and investor testimony and contemporaneous documents (UF ¶¶ 64, 68, 76, 94; AF ¶¶ 14, 18), they are also rebutted by the SEC's expert witness Michael Mayer, who disagrees with Gompers' assessment of analyst reports. (AF Ex. 25). Gompers' superficial approach has led courts to exclude him as an expert witness. *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 2019 WL 3716441 at *9-*11 (S.D.N.Y. Aug. 7, 2019); *U.S. v. Martoma*, 993 F. Supp. 2d 452, 455-59 (S.D.N.Y. 2014). Gompers' report does not move the needle here.

### D. Ustian's Culpable State of Mind for His November 2010-April 2011 Misstatements

Ustian acted knowingly, recklessly, and/or negligently regarding his November 2010 through April 2011 misstatements by representing that Navistar had successfully developed a 0.2 NOx engine that it could sell and certify, since he knew this was not the case. *SEC v. Sentinel Management Group, Inc.*, 2012 WL 1079961 at *9 (N.D. Ill. Mar. 30, 2012); *Mozilo*, 2010 WL 3656068 at *15-*20; *SEC v. Johnston*, 310 F. Supp. 3d 265, 272-73 (D. Mass. 2018). *KB Partners*, 2015 WL 3794769 at *10-*11.

As of November 2010, Ustian knew that Navistar had not developed EGR to the level necessary to produce an engine with competitive fuel economy and performance. He knew from Hebe that Cummins had abandoned EGR technology because Cummins did not believe the

technology was capable of achieving a road-ready 0.2 NOx engine. (AF ¶ 3). He also knew from Piech that Navistar needed more time to get to 0.2 NOx because Navistar's EGR technology was not capable of producing a competitive 0.2 NOx engine. (AF ¶ 12; UF ¶ 57). Navistar engineers believed that Ustian "totally knows" that the engine's "power curve is not drive-able or saleable." (UF ¶ 81). Ustian has admitted that the engine "was never intended to be sellable" and that Navistar "knew it didn't have the other parameters, fuel economy, performance." (UF ¶ 82).

Ustian's claim that he believed he was only telling the public about an engine two years out (Ustian Br. at 31-32) does not hold water. In November 2010, Navistar employees sent Ustian an analyst report stating that the just-announced planned certification submission by Navistar "proves that its technology is not just an 'interim technology.'" (UF ¶ 64). Navistar employees also sent Ustian media reports quoting Ustian as stating that "[t]here is this (perception) that when you go to 0.2, you're going to lose fuel economy," but "[w]e'll be able to show you that it's better fuel economy (at 0.2g) just because of improvements in the technology." (UF ¶ 67). In December 2010, Ustian approved draft answers to a New York Times reporter's questions, one of which described Navistar's plan "to submit applications for certification of our engines at 0.2g without using credits in the next few months," and that those engines will "have great fuel efficiency." (UF ¶ 77). Thus, Ustian knew that he and Navistar were representing that the company had <u>already</u> achieved 0.2 NOx with competitive fuel efficiency and performance, and he knew that the public was interpreting his statements to mean that this had <u>already</u> occurred or would occur shortly. Meanwhile, the documents relied upon by Ustian (Ustian Br. 32) only show reports by engineers to Ustian that they were making some

progress with EGR, not that Navistar was already capable of producing a 0.2 NOx engine with competitive fuel economy and performance.

Ustian falsely claims he was "told there was nothing wrong with the 2011 Application." (Ustian Br. at 32). In fact, Navistar engineers told Ustian that durability data from Navistar's 0.5 NOx engine was "used in the submittal despite EPA disallowing that version of durability demonstration" and that the EPA had "issues with" Navistar's DF testing. (UF ¶ 85). Navistar employees also sent Ustian a presentation stating that "EPA rejected carryover DF" for the submission and highlighting it in red, which, according to Piech, signified there was something that threatened approval entirely or approval within a certain timeframe. (UF ¶ 89).

Navistar engineers were not "upbeat" about the prospects for the February 2011 application's success. (Ustian Br. at 32). The Navistar engineer whom Ustian cites as being "upbeat" (Ustian Br. at 32) wrote his fellow Navistar engineers that the EPA had "officially rejected" Navistar's bid to use carryover DF for the application and that Navistar was submitting the application "as a formality." (AF ¶ 17). And Piech, who worked on the application (AF ¶ 12), believed it was unlikely the EPA would approve carryover DF. (UF ¶ 91).

The *SEC v. Shanahan* case, 646 F.3d 536 (8th Cir. 2011) (Ustian Br. at 32-33), is inapposite. *Shanahan* involved options backdating and an outside director defendant. *Id.* at 539-40. The court held that the SEC had failed to show recklessness or negligence at trial. *Id.* at 544-46. But to the extent that *Shanahan* stands for the principle that the SEC must produce expert testimony to prove recklessness-based and/or negligence-based claims (Ustian Br. at 10), that principle finds no support in the Seventh Circuit or in this District, where courts have regularly

adjudicated such claims in SEC enforcement actions without experts. *See McConville v. SEC*, 465 F.3d 780, 788 (7th Cir. 2006); *SEC v. Jakubowski*, 150 F.3d 675, 681-82 (7th Cir. 1998); *SEC v. Koenig*, 2007 WL 1074901 at *5 (N.D. Ill. Apr. 5, 2007), *aff'd and remanded on other grounds*, 557 F.3d 736 (7th Cir. 2009); *Sentinel*, 2012 WL 1079961 at *9-*10. Regardless, the SEC has produced evidence on the standard of care, including that engine manufacturers like Navistar typically say nothing about certification efforts. (UF ¶ 60; AF ¶ 10). This, along with evidence that establishes Ustian's scienter, shows Ustian's conduct to represent an extreme departure from the standard of care. *See SEC v. Present*, 2018 WL 792036, at *1-*2 (D. Mass. Feb. 8, 2018); *SEC v. Snyder*, 292 Fed. Appx. 391, 402 (5th Cir. 2008).

### E. Ustian Made Misstatements From December 2011-March 2012

#### 1. The 2011 10-K Was False and Misleading

In Navistar's December 2011 10-K, Navistar and Ustian misleadingly represented that that the company faced a mere "risk" of a lack of success with its EGR strategy to meet the 0.2 NOx Standard and that Navistar believed its upcoming certification application met the EPA's certification requirements. The 10-K's purported "risk" disclosure was similar to the "risk" disclosure that Navistar had been making for years, except with regard to when Navistar's credits might expire. (UF ¶ 44; AF ¶ 26). By December 2011, however, Navistar's lack of success was already a reality. Navistar was no longer pursuing its February 2011 application (AF ¶ 22), which had "withered on the vine" by October 2011. (AF ¶ 22). By December 2011, Navistar had been trying to meet the 0.2 NOx standard for ten years (AF ¶ 23) but still needed a NTE deficiency (UF ¶¶ 113-114) (a waiver from the NTE certification limits of 0.3 NOx) (UF ¶ 112),

which the EPA had just told Navistar it would not grant. (UF ¶¶ 114-115). And just days before

the 10-K filing, the EPA told Navistar that its planned certification submission for early 2012 did

not meet the EPA's certification requirements. (UF ¶¶ 114-115).

Because Ustian and Navistar mischaracterized a reality as a mere "risk," the 10-K was

false and misleading. *See, e.g., SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 352-56

(S.D.N.Y. 2011); *SEC v. True North Finance Corp.*, 909 F. Supp. 2d 1073, 1102-05 (D. Minn.

2012). The 10-K risk disclosure was especially misleading because it was essentially unchanged

from prior years' 10-Ks, except with respect to credit expiration. *See In re Harman Intern. Indus.*

*Inc. Secur. Litig.*, 791 F.3d 90, 104, 107 (D.C. Cir. 2015).

Navistar and Ustian's statement in the 10-K that, with respect to the company's

upcoming certification applications, "[w]e believe that our engines meet the EPA's certification

requirements," (UF ¶ 118), was particularly misleading because just days earlier, the EPA had

told Navistar that the EPA believed the opposite. (UF ¶¶ 114-15). *See Omnicare v. Laborers*

*Dist. Council Const. Indus.*, 135 S.Ct. 1318, 1329 (2015). A Wells Fargo analyst believed that

the 10-K statement signified that Navistar "should be pretty close to receiving certification." (AF

¶ 26). Meanwhile, the Wellington investor representative wrote, after talking to Ustian that day,

that he would "take the high probability bet and assume they get approval." (UF ¶ 129).

That Navistar's 2011 discussions with the EPA were in some sense "preliminary" (Ustian

Br. at 33) or "iterative" (Ustian Br. at 33, 35) does not affect the analysis. In the EPA

certification context, all communications between an engine manufacturer and the EPA are

"preliminary" and "iterative" in some sense: the EPA rarely, if ever, denies applications. (AF ¶

5). Indeed, the EPA even labeled its June 15, 2012 letter to Navistar reiterating the defects in Navistar's third certification application as "preliminary." (UF ¶ 218; AF ¶ 36). The Court should reject Ustian's argument that he cannot face liability regarding "iterative" communications with the EPA. *See Johnston*, 310 F. Supp. 3d at 270 (rejecting argument that FDA's recommendation that pharmaceutical company conduct a second trial was "not a directive," only "part of the regulatory back and forth between the agency and the company," and "innately provisional"); *KB Partners*, 2015 WL 3794769 at *9 (rejecting argument that "because the FDA allows applicants to design their own stability testing methodology and justify the results, Defendants could not have known" that their drug product "remained insufficiently stable or otherwise did not meet FDA stability specifications until the FDA actually rejected the second" new drug application.)

Ustian betrays a remarkable double standard by claiming that "the SEC omitted from its Amended Complaint the events of December 17 through 20." (Ustian Br. at 34). In fact, it is Ustian who omits the most significant piece of evidence from this time period: the December 20 email. In it, Charbonneau stated that Bunker "does not want to approve an NTE deficiency that is above .3 NOx (not that he can't, he doesn't want to). He does not want to approve an AECD that is on 100% of the time (not that he can't, he doesn't want to.)" (UF ¶ 117; UF Tab 135).

This piece of evidence is significant for three reasons. First, Charbonneau sent the email to Ustian on December 20, 2011, the same date on which Navistar filed the 10-K (*See* p. 9, fn.1, *infra*; UF ¶¶ 117-118). Second, the December 20 email directly contradicts the 10-K's assertion that Navistar believed that the engine to be submitted for certification in early 2012 met the

EPA's requirements. This document shows that, in fact, Navistar knew the engine did not meet the EPA's requirements and that it needed an NTE deficiency. Third, the December 20 email demonstrates that Navistar knew its communications with the EPA were not part of the normal back-and-forth with the agency. It demonstrates that Navistar knew it had to go to extraordinary lengths – reaching out to Bill Daley, then the Chief of Staff of the President of the United States – to try to circumvent the normal EPA certification process.

The case of *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (Ustian Br. at 35), is distinguishable. First, the *Sanofi* case was decided on a motion to dismiss, not summary judgment. This Court already rejected Ustian's arguments at the motion to dismiss stage. *Ustian*, 229 F. Supp. 3d at 770-73. Second, in *Sanofi* the plaintiffs were "sophisticated," *Sanofi*, 816 F.3d at 211. Here by contrast, with the mix of institutional and individual investors in Navistar (AF ¶ 1), there is no evidence that a reasonable Navistar investor was sophisticated. Third*, in *Sanofi*, the defendants disclosed that they were relying on disfavored single-blind drug trials, *Sanofi*, 816 F.3d at 212, whereas here neither Navistar nor Ustian made any similar public disclosures.

Finally, in *Sanofi*, the plaintiffs failed to allege "that the risks arising out of the FDA feedback were out of the ordinary, or presented a special challenge not of the kind normally confronted by pharmaceutical companies seeking FDA approval for their drugs." *Id.* Here, by contrast, the EPA feedback and Navistar's reaction to it was unusual, and the attendant risks presented unusual challenges. (AF ¶¶ 22-23, 25, 29; UF ¶¶ 133, 136, 193). These anomalies included, among other things, that: (a) the EPA did not act on the February, 2011 application, and the application just "withered on the vine" (AF ¶ 22); (b) by December 2011, Navistar had

invested 10 years of time, hundreds of millions of dollars, and thousands of employee hours unsuccessfully trying to develop a 0.2 NOx engine (AF ¶ 23) and was facing the imminent expiration of its credits and the payment of NCPs (UF ¶¶ 106, 108-109), which would be a "marketing and sales disaster" (AF ¶ 25; UF Tab 135 (third page of slides attached to email)); (c) after Navistar's December 16, 2011 meeting with the EPA, Navistar commenced its efforts to exert political pressure to obtain certification (UF ¶¶ 117, 134-36, 189, 193, 205-206); and (d) the EPA sent a formal, detailed response to Navistar in February 2012 rejecting Navistar's January 2012 application. (AF ¶ 29; UF ¶ 147).

Ustian distorts the evidence when he claims that "EPA has consistently taken the position" that "publicly disclosing 'pre-decisional dialogue' would cause "public confusion." (Ustian Br. at 35). Ustian's only support for his claim rests on a Freedom of Information Act ("FOIA") exemption. *See* UF ¶¶ 130-32. This case has nothing to do with FOIA. When it comes to Navistar's public disclosures to analysts and investors, the EPA never took a position; Navistar's public disclosures were Navistar's and Ustian's responsibility, not the EPA's. (AF ¶ 10). In the FDA context, courts have rejected arguments similar to Ustian's on summary judgment. *See Johnston*, 310 F. Supp. 3d at 271-72; *KB Partners,* 2015 WL 3794769 at *4, *10. Moreover, Navistar's own conduct undercuts Ustian's argument. In Navistar's June 2012 10-Q, the company disclosed that the EPA had raised "concerns" about the already-withdrawn January 2012 application. (UF ¶ 234). Its decision to disclose these "concerns" shows that Navistar and Ustian did not believe it was categorically improper to disclose EPA feedback.

## 2. **Ustian Made Misstatements on March 8, 2012 and March 22, 2012**

Navistar's and Ustian's statements in the March 8, 2012 10-Q, Press Release and Call and the March 22, 2012 Press Release were misleading because they suggested that Navistar was on track to get EPA certification of a 13-liter 0.2 NOx engine in response to the January 2012 application and that certification likely would occur by June 2012. In March and April 2012, Navistar and Ustian repeatedly represented that certification likely would occur by June 2012. (UF ¶ 180 (3/6/12 email, "approval maybe april, production June"); UF ¶ 184 (3/8/12 Call, "When we get the certification, it still takes some time for us to get into production on this. . . it will be about June before we can get into production"); UF ¶ 198 (4/10/12 analyst report, "We recently had an opportunity to host investor meetings with Navistar's CEO Dan Ustian . . . Navistar is working through this process and expects to receive certification in June"); (4/13/12 email "reflects my interpretation of what [Navistar's investor relations] told me, that they would receive certification in June.")). Based on Ustian's statements in the March 8, 2012 Call, the Wells Fargo analyst believed that Navistar expected certification by May 1, 2012. (AF ¶ 33).

Similarly, in the March 8, 2012 10-Q and Press Release, Navistar and Ustian referred to the January 2012 application as a "milestone." In the March 22, 2012 Press Release, they misleadingly stated that "[o]nce certified," the company would be the only engine maker to achieve 0.2 NOx using in-cylinder technology, and "[d]uring the certification process, Navistar is making preparations to launch" a 0.2 NOx 13-liter engine "this summer." (UF ¶ 184). These statements misleadingly communicated that certification of the engine based on the January 2012 application was on track. Navistar and Ustian had no basis to represent that certification would

33

occur by June or that the engine could be launched in the summer "once certified." On the

contrary, from both the EPA's and Navistar's perspectives, Navistar's certification efforts were

floundering. (UF ¶¶ 111-15, 117, 135-38,[4] 140, 145-49, 151-53, 159, 189-93).

**F. Ustian's December 2011-March 2012 Statements Were Material**

Analysts and investors cared not only about whether EPA would grant certification, but

<u>when</u> EPA would grant certification. For instance, in the Avondale analyst's March 2012 report,

she stated that "[w]e see possible risk to the company's FY12 guidance if the EPA certification

process draws out longer than anticipated." (UF ¶ 178). A few days later, Ustian received an

email from an investor stating that when the certification issue "starts to impact end customer

decisions it's going to be a major problem." (UF ¶ 180). But the certification issue already had

impacted end customer decisions. Truck sales had come to a "standstill" (AF ¶ 32), and, in the

one month since the institution of NCPs, there had been "dramatic order reductions" and 50% of

customers surveyed said they would "not buy Navistar products because of NCPs." (UF ¶ 189).

Ustian incorrectly asserts that Navistar's February 2011 application was no longer

material after Navistar announced in December 2011 that it would applying for 0.2 NOx

certification in early 2012. (Ustian Br. at 38). But investor representative Nathan Kieffer

---

[4] In a late January 2012 email, Grundler sent Oge a copy of a Navistar press release regarding 0.2 NOx certification. Oge found the press release "[a]mazing' because 'the company and Mr. Ustian knows that they are not anywhere close to have a .2 NOx gram engine be certified.'" (UF ¶ 138). The SEC did not charge Ustian for this press release. As this and other evidence (*see* UF ¶¶ 129, 198) shows, Ustian and Navistar made a number of other public statements about 0.2 NOx certification besides the statements for which the SEC has charged Ustian, contrary to the misleading suggestions by Ustian in his brief. *See* Ustian Br. at 50 ("the SEC reached for eleven statements (out of the hundreds of public statements required of a CEO and a public company.")).

("Kieffer") of Wellington was still emailing Navistar about that application and the April 5, 2011 Press Release regarding that application in early 2012 (AF ¶ 20), demonstrating that Ustian's misstatements remained material to investors into 2012. This email also indicates that as of January 2012, Kieffer did not know the outcome of the February 2011 application. The Wells Fargo analyst testified that as of late 2011, he did not know the outcome of the application. (AF ¶ 22).

Ustian falsely states that "[t]he market was well-apprised of the EPA feedback" on Navistar's January 2012 application (Ustian Br. at 33) and that "[i]nformation made public by both Navistar and EPA in late February and early March 2012 echoes near verbatim the information the SEC accuses Ustian of omitting." (Ustian Br. at 37). The reality is that the certification was a "black box." The public could not get information about Navistar's certification efforts from the EPA, on its website or elsewhere. (AF ¶ 6).

Ustian disregards both the facts and the applicable law by relying heavily on the McCarthy Letter in arguing that his December 2011 through March 2012 statements were immaterial. (Ustian Br. at 37-38). To determine whether information can be considered part of the "total mix" of information, the court must assess whether the information was reasonably available to an investor. *See, e.g., In re American Realty Capital Properties, Inc. Litig.*, 2019 WL 2082508 at *2 (S.D.N.Y. May 10, 2019); *Brown v. Brewer*, 2010 WL 2472182 at *21-*22 (C.D. Cal. June 17, 2010). Not only must the court assess whether the information was reasonably available to an investor, but the court must also make such an assessment from the perspective of a reasonable investor at the time the misstatement was made, not with the benefit of hindsight.

*See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003); *SEC v. Staples*, 55 F. Supp. 3d 831, 839 n.6 (D.S.C. 2014). Thus, the issue here is not whether analysts "were capable of reviewing Court filings." (Ustian Br. at 38). Rather, the pertinent question is whether the McCarthy Letter was reasonably available to a Navistar investor at the time Ustian made his December 2011 through March 2012 misstatements. The answer to that question is no.

The EPA did not send out the McCarthy Letter until late February 2012, at which point the EPA sent it to Navistar and to the lawyers for certain Navistar competitors that were suing the EPA. (Ustian Br. at 37-38; UF ¶¶ 165-166). Thus, just based on the timing of the letter, it is irrelevant to Ustian's December 2011 misstatements because it did not exist at the time.

With regard to Ustian's March 8, 2012 and March 22, 2012 misstatements, the question in whether the McCarthy Letter was reasonably available to an investor at the time of those misstatements based on Navistar's inclusion of the letter in its 80-page March 1 filing in the *Mack v. EPA* litigation. (UF ¶ 168). There is no evidence that at the time of Ustian's March 2012 misstatements, an investor could have accessed the McCarthy Letter outside of pulling the March 1 filing in the *Mack v. EPA* litigation through PACER. No analyst or investor has testified to ever having seen the letter, in March 2012 or otherwise. (UF ¶¶ 173-74). No analyst report from March 2012 discussed the letter (UF ¶ 175), and Ustian does not argue that any media reports or Navistar SEC filings discussed the letter as of March 2012. There is no evidence that a reasonable Navistar investor knew how to access the March 1 filing through PACER. (UF ¶¶ 169, 174). Even if a reasonable investor knew how to access PACER, Ustian presents no evidence about how a reasonable investor would have known as of March 8, 2012 or March 22,

2012 that Navistar had made the March 1 filing. And even if an investor knew about the March 1 filing, it is unclear what would have motivated an investor to look at it. After all, at Navistar's February 2012 analyst day Ustian publicly stated that Navistar was not planning to use NCPs (AF ¶ 30). Thus, as of March 1 an investor had little reason to care about the *Mack v. EPA* litigation, which only involved NCPs. By the time Navistar and Ustian disclosed in their March 8, 2012 statements that Navistar was in fact using NCPs, the D.C. Circuit had already resolved the motion that Navistar had opposed in its March 1 filing. (AF ¶ 31). Under these circumstances, the March 1 filing was not reasonably available to an investor. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999); *United Paperworkers Intern. Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993).

Moreover, even if Ustian had provided some evidence that the March 1 filing was reasonably available to a Navistar investor, this evidence would only result in a fact question for trial. *See Brown*, 2010 WL 2472182 at *21-*22. Moreover, even if were undisputed that the March 1 filing was reasonably available to a Navistar investor as of March 2012, this would not absolve Ustian from liability. *See Litwin*, 634 F.3d at 718; *McKenna v. Smart Technologies, Inc.*, 2012 WL 1131935 at *13 (S.D.N.Y Apr. 3, 2012); *Mozilo*, 2010 WL 3656068 at *8.

Like Ustian did with earlier misstatements, he cites to Gompers' report for the proposition that there is "no economic basis to determine that the alleged omissions" regarding the January 2012 application "impacted Navistar's stock price." (Ustian Br. at 39). But Ustian ignores the substantial evidence indicating that Ustian's misstatements were material. (UF ¶¶ 129, 144, 178, 180; AF ¶¶ 22, 33-34). Numerous courts deciding SEC enforcement actions have

rejected the types of arguments that Ustian relies on Gompers to make. *See Mozilo*, 2010 WL 3656068 at *8; *Koenig*, 2007 WL 1074901 at *3; *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1265, 1271 n. 19 (S.D. Fla. 2011), *aff'd,* 756 F.3d 1326 (11th Cir. 2014). In any event, Ustian's and the SEC's experts disagree on stock price movement. *Compare* UF Tab 268 at pp.13-20 *with* UF Tab 406, pp. 73-77, creating a fact issue for trial.

### G. Ustian's Culpable State of Mind for His December 2011-March 2012 Misstatements

When Ustian made misstatements during the December 2011 through March 2012 time period, he acted knowingly, recklessly, and/or negligently. Ustian made public statements that conflicted with his and Navistar's non-public discussions. For example, on the same date on which he signed the December 20, 2011 10-K stating that Navistar believed its engine met the EPA's certification requirements, and on the same date on which he spoke with Wellington's Kieffer and "sounded confident" that Navistar would get certification, he received the email from Charbonneau attaching materials for Bill Daley, which among other things complained that the EPA was refusing Navistar's request for a NTE deficiency. (UF ¶¶ 117-119, 129).

Similarly, in early March 2012, Ustian suggested an investor be told that Navistar expected "approval maybe april, production June" (UF ¶ 180) and stated publicly that "what we are doing right now is getting ready to go to production, and it will be about June before we can get into production." (UF ¶ 184). Meanwhile, Navistar was contacting Senator Durbin's office to complain that the EPA had demonstrated "Unfair Bias" and ".2 certification dialogue stopped." (UF ¶ 189). Ustian's knowledge of facts contradicting his public statements demonstrates scienter. *See Mozilo*, 2010 WL 3656068 at *16; *Johnston*, 310 F. Supp. 3d at 273.

Further, the testimony of Navistar's current CEO, Clarke, provides further evidence that Ustian departed from the standard of care during this timeframe. When Clarke became responsible for assessing Navistar's certification prospects in June 2012, he immediately determined that it was unlikely the EPA would certify Navistar's EGR engine, and he then so informed Navistar. (UF ¶ 246). By contrast, Ustian was involved with 0.2 NOx certification efforts for years, met with the EPA three times between October 2011 and January 2012 in connection with those efforts (UF ¶¶ 108, 111, 136), and yet he continued to falsely suggest that EPA certification of Navistar's 0.2 NOx EGR engine would occur soon. Clarke's testimony establishes what a reasonable executive would have done when faced with the information available to Ustian, and Ustian's conduct demonstrates an extreme departure from that standard of care.

Ustian engages in misdirection when he claims the scienter issue revolves around whether Ustian knew that Navistar's "dual mapping strategy was itself fraudulent." (Ustian Br. at 39). That is neither here nor there. Rather, the question is whether Ustian knew, or was reckless in not knowing, that his statements were false or misleading based on the EPA's response to the strategy. Ustian knew that Navistar needed – but the EPA would not grant – a NTE deficiency because the "map" that was engaged during the majority of the engine's operation produced NOx emissions under the NTE test exceeding 0.30g of NOx per brake-horsepower hour. (UF ¶¶ 112-115, 140, 147-149, 154-155). He also knew that the EPA believed that this "map" resulted in excess NOx levels on the FTP and SET certification tests. (UF ¶¶ 114, 147-149). Based on this knowledge, Ustian acted with scienter when he publicly stated that Navistar believed its engines

complied with the EPA's requirements, and when he predicted that certification would occur by June 2012.

Ustian inaccurately asserts that he relied on Navistar engineers and concluded that the EPA was likely to certify the engine. (Ustian Br. at 39-40). The record evidence shows that during the December 2011 through March 2012 time period, these engineers believed that EPA certification was going poorly. (UF ¶¶ 114-115, 117, 135-136, 147-149, 151-153, 189-193). Moreover, even if Ustian reasonably believed the EPA eventually would grant certification – which he did not – Navistar and investors did not have the luxury of waiting until a possible certification down the road. With Navistar's credits running out, with California and nine other states not accepting NCPs, and with Navistar's payment of NCPs in the other 40 states having a "devastating impact" on the company (UF ¶ 189), Navistar needed immediate certification. Ustian had no reason to believe that certification would happen soon. But that is precisely what he told investors was likely to occur. And even if Ustian could establish his reliance on others, that would only create a fact issue. *See Silverman*, 798 F. Supp. 2d at 969; *Sentinel*, 2012 WL 1079961 at *9.

Finally, Ustian makes the puzzling argument that the EPA's treatment of SCR engines affected Ustian's state of mind such that the Court should grant summary judgment. (Ustian Br.at 39). First, Judge Schenkier already has rejected this argument in the course of denying Ustian's motion to compel competitors' certification-related documents. (UF ¶ 37). Judge Schenkier's reasoning applies with full force here. Second, the SEC has not accused Ustian of making misstatements regarding SCR engine manufacturers' certification applications. Third, even if

SCR engine manufacturers' certification applications were somehow relevant, the EPA's position on SCR only hurts Ustian's case. Ustian knew that the EPA "would not talk to us about SCR, period" (UF ¶ 108), and he felt the EPA had an "unfair bias" favoring SCR (UF ¶ 189), as, in his view, the EPA had "favor[ed] SCR many times." (UF ¶ 212). In other words, as far as Ustian was concerned, given the EPA's pro-SCR bias, the roadblocks Navistar faced in its quest for certification were that much more severe.

### H. Ustian Made Misstatements in the June 7, 2012 10-Q and Call

As noted above, in June 2012, Navistar and Ustian disclosed that Navistar had withdrawn the January 2012 application and that Navistar had submitted a new May 2012 application. (UF ¶ 234). Thus, for Ustian's June 7, 2012 statements, the question is whether he made misstatements regarding the May 2012 application, which he did.

Ustian's June 7, 2012 statements falsely conveyed that the May 2012 application merely raised "issues" that were under EPA "review." (UF ¶ 234). Meanwhile, in the June 7, 2012 Call, Ustian stated for the May 2012 application, "we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance et cetera. And so we resubmitted that back to them and we're in the process or working with them and getting that certified. So there's where that stands." (UF ¶ 237). Ustian added on the June 7, 2012 Call that "as soon as that certification is approved we can go to instant production within 30 days," and "there is plenty of background out there now that it shouldn't take nearly as long" as 3-4 more months for certification. (UF ¶ 237; UF Tab 242 at 173). The Jefferies analyst

understood from the June 7, 2012 Call that, according to Ustian, certification should occur within a time period shorter than three to four months. (AF ¶ 37).

Contrary to Navistar's and Ustian's June 7, 2012 statements, the EPA had already responded on June 4, 2012 with "unequivocally NO!" to the May 2012 application (UF ¶¶ 224, 227) because "this engine will have FTP emissions of 0.42g/hp-hr" (UF ¶ 229) and Navistar "wants to be compliant in [a] test cell but not in a vehicle." (UF ¶ 225). The EPA promised in its June 5, 2012 email that it would send a "more detailed written response delineating all of our concerns." (UF ¶ 229). The EPA did so on June 15, 2012 -- the date by which Navistar had requested approval of the May 2012 application. (UF ¶¶ 202, 218). When the EPA delivered its rejection of the May 2012 application on June 4, 2012, Ustian understood the EPA's message, as evidenced by the fact he "was just using F…" (UF ¶ 226).

According to Ustian, the evidence shows that "investors harbored substantial skepticism about Navistar's emissions strategy and its prospects for certification, both before and after the June statements." (Ustian Br. at 41). But Ustian ignores the fact that beginning in May 2012, Empyrean began investing in Navistar "predicated on the approval of NAV's 13L engine by the EPA," which Empyrean expected to occur by June 2012. (UF ¶ 208). Ustian also ignores that after the June 7, 2012 10-Q and Call, the Barrington analyst opined that "the 13L 2010 EPA certification should happen soon." (AF ¶ 38). This evidence shows that the skepticism of some was tempered by the optimism of others.

Ustian mischaracterizes Bunker's June 5, 2012 email to Navistar as merely "part of the iterative certification process." (Ustian Br. at 41). Navistar's engineers understood that Bunker

42

had said "unequivocally NO" to the May 2012 application and had essentially rejected it. (UF ¶¶ 224, 227). Ustian knew, or was reckless in not knowing, that Bunker's June 5, 2012 represented another confirmation that Navistar had no hopes of near-term certification.

## I.  <u>The Statements in the June 7, 2012 10-Q and Call Were Material</u>

As Empyrean's late spring 2012 Navistar investments predicated on near-term EPA certification illustrate, Ustian's June 7, 2012 misstatements about certification affected the "total mix" of information available to Navistar investors.

While Ustian argues that the June 7, 2012 10-Q's risk disclosures rendered his misstatements immaterial (Ustian Br. at 43), these risk disclosures obscured that the "risk" to near-term EPA certification had already been realized. Therefore, these "risk" disclosures themselves were materially false and misleading. *See In re Harman Int'l*, 791 F.3d at 104, 107; *True North Finance Corp.*, 909 F. Supp. 2d at 1102-05; *Tecumseh Holdings*, 765 F. Supp. 2d at 352-56. Moreover, some analysts believed that near-term certification was possible or even likely notwithstanding risks -- powerful evidence of materiality. For example, a Wolfe Trahan analyst stated on June 8, 2012 that "[w]e still think near term EPA certification is more likely than not" even though "we continue to see high risks around NAV's engine strategy" (UF Tab 420, Ex. A to Tab at p. 32). The J.P. Morgan analyst stated on June 12, 2012 that "[l]ikely next steps" included the possibility that "NAV gets EPA approval for its 13-L 0.2 NOx engine in the very near term." (UF Tab 420, Ex. A to Tab at p. 34). Navistar's "risk" disclosures in the June 7, 2012 10-Q do not negate materiality.

Ustian again relies on Gompers' flawed and superficial analysis to argue against materiality for the June 7, 2012 10-Q and Call. (Ustian Br. at 43). But Gompers does not even mention Empyrean's late-spring 2012 investment in Navistar predicated on near-term EPA certification. (UF Tab 406 at ¶¶ 109, 114, 116). Gompers' neglect of Empyrean betrays his cavalier treatment of the evidence in this case. Gompers also ignores the reports from the analysts from Barrington, J.P. Morgan, and Wolfe Trahan after the June 7, 2012 10-Q and Call stating that near-term certification was possible or likely. (AF ¶ 38; UF Tab 420, Ex. A to Tab at pp. 32, 34). The Court should construe evidence in favor of the SEC, as the non-movant, not completely ignore the evidence as Ustian and Gompers do.

### J. Ustian's Culpable State of Mind For His June 7, 2012 Statements

Ustian acted knowingly, recklessly, or negligently in making misstatements in the June 7, 2012 10-Q and Call. Ustian misleadingly suggested that EPA certification could happen soon and that the May 2012 application was merely under EPA "review." Ustian knew, or was reckless in not knowing, that as of June 7, 2012, the EPA already had rejected the May 2012 application, and he and Navistar had no basis to believe that certification would occur soon. For purposes of recklessness and negligence, the SEC has provided evidence that the standard of care for an engine manufacturer was to say nothing about certification efforts (UF ¶ 60; AF ¶ 10), and the standard of care for an executive in Ustian's shoes would have been to inform others that EPA certification of an EGR solution was unlikely. (UF ¶ 246). Ustian did the opposite.

Ustian incorrectly asserts that "[h]e was told that the May 2012 Application complied with EPA certification standards." (Ustian Br. 44). The evidence shows otherwise: Ustian was

told, and he knew, that the application did not comply with EPA standards. In the days leading up to the June 7, 2012 10-Q and Call, Ustian was told that the emissions for "Map B" of Navistar's "dual mapping" strategy were 0.471 (UF ¶ 211); that Bunker had "advised the rest of the EPA that our current product cannot achieve .2" (UF ¶ 212); that for Navistar's 2012 "Cert App 2," the NTE level was "0.3-0.4 Map B," whereas "Byron expects" NTE emissions to be "0.2 90 + % Time" (UF ¶ 214); and that "[t]his 0.2g cert would run no higher than 0.48 overall, 0.41 NTE." (UF ¶ 216). And he knew on June 5, 2012 that the EPA believed Navistar's engine was "unlikely to receive a certificate of conformity as it is currently designed" because "under all in-use circumstances, this engine will have FTP emissions of 0.42 g/hp-hr." (UF ¶ 229). Thus, Ustian knew that the engine did not meet the EPA's FTP and NTE requirements.

The issue of an "in use audit" (Ustian Br. at 44) is another red herring. Navistar was attempting to get EPA certification, not pass an "in use audit." To get certification, Navistar had to meet the EPA's three main certification requirements, which were FTP, RMC/SET, and NTE. (UF ¶ 12). Ustian and Navistar knew that the EPA did not believe the engine described in the May 2012 application met these tests, and he knew that the engine exceeded the .3 NTE limit.

Ustian's professed belief that the EPA would certify the engine (Ustian Br. at 45) does not absolve him from liability. Navistar knew that a transition to SCR technology would be "painful." (AF ¶ 39). So Ustian had no choice but to continue to champion EGR even after he knew the EPA would not issue a near-term certification. The key for Ustian's scienter was whether he knew, or was reckless in not knowing, that his statements signaling near-term EPA certification were false or misleading. Since Navistar was running out of credits and enduring the

"devastating impact" of NCPs (UF ¶ 189), an eventual certification at some indeterminate time in the future was not good enough. The facts establish Ustian's scienter. *See Jakubowski*, 150 F.3d at 681-82 (7th Cir. 1998).

**K.** **Recent Supreme Court Precedent Resolves Ustian's "Scheme Liability" Argument**

Ustian's "scheme liability" arguments are foreclosed by the Supreme Court's recent holding in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). In *Lorenzo*, the Court held that the SEC does not have to prove conduct separate and apart from misstatements to establish "scheme liability" against a person who makes or disseminates misstatements. In *Lorenzo*, the Court held that a defendant could be liable for disseminating false or misleading statements under the so-called "scheme liability" provisions of Exchange Act Rules 10b-5 (a) and (c). *Id.* at 1100-01. In making its decision in *Lorenzo*, the Supreme Court addressed its earlier ruling in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), stating that "we can assume that *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information." *Lorenzo*, 139 S. Ct. at 1103 (emphasis in original). Thus, *Lorenzo* plainly applies to individuals who either make or disseminate false information. Under *Lorenzo*, such individuals can be liable under the securities laws' "scheme liability" provisions. In *SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 at *5 (S.D.N.Y. Apr. 26, 2019), the court held that based on *Lorenzo*, the defendants could be liable under the "scheme liability" provisions based on the SEC's allegations that "defendants repeatedly made false or misleading statements;" *cf. Malouf v. SEC*, 2019 WL 3788225 at *6-*7 (10th Cir. 2019).

Even before *Lorenzo*, this Court already ruled at the motion to dismiss stage that the SEC had sufficiently pled "scheme liability." *Ustian*, 229 F. Supp. 3d at 774-75. The Court need not revisit this ruling in light of *Lorenzo*. But even if the Court did, the result should not change based on the evidence of a scheme that the Court now has before it (*e.g.,* UF ¶¶ 58, 73, 80-82, 85, 89, 93, 115, 118, 137-138, 145-146, 148, 182, 184, 188, 213, 223, 228, 232, 234, 237) and based on pre-*Lorenzo* law. *See, e.g., ITT*, 303 F. Supp. 3d at 764-766.

## L. Ustian Obtained "Money or Property" Under Securities Act Section 17(a)(2)

Ustian "directly or indirectly" obtained "money or property by means of" his November 2010-April 2011 misstatements under Section 17(a)(2) of the Securities Act. [15 U.S.C. § 77(q)[a]] through his April 5, 2011 stock sale. The evidence establishes a causal connection in three different ways.

First, there was a causal connection between Ustian's misstatements and stock price inflation. The SEC's expert conducted an event study and determined that Ustian's statements -- including those during the November 2010 through April 2011 time period -- had a material impact on Navistar's stock price. (UF ¶ 102; UF Tab 268 at pp. 9-15). By contrast, in *SEC v. Forman*, 2010 WL 2367372 at *8 (D. Mass. June 9, 2010) (Ustian Br. at 48), the SEC provided no expert or other evidence that the alleged fraud had an impact on the company's stock price.

Second, there was a causal connection between the misstatements and Ustian's reason for making the trades. A SEC accountant summarized Ustian's trading and determined that Ustian's April 5, 2011 stock sale was his only Navistar stock transaction on the open market during the November 2010 through August 2012 time period. (UF ¶ 103). Ustian made the stock sale on the

same day Navistar issued the April 5, 2011 Press Release. (UF ¶ 102). The suspicious timing creates a reasonable inference that Ustian's reasons for making the stock sale were related to his misstatements. *Cf. SEC v. Roszak*, 495 F. Supp. 2d 875, 887-88 (N.D. Ill. 2007). While Ustian now claims that he made the stock sale at his financial advisor's recommendation (UF Tab 1 at ¶ 22), the Court should disregard this declaration because it directly contradicts Ustian's deposition testimony that he did not know why he made the stock sale. (UF Tab 44 at 147:7-148:3). *See Von Holdt v. A-1 Tool Corp.*, 2012 WL 13048975 at *1 (N.D. Ill. Sept. 29, 2012).

Third, there was a causal connection between Ustian's misstatements and Navistar's permission for him to make the stock sale. Navistar permitted Ustian to make the stock sale only after he confirmed to the company that he did not possess any material, non-public information when making the sale. (AF ¶ 21). In fact, Ustian did in fact possess the material, non-public information that the engine submitted for certification lacked the necessary fuel economy and performance features necessary for it to be sold (UF ¶ 82), and that Navistar's application failed to satisfy the EPA's DF testing requirements. (UF ¶¶ 85, 89). The evidence – establishing three different connections between Ustian's misstatements and his stock sale – permits the SEC to try its Section 17(a)(2) claims. *See SEC v. Tourre*, 2014 WL 61864 at *4 (S.D.N.Y. Jan. 7, 2014); *SEC v. Stoker*, 865 F. Supp. 2d 457, 464 (S.D.N.Y. 2012).

**M. Ustian Aided and Abetted Navistar's Violations and Acted as a Control Person**

Ustian expends little effort arguing for summary judgment (Ustian Br. at 49-50) on the SEC's aiding and abetting, control person, and certification[5] claims, and the Court should allow the SEC to present these claims to the jury. First, Ustian wrongly asserts that the SEC cannot assert a primary violation by Navistar. (*Id.* at 49). The SEC has established securities law violations by both Navistar and Ustian. (*See* Section III, *supra*). Second, Ustian claims that he "was not aware of any improper or illegal conduct" and acted in "good faith." (*Id.* at 49-50). The evidence shows otherwise; Ustian acted with scienter. (*See* Sections III.D., III.G., and III.J., *supra*). At the very least, whether or not Ustian acted in good faith is a hotly disputed matter to be resolved by the jury. The record supports the SEC's aiding and abetting, control person, and false certification claims. *See ITT*, 303 F. Supp. 3d at 771-73; *Mozilo*, 2010 WL 3656068 at *21; *Johnston*, 310 F. Supp. 3d at 273-74.

**IV.  CONCLUSION**

For the foregoing reasons, the Court should deny Ustian's motion for summary judgment.

---

[5] Though Ustian is unclear, he appears to direct his arguments on pp. 49-50 to Count VI of the SEC's Complaint (Rule 13a-14 violations), as well as Counts II and IV. (*See* Ustian Br. at p. 6).

Dated: September 13, 2019

Respectfully submitted,


/s/ Eric M. Phillips

Eric M. Phillips
Jonathan S. Polish
Anne Graber Blazek
Timothy Stockwell
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on September 13, 2019, a copy of the foregoing Plaintiff Securities and Exchange Commission's Response in Opposition to Defendant's Motion for Summary Judgment was served upon the following counsel by the Court's CM/ECF system:

Sean M. Berkowitz
Cary R. Perlman
Latham & Watkins LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
sean.berkowitz@lw.com
cary.perlman@lw.com

Laurence H. Levine
Law Offices of Laurence H. Levine
189 East Lake Shore Drive, 16th Floor
Chicago, IL 60611
laurence.levine@lhlevine.com

Attorneys for Defendant Daniel Ustian

/s/ Eric M. Phillips
Eric M. Phillips