## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
|  | ) | **Case No. 1:16-cv-03885** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Judge Sara L. Ellis** |
|  | ) | **Magistrate Judge Sidney I. Schenkier** |
| **DANIEL C. USTIAN,** | ) ) | |
| **Defendant.** | ) | |

## REPLY IN SUPPORT OF DEFENDANT
## DANIEL C. USTIAN'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...........................................................................................1

II.    THE SEC'S ADMISSIONS OF FACT AND LAW ............................................3

       A.     The SEC Ignores the Undisputed Facts and the Context .......................3

       B.     The SEC Distorts or Ignores Ustian's Actual Statements ......................5

       C.     The SEC's Cherry-Picked Analysts Do Not Create a Genuine Dispute.................6

       D.     The SEC Misstates the Law of the Case to Avoid Undisputed SCR Facts ...........9

III.   EVERY COUNT FAILS AS A MATTER OF LAW........................................12

       A.     The Alleged Omissions Were Not Misleading, Not Material, and Not
              Made with the Required State of Mind (Counts I-VII).........................12

              1.     Ustian's Statements Related to the February 2011 Application
                     Were Not False or Misleading ..................................................12

              2.     Ustian's Statements Related to the January 2012 Application Were
                     Not False and Any Omissions Were Not Material ...................15

                     a.     The December 2011 10-K Was True and Not Misleading ...........16

                     b.     The March 2012 Statements Do Not Support Liability.................19

              3.     Ustian's June 7, 2012, Statements Related to the May 2012
                     Application Were Not "Misstatements" ....................................21

       B.     There is No Factual Dispute as to Scheme Liability (Counts I-IV).......................23

       C.     The Section 17(a)(2) Claim Fails Because There Is No Evidence of a
              Causal Connection Between an Alleged Misstatement and Ustian
              Obtaining Money or Property (Counts III and IV) ...............................25

       D.     The Aiding and Abetting & Control Person Claims Fail (Counts II, IV,
              VII).......................................................................................................28

IV.    CONCLUSION............................................................................................28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Basic v. Levinson,*
    485 U.S. 224 (1988) .............................................................................................. 21

*Carroll v. Lynch,*
    698 F.3d 561 (7th Cir. 2012) ................................................................................. 7

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.,*
    114 F. Supp. 3d 633 (N.D. Ill. 2015) .................................................................. 13

*Flannery v. SEC,*
    810 F.3d 1 (1st Cir. 2015) ................................................................................... 25

*In re Adobe Sys., Inc. Sec. Litig.,*
    787 F. Supp. 912 (N.D. Cal. 1992) ....................................................................... 2

*In re Bank of Am. AIG Disclosure Sec. Litig,*
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................................ 7, 21

*In the Matter of John P. Flannery & James D. Hopkins,*
    Release No. 3981 (Dec. 15, 2014) ................................................................ 25, 27

*Koppel v. 4987 Corp.,*
    167 F.3d 125 (2d. Cir. 1999) ............................................................................... 19

*La Pietra v. RREEF Am., L.L.C.,*
    738 F. Supp. 2d 432 (S.D.N.Y. 2010) ................................................................ 20

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ........................................................................................ 24

*Malouf v. SEC,*
    933 F.3d 1248 (10th Cir. 2019) ........................................................................... 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) ....................................................................... 3, 4, 6, 16, 17

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
    *Allscripts-Misys Healthcare Sols., Inc.,* 778 F. Supp. 2d 858 (N.D. Ill. 2011) ...................... 4, 5

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.,*
    2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) .................................................. 7, 24

*Sailors v. Northern States Power Co.,*
    4 F.3d 610 (8th Cir. 1993) ................................................................................... 21

*SEC v. Bauer*,
723 F.3d 758 (7th Cir. 2013) ............................................................ 7, 8

*SEC v. SeeThruEquity, LLC*,
2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ...................................... 24

*SEC v. Shanahan*,
646 F.3d 536 (8th Cir. 2011) ................................................... 19, 27, 28

*SEC v. Ustian*,
229 F. Supp. 3d 739 (N.D. Ill. 2017) ............................................. 24, 25

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ........................................................... 16, 17

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993) ............................................................... 19

*Waldridge v. Amer. Hoechst Corp.*,
24 F.3d 918 (7th Cir. 1994) ......................................................... 12, 25

## STATUTES

Securities Act of 1933 § 17(a)(1) ............................................................ 24

Securities Act of 1933 § 17(a)(2) ..................................................... 26, 29

Securities Act of 1933 § 17(a)(3) .............................................................. 4

## RULES

SEC Rule 10b-5(a) .................................................................................. 24

SEC Rule 10b-5(c) .................................................................................. 24

# I.     INTRODUCTION

The SEC's Response in Opposition to Ustian's Motion for Summary Judgment (Dkt. 260), along with its "Statement of Additional Facts" (Dkt. 258), confirms that Ustian is entitled to summary judgment. Prior to now, the SEC could and did make allegations unsupported by, or even in conflict with, the evidence. In its Opposition, however, the SEC was confronted with the record and Ustian's Memorandum in Support of Summary Judgment (Dkt. 254). As a result, the summary judgment briefs narrow the issues and provide a map to summary judgment.

The SEC's "Response in Opposition" is mistitled. It is an opposition but not a response, as it ignores lengthy, critical sections of Ustian's moving brief. For example, the Memo in Support references the Senior Engineering Group sixteen times, hammering that these were the engineers whom Ustian relied upon, and who were the sources for his public statements. The Senior Engineering Group believed the applications would be certified and told Ustian as much. *See* Mem. in Supp. at 1-3, 5, 13, 18, 20, 24, 25, 34, 39, 44, 45, and 50. But the Opposition never meaningfully responds. Further, the Opposition ignores the Joint Statement of Undisputed Facts (Dkt. 255) that directly supports summary judgment and provides context to judge the accuracy of Ustian's statements and the materiality of alleged omissions. When ignoring the facts fails, the Opposition turns to mischaracterizations of Ustian's statements. *See infra* Part II.A-B.

On the plus side, the Opposition clarifies the summary judgment picture by narrowing the legal issues and revealing the SEC's current theories of liability (which often do not match the Amended Complaint). In response to six pages of legal authority elucidating the high burdens of proof SEC faces, the Opposition offers only the unremarkable proposition that courts must construe facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Compare* Mem. (Dkt. 254) at 6-12, *with* Opp'n (Dkt. 260) at 19. The SEC nevertheless does not contest that unsupported inferences alone will not carry the day.

The "Supreme Court has made clear that strained or inconclusive inferences alone should not defeat a motion for summary judgment. The rigorous scrutiny of evidence offered in opposition to a motion for summary judgment is no less appropriate in complex, fact-specific securities fraud cases." *In re Adobe Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 918-19 (N.D. Cal. 1992) (collecting cases) (citation omitted). The SEC does argue one point of law that matters, seeking to sweep away the importance of SCR certification and technological neutrality through a misstatement of Judge Schenkier's discovery ruling. *See infra* Part II.D.

Finally, Part III is the heart of this Reply, where Ustian responds directly to arguments in the Opposition. Sometimes, that means all the arguments. For example, the SEC seeks to avoid summary judgment on scheme liability by denying this Court's ruling on its legal elements, and then string-citing two dozen Undisputed Facts together and labeling them "a scheme." Ustian disproves both arguments. This Court was right about the law, and there is no scheme in the SEC's hodge-podge. Turning, however, to the elements common to all seven counts (false/misleading, material, and state of mind), there is no need to respond to every SEC argument. For each statement, Ustian replies to the argument on the element with the most direct route to summary judgment. For the 2010 statements, the express route to summary judgment is that the SEC's claim rests on the premise that Ustian said the February 2011 engine already had achieved fuel economy and performance. This Court, and the Undisputed Facts, establish that he did not say that. For the June 7, 2012, statements, the express route to summary judgment is that the SEC's claim rests on the premise that EPA had rejected Navistar's May 2012 application before June 7. The Undisputed Facts establish that premise is false. And so on. In order to simplify matters further, or at least visually put them in a fresh light, Ustian reproduces certain arguments in flow chart format in Exhibit 4.

## II.  THE SEC'S ADMISSIONS OF FACT AND LAW

### A.  The SEC Ignores the Undisputed Facts and the Context

The SEC's Response to Ustian's Motion to Strike admits that the SEC "determined ***the need*** to include 39 additional facts to respond to Ustian's arguments."  Dkt. 265 at 7.  (***Bolded italics*** always means emphasis added unless otherwise noted.)  That admission effectively concedes Ustian is entitled to summary judgment based on the Undisputed Facts, and it explains why the SEC ignores or distorts the Undisputed Facts that Ustian cites in his Memo in Support. To survive summary judgment, the SEC needs record evidence supporting "particular (and material) facts … whose omission makes the … statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).  Whistling past the Undisputed Facts prominently relied upon by Ustian does not move that ball, and neither does mischaracterization.

For example, the SEC mischaracterizes EPA feedback as "rejections."  *See, e.g.*, Opp'n at 11, 16, 32, 42.  The Undisputed Facts plainly establish that "EPA never denied any Navistar application seeking to certify an EGR-only engine to meet the 0.2g NOx standard."  UF 39.  In the SEC's mischaracterization, however, "the EPA sent a formal, detailed response to Navistar in February 2012 ***rejecting*** Navistar's January 2012 application."  Opp'n at 32 (relying on AF 29 and UF 147).  Neither of the facts the SEC points to says the letter was a rejection.  The letter, atypical or not [AF 29], "invite[d] Navistar to provide supplemental information in writing to address these issues," noting that EPA would be "happy" to "schedule a meeting to discuss this matter."  UF 147.  The only thing suggesting the letter was a rejection is the SEC's Opposition.

The SEC also ignores undisputed facts about public information available concerning Navistar's applications in favor of its own mischaracterization that certification is a "black box." Opp'n at 35.  The Undisputed Facts [UF 127, 164, 166, 168, 176, 222] establish how much

public information was part of the total mix available.  The "black box" mischaracterization was conceived to avoid summary judgment, but is based entirely on deposition testimony from analysts who did not recall ever contacting the EPA.  AF 8, 6.  No reasonable jury could find that the public "could not get information about Navistar's certification efforts from the EPA." Opp'n at 35.  Undisputed facts establish the opposite.  EPA prepared desk statements to "respond to anticipated questions from the public" and the "contents [of those desk statements] become effectively public information."  UF 176, 222.  EPA had a desk statement for the January 2012 Application stating that "EPA has substantial concerns regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level."  UF 176(a).  EPA also had a desk statement for the May 2012 Application.  UF 222.  Ustian respectfully asks the Court to evaluate every characterization of facts by the lawyers – for the SEC and for Ustian – against the actual Undisputed Facts.

Relatedly, the SEC ignores Undisputed Facts that establish context.  Reasonable investors are not misled by statements that are clear in light of all the available information.  *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) (statement was not misleading because "in its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes"); *Omnicare*, 135 S. Ct. at 1332 (actionable omission must make statement "misleading to a reasonable person reading the statement fairly and in context").  An omission is material only if it alters the total mix of information [Mem. in Supp. at 8], and the **total** mix includes context.

In support of scienter, for example, the SEC claims Ustian's statements on a June 7, 2012, analyst call were "signaling near-term EPA certification."  Opp'n at 45.  But on the **same call**, Ustian said it was out of Navistar's "control to tell you exactly the timing of any of that." UF 237.  And on the **same day**, Navistar's 10-Q disclosed that Navistar's business and financial

4

condition could be adversely affected by "decisions from the EPA … on our 0.20g NOx engine certificate applications," and that Navistar "may be required to stop selling medium and heavy HDD engines." UF 234. To paraphrase *Allscripts*, no reasonable investor could arrive at the conclusion that Ustian was "signaling near-term EPA certification" when Ustian expressly stated that timing was out of Navistar's control and when Navistar stated that it literally might not be able to sell trucks for lack of certification. Opp'n at 45; *Allscripts*, 778 F. Supp. 2d at 878.

### B. The SEC Distorts or Ignores Ustian's Actual Statements

Throughout the Opposition, the SEC relies on its mischaracterizations of Ustian's and Navistar's actual statements rather than quoting them directly. Frequently, the SEC announces its mischaracterizations by claiming that Ustian "signaled" or "communicated" or "suggested" a fact rather than quoting what Ustian actually said. *See, e.g.*, Opp'n at 19, 24, 33, 45. These "tells" represent attempts to salvage securities claims that are unsupported by the actual statements. The following examples are not comprehensive, but the point is simple. The Court should evaluate the statements and context at issue, not the lawyers' characterizations. To aid the Court in this analysis, the timelines applicable to each application (Ex. 1-3 hereto) have been revised to include in a blue box each actual statement SEC put at issue in its Opposition.

According to the Opposition, in statements concerning the February 2011 engine, Ustian "***communicated*** that Navistar had developed a 13-liter 0.2 NOx engine that had competitive fuel economy and performance features …." Opp'n at 19. No, he did not. Ustian stated (1) that Navistar planned to file an application at 0.2g NOx; (2) later, that Navistar had filed an application at 0.2g NOx; and (3) that the engine would, in fact, **not** be sold for two years while Navistar used the time to perfect fuel economy. *See* Tab 272 (cited at UF 58); UF 63, 71.

Similarly, the SEC claims Ustian "***suggested*** that Navistar was on track to get EPA certification of a 13-liter 0.2 NOx engine in response to the January 2012 application and that

certification likely would occur by June 2012." Opp'n at 33. Actually, Ustian's statements concerned when production might begin **if** the application were approved. He said that "it will be about June before we can get into production." UF 184. That statement matched Navistar's goal for production in June. *See* UF 187. Ustian explicitly differentiated between certification and Navistar's production: "When we get the certification, it still takes some time for us to get into production on this." UF 184. He further explained: "As for the preciseness of it, we can't tell you, but our objective is to be in production on that in June." *Id.* Again, Ustian did not say that Navistar was "on track" to get certification, much less when certification likely would occur.

### C.     The SEC's Cherry-Picked Analysts Do Not Create a Genuine Dispute

The SEC's Opposition is filled with citations to what a few analysts supposedly believed at various times, but as a matter of law these statements cannot carry the SEC's burden to show a genuine dispute of material fact. That the SEC engaged in ultra cherry-picking here is obvious. Analysts from 28 financial institutions and research firms published at least 438 reports covering Navistar during the relevant period. *See* Tab 406 (cited at UF 170) at 16 n.16; excerpts from some reports are at Ex. A to Tab 420 (cited at UF 6). The Opposition points to only a sliver of the analysts, and a sliver of a sliver of the reports. To make sense of this SEC strategy, the Court needs to ask "for what purpose are the opinions of these analysts cited in the Opposition?" The SEC uses subjective opinion testimony from a few analysts in support of its arguments that the statements at issue were misleading or that the alleged omissions were material. But the legal standards applicable to those issues make clear that the SEC's strategy entirely misses the mark.

First, whether an omission makes a statement "misleading to a reasonable person reading the statement fairly and in context" depends on "the perspective of a reasonable investor," not any individual's subjective assessment. *Omnicare*, 135 S. Ct. at 1332, 1327. The SEC introduces absolutely no evidence that any analyst was reasonable or considered any statement

fairly in context.  This alone shows the irrelevance of their subjective opinions, and renders those opinions inadmissible.  Indeed, if "a few analysts might have ignored the context in which [the] statements were made" and come to an erroneous conclusion, that "does not make [the] statements misleading where the language and import of [the] statements are plain." *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017).  Tellingly, the SEC does not cite a single case for the proposition that an individual's subjective belief on a certain topic can create a dispute of fact sufficient to preclude summary judgment with respect to statements that objectively, on the factual record, are not misleading.  (Were this the law, a securities plaintiff's statement that she personally reached an incorrect opinion following statements alleged to be misleading would be sufficient get to a jury.)  Thus, any evidence about what a specific analyst believed is not relevant to an analysis of whether a **genuine** dispute exists on an issue that is **material** to summary judgment.  *Cf.  Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) ("'[I]rrelevant or unnecessary' factual disputes do not preclude summary judgment.") (citation omitted).

Second, the analyst testimony in the Opposition is equally irrelevant to the Court's materiality inquiry.  That inquiry turns on an analysis of the allegedly omitted information compared to the total mix of information, and a determination whether the non-public information alters the total mix.  *See SEC v. Bauer*, 723 F.3d 758, 773 (7th Cir. 2013).  Ustian argued materiality throughout his Memo in Support, proving with undisputed facts [UF 127, 168, 176] that "because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law."  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) (citation omitted).  The Opposition seeks to avoid the

consequences of Undisputed Facts by pointing to a few individual analysts who claim they personally were unaware. But as a matter of law, the issue is the "total mix of information made *available*," not the information actually **known** to a particular analyst or investor. *Bauer*, 723 F.3d at 772 (internal quotation marks and citation omitted). A contrary interpretation would allow the SEC to reach a jury on materiality so long as it could find **anyone** who was not subjectively aware of a fact the SEC alleges was misleadingly omitted.

Third, and beyond its legal irrelevance, reliance on the testimony of cherry-picked analysts in both "Additional Facts" and Undisputed Facts does not create a genuine dispute of fact because the testimony does not support what the SEC claims. The SEC ignores testimony and contemporaneous reports from the **same** analysts that change the meaning of the analysts' testimony and the declarations that the SEC drafted for the analysts. In one egregious example, the Opposition quotes an SEC-drafted declaration[1] to prove the analyst believed, in part based on the March 9, 2011, quarterly call, that the February 2011 engine already was "competitive regarding fuel economy and performance." Opp'n at 7. But what the SEC wrote for her is not what the analyst believed. The analyst testified that after the March 2011 call she knew Navistar had **not** produced an engine with competitive fuel economy and that she had "concerns" about Navistar's ability ever to produce a 0.2g NOx engine with competitive fuel economy. Kubacki Dep. at 163:15-23, Ex. 6. Worse, the analyst testified that the language in the declaration did **not reflect** the concerns about the engine's fuel economy and performance that she held during 2010 and 2011. *See id.* at 103:10-14. The SEC also ignores five of the analyst's reports, every one of which indicated the analyst had "concerns over NAV's ability to address all of our concerns

---

[1] On January 7, 2016, an attorney for the SEC sent an email to the analyst's attorney attaching a "draft declaration" for the analyst to sign. Kristine Kubacki ("Kubacki") Dep. Ex. 14, Jan. 7, 2016 Email from T. Stockwell to P. Shepherd, attached hereto as Ex. 5.

around … ***fuel economy (or fluid economy) benefits***." Ex. A to Tab 420 (cited at UF 6) at 3-5, 6, 8. Although this is the most conspicuous misuse of analyst opinions, the pattern is repeated.

In the disputed "Additional Facts," for example, the SEC relies on testimony from 2018 to assert that a "Jefferies analyst interpreted Ustian's [June 7] statements to mean that certification should occur within a time period shorter than three to four months." Opp'n at 18 (citing AF 37). Again, that is not a fair representation. The analyst actually "understood there was a possibility that Navistar ***would not be certified at all*** in 2012." Stephen Volkmann ("Volkmann") Dep. at 209:14-18, Ex. 7. He did not testify that "***certification*** should occur" within a short period; rather, he testified that he understood EPA's **review** of the application "should take shorter than three to four months." *Id.* at 210:9-11. And Volkmann testified that he "understood … Mr. Ustian couldn't predict the timing of any EPA certification." *Id.* at 209:14-18. Even if this were relevant as matter of law, no reasonable jury could rely on the SEC's mischaracterization to reach a verdict in the SEC's favor.

### D.     The SEC Misstates the Law of the Case to Avoid Undisputed SCR Facts

Ustian's Memo in Support fully explains the connection between EGR technology and EPA's treatment of SCR technology for purposes of certification. *See* Mem. in Supp. at 15-19. The Memo in Support and the Undisputed Facts establish why the Senior Engineering Group and Ustian believed that EGR technology was better for the environment than SCR technology, that SCR technology often spewed higher on-road emissions than EGR, that EPA knew about the high on-road emissions, that EPA routinely certified the SCR engines at 0.2g NOx nonetheless, that EPA did so because it interpreted its own regulations to turn only on test cell results, and that EPA's "test cell only" interpretation applied equally to EGR because EPA's certification procedures are neutral for all technologies. *Id.* Among other reasons, these undisputed facts explain why the Senior Engineering Group and Ustian also believed that Navistar's certification

application complied with law and would be approved.  With respect, there is no chance the SEC really finds Ustian's SCR argument to be "puzzling."  *See* Opp'n at 40.

To avoid the SCR undisputed facts, the SEC misstates Judge Schenkier's ruling on a motion to compel certain EPA documents.  Without explanation, the SEC asserts that Judge Schenkier "rejected" the argument that "EPA's treatment of SCR engines affected Ustian's state of mind."  *Id.* at 40.  That is wrong.  *See* Minute Order (Dkt. 153).  Judge Schenkier denied Ustian's motion for documents internal to EPA because "the good faith and reasonableness of Mr. Ustian's belief rises or falls based on the information he had before him at that time," and "not on information to which he was not privy."  *See* Hr'g Tr. (Dkt. 198) at 12:7-12, 23-25.  Judge Schenkier's ruling is in accord with this Court's own statement on August 7, 2019, that the way to know "what was going on in the mind of Mr. Ustian" is to identify "what information … he kn[e]w during the relevant time period and from whom."  Hr'g Tr. (Dkt. 249) at 6:17-20.

Indisputably, Ustian was "privy" during the relevant time period to information that showed "EPA had certified SCR at 0.2g NOx" even though SCR engines "emitted uncontrolled NOx under some real-world conditions."  UF 34.  Ustian did know "that the strategies that Navistar engineers employed were no different than SCR turning off in the real world[.]"  UF 38.  And Ustian did know the Senior Engineering Group had concluded, because of technological neutrality, that "EPA should certify Navistar's 0.2g NOx applications based on EPA's treatment of SCR certification applications."  *Id.*  Every SCR argument in Ustian's motion was based on Ustian's personal knowledge established by an undisputed fact.  His SCR arguments are consistent with Judge Schenkier's discovery ruling and this Court's August 2019 statement.

Three sentences after claiming to be puzzled over the connection between SCR and EGR, the SEC solves the riddle and tries to use the connection to its own advantage.  Specifically, the

SEC asserts that because certain EPA staff may have been violating EPA's policy of technological neutrality, "the road blocks Navistar faced in its quest for certification were that much more severe." Opp'n at 41. The degree of any "road blocks" to Navistar's certification, however, is not material to any summary judgment issue. Ustian never said Navistar's path was without road blocks, or that certification was certain, or even that Navistar had received any positive feedback from EPA. Again, the SEC is trying to misdirect the Court from Ustian's actual statements to fake statements more convenient for the SEC's case. *Cf. supra* at Part II.B.

EPA's disparate treatment of two technologies it was required to treat neutrally is key in one more respect. The SEC's Opposition often cites to documents related to Navistar outreach to politicians. But these efforts are consistent with the conclusion of the Senior Engineering Group and Ustian that EPA's treatment of SCR applications show EPA should have certified Navistar. The SEC does not allege, much less point to evidence, that Navistar asked any elected official to do anything improper. Instead, the Undisputed Facts establish that Navistar told government officials that Navistar should be certified **according to the law**, and in part due to the SCR reasons described above. Navistar told politicians that SCR trucks were "meeting the standard with a technology that … yield[s] poorer emissions in the real world." Tab 200 (cited at UF 205); *see also* Tab 175 (cited at UF 189) (stating in a PowerPoint that SCR is "easily tampered with causing huge emissions increase"). Navistar told politicians that EPA was required to be technologically neutral. *See* Tab 185 (cited at UF 193) (Navistar "[l]ived within the law" but "EPA used flexibility on SCR" and should apply that same regulatory interpretation to Navistar). Ustian and Navistar asked only for a level playing field. UF 133 (Navistar's reason for lobbying was to "provide politicians with 'input on the level playing field.'"). None of these facts,

undisputed or "additional," create a genuine dispute as to anything material. Indeed, the facts are consistent with Ustian's motion.

## III. EVERY COUNT FAILS AS A MATTER OF LAW

### A. The Alleged Omissions Were Not Misleading, Not Material, and Not Made with the Required State of Mind (Counts I-VII)

The Court "*must*" enter judgment against the SEC if it fails to adduce evidence from which a reasonable juror could find in its favor on each of the elements it must prove, specifically that each statement was misleading, that each alleged omission was material, and that Ustian acted with scienter. *Waldridge v. Amer. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (emphasis in original). Ustian's Memo in Support establishes that every alleged misstatement and every alleged count fails for multiple reasons. *See* Mem. in Supp. Part III.A. Ustian continues to press all of those arguments. In this Part III, however, Ustian, as promised, points the most direct path to summary judgment. The flow charts attached as Exhibit 4 illustrate that path for each set of statements at issue.

### 1. Ustian's Statements Related to the February 2011 Application Were Not False or Misleading

The most direct route to summary judgment for the SEC's claims related to the November 2010 to April 2011 statements is that none of these statements was false or misleading. *See* Ex. 4 at 1. The SEC's claims to the contrary are presented in Part III.B. of the Opposition. Opp'n at 19-23. The SEC's primary theory is based on the false premise that Ustian said Navistar **had** developed "a 13-liter 0.2 NOx engine that ***had*** competitive fuel economy and performance features …." Opp'n at 19. It is undisputed, however, that Ustian did not say this. *See* UF 63; Ex. 1 (Revised Timeline). None of the four statements placed at issue by the SEC says what the SEC claims in its Opposition, and no reasonable investor would have understood otherwise. Indeed, this Court already has ruled "Ustian simply did not say that Navistar had

12

commercially viable 0.2 NOx engines … *[and no] reasonable investor could have understood Ustian to be saying that Navistar had commercially viable 0.2 NOx engines ready for production*." *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 650 (N.D. Ill. 2015) (Ellis, J.). The SEC has a record where the private plaintiffs had none, but the statement itself is identical in both cases.[2]

Ustian actually said that Navistar anticipated competitors would claim "that 0.2 can't be done" and that Navistar "submitted to the EPA a certification of 0.2 to take that argument away." UF 93. Ustian and Navistar repeatedly told the market that Navistar would not put any 0.2g NOx engine into production for years. UF 58, 63, 68, 75, 93. Far from touting the February 2011 engine's performance, Ustian pointed to "customer experience" (and fuel economy) to explain why production would be delayed. UF 75(b). "By *delaying* the switchover," he said, "customers will see almost no change in performance." *Id.*

The SEC seeks to avoid this Court's previous ruling that Ustian "simply did not say" what the SEC's Opposition claims he did say by citing selected analysts who allegedly reached an understanding no reasonable investor would reach. This is a perfect example of why anecdotal analyst testimony must be ignored. *See supra* Part II.C. Certain analysts testified that they "assumed" fuel economy or performance, and one testified that he was "skeptical that the engine could have performance features matching SCR engines' performance features." AF 18,19. Those facts are disputed and not probative; Ustian's facts are undisputed. And, again,

---

[2] These statements survived a motion to dismiss because the SEC previously claimed they were misleading for a **different** reason, which did not conflict with the Court's prior holding. The SEC abandoned that theory: "Here, the SEC alleges that Ustian falsely communicated that Navistar *already* had developed such an engine." Opp'n at 24 (emphasis in original).

if these particular analysts really understood Ustian to have said the February 2011 engine had

fuel economy and performance, then their idiosyncratic opinions are legally irrelevant.

The SEC also claims that this Court's plain reading of Ustian's statement was wrong

because Navistar "represented to the EPA in December 2010" that Navistar was proposing to

later file an application for an engine of "[l]imited volume" for "select customers."  Opp'n at 21;

UF 70.  The SEC claims that this "shows[] a reasonable investor could have understood that

Navistar would produce and sell the engine in limited amounts."  Opp'n at 21. The SEC's logic

is hard to follow and also wrong.  The fact the SEC wants to put in genuine dispute here is

whether a reasonable investor would have believed the February 2011 engine already had

competitive fuel economy and performance based on Ustian's statements; however, the

additional information of "limited volume" for "select customers" in no way would say to a

reasonable investor that the engine already was competitive.  If the engine had competitive fuel

economy and performance, then Navistar would have proposed to sell lots of them, not a limited

volume.  Regardless, the actual engine covered by the actual application that was filed in

February 2011 indisputably was not for sale.  UF 82.  And Navistar and Ustian both said 0.2g

NOx engines would not go into production until long after the February 2011 application

certificate would be expired.  *See* UF 63, 75, 93.  No reasonable investor would have concluded

from Ustian's statements that the engine already had fuel economy and performance.

For 2011 statements, the SEC also claims that Ustian "misleadingly ***suggested*** that the

engine met the EPA's certification requirements" because the February 2011 engine "did not

meet EPA's DF testing requirements" and EPA had "'officially rejected' Navistar's proposal"

for one alternative test.  Opp'n at 19-21.  Regardless, the SEC turns again to its "Additional

Facts" and relies on an email in which a Navistar employee uses the words "officially rejected."

AF 17.  The Undisputed Facts, however, establish that there was never a determination of success or failure on DF test requirements at the time of Ustian's statements.  *See* Mem. in Supp. at 21.  The SEC conspicuously does not identify the Navistar employee who wrote the email.  It was Navistar's Chief Certification Engineer Tom Kramer, and he "believed EPA would ***approve*** the February 2011 application" despite the negative feedback on the particular type of DF testing initially proposed.  UF 86-88, 92; *see also* Mem. in Supp. at 22 n.9.  EPA's own reaction when it received Navistar's February 2011 application supports that no adverse determination was made.  The EPA employee responsible for the application told his superior there were "[m]ore discussions to come on DFs."  Tab 418 (cited at UF 84).  Kramer also knew there were more discussions to come.  Discussions about a variety of DF testing options continued until at least August 2011.  UF 84; Tab 108 (cited at UF 84).  Based on the Undisputed Facts, no reasonable juror could find that EPA had "officially rejected" anything or that the February 2011 Application did or did not meet DF test requirements.  Because Ustian never said that the February 2011 engine "had" achieved fuel economy, and because EPA did not officially reject the application before it was filed, Ustian's statements were not false or misleading.[3]

### 2. Ustian's Statements Related to the January 2012 Application Were Not False and Any Omissions Were Not Material

The allegedly false or misleading statements related to the January 2012 Application divide into two categories, and there is a clear path to summary judgment for each category.  *See* Ex. 4 at 2.  <u>First</u>, there are statements in the December 20, 2011, Form 10-K Annual Report that Navistar "believes" its engines meet certification requirements but its emissions solution may not

---

[3]  For these statements, "no scienter" is also a direct a route to summary judgment.  Ustian was informed that the February 2011 application complied with emissions requirements and that the engineers were working to resolve differences related to the DF issue.  UF 86, 88, 92.  Ustian's external statements were consistent with what he knew from the Senior Engineering Group.  *See* Mem. in Supp. at 31-33.

be successful.  Second, there are March 2012 statements in an analyst call, a Form 10-Q, and press releases that the SEC claims are misleading because they allegedly suggest Navistar's January 2012 Application was on track and likely to be certified by June.

### a.       The December 2011 10-K Was True and Not Misleading

The most direct route to summary judgment for the SEC's claims related to the 2011 Form 10-K is that the statement at issue was not false or misleading.  The SEC's claims to the contrary are all presented in Part III.E.1. of the Opposition.  Opp'n at 28-33.  First, statements of opinion or belief – such as the statement, "We believe that our engines meet [EPA's] certification requirements" [UF 118] – are not misleading so long as they "fairly align with the information in [Ustian and Navistar's] possession at the time" the statement is made.  *Omnicare*, 135 S. Ct. at 1329.  The SEC's "most significant" evidence to avoid defeat at the hands of *Omnicare* is an email Ustian received on December 20, 2011.  Opp'n at 30-31.  That email was sent **after** the Form 10-K already had been filed.[4]  Ustian did not have access to this email "at the time" he approved the statement in NIC's Form 10-K.  *See Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (*Omnicare* requires "making statements that 'fairly align[] with the information in the issuer's possession *at the time*'") (citation omitted).  Also, the document the SEC claims is the best evidence to avoid summary judgment actually supports summary judgment.  Charbonneau wrote that EPA's Bunker "does not want to approve an NTE deficiency that is above .3 NOx (***not that he can't***, he doesn't want to)."  UF 117; Opp'n at 30.  Charbonneau's words on their face tell Ustian that EPA legally could approve the not-yet-drafted-or-submitted

---

[4] Charbonneau sent the email at 4:32 p.m. on December 20.  Tab 135 (cited at UF 117).  The SEC accepted NIC's filing of its Form 10-K at 7:53 a.m.  *See* Ex. 8, https://www.sec.gov/Archives/edgar/data/808450/000080845011000104/0000808450-11-000104-index.htm.

application, which supports Ustian's belief that Navistar's engines met "certification requirements." UF 116.

Second, turning to the facts the SEC agrees are less important, Navistar engineers and EPA employees met on December 16, 2011, to discuss a concept for a future application for certification of an engine at 0.2g NOx. UF 114; *see also* Mem. in Supp. Ex. 2 (Revised Timeline). This meeting was not inconsistent with Ustian's belief in compliance. The staff did not say EPA would deny Navistar's future application or even that EPA would deny an NTE deficiency. UF 114. Moreover, on December 17, 2011, "Navistar engineers met to discuss how to address the concerns raised by EPA during the [December 16] meeting." UF 116. The same engineers "shared with Ustian and Navistar's general counsel several options to address EPA's concerns," and the engineer outlining the new options "believed the application was certifiable." *Id.* As a result, "Ustian believed Navistar's engineers would be able to address EPA's concerns." *Id.* These Undisputed Facts establish that NIC's Form 10-K "fairly align[ed] with information in [Ustian's and NIC's] possession" at the time of the statement because they rested on a "meaningful inquiry" that involved Navistar's top engineers and attorneys. *Sanofi*, 816 F.3d at 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1328) (internal quotation marks omitted).[5]

Third, the SEC's back-up theory for why the 10-K was false or misleading presumes that "Navistar represented a mere 'risk' of failure" when in fact it was a "reality" that Navistar's 0.2g strategy already had failed. Opp'n at 28-29. Both sides of that coin are false. Navistar did not

---

[5] The SEC attempts to distinguish *Sanofi* because it was decided on a motion to dismiss and involved sophisticated plaintiffs. Opp'n at 31. But the procedural posture is not material to the legal standard. The SEC cited motion to dismiss cases for the legal standard for misleading statements in its Opposition. *Id.* at 29. Nor does the relative sophistication of the plaintiffs have any bearing on the legal standard. *Omnicare* holds (and *Sanofi* quotes) that whether a statement of opinion is misleading depends on what a "reasonable investor would take from the statement itself." *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329) (internal quotation marks omitted).

"represent" a "mere 'risk.'" *Id.* Rather, some of the relevant disclosures happen to be in the "Risk Factors" section of the 10-K [*see* Ex. C to Tab 420 (cited at UF 47 at 7], and the SEC's Opposition presents the form's section heading as though it were a Navistar statement. Disclosing that Navistar's technology solution might not be successful was significant, but Navistar also disclosed that it "***expect[ed]***" to use up emissions credits for some engines. The Form 10-K also disclosed, twice, that Navistar was "engaged in ongoing discussions" with EPA to explore "regulatory solutions that would permit" Navistar to continue producing engines when the emissions credits ran out. *Id.* at 7-9 (the Court should read all three single-spaced pages if it wants to confirm what Navistar **actually** disclosed).

The flip side of SEC's claim is also false. Failure of the EGR strategy was not a "reality" in December 2011. As described immediately above, Ustian and Navistar believed Navistar's engines complied with government certification requirements. UF 116, 125. That alone confirms a reality that matches the disclosures. Dozens of Undisputed Facts kill the SEC's premise. If the EGR strategy had failed before December 20, 2011, then Navistar would not have filed an application on January 31, 2012 [UF 142] following a successful test cell run on January 25 [UF 139, 141] and the confirmation from senior engineers that the engine was certifiable. UF 39. Failure before December 20, 2011? No, the May 2012 Application passed certification limits not only in the test cell but also on the road. UF 16. A May 30, 2012, meeting with EPA concerning that application went so well that one engineer was "sure" the application would be approved and another engineer was "optimistic." UF 218. No application was ever rejected. UF 39. "Failure" of the EGR strategy was never a "reality," and the Undisputed Facts preclude a reasonable jury from finding failure before December 20, 2011.

The Court should grant summary judgment as to the alleged misstatement in the December 2011 Form 10-K.[6]

### b. The March 2012 Statements Do Not Support Liability

The most direct route to summary judgment for the SEC's claims related to the March 2012 statements – supposedly, that the January 2012 Application was "on track" and likely would occur by June – is that the allegedly omitted information was not material because it was available to investors. *See* Ex. 4 at 2. The SEC's claims to the contrary are all presented in Part III.F. of the Opposition. Opp'n at 34-38. On February 28, 2012, EPA Assistant Administrator Gina McCarthy wrote a letter to Navistar's competitors that expressed EPA's "substantial concerns" with Navistar's January 2012 Application (the "McCarthy Letter"). UF 165. The Opposition does not dispute that the McCarthy Letter contains precisely the information the SEC alleges was omitted from the March 2012 statements. Opp'n at 35-38. The SEC's sole response is that because some analysts did not read the letter, it "was not reasonably available to a Navistar investor …." *Id.* at 36. But random actual acts of individual analysts do not matter. *See supra* Part II.C. The letter was public. UF 168. PACER makes litigation filings broadly available.[7] UF 169. The letter was reasonably available.

---

[6] The Court should also grant summary judgment on these statements because Ustian did not act with scienter. It is undisputed that "Ustian believed that the statements in the December 20, 2011 Form 10-K were accurate based on his engineers' ability to address EPA's concerns." UF 125. It is also undisputed that Navistar's general counsel is reasonably certain he drafted the language in the Form 10-K after consultation with Navistar's top engineers. UF 116, 120. This undisputed evidence is sufficient to support a finding that Ustian did not act with scienter. *See SEC v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) (reliance on others to ensure the accuracy of public disclosures "is not severely reckless conduct that is the functional equivalent of intentional securities fraud").

[7] The cases cited by the SEC are not to the contrary. *See* Opp'n at 37. In *Koppel v. 4987 Corp.*, the Second Circuit found that a document for which there was "limited opportunity to review" because it was available "at one location … does not alone constitute ready availability for most Participants." 167 F.3d 125, 132 (2d. Cir. 1999). In contrast, the McCarthy Letter was available remotely from any location with Internet access. For its part, *United Paperworkers Int'l Union v. Int'l Paper Co.* is inapplicable because it involved proxy materials sent to shareholders. 985 F.2d 1190 (2d Cir. 1993). "As subsequent decisions

Further, the McCarthy Letter is only the tip of the disclosure iceberg. The same information was available from other public sources. The Interim Final NCP rule and the proposed NCP rule were published in the *Federal Register* on January 31, 2012. They were available to anyone with an Internet connection. UF 161. In the Federal Register, EPA said that NCP's are for a "technological laggard," which EPA described as "a manufacturer who cannot meet a particular emission standard due to technological (not economic) difficulties and who, in the absence of NCPs, might be forced from the marketplace.… [W]e have determined that this criterion has been met for one manufacturer." Tab 379 (cited at UF 161). The NCP rule and its contents got plenty of press, and it was known that Navistar was the manufacturer referenced in the rule as having "technological" difficulties to the point Navistar "might be forced from the marketplace." *See, e.g.*, Ex. A to Tab 420 (cited at UF 6) at 14 (January 23, 2012 Jefferies Report: "Recent EPA publications show that potential non-conformance penalties would be much lower than investors speculated last week."); *id.* at 15 (January 23, 2012 Wells Fargo Report: "On January 20, the EPA issued an interim ruling defining NCPs (*i.e.*, for NAV)."); *id.* at 16 (February 2, 2012 Barrington Research Report: "In the EPA report, we learned that NAV will get hit with a 'nonconformance penalty (NCP)' of $1,300-1,500 per engine if the company runs out of EPA emissions credits before it gets its new engines certified at 0.2 NOx."). Even if the McCarthy Letter were not available, the NCP rulemaking was.

The SEC also ignores that EPA drafted a desk statement on February 28, 2012 – prior to the March statements – that conveyed the agency's "substantial concerns regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level." UF 176(a). This was "effectively public

---

have recognized, *United Paperworkers* has limited application outside the context of a proxy contest." *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 442 (S.D.N.Y. 2010) (collecting cases).

information" that was available to anyone who called EPA asking for it.[8]  UF 176.  That a few

analysts said they personally did not attempt to ask EPA for public information does not create

any genuine dispute because it is undisputed that the information was available "upon reasonable

inquiry" from either the D.C. Circuit docket (the McCarthy Letter) or a call to EPA's press office

(the desk statement).  *Sailors v. N. States Power Co.*, 4 F.3d 610, 612 (8th Cir. 1993) (omission

not material where "[m]uch of what the plaintiff argues was hidden from public view is actually

part of the regulatory process and upon reasonable inquiry was available to the public"); *see also*

*supra* Part II.C.  The January 2012 Application Timeline shows visually the extent of the

information available publicly from January 31, 2012, until the March 2012 statements.  *See*

Ex. 2.  "Because the substance of the alleged omissions was already in the public domain, the

alleged omissions could not have altered 'the total mix of information available' to the public

and were also immaterial as a matter of law."  *In re Bank of Am.*, 980 F. Supp. 2d at 577 (quoting

*Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).[9]

### 3.    Ustian's June 7, 2012, Statements Related to the May 2012 Application Were Not "Misstatements"

Resolution of the SEC's claims regarding Ustian's June 7, 2012, statements is the

narrowest summary judgment issue before the Court.  The SEC concedes that as of June 7

---

[8]  The testimony cited in the SEC's Additional Fact 7 is not applicable to EPA's February 28, 2012, desk statement.  In the cited testimony, Bunker was describing circumstances unique to a **June** 2012 email, which contained a draft for a **different** desk statement.  Tab 227 (cited at UF 222).

[9]  The March 2012 statements were also not misleading.  The SEC argues that the statements were misleading because they suggested that "Navistar was on track to get EPA certification … in response to the January 2012 application and that certification likely would occur by June 2012."  Opp'n at 33.  But it is undisputed Navistar's internal target for production was June.  UF 187.  And Ustian's statements clearly distinguish between certification, which Ustian said Navistar could not predict with "preciseness," and "getting ready to go to production" for which it is undisputed that June was targeted.  UF 184, 187, 220(a).  Nor did Ustian act with scienter.  The last communication from EPA that Ustian saw before making the March 2012 statements indicated that as a follow-up to the "preliminary concerns" letter, EPA expected "a fruitful meeting in the near future."  UF 156.  There was no basis to believe the application had been rejected or that it was "floundering."  *See* Mem. in Supp. at 36-37.  For these statements, all three paths to summary judgment are straightforward.

"Navistar and Ustian disclosed that Navistar had withdrawn the January 2012 application .…
Thus, for Ustian's June 7, 2012 statements, *the question is whether he made misstatements
regarding the May 2012 application* .…" Opp'n at 41. That was a new application, with a new
confirmation by the Navistar engineer in charge that the "engine conforms to the requirements."
UF 202. As a result, the Court need focus only on what happened between May 21 and
June 7, 2012. The most direct route to summary judgment is that the June 7 statements were not
false or misleading. *See* Ex. 4 at 3. The SEC's claims to the contrary are all in Part III.H. of the
Opposition. Opp'n at 41-43.

The SEC calls the June 7, 2012, Form 10-Q "Ustian's ... statements" and argues the
Form 10-Q was misleading, but the SEC again ignores what the filing actually says. Opp'n
at 41. The Form 10-Q **disclosed** not just "issues" but also that Navistar had withdrawn its
January 2012 application, had failed to certify any engine at 0.2g NOx, and was at risk of
running out of credits and NCP options before certification might be granted. *See* UF 234. No
reasonable investor could understand the 10-Q, or Ustian's statements later that day, as saying
anything remotely optimistic or encouraging about certification.

The SEC should have dropped its claims related to June 7, 2012, but instead the
Opposition substitutes fiction, the fiction that the May 21, 2012, application already had been
rejected, and therefore the June 7 statements were misleading because they omitted that made-up
fact. Here is the SEC's argument in its own words: "Contrary to Navistar's and Ustian's June 7,
2012 statements, the EPA had already responded on June 4, 2012 with 'unequivocally NO!' to
the May 2012 Application .…" Opp'n at 42.

Fortunately for summary judgment, the Undisputed Facts establish plainly that "EPA
*never denied* any Navistar application seeking to certify an EGR-only engine to meet the 0.2g

NOx Standard." UF 39. The Undisputed Facts also establish that **after** June 4, 2012, and indeed **after** June 7, 2012, Navistar received emails from EPA "outlining concerns with the May 2012 Application" [UF 218] and "invit[ing] Navistar to present any information and analysis that would answer these objections and support Navistar's claim of compliance with EPA regulations." UF 244. Whether EPA did or did not "unequivocally deny" the May 2012 application on June 4, 2012, is not a "hotly-contested fact." Opp'n at 19, 42. It is incontrovertible that EPA did not do what the Opposition claims, and the support in the Opposition is, at best, disingenuous. The SEC relies on a portion of Undisputed Fact 224, which reveals "unequivocally NO!" was not an EPA response but a mid-meeting read of the room by a Navistar employee. That employee testified as follows about his own words: "**Q**. In fact, did you believe that after the June 4th meeting, that it was quite possible that Navistar would still get certified on the .2 engine? **A**. Yes ... That was a yes. I felt that we were still going to get certification. I think the unequivocal no meant on that day at that meeting, we weren't going to get [certification]. Not we're never going to get it." UF 38(m).[10] In other words, the undisputed fact the SEC relies on for "Navistar's engineers understood" that EPA said "unequivocally no" proves the opposite. Therefore, the premise of SEC's liability theory it false, and summary judgment is appropriate.

**B.**     **There is No Factual Dispute as to Scheme Liability (Counts I-IV)**

As the Court recognized at the motion to dismiss stage, "[t]he SEC cannot premise its Rule 10b-5(a) and (c) claims and Section 17(a)(1) and (3) claims solely on Ustian's alleged misrepresentations or omissions" but the facts could "give rise to scheme allegations if [the SEC]

---

[10] Similarly, the SEC tries to compound the misleading reliance on Iwaskiewicz with some words it put in the mouth of Younessi [UF 227], ignoring that Younessi was not at the June 4 meeting and believed the May 2012 Application met certification requirements. *See* UF 217-19.

alleges that [Ustian] undertook a deceptive scheme or course of conduct that went **beyond** the misrepresentations." *SEC v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017). Instead of pointing to a dispute of fact that is material in light of this Court's legal standard, the SEC tries to salvage is scheme liability claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) by arguing that the SEC does **not** need to prove any conduct "beyond the misrepresentations." Opp'n at 46-47. Both sides agree this is a pure legal question for the Court.

The SEC has not cited any case that holds a plaintiff can establish a "scheme" without establishing deceptive conduct independent of making the allegedly misleading statements. *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), does not so hold, as Ustian explained in his opening brief. *See* Mem. in Supp. at 47. The defendant in *Lorenzo* did not **make** the statements at issue. He **disseminated** the statements to investors with the intent to defraud. *Lorenzo*, 139 S. Ct. at 1101. That was the scheme – dissemination of **other people's statements** with intent to deceive. The SEC's citation to *SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019), is unpersuasive. The *SeeThruEquity* court held that the SEC had adequately alleged scheme liability because the complaint "allege[d] that the defendants' entire business model, **beyond any misstatements or omissions**, is deceptive." *Id*. Similarly, *Malouf v. SEC*, 933 F.3d 1248, 1259-60 (10th Cir. 2019), found the existence of a scheme where the SEC established conduct beyond making alleged misstatements, namely the defendant's affirmative failure to correct another entity's misstatement.

Hedging its bets in the final lines of its argument, the SEC provides a string cite to twenty-four undisputed facts that it asserts, without elaboration, are "the evidence of a scheme that the Court now has before it." Opp'n at 47. This hodge-podge of facts provides no evidence of deceptive conduct sufficient to establish a scheme, and the SEC does not explain how these

facts constitute "a plan or program of something to be done; an enterprise; a project; as, a business scheme, or a crafty, unethical project." *Ustian*, 229 F. Supp. 3d at 774 (internal quotation marks and citation omitted). Because the SEC has "not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question, … the Court *must* enter summary judgment against" the SEC on its scheme liability claims. *See Waldridge*, 24 F.3d at 920 (emphasis in original).

### C. The Section 17(a)(2) Claim Fails Because There Is No Evidence of a Causal Connection Between an Alleged Misstatement and Ustian Obtaining Money or Property (Counts III and IV)

Section 17(a)(2) requires the SEC to prove that Ustian obtained money or property by means of a false or misleading statement. To survive summary judgment, the EPA must point to undisputed facts that establish "causal link between the misrepresentation and the acquisition of money." *Flannery & James D. Hopkins*, Release No. 3981, 2014 WL 7145625, at *25 (Dec. 15, 2014), *vacated on other grounds*, 810 F.3d 1 (1st Cir. 2015). The Opposition fails to identify evidence of a causal link. Importantly, the Opposition also does not identify a **factual** dispute. The Court should enter summary judgment in Ustian's favor because there is a complete failure of evidence as to the requisite causal link between a material misstatement and the acquisition of money or property.

The SEC's theory is that Ustian obtained money by means of false statements because he sold stock at an artificially inflated price [Opp'n at 47], and for that to be true, the alleged misstatement must have been made **before** the stock sale. This means that the April 5, 2011, statement and all subsequent statements cannot support the Section 17(a)(2) claim. The April 5, 2011, press release was issued after market close,[11] and therefore it could not have affected the

---

[11] *See* Ex. 9. (*Business Wire*, "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine at 0.39g NOx," April 5, 2011, 5:17 p.m. ET.).

price at which Ustian sold NAV shares earlier that day.[12]  If none of the three earlier statements is a material misstatement (and none is [*see supra* Part III.A.]), then the Court must enter summary judgment for Ustian on the Section 17(a)(2) claim.  End of inquiry.

For the casual connection, the SEC claims its expert "conducted an event study and determined that Ustian's statements – including those during the November 2010 through April 2011 time period – had a material impact on Navistar's stock price."  Opp'n at 47.  But the SEC's expert expressed no such opinion, and the undisputed fact cited by the SEC does not support the conclusion the SEC urges on the Court.  It actually states:  "A SEC expert witness conducted an event study and believes that ***certain statements*** made or approved by Ustian were important and had a material impact on Navistar's stock price, and that Navistar's stock price experienced an excess return."  UF 102.  Ustian is not disputing that the SEC's expert "believes" that "certain statements" impacted Navistar's stock price, but that falls far short of evidence that the three alleged misstatements before April 5, 2011, inflated Navistar's stock price.[13]  "Certain statements" could be any two or more alleged misstatements at any point in time.  Nor does anything in the SEC expert's **report** support the conclusion that any specific statements at issue inflated Navistar's stock price.  The SEC's expert considered the alleged misstatements only "as a whole."  Tab 268 (cited at UF 170) at 14.  Because Navistar's stock price dropped on July 6, 2012, the SEC's expert concluded that the alleged misstatements "***as a whole*** were also

---

[12]  The SEC argues that the "suspicious timing" of Ustian's April 5 trade "creates a reasonable inference" that Ustian's motives for making the sale were related to a press release issued the same day.  Opp'n at 47-48.  But the inference is not reasonable, as Ustian sold his shares before the press release.

[13]  The SEC seeks to support the inference that Navistar's stock price was inflated with the true but economically insignificant fact that the stock "experienced an excess return."  UF 102. "Excess return" means the difference – positive or negative – between the actual price movement of Navistar's stock and what the SEC's expert determined was "expected."  *See* Tab 268 (cited at UF 102) at 15. According to the SEC's expert, Navistar's stock experienced an excess return – some positive, some negative – every single trading day between November 4, 2009 and July 11, 2012.  *Id.* at 18 and Ex. 6.4 thereto.

material." *Id.* The expert expressed no opinion that any individual statement had an impact on Navistar's stock price, or that any set of statements other than the alleged misstatements "as a whole" could have affected Navistar's stock price. His opinion (or his "belief") does not constitute evidence that the November 2010 to March 2011 statements had any impact on Navistar's stock price, and the SEC points to no other evidence tying Ustian's alleged misstatement to the price of NAV stock. UF 170 (a)-(c). There is thus a complete failure of evidence as to the requisite "causal link between the misrepresentation and the acquisition of money." *Flannery*, 2014 WL 7145625, at *25.

Independent of the above two reasons for summary judgment, the SEC has presented no evidence of the standard of care applicable to Ustian with respect to the truth or falsity of the November 2010 – March 2011 statements. *See Shanahan*, 646 F.3d at 545-46 (affirming grant of judgment as a matter of law on 17(a)(2) claim where "the SEC presented no evidence … with respect to the degree of care than an ordinary careful person would use under the same or similar circumstances"). The SEC claims that the evidence of the standard of care applicable to Ustian is that Troy Clarke, who became CEO six months after Ustian left, "determined that it was unlikely the EPA would certify Navistar's EGR engine" when he "became responsible for assessing Navistar's certification prospects in June 2012." Opp'n at 39. The SEC does not explain why Clarke, who "had no responsibility or knowledge of the certification process" until June 2012 [UF 246], was a reasonable CEO before he was ever a CEO or why his conduct establishes the one course of action a CEO could reasonably have taken. Regardless, Clarke's conduct based on information available in June 2012 does not tell the Court anything about what a reasonable CEO in Ustian's position would do with information available in April 2011. Thus,

the finder of fact is impermissibly "left to speculate[.]"  *Shanahan*, 646 F.3d at 546.  The Court

should grant summary judgment for Ustian.[14]

### D. The Aiding and Abetting & Control Person Claims Fail (Counts II, IV, VII)

The aiding and abetting claims (Counts II and IV) and the Section 20(a) control person

claim (Count VII) fail for the reasons stated in Ustian's memo, including because the SEC

cannot establish a primary violation of the securities laws by Navistar.  There is no primary

violation because (1) the statements at issue in these counts are exactly the same statements at

issue in primary claims against Ustian and (2) these statements are not false or misleading for the

reasons stated above and in the Memo in Support.  *See supra* Part III.A.  This is sufficient to

support summary judgment on Counts II, IV, and VII.

## IV. CONCLUSION

The SEC's Opposition hides the statements actually at issue instead of highlighting them.

Ustian asks that the Court focus on the revised timelines he has prepared (Ex. 1-3 hereto), where

each statement at issue in the Opposition is set out in blue.  Objectively, those statements were

not false, nor were they misleading.  The alleged falsities the SEC conjures up were not actually

"stated" or even "communicated."  What analysts may have said in depositions or declarations

well after the fact creates no genuine dispute when examining what **was actually said** back in

the day and what in real time an "objective reasonable investor" would have

concluded.  Throughout the period, there was an overwhelming encore of analysts and press

statements discussing the risks, as well as Navistar's clear and escalating public disclosures.  UF

---

[14]  The SEC also suggests, for the first time, that Ustian was in possession of material non-public information at the time of the April 5 trade, and that his possession of that information provides a causal link between a material misstatement and money or property he obtained.  This is not an insider trading case, and the SEC cites no case for the proposition that mere purported possession of material nonpublic information at the time of a trade supports a Section 17(a)(2) violation.

6, 7, 47. Even if this Court believes a genuine factual dispute exists on misleading, the alleged "omissions" that SEC argues Ustian should have aired to the public were already in the mix of information that was undisputedly available to investors.

But from Ustian's perspective, the most jarring focus of SEC's Opposition is its attempt to paint him as culpable, acting knowingly, recklessly, and negligently. Ustian stands accused of fraud, of exploiting and misleading the public. In this regard, however, both this Court and Judge Schenkier are aligned – "the good faith and reasonableness of Mr. Ustian's belief rises or falls based on the information he had before him at that time;" and the only way to know "what was going on in the mind of Mr. Ustian" is to identify what information he did know during the relevant time period and from whom. *See supra* at Part II.D. Applied to this case, that reduces to two questions: (1) "What was Ustian told by the team of senior Navistar engineers who provided him with information?," and (2) "Did he stay true to that information in his public statements?" Again, Ustian asks the Court to view the timelines that illustrate based solely on the Undisputed Facts what Ustian was told and how he stuck to those facts. Exs. 1-3.

Ustian is not an engineer. UF 1. He performed no certification tests (though an independent, high-quality third-party laboratory – Southwest Research Institute – did). UF 79. As CEO, he relied on Navistar's most senior, seasoned engine engineering experts. UF 5; s*ee also* Chart of Engineers, Ex. 10. Those he relied on had extraordinary knowledge and decades of experience. Those same senior engineers uniformly assured him they were following EPA regulations, had legitimately applied for certification, would answer EPA's questions in the familiar give-and-take with EPA engineers, and that "EPA should approve the 0.2g NOx applications Navistar submitted." UF 38; *see also* 43, 86, 92. It is undisputed "Ustian **believed** that to be true." UF 38. That is the uncontroverted record, and that is exactly what Ustian

knew.  That is what he stuck to in talking with analysts and what Navistar stuck to in the public

filings and press releases.  The Court should grant summary judgment in Ustian's favor on all

counts.

Dated:  October 4, 2019

Respectfully submitted,

**DANIEL C. USTIAN**

*/s/ Sean M. Berkowitz*

By Sean M. Berkowitz

Sean M. Berkowitz (ARDC No. 6209701)
Cary R. Perlman (ARDC No. 6197698)
Robin M. Hulshizer (ARDC No. 6230994)
Eric R. Swibel (ARDC No. 6297743)
Caitlin E. Dahl (ARDC No. 6312614)
Adam L. Rosenbloom (ARDC No. 6317055)
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700

Laurence H. Levine (ARDC No. 1638459)
LAURENCE H. LEVINE LAW OFFICES
189 East Lake Shore Drive, 16th Floor
Chicago, Illinois 60611
Telephone:  (312) 927-0625

*Attorneys for Defendant Daniel C. Ustian*