## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 16-cv-03885** |
| **v.** | ) ) ) | **Hon. Sara L. Ellis** |
| **DANIEL C. USTIAN,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

# PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
# MOTIONS *IN LIMINE* NOS. 1-10

Eric M. Phillips
Jonathan S. Polish
Anne Graber Blazek
Timothy Stockwell
United States Securities and Exchange
Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

## Table of Contents

I.  MOTION IN LIMINE NO. 1: Motion *In Limine* For An Order Permitting The SEC To Use Leading Questions On Direct Examination Of Six Current Or Former Navistar Employees And To Preclude Ustian From Using Leading Questions In Cross-Examination Of These Witnesses........................ 1

II.  MOTION IN LIMINE NO. 2: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument That The EPA Never Raised Concerns To Ustian, Navistar, Or Other Agencies About Ustian's And Navistar's Public Disclosures ........................................................ 7

III.  MOTION IN LIMINE NO. 3: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument Regarding FOIA Exemptions And The EPA's Responses To FOIA Requests ........................................ 11

IV.  MOTION IN LIMINE NO. 4: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument That The SEC and EPA Are Part of One Federal Government........................................................ 18

V.  MOTION IN LIMINE NO. 5: Motion *In Limine* For An Order Permitting The SEC To Introduce Evidence Of Meetings And Communications Between Navistar And The EPA And To Preclude Ustian From Arguing Such Meetings And Communications Constituted "Settlement Discussions" Under FRE 408 ........................................................ 21

VI.  MOTION IN LIMINE NO. 6: Motion *In Limine* To Preclude Ustian From Eliciting Lay Opinion Testimony Regarding The Accuracy Of Disclosures And Ustian's State Of Mind ........................................................ 30

VII. MOTION IN LIMINE NO. 7: Motion *In Limine* To Preclude Ustian From Introducing Evidence and Argument Regarding Unknown SCR Issues .................. 37

VIII.MOTION IN LIMINE NO. 8: Motion *In Limine* To Exclude The Trial Testimony of EPA Official Allen Duncan.................................................. 42

IX.  MOTION IN LIMINE NO. 9: Motion *In Limine* To Preclude Ustian From Introducing Evidence And Argument Regarding Reliance On Counsel .................. 48

X.  MOTION IN LIMINE NO. 5: Motion *In Limine* To Exclude The Trial Testimony Of Former Navistar General Counsel Steven Covey.............................. 53

**Exhibits to the SEC's Motions *In Limine***

| | |
|---|---|
| 1 | Collection of deposition transcript pages showing witness representation |
| 2 | Bunker Deposition Excerpts |
| 3 | EPA 30(b)(6) Deposition Excerpts |
| 4 | Grundler Deposition Excerpts |
| 5 | Oge Deposition Excerpts |
| 6 | 6/7/2012 Email, Grundler Ex. 26 (US-EPA4220587) |
| 7 | 5/8/2015 Email, Exhibit X to Ustian Motion to Dismiss Brief (Doc. 27-25) |
| 8 | 6/25/2015 Letter, Exhibit Y to Ustian Motion to Dismiss Brief (Doc. 27-26) |
| 9 | 6/1/2016 Ustian Letter to SEC |
| 10 | 7/1/2016 Ustian Letter to SEC |
| 11 | Deposition Exhibit 423 |
| 12 | Deposition Exhibit 24 |
| 13 | EPA Rule 30(b)(6) Deposition Exhibit 3 |
| 14 | US_EPAB2135900-901, Ex. 114 to Docket No. 241 |
| 15 | EPA Rule 30(b)(6) Deposition Exhibit 35 |
| 16 | Deposition Exhibit 220 |
| 17 | Iwaszkiewicz Deposition Excerpts |
| 18 | Ostarello Deposition Excerpts |
| 19 | Hammes Deposition Excerpts |
| 20 | Orehowsky Deposition Excerpts |
| 21 | Duncan Deposition Excerpts |
| 22 | 8/15/2018 Hearing Transcript (Doc. 198) |
| 23 | 1/16/2018 Ustian's Amended Responses to Interrogatories 2 and 3 |
| 24 | 11/13/2019 Ustian Draft Witness List |
| 25 | Covey Investigative Testimony |
| 26 | 6/14/2016 Ustian Rule 26 Disclosures |
| 27 | 12/21/2017 Ustian Interrogatory Responses |

I.    **SEC Motion *In Limine* No. 1: Motion *In Limine* For An Order Permitting The SEC To Use Leading Questions On Direct Examination Of Six Current Or Former Navistar Employees And To Preclude Ustian From Using Leading Questions In Cross-Examination Of These Witnesses[1]**

The SEC respectfully requests that the Court permit the SEC to use leading questions on direct examination for six current or former Navistar employees that the SEC may call during its case-in-chief. Federal Rule of Evidence 611 provides that a party "ordinarily" should be permitted to conduct a direct examination by means of leading questions for adverse parties and witnesses "identified with an adverse party." Fed. R. Evid. 611(c). The SEC expects it will or may call as witnesses current or former Navistar employees Patrick Charbonneau ("Charbonneau"), Thomas Kramer ("Kramer"), Titus Iwaszkiewicz ("Iwaszkiewicz"), Randy Diaz ("Diaz"), Ramin Younessi ("Younessi"), and Troy Clarke ("Clarke"). All were employees of Navistar while Ustian served as CEO; all worked with Ustian on the certification applications at issue in this case; and all have been represented in sworn testimony by the same counsel who represent Ustian and Navistar. Under such circumstances, this Court has held that the party in the SEC's position should be permitted to ask leading questions of such witnesses.

These witnesses are clearly aligned with Ustian:

- Charbonneau is a former Navistar employee who previously served as the company's Vice-President of Government Relations. He worked under Ustian during the period of Ustian's alleged misconduct. Ustian's and Navistar's lawyers represented Charbonneau during sworn investigative testimony during the SEC's pre-litigation investigation and during Charbonneau's deposition in this litigation. (*See* Ex. 1 (collecting deposition transcript pages showing witness representation)).

---

[1] In addition to SEC Motions *In Limine* 1-10 contained herein, the SEC also filed two motions to exclude Ustian's expert witnesses. *See* Docket Nos. 274, 276. For the Court's convenience, the SEC and Ustian agreed to file these motions separately from their motions *in limine.*

- Kramer is an engineer currently employed by Navistar. He worked under Ustian during the period of Ustian's alleged misconduct. Ustian's and Navistar's lawyers represented Kramer during his investigative testimony and during his deposition. (*Id.*).

- Iwaszkiewicz is an engineer formerly employed by Navistar. He worked under Ustian during the period of Ustian's alleged misconduct. Ustian's and Navistar's lawyers represented Iwaszkiewicz during his investigative testimony and during his deposition. (*Id.*).

- Diaz is a current Navistar employee who formerly worked in Navistar's investor relations department. He worked under Ustian during the period of Ustian's alleged misconduct. Ustian's and Navistar's lawyers represented him during his deposition. (The SEC did not take investigative testimony from Diaz.) (*Id.*).

- Younessi is an engineer formerly employed by Navistar. He worked under Ustian during the period of Ustian's alleged misconduct. Ustian's and Navistar's lawyers represented Younessi during his investigative testimony, as did an additional lawyer presumably paid for by Navistar. During Younessi's deposition, this additional lawyer represented Younessi. (*Id.*).

- Clarke is Navistar's current CEO and served in various executive capacities at Navistar during the period of Ustian's alleged fraud. Ustian's and Navistar's lawyers represented Clarke during his investigative testimony. (*Id.*).

Given that Ustian is an adverse party and the others are identified with him, the SEC respectfully requests that the court allow it to use leading questions during the examinations of each of these witnesses.

Conversely, defense counsel should not be permitted to lead these witnesses or Defendant Ustian during their "cross-examinations." *See* 3 Federal Evidence § 6:71 (4th ed. 2019) ("when a party in a civil action actually calls an adverse party as a witness, or an agent or employee closely aligned with an adverse party, the usual modes of questioning are reversed"). Although the SEC may call these witnesses during its case-in-chief, they are identified with Defendant Ustian. Because they are identified with Ustian, the rationale allowing counsel to ask leading questions on cross-examination does not apply.

### A. Leading questions should be allowed where the witness is an adverse party or identified with an adverse party

Under Rule 611(c), a district court "ordinarily . . . should allow leading questions . . . when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Before the adoption of Rule 611(c), a party could ask leading questions on direct examination only after a showing "of actual hostility or a determination that the witness being examined was an adverse party, or an officer, director, or managing agent of such an adverse party." *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir. 1981). The drafters of Rule 611(c) found that restriction "'an unduly narrow concept of those who may safely be regarded as hostile without further demonstration.'" *Id.* (quoting Advisory Committee Note to Rule 611(c)). Their inclusion of the phrase "witness identified with an adverse party" was "designed to enlarge the category of persons" of whom parties could ask leading questions on direct examination. Advisory Committee Notes to Fed. R. Evid. 611(c); *see Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1478 (11th Cir. 1984) (noting that the rule "significantly enlarged" the class of witnesses subject to leading questions without a showing of actual hostility). Now, a "witness identified with an adverse party" is considered a hostile witness as a matter of law and is subject to direct examination by leading questions without any showing of actual hostility. *See* Notes of Committee on the Judiciary (Senate Report 93-1277) to Fed. R. Evidence 611.

The restrictions on leading questions during direct examination were "designed to guard against the risk of improper suggestion inherent in examining friendly witnesses through the use of leading questions." *Ellis*, 667 F.2d at 612. Yet, "the risks of suggestion are reduced where the witness has an interest in promoting a version of the facts contrary to that suggested." Charles A. Wright and Victor J. Gold, 28 *Fed. Prac. & Proc. Evid.* § 6168 (2d ed. 2019). Thus,

3

the term "witness identified with an adverse party" has come to "mean, in general, an employee, agent, friend, or relative of an adverse party." *Ratliff v. Chicago*, No. 10 C 739, 2012 WL 7993412, at *1 (N.D. Ill. Nov. 20, 2012). Courts have broad discretion to designate a witness as hostile. *See, e.g., Ellis*, 667 F.2d at 613 (the decision to permit leading questions "'must be left to the sound discretion of the trial judge'") (quoting *St. Clair v. United States*, 154 U.S. 134 (1894)).

Following these principles, courts have allowed leading questions when witnesses share a current or former employment or agency relationship with a defendant. For example, in *Ellis*, the Seventh Circuit held that in a civil rights action against the City of Chicago and one of its police officers, the district court should have permitted the plaintiffs to use leading questions in their direct examinations of two former City policemen. *Ellis,* 667 F.2d at 613. The Seventh Circuit stated: "These police officers were employees of Defendant City of Chicago at all times during the litigation and were each present during portions of the incident which gave rise to this lawsuit. Moreover, the record indicates that both officers had worked closely with Defendant Frank Kusar during the period of their employment. Officer Calandra and Sergeant Holub thus clearly qualified as 'witnesses identified with an adverse party' for purposes of Rule 611(c)." *Id. See also Favila v. City of Chicago*, No. 09 C 3265, 2011 WL 2160882, at *2 (N.D. Ill. June 1, 2011) (permitting plaintiff to call and using leading questions to examine non-party city police officers and employees because they were identified with the city defendant).

Similarly, in *United States v. McLaughlin*, No. 95 CR 0113, 1998 WL 966014 at *1 (E.D. Pa. Nov. 19, 1998), the court permitted leading questions of a defendant's accountant, an independent contractor who prepared the defendant's tax returns. Noting that the defendant and the accountant "worked together" for many years, including on the tax returns at issue, the

4

district court found that while they were not necessarily "in cahoots, they were, at the very least cohorts." *Id.*

Like in the *Ellis* and *McLaughlin* cases, Charbonneau, Kramer, Iwaszkiewicz, Diaz, Younessi, and Clarke all worked under Ustian for years, and all worked in some capacity relating to the company's EPA certification efforts and/or public disclosures regarding the same. Many also provided favorable (albeit inadmissible) lay opinion testimony for Ustian when questioned by his and Navistar's counsel in depositions. (*See, e.g.*, Joint Statement of Undisputed Material Facts (Dkt. #255) at ¶¶ 73, 96, 126, 187, 240). They were all "cohorts" in the events that gave rise to this litigation. The fact that Ustian's and Navistar's lawyers have all represented these witnesses in sworn testimony during the SEC's investigation and/or this litigation provides additional strong evidence that these witnesses are identified with Ustian. Therefore, the Court should permit the SEC to use leading questions in direct examinations of Charbonneau, Kramer, Iwaszkiewicz, Diaz, Younessi, and Clarke in the SEC's case-in-chief.

**B.** **The Court should preclude Ustian's lawyers from leading their own clients, all of whom are current or former Navistar employees.**

For precisely the same reasons the Court should permit the SEC to lead these witnesses, Ustian should be precluded from doing so. Leading questions are ordinarily allowed on cross-examination because the witness being cross-examined "is often reluctant and resistant to respond directly." *McLaughlin*, 1998 WL 966014 at *2. "This is due to 'not only the presumable bias of the witness for the opponent's cause, but also his sense of reluctance to become the instrument of his own discrediting.'" *Id.* (quoting *Wigmore on Evidence* § 733). Rule 611(c)'s inclusion of the word "ordinarily" was meant to give courts the authority to bar a party from leading friendly witnesses on cross-examination:

> The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the "cross-examination" of a party by his own counsel after being called by the opponent (savoring more of re-direct) or of an insured defendant who proves to be friendly to the plaintiff.

Advisory Committee Notes, Rule 611(c). "When an opponent's witness proves to be biased in favor of the cross-examiner, the danger arises that leading questions will avoid the complete truth, and such questions may be forbidden, with the court treating the cross-examination as if it were on direct." *McLaughlin*, 1998 L 966014, at *2 (citations omitted) (granting government's motion to preclude defense counsel from leading friendly witnesses during cross-examination). *See also United States v. Collins*, 321 F.3d 691, 695-96 (8th Cir. 2003) (upholding district court's preclusion of defense counsel from asking leading questions during cross-examination of a witness who was "as a practical matter" a defense witness).

Ustian and his former employees are aligned, both through their participation in the events at issue here and their retention of the same counsel. These witnesses will not be "reluctant and resistant to respond directly" to questions from their own attorneys designed to elicit evidence in support of their former boss and Navistar, their current or former employer, whom Ustian is alleged to have controlled. As the court in *McLaughlin* noted:

> [L]awyers in this land have the right to prepare their own witnesses so that testimony comes forth smoothly, clearly, and logically. Once the witness is on the stand, however, lawyers no longer have that right, including the right to lead. The search for truth is better served when the witness actually goes it on his own, without friendly counsel serving as some sort of testimonial TelePrompTer.

*McLaughlin*, 1998 WL 966014 at *2. Thus, for the same reasons the SEC should be allowed to lead these witnesses during its direct examinations, defense counsel should be precluded from leading them during their "cross-examinations."

6

II.     **SEC Motion *In Limine* No. 2: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument That The EPA Never Raised Concerns To Ustian, Navistar, Or Other Agencies About Ustian's And Navistar's Public Disclosures**

The SEC moves *in limine* to exclude any evidence or argument by Defendant Ustian that the EPA never complained to Ustian, Navistar, the SEC, or anyone else about Navistar's public disclosures regarding its attempts at getting a 0.2 NOx EGR-only engine certified by the EPA. The court should exclude such evidence and argument as irrelevant under Federal Rule of Evidence 401. Even if the evidence was relevant, the court should exclude this evidence and argument under Federal Rule of Evidence 403 given that the minimal probative value is substantially outweighed by the danger that it would simply confuse and mislead the jury.

A.      **Background**

The SEC anticipates Ustian may argue that because the EPA never complained or otherwise reported to anyone outside the agency its concerns with Ustian's or Navistar's public disclosures, this somehow provides a defense to the SEC claims.

For example, Ustian's counsel elicited the following information from the EPA's Byron Bunker during deposition testimony:

> Q. Did you ever, between 2010 and 2012, communicate with Michael Horowitz or anyone in the Office of General Counsel at the EPA, a concern that you specifically had about the accuracy of Navistar's public filings or statements?
> A. I had conversations with Michael Horowitz and John Hannon about that fact.
> Q. Okay. And do you know whether any action was taken?
> A. As best I'm aware no action was taken.

(Ex. 2, Bunker Dep. at 306:16-307:5). Similarly, the Joint Statement of Undisputed Material Facts in support of Ustian's Motion for Summary Judgment includes the following:

> Between 2010 and 2012, the EPA's Bunker had conversations with members of the EPA's Office of General Counsel about Bunker's concern about the accuracy of Navistar's public filings or statements. EPA took no action and did not

7

communicate with Navistar about the alleged subject matter of the conversation. Bunker Dep. Tab 2, at 306:16-307:5.

Docket No. 255 at ¶ 74. Ustian elicited additional testimony that while the EPA was aware of Navistar's public statements and filings with the SEC, it never notified anyone at the SEC or Navistar of concerns about the accuracy of those statements. (*E.g.*, Ex. 3, EPA 30(b)(6) Dep. at 186:21-187:17, 189:22-190:19; Ex. 4, Grundler Dep. at 242:16-243:6).

### B. The EPA's silence as to Ustian's and Navistar's disclosures is irrelevant, and calling attention to such silence would be unfairly prejudicial

Any evidence that the EPA somehow approved of or ratified Ustian's or Navistar's disclosures because of its silence, or that Ustian relied in good faith on the EPA's silence, is irrelevant and prejudicial. First, the EPA does not regulate or enforce the federal securities laws, and therefore it has no obligation or authority to warn Ustian, Navistar, or the SEC of false and misleading public statements, or to ratify such statements by its silence. In fact, even the SEC – which actually does regulate and enforce the securities laws – has no obligation or authority to do so. Section 26 of the Securities Exchange Act of 1934 (15 U.S.C. § 78z), is unequivocal that the SEC's failure to act with regard to statements or reports filed with or examined by the SEC, will not "be deemed a finding by [the SEC] that such statement or report is true and accurate on its face or that it is not false or misleading." Not only is it wrong to argue that the SEC "approves" of filings or statements as accurate, true, or not misleading, it is actually *unlawful* for a party to take that position when speaking to investors. *Id*. It is obvious that if the SEC cannot approve of or ratify Ustian's and Navistar's false and misleading statements by its silence or inaction, then neither can the EPA.

8

To allow Ustian to take this position would be inaccurate, and thus would provide no probative value under Federal Rule of Evidence 401. Furthermore, it would be unfairly prejudicial and confusing to the jury under Federal Rule of Evidence 403. *See, e.g., SEC v. Keating*, 1992 WL 207912, at *4 (C.D. Calif. July 23, 1992) (relying, in part, on Section 26 of the Exchange Act in rejecting defense that the SEC had ratified misconduct because such a defense "directly conflicts with the establish law that the SEC cannot be held to have ratified illegal acts") (citing *SEC v. Gulf & W. Indus. Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980)); *SEC v. Bank of Am. Corp.*, 2009 WL 4797741, *1 (S.D.N.Y. Dec. 8, 2009) (applying Section 26 to reject motion to compel SEC internal papers because the SEC could not be viewed as taking any position on the filings).

Additionally, introduction of the EPA's silence in the face of Ustian's and Navistar's false and misleading statements might lead the jury to believe that the EPA had no concerns with the disclosures. This would also be inaccurate, confusing, and unfairly prejudicial because the EPA did, in fact, have concerns regarding Ustian's and Navistar's public disclosures – concerns that it often shared internally within the EPA. As referenced above, the EPA's Byron Bunker raised the issue with the EPA's Office of General Counsel. Further, the EPA's Marge Oge testified that she was "uncomfortable" with some of the statements Ustian and Navistar were making because they were not being "transparent" and Ustian was not being "truthful" based on what she knew. (Ex. 5, Oge. Dep. at 211:7-14; 218:11-16). Oge went so far as to question whether the Department of Justice, Federal Trade Commission, or SEC knew about Ustian's false and misleading statements in the June 7, 2012 Earnings Call. (Ex. 6, 6/7/2012 Email, Grundler Ex. 26). EPA official Chris Grundler also had his own concerns, testifying that he "express[ed] concerns to colleagues about what [he] was reading in the trade press that was the

9

comments attributed to the firm or to Mr. Ustian." (Ex. 4, Grundler Dep. at 243:7-13). The fact that the EPA expressed these concerns internally, as opposed to Ustian, Navistar, or the SEC directly, is of no consequence and provides no defense to Ustian.

Given that the above evidence and argument is irrelevant to the issues in this case and that its introduction would only serve to confuse and mislead the jury, the Court should exclude any of this evidence or argument at trial.

**III.    SEC Motion *In Limine* No. 3: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument Regarding FOIA Exemptions And The EPA's Responses To FOIA Requests**

The SEC moves *in limine* to exclude any evidence or argument by Defendant Ustian that the disclosures at issue were not false, misleading, or material because the "EPA has consistently taken the position" that "publicly disclosing 'pre-decisional dialogue' would cause 'public confusion.'" *See* Docket No. 254, Ustian Motion for Summary Judgment Brief at 35; *see also* Docket No. 27, Ustian Motion to Dismiss Brief at 16-17. The court should exclude any evidence relating to Freedom of Information Act ("FOIA") exemptions or the EPA's responses to FOIA requests because such evidence is irrelevant under Federal Rule of Evidence 401. Even if relevant, the court should exclude the evidence under Federal Rule of Evidence 403 given that the minimal probative value is substantially outweighed by the danger that it would simply confuse and mislead the jury.

**A.    Background**

In 2015 – three years after Ustian's alleged misconduct ended -- Navistar submitted a FOIA request to the EPA requesting information regarding the EPA's review of two of Navistar's 0.2 NOx EGR-only certification applications. The EPA refused to produce internal EPA dialogue in response to the request because the EPA determined such communication was deliberative and thus covered by FOIA Exemption 5 – the deliberative process privilege. (Ex. 7, 5/8/2015 Email; Ex. 8, 6/25/2015 Letter (attached as Exhibits X and Y to Ustian Motion to Dismiss, Doc Nos. 27-25 and 27-26)).

Exemption 5 of FOIA "shields from the mandatory disclosure requirements of the FOIA the deliberative process that precedes most decisions of government agencies." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1047-48 (D.C. Cir. 1982) (citing *Jordan v. United States Dept.*

11

*of Justice*, 591 F.2d 753, 773 (D.C.Cir.1978)). "Thus, the exemption protects not only

communications which are themselves deliberative in nature, but all communications which, if

revealed, would expose to public view the deliberative process of an agency." *Id*. (citing

*Montrose Chemical Corp. of California v. Train*, 491 F.2d 63 (D.C. Cir. 1974)). In *Jordan*, the

court described the policies behind Exemption 5's protection of the deliberative process:

> There are essentially three policy bases for this privilege. First, it protects
> creative debate and candid consideration of alternatives within an agency, and,
> thereby, improves the quality of agency policy decisions. Second, it protects the
> public from the confusion that would result from premature exposure to
> discussions occurring before the policies affecting it had actually been settled
> upon. And third, it protects the integrity of the decision-making process itself by
> confirming that "officials should be judged by what they decided(,) not for
> matters they considered before making up their minds."

591 F.2d at 772-73 (citations and footnotes omitted).

## B. The FOIA evidence is irrelevant

Ustian claims that the "pre-decisional" back-and-forth between Navistar and the EPA

regarding Navistar's failed certification efforts cannot be false, misleading, or material because

the EPA determined in the FOIA context that its disclosure would cause "public confusion."

This is a fairly audacious argument for Ustian to make, since this litigation is an outgrowth of his

both public and highly deceptive characterizations of the dialogue between the company and the

EPA. Indeed, it were these statements by Ustian that gave rise to his obligation to disclose the

truth about what the EPA was consistently telling Navistar and Ustian.

That obligation is steeped in securities laws, not FOIA. This case has nothing to do with

FOIA. It was the EPA that invoked FOIA; not Ustian, Navistar, or the SEC. Neither Ustian nor

Navistar are a governmental agency or the maker of federal policies. Therefore, the justifications

for the deliberative process privilege, including the desire to avoid public confusion "that would

result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon" (*id*.), simply have nothing to do with disclosures by a publicly traded company such as Navistar and its CEO.

This argument appears to be an inappropriate attempt by Ustian to put the EPA on trial. But unlike Ustian and Navistar, the EPA never took a public position regarding Navistar's engine certification attempts. Both Ustian and Navistar are subject to the federal securities laws; any public disclosures are their responsibility, not the EPA's. The EPA also has no regulatory or enforcement authority over the federal securities laws; any determination by the EPA that disclosure of information could cause public confusion has no bearing on Ustian's or Navistar's disclosure obligations. Ustian cannot be shielded from liability because of a governmental privilege – invoked by a non-party with no regulatory or enforcement authority over the federal securities laws, no less – that has no applicability whatsoever to his false and misleading disclosures about Navistar's certification efforts.

Further, as made clear in emails between the EPA and counsel for Navistar, the back-and-forth between Navistar and EPA, in which the EPA continually shot down Navistar's certification attempts, was not even part of Navistar's FOIA request. (Ex. 7). The EPA's Justin Greuel made this clear in his email to Navistar's counsel regarding the FOIA request, clarifying that the EPA was raising the deliberative process privilege only as to the EPA's *internal* documents:

> Regarding records of EPA's review/analysis of those two applications, Navistar is already in possession of the Agency's formal analysis response on both. Any preliminary records that would have been generated in developing those formal analysis responses would have been predecisional or deliberative, covered by FOIA Exemption 5 – Deliberative Process Privilege, and would ultimately not be released under this FOIA request.

13

*Id*. Counsel for Navistar then confirmed that Navistar's FOIA request was limited to these internal EPA documents, which did *not* include the back-and-forth correspondence between the EPA and Navistar that is at the heart of the SEC's case. *Id*. Therefore, the EPA never invoked the deliberative process privilege as to the documents at issue in this case, making Ustian's FOIA argument completely irrelevant.[2]

Even if the deliberative process privilege were somehow applicable, it does not follow that Ustian's or Navistar's disclosures about its communications with the EPA could confuse the public. In fact, such disclosures would have clarified issues for investors given Ustian's and Navistar's continuous false and misleading statements about 0.2 NOx certification efforts, including the omission of material information about the EPA's continued rejection of Navistar's certification efforts. In the FDA context, courts have rejected arguments similar to Ustian's on summary judgment. *See SEC v. Johnston*, 310 F. Supp. 3d 265, 271-72 (D. Mass. 2018); *KB Partners I, LP v. Pain Therapeutics, Inc.*, 2015 WL 3794769 at *4, *10 (June 16, 2015).

Further, there is no evidence that the EPA, or anyone else, made a determination that disclosure of the EPA's pre-decisional documents at issue "would," as opposed to "could," cause confusion to the public. *See* Docket No. 255, Joint Statement of Undisputed Material Facts at ¶¶ 130-132, and supporting exhibits. Ustian has not, and indeed cannot, establish that anyone from the EPA made an actual assessment of the documents at issue and determined that disclosure

---

[2] The EPA's decision to invoke the privilege as to the documents at issue also took place in 2015, three years *after* the conduct at issue in this case. In his Summary Judgment brief, Ustian also raises the EPA's prior invocation of the deliberative process privilege as to internal EPA documents regarding the certification applications of SCR engine manufacturers. *See* Docket No. 255, Joint Statement of Undisputed Material Facts at ¶¶ 130-132, and supporting exhibits. This evidence should likewise be excluded as irrelevant and unduly prejudicial.

would, in fact, cause public confusion.  The deliberative process privilege does not require such a determination.

Finally, Navistar's own conduct undercuts Ustian's argument.  In Navistar's June 2012 10-Q, the company disclosed that the EPA had raised "concerns" about the already-withdrawn January 2012 application.  *See* Docket No. 255, Joint Statement of Undisputed Material Facts at ¶ 234, and supporting exhibits.  While the SEC alleges that this disclosure was woefully inadequate, Navistar's decision to disclose these "concerns" shows that Ustian and Navistar did not believe it was categorically improper to disclose EPA feedback.

### C.    The FOIA evidence and argument would confuse and mislead the jury and waste time

Even if the Court were to find Ustian's FOIA argument somehow relevant, its minimal probative value is substantially outweighed by the fact that it would confuse, mislead, and waste the jury's time.  *See* Fed. R. Evid. 403.  "The danger of 'confusion of the issues' and 'misleading the jury' arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case."  *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) (citing *United States v. Guardia*, 135 F.3d 1326, 1331–32 (10th Cir. 1998)).

Here, the proffered FOIA evidence's minimal probative value is substantially outweighed by the fact that the evidence could mislead and confuse the jury into improperly believing that, among other things: (1) the FOIA exemption at issue actually related to the correspondence between the EPA and Navistar, when in fact it did not; (2) the EPA actually made a determination that correspondence regarding Navistar's engine certifications would confuse the public, when no such determination was made; (3) the EPA somehow acted improperly in

15

invoking the FOIA exemption and not disclosing its internal communication; (4) the FOIA exemption applies to Ustian and somehow provides him with a defense regarding his false and misleading disclosures; and/or (5) that the FOIA exemption's "public confusion" policy rationale should be considered as part of the law governing the definition of "materiality."

This case is analogous to *United States v. Klein*, 2017 WL 1316999, at *8-10 (E.D.N.Y. Feb. 10, 2017). In *Klein*, the court determined that introduction of an SEC complaint in a parallel criminal trial, in which the SEC's and Department of Justice's allegations differed as to the defendant, would lead to substantial confusion by resulting in "mini-trials" about which agency's charging decisions were the right ones and the difference between the two investigations. *Id.* at *8-10. Similarly, introduction of the FOIA evidence would result in a mini-trial as to whether the EPA or the SEC was right about whether public disclosure of certain EPA "pre-decisional" documents could "confuse the public," and the differences between the EPA's invocation of the FOIA exemption and the SEC's enforcement case. This risk is evident in Ustian's argument that "Ustian cannot have violated the securities laws by failing to disclose information that ***EPA itself*** believes would confuse the public." (Doc. No. 27, Ustian Motion to Dismiss Brief at 17 (emphasis in original)).[3]

---

[3] To the extent Ustian argues that the EPA's invocation of the FOIA exemption is relevant to prove that the EPA never made an appealable final decision on Navistar's certification applications, this is unnecessary cumulative evidence that is not in dispute. *See* Fed. R. Evid. 403; *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) ("The district court 'retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body.'") (quoting *Hamling v. United States*, 418 U.S. 87, 127 (1974)).

16

Given that the proffered FOIA evidence is irrelevant to the issues in this case and its introduction would only serve to confuse, mislead, and waste the jury's time, the Court should exclude any of this evidence or argument at trial.

IV.     **SEC Motion *In Limine* No. 4: Motion *In Limine* To Preclude Ustian From Introducing Any Evidence Or Argument That The SEC and EPA Are Part of One Federal Government**

The Court should prohibit Ustian from eliciting testimony or arguing that the SEC and EPA are related entities, both federal agencies, "sister agencies," or two parts of "one government." Such questioning or argument could suggest to jurors, without any legitimate basis, that the SEC case is unfair given EPA inaction on Ustian's and Navistar's misstatements. The inter-governmental relationship between the EPA and SEC is irrelevant to the claims at issue here, and the danger of unfair prejudice substantially outweighs any value the evidence might have.

A.      **Ustian repeatedly has suggested that the SEC and EPA are synonymous**

Throughout the course of this litigation, Ustian has repeatedly attempted to conflate the EPA and the SEC, to hold one agency responsible for the knowledge or actions of the other, or to argue that the SEC's claims are unfair based on EPA action or inaction.

For example, at summary judgment, Ustian initially sought to include within the parties' Statement of Undisputed Facts the argument that "[i]t would be inconsistent with the SEC mandate for clarity in disclosures made to the public to the public [sic] for Navistar to publicly disclose information which another arm of the government says cause [sic] confusion to the public." (7/25/19 Joint Motion to Determine Factual Disputes, Doc. 241 ¶ 35 (page 85)). He made the same argument in his motion to dismiss, asserting, "The government itself already expressly stated that the very same information SEC claims Ustian ***had*** to disclose should ***not*** be disclosed to the public. Specifically, EPA previously denied entirely a FOIA request . . . . Therefore, according to the government, such documents should never see the light of day . . . ." (8/23/2016 Reply to Motion to Dismiss (Doc. 48) at 12).

18

In discovery, Ustian sought to make the SEC responsible for "confirm[ing] in writing that EPA has preserved" requested documents and "identify[ing] the most knowledgeable person(s) within EPA as the preservation of documents pertaining to this matter." (Ex. 9, 6/1/2016 Ustian Letter to SEC.) When the SEC objected that it had no ability to control the actions of an unrelated third party, Ustian maintained that the SEC and EPA were "sister agencies" with "inter-agency control of relevant documents." (Ex, 10, 7/1/2016 Ustian Letter to SEC).

Further, in depositions of EPA officials, Mr. Ustian repeatedly elicited testimony that while the EPA was aware of Navistar's public statements and filings with the SEC, it never notified anyone at the SEC or Navistar of concerns about the accuracy of those statements. (*E.g.*, Ex. 3, 10/23/2018 EPA 30(b)(6) Dep. at 186:21-187:17, 189:22-190:19; Ex. 2, 12/07/2018 Bunker Dep. at 306:16-307:22; Ex. 4, 12/18/2018 Grundler Dep. at 242:16-243:6).

B. **The fact that the SEC and EPA are both federal agencies is irrelevant and unfairly prejudicial**

Taken together, these arguments and questions could suggest to a jury that the EPA and the SEC are one body, and that the EPA's purported failure to alert the SEC to its concerns regarding Ustian's and Navistar's statements at the time they were made should limit the SEC's ability to pursue its claims against him. Such a result does not comport with reality or the law. In *United States v. Rourke*, 74 F.3d 802, 806-07 (7th Cir. 1996), a case that also involved two federal entities, the Seventh Circuit held that an Assistant United States Attorney's statement during a criminal plea hearing that "'the government' promised not to take any action regarding [defendant's] pilot license" did not bind the Federal Aviation Administration. Likewise, any action or inaction by the EPA here would not impact the SEC's mandate to hold accountable those who violate the federal securities laws.

19

The fact that the SEC and EPA are both government agencies is not relevant to the claims at issue. Fed. R. Evid. 401 (providing that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action"). It is not even relevant to the credibility of the EPA officials' testimonies. Ustian can easily explore such issues through questions regarding the witnesses' interactions with SEC counsel without pointing out or arguing that they are all federal employees. As relevant to this case, the EPA and SEC are not "the government."

Finally, even if such evidence were relevant, "its probative value is substantially outweighed by the danger . . . of unfair prejudice." Fed. R. Evid. 403. The fact that the SEC and EPA are both federal agencies is, at best, tangential to the issues the jury must decide. Any possible value associated with such information is minuscule in comparison to the danger the jury might unfairly fault the SEC for holding Ustian to account when the EPA never informed him that he was in violation of the laws the SEC enforces. The Court should exclude evidence or argument that the EPA and SEC are part of one federal government because this issue is irrelevant, and the prejudicial effect of admitting such evidence would significantly outweigh any claimed probative value. *See Simmons v. City of Chicago*, 2017 WL 3704844 at 4 (N.D. Ill. Aug. 28, 2017) (granting motion *in limine* based on lack of relevance and prejudicial effect); *Martinez v. City of Chicago*, 2016 WL 3538823 at *12 (N.D. Ill. June 29, 2016) (same).

**V.  SEC Motion *In Limine* No. 5: Motion *In Limine* For An Order Permitting The SEC To Introduce Evidence Of Meetings And Communications Between Navistar And The EPA And To Preclude Ustian From Arguing Such Meetings And Communications Constituted "Settlement Discussions" Under FRE 408**

The Court should allow the SEC to introduce evidence of various meetings and communications between Navistar and the EPA from June 2011 to December 2011, notwithstanding Ustian's flawed claims that these meetings and communications are subject to Federal Rule of Evidence 408. The evidence in this case establishes that the purpose of these meetings and communications was to help Navistar's business, not to settle any litigation. More specifically, the purpose of these meetings and communications was to provide a solution to Navistar's problem that the EPA had not certified a Navistar EGR-only engine at 0.2g NOx, and Navistar was running out of emissions credits that allowed Navistar to sell "heavy-heavy" engines in the absence of EPA certification at 0.2g NOx. Even if these 2011 meetings and communications constituted settlement discussions – which they did not – these meetings and communications still would not be subject to Rule 408 in this case. It is undisputed that Navistar and the EPA were the two parties to any litigation to which these meetings and supposedly related discussions. By contrast, the two parties to this litigation are Ustian and the SEC. Rule 408 does not preclude introduction of evidence in a case that involves different parties and different issues from the parties and issues involved in the litigation to which the purported "settlement discussions" relate. For similar reasons, the Court should prohibit Ustian from introducing evidence that these 2011 meetings and discussions were "settlement"-related. Because these meetings and discussions are fully admissible in this case, Ustian's arguments about their relationship to "settlement" are irrelevant here.

A.     **Background**

During the parties' meet-and-confer discussions, Ustian's lawyers indicated that Ustian's Rule 408 claims are directed principally at three 2011 meetings: (1) a late October 2011 meeting between Ustian and Margo Oge ("Oge") a senior EPA official; (2) a December 9, 2011 meeting involving Ustian, Oge, and other Navistar and EPA representatives; and (3) a December 16, 2011 meeting involving Navistar engineers and EPA engine certification staff. The SEC briefly addresses each of these meetings.

In late October 2011, Ustian and Oge met in Oge's offices at EPA's headquarters in Washington, D.C. (Ex. 5, Oge Dep. at 51:20-51:22). No lawyers or engineering staff were present. (*Id.* at 55:12-55:18). Ustian and Oge were the only two people present at the meeting. (*Id.* at 55:19-55:20). According to Oge, the purpose of the meeting was "very basic. Mr. Ustian, I understand that your engineers are working on EGR engines that are not meeting, not even close to meeting the standards. You have some credit that will carry you for a few months. I would like to know how many credits you have for how long because the only option I have is to do an NCP rule to allow you to pay penalties so the company continues to be open for business. That was about it. So I wasn't there with lawyers or to negotiate . . . " (*Id.* at 52:22-53:11). At around the time of this meeting, Navistar's Patrick Charbonneau emailed Ustian regarding Navistar's discussions "with the EPA on solutions to running out of credits" and advised Ustian that Navistar was projecting that it would run out of heavy-heavy engine credits in late February 2012. (Ex. 11, Deposition Exhibit 423).

On December 9, 2011, Ustian and Charbonneau met with Oge and the EPA's Gina McCarthy and Byron Bunker ("Bunker"). (Ex. 12, Deposition Exhibit 24). No lawyers were present. (*Id.*) After the meeting, Oge emailed Ustian and stated in part : "We were surprised, but

22

of course pleased, to learn that your current 0.5 g NOx engine can be recalibrated to meet the 0.2 g NOx standard. Given the significant technical review necessary to certify an engine, I would encourage your team to meet with Byron and his Compliance Division staff as soon as possible . . . " (Ex. 13, EPA Rule 30(b)(6) Deposition Exhibit 3). The email did not mention any litigation or settlement. Prior to the meeting, Bunker's supervisor had reminded Bunker that "[w]e are not in settlement negotiations." (Ex. 14, US_EPAB2135900-901, Ex. 114 to Docket No. 241).

On December 16, 2011, Charbonneau and other Navistar engineers met with Bunker and other EPA personnel. On the day before the meeting, Bunker emailed Charbonneau to confirm that the purpose of the meeting would be "to talk about a new certification application for 2012," and Charbonneau confirmed: "That is our understanding." (Ex. 15, EPA Rule 30(b)(6) Deposition Exhibit 35). After the meeting concluded, Bunker emailed Navistar to confirm what had been discussed at the meeting. Bunker confirmed that the "engine discussed today does not appear to meet" the EPA's certification requirements. (Ex. 16, Deposition Exhibit 220). The email did not mention any litigation or settlement.

EPA witnesses have testified that their December 2011 meetings with Navistar were not related to the settlement of any lawsuits. (*See, e.g.*, Ex. 2, Bunker Dep. at 47:19-48:19) ("Q: And, at this time, October of 2011, was there litigation pending between Navistar and the EPA?  A: There may have been.  But, I don't think this claim was with respect to any active litigation at that time, as best I understood it."); Ex. 3, EPA 30(b)(6) Dep. at 140:14-142:19 ("Q: At this time, do you recall that there was litigation that was ongoing as of December of 2011 between Navistar and the EPA related to SCR certifications?  . . . A: I don't believe this meeting was focused on those lawsuits at all.  To the best of my recollection they weren't.  I mean, they weren't the subject of it."); Ex. 4, Grundler Dep. at 144:14-22 ("[M]y recollection of meetings

23

with Mr. Allen were more with respect to trying to find a settlement solution and kind of where they were on their credit balances and what about California. And then the other meetings were these technical meetings where Navistar was trying to convince my technical team that they designed their engine that met our requirements. But I don't remember the sequence.").

### B. The EPA and Navistar meetings did not involve settlement discussions

The evidence in this case is clear: neither the late October 2011 meeting nor the December 9, 2011 meeting nor the December 16, 2011 meeting constituted a settlement meeting. Instead, Navistar conducted these meetings with the EPA for business reasons. Navistar was running out of "heavy heavy" emissions credits, and Navistar needed EPA 0.2g NOx certification or some other solution to allow Navistar to sell heavy heavy engines once Navistar's credits ran out. Eventually, the EPA passed an interim NCP rule that allowed Navistar to pay penalties in the states that allowed Navistar to pay them. Because of NCPs, Navistar was able to extend its dwindling supply of emissions credits during 2012. Navistar's business purpose in meeting with the EPA belies Ustian's assertions that these meetings were settlement-related. While some Navistar-EPA communications may have been affixed with a Rule 408 label, this labeling does not transform communications with a primary business purpose into settlement communications.

"For Rule 408 to be applicable, defendants need [] to make a 'substantial showing' that [a communication] was, in fact, part of a settlement attempt." *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1240 (7th Cir. 1995). Moreover, as the Seventh Circuit has held in a case involving a purported written settlement communication, to assess that showing, "this court must look at the totality of the circumstances, carefully reviewing the contents of the letter and the timing of its delivery." *Id*. In *Raybestos Products*, the court held that the communication at

24

issue was *not* a settlement communication despite the fact that it contained "a plan that both [defendants] contended would obviate the need for litigation." *Id.* The court concluded that the letter was instead sent to intimidate the plaintiff and therefore was not inadmissible under Rule 408. *Id.* Similarly, in *Rennenger v. Manley Toy Direct L.L.C.*, 161 F.Supp.3d 719, 722 (S.D. Iowa 2015), the district court refused to exclude evidence of a phone call between the parties in which the defendant offered to give the plaintiff a gift, money or a car after telling her that he had done nothing wrong but her attorneys were going to portray him badly, which would cost his company money. The court refused to exclude the call under Rule 408, concluding that it could "not on the current record conclude [defendant's] conduct was in the nature of settlement negotiations as that concept can reasonably be characterized under the rule." *Id.*

Here, Ustian cannot make the substantial showing required to establish that the communications at issue were in fact settlement attempts. Instead, when viewing the totality of the circumstances, it is clear that the meetings were business discussions.

### C. The Court should not apply Rule 408 to this case, which involves different issues and different parties

Even assuming *arguendo* that any 2011 meetings or discussions between Navistar and the EPA were settlement-related, Rule 408 still does not require exclusion of those meetings and discussions because the parties and claims here are all different. In the litigation allegedly at issue in the 2011 discussions, Navistar and the EPA were litigating over various disputes between the company and the EPA. Here, by contrast, the SEC and Ustian are litigating securities fraud claims that Ustian misled investors regarding the status of its development and certification of an EGR-only engine. There is no overlap with the 2011 case. The lack of overlap supports the admission of such evidence. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*,

417 F.3d 682, 689 (7th Cir. 2005) ("The balance is especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is offered."); *Wesco Ins. Co. v. Elements Architectural Group, Inc.*, 2019 WL 5725440, at *3 (N.D. Ill. Nov. 5, 2019) ("Rule 408 only bars the introduction of a statement if it is being introduced to prove the validity of the claim that was being settled when the statement was made."); *Armstrong v. HRB Royalty, Inc.*, 392 F. Supp. 2d 1302, 1304-05 (S.D. Ala. Oct. 14, 2005) ("Rule 408 unambiguously requires that the claim as to which a settlement offer was made and the claim at issue in the litigation in which the offer is proffered as evidence must be the same claim.").

As the Seventh Circuit noted in *Wine & Canvas Development, LLC v. Muylle*, 868 F.3d 534 (7th Cir. 2017), this conclusion follows from the text of Rule 408:

> Paragraph (a) uses the term "a disputed claim," not "disputed claims" or "any claims." Subparagraphs (1) and (2) of paragraph (a) likewise speak of "the" claim. The Rule's use of the singular term "claim" suggests that settlement discussions concerning a specific claim are excluded from evidence to prove liability on *that* claim, not on others.

*Id.* at 541 (emphasis in original). Indeed, the court in *Wine* held the evidence admissible even though the settlement discussions at issue involved a separate claim in the *same case*. *Id.* Here, the facts are far more attenuated. Such distance reduces the danger Rule 408 is intended to address — the possible chilling effect on future settlement negotiations. *See Zurich*, 417 F.3d at 689. The district court in *Thomas v. Chambers*, 2019 WL 1989236, at *6-7 (E.D. La. May 6, 2019), a case "involving completely different parties and claims" from those at issue in the settlement discussions, described it well: "Admission under these circumstances does not create a disincentive for parties to engage in settlement negotiations, because the evidence is not being

used to the prejudice of any of the parties in the case in which the settlement negotiations took place."

### D. The court should allow evidence of 2011 meetings and discussions because the SEC will be offering the evidence for a purpose different from the purposes envisioned by Rule 408

Additionally, regardless of whether any 2011 meetings and discussions were in fact settlement discussions, the communications are not subject Rule 408 because the SEC will be introducing them for a different purpose from the purposes behind Rule 408. The rule provides:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408.

Here, the evidence of Navistar's discussions with the EPA regarding its likely treatment of a forthcoming certification application would not be offered to prove or disprove the validity or amount of a disputed claim or to impeach Ustian. Instead, it would be offered to establish notice: that Ustian and Navistar were on notice that the EPA would not certify an engine with the characteristics proposed by Navistar.

Rule 408 does not preclude such notice evidence. *United States v. Austin*, 54 F.3d 394 (7th Cir. 1995) (upholding the trial court's admission of defendant's settlement with the FTC because it was offered to prove that the defendant was on notice that subsequent similar conduct was wrongful). Indeed, the Advisory Committee Notes to Rule 408 specifically state that "Rule

408 is inapplicable when evidence of compromise is offered to prove notice." Advisory Cmte Notes to Fed. R. Evid. 408 (2006 amendments). Notice of the EPA's concerns regarding Navistar's proposed approach to satisfy the 0.20 NOx standard is relevant to Ustian's state of mind, which the Seventh Circuit has noted provides grounds for the admission of settlement evidence. *Zurich*, 417 F.3d at 689 ("It has also been admitted by courts for additional purposes other than establishing liability, including for purposes of rebuttal, for purposes of impeachment, *to show knowledge and intent, to show a continuing course of reckless conduct*, and to prove estoppel.") (emphasis added).

In *Wine*, 868 F.3d at 540-41, the Seventh Circuit upheld the district court's admission of such evidence of the defendant's intent. The plaintiffs filed claims of trademark infringement against a former licensee. *Id.* at 537. The licensee counterclaimed for trademark cancellation and abuse of process. *Id.* During trial, the district court allowed testimony concerning a statement one of the plaintiffs made to the defendant during the parties' settlement discussions on the plaintiffs' claims. *Id.* at 540. The plaintiff said his goal was to "close [defendant's] door or [plaintiff's expletive] attorney would close [it] for [him]." *Id.* Plaintiffs argued that the evidence was inadmissible under Rule 408, but the Seventh Circuit rejected that argument, concluding that the plaintiff's statement, made in the context of negotiations concerning the plaintiffs' claims, was "not offered to disprove liability on those claims, but rather to show Plaintiffs' improper intent and ulterior motive in filing their lawsuit for the purpose of proving [the defendant's] abuse of process counterclaim." *Id.*

**E.      The Court should preclude Ustian from offering irrelevant evidence that 2011 meetings or discussions were "settlement"-related**

As demonstrated above, the Court should rule that the SEC can introduce evidence of 2011 meetings and discussions, notwithstanding Ustian's claims that such communications are "settlement"-related. If the Court rules on the legal issue of whether these meetings and discussions are admissible under Rule 408, then there will be no longer be a reason for Ustian to argue before the jury that these communications are settlement-related. The issue will be irrelevant, and the Court should exclude the evidence under Rules 401 and 403.

## VI. SEC Motion *In Limine* No. 6: Motion *In Limine* To Preclude Ustian From Eliciting Lay Opinion Testimony Regarding The Accuracy Of Disclosures And Ustian's State Of Mind

Ustian should be precluded from eliciting testimony regarding a witness's opinion on: (1) whether statements by Ustian or Navistar were inaccurate and; (2) Ustian's state of mind. Such testimony would constitute irrelevant and unhelpful lay opinions under Federal Rules of Evidence 402, 403 and 701. Whether a statement is misleading must be judged based on the circumstances as they existed at the time the statement was made, not what a witness believes today. Because testimony from a witness today on his opinion regarding the accuracy of Ustian's statements would do nothing more than tell the jury his personal opinion on the legal issue of whether Ustian's statements were misleading, it would be unhelpful. Likewise, speculative lay opinion testimony about Ustian's state of mind — including his motivations and sincerity — would add nothing of value and would be unfairly prejudicial.

### A. Background

Ustian has already attempted to rely on impermissible lay opinions. In his argument in support of his motion for summary judgment, he repeatedly argued that Navistar engineers opined that certain of the alleged false and misleading statements were true and not misleading. (*See, e.g.*, Ustian Memorandum in Support of Motion for Summary Judgment (Dkt. #254) at 28, 32, 34; *see also* Joint Statement of Undisputed Material Facts (Dkt. #255) at ¶¶ 73, 96, 126, 187, 240).

The discovery record is also replete with instances in which Ustian's counsel elicited irrelevant lay opinions from witnesses. For example, at the deposition of former Navistar engineer Titus Iwaszkiewicz, Ustian's counsel read a portion of the March 22, 2012 Navistar press release and asked Mr. Iwaszkiewicz, "Do you see anything – are you aware of any facts

that you believe are inconsistent with that statement as of the date it was circulated?" He responded, "I'm not aware of any." (Ex. 17, Iwaszkiewicz Dep. at 312:1-19). Similarly, at the deposition of former Navistar engineer Steven Ostarello, Ustian's counsel read a portion of Ustian's statements on the December 2010 earnings call and had the following exchange with Mr. Ostarello:

> Q: Now, in March of 2011, given your position in charge of powertrain and understanding the development of the engine, as well as the discussions that were taking place at the EPA at the time regarding the certification application, do you see that there's anything in accurate in that statement?
>
> A: No, I see nothing inaccurate. In fact, I remember this statement quite well, to be honest with you. When he talks about we took that away, he's talking about the fact that we delivered a .5 NOx engine that really exceeded our competition's fuel consumption and they were blown away by it because they told everybody you can't do that. And of course we loved it because they said we couldn't do it and we did it. And the second part of that is about .2 and it all looks accurate to me.

(Ex. 18, Ostarello Dep. at 306:5-307:23). Similarly, counsel read a portion of the March 2012 earnings call and asked him, "Given your team has been working on this and your discussions with EPA, do you see anything inaccurate about that statement?" He responded, "No, I do not ... I see nothing inaccurate about it." (Ex. 18, Ostarello Dep. at 419:20-420:19).

And Ustian's counsel elicited the following information from Michael Hammes, a Navistar director: (i) Ustian was an "outstanding" leader with "vision" and "passionate about what he does" (Ex. 19, Hammes Dep. at 270:12-270:22); (ii) Ustian had a high standard of ethics "not just for himself, but he expected that of his … team, his people, also" (*Id.* at 272:14-272:20); and (iii) Ustian was not motivated by making money for himself but rather motivated by "making Navistar a viable, successful company that could continue for a long time . . . That was . . . what turned Dan on. And . . . the last thing in his head was what his compensation was." (*Id.* at 273:1-273:11). This testimony was also part of the evidence provided in support of

31

Ustian's Motion for Summary Judgment. (S*ee* Joint Statement of Undisputed Material Facts (Dkt. #255) at ¶ 4). These statements of opinion, and others like them, should be excluded.

### B. The Court should exclude lay opinion regarding Ustian's and Navistar's disclosures

When assessing a securities fraud claim, the truth of the alleged misstatements must be evaluated at the time "when they were made." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002). Rule 10b-5 under the Exchange Act states that whether statements are misleading is determined based on "the circumstances in which they were made." *See* 17 C.F.R. § 240.10b-5. Context matters. *See In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) ("some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors"). Additionally, whether a statement is misleading is judged from the perspective of the "reasonable investor." *See In re K-Tel Int'l, Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002).

Testimony from a witness in a 2018 deposition or a 2020 trial regarding whether he sees anything inaccurate in a 2011 or 2012 statement is irrelevant because it does not prove whether the statement was misleading when it was made or under the circumstances in which it was made. The witnesses' level of knowledge at a 2018 deposition or a 2020 trial is markedly different from their knowledge when Ustian made the alleged misstatements seven to nine years ago. The witnesses now are aware of the SEC's allegations and in many cases are represented by and have been prepared by Ustian's own attorneys. Thus, whether a witness thinks a statement is accurate today is not probative of whether that statement was misleading to a reasonable investor at the time it was made. A party to a securities fraud case cannot prove "guilt" or "innocence" in hindsight. *Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 662 (8th

Cir. 2001) ("Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off.").  By eliciting witness testimony about what a witness believes about a statement today, Ustian is improperly trying to establish innocence by hindsight.

Moreover, such testimony does not satisfy the requirements of Federal Rule of Evidence 701 and would be unfairly prejudicial under Rule 403.  Under Rule 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  If "attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule."  Advisory Committee Notes to Fed. R. Evid. 701 (1972).

Lay witnesses are not qualified to offer opinions about loaded legal concepts such as whether or not the defendant's statements were materially false or misleading or inaccurate under the federal securities laws.  They may apply different standards or definitions than the law requires.  Jurors are responsible for determining whether the elements are present, and allowing a witness to offer his or her personal, non-expert opinion on one of those elements (here, whether a statement was false or misleading or inaccurate) is not helpful and is unfairly prejudicial.  It does no more than show the jurors which "side" of this case the witness has chosen.  In *United States v. Ness*, 665 F.2d 248, 250 (8th Cir. 1981), which involved charges of misapplication of bank funds arising from a check-rolling scheme, the court upheld the district court's refusal to allow defense counsel to ask the defendant's former co-workers whether, "based on their respective

observations and contact" with the defendant, they thought he had any intent to "'hurt,' injure, or defraud the bank." The court concluded:

> In such a circumstance, where the opinion proffered necessarily encompasses a legal conclusion, a trial court may very properly conclude that a response would not be helpful to the trier of fact. The danger here is that the jury could easily accord too much weight to the pronouncement of a lay witness unfamiliar with the standards erected by the criminal law, whose statement may be charged with the emotionalism of a person coming to the rescue of an embattled co-worker. Defense counsel had an adequate opportunity to elicit testimony from each witness about appellant's conduct at the bank. The only restriction placed upon counsel was that he could not, in effect, ask the witness to draw a legal conclusion from his own testimony.

*Id.*

The same dangers are present here. Witnesses such as Mr. Ostarello and Mr. Iwaszkiewicz are not familiar with the standards governing securities fraud claims, and their opinions on the "accuracy" of Ustian's statements are charged with the emotionalism of someone coming to the rescue of an embattled co-worker. Defense counsel can ask them questions about the facts that might lead them to conclude that the statements were not inaccurate, but they should not be allowed to elicit a legal conclusion regarding whether those statements were misleading or inaccurate. Courts routinely limit lay witness testimony in this way. *See, e.g., United States v. Wantuch,* 525 F.3d 505, 514-15 (7th Cir. 2008) (concluding that testimony that a defendant was "aware" and "knew" that what he did "was illegal" was not helpful to the jury and should have been excluded); *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980) (affirming district court's exclusion of a defendant's former attorney's opinion testimony on whether his conduct was unlawful or willful or whether the defendants conspired).

**C.     The Court should exclude lay opinion regarding Ustian's state of mind**

Likewise, testimony like Hammes' regarding Ustian's sincerity, intentions, and motivations is speculative lay opinion that should be excluded. While evidence of Ustian's state of mind is obviously relevant, speculative lay opinion testimony cannot be "rationally based on the witness's perception," as required by Rule 701(a). Rule 701(a)'s rational-basis requirement "is the familiar requirement of first-hand knowledge or observation." Fed. R. Evid. 701 Advisory Cmte. Note on 1972 Proposed Rules; *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Barring supernatural psychic abilities, one cannot know or perceive the mental state of another person. If a witness has no direct knowledge of Ustian's state of mind, then the witness can offer no admissible testimony about Ustian's intentions or motivations.

The Seventh Circuit has ruled that evidence of another person's mental state is inadmissible for this very reason. *See United States v. Jackson*, 569 F.2d 1003, 1011 (7th Cir. 1978) (barring testimony from defendant's wife as to why the defendant was depressed at the time of the crime in question because the wife "could not perceive why the defendant was depressed"). In *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991), the Seventh Circuit held that third party opinions regarding a defendant's "motivations" amounted to "amateur psychoanalysis" and were improper. *See also Bates v. Delgais*, 2009 WL 3234227, at *1 (D. Conn. Oct. 2, 2009) (granting motion *in limine* to exclude opinion testimony concerning another party's motivation as inadmissible under Rule 701). Witnesses should be allowed to present evidence about discrete matters based on their perceptions: what they heard, saw, and

35

said.  Anything more would involve the type of speculation clearly prohibited under Rule 701(a).  Witnesses should not be invited to speculate about what was going on in Ustian's head.

Furthermore, such testimony is unhelpful to the jury as required under the second prong of Rule 701.  When lay opinion testimony about a defendant's state of mind is based on mere speculation, courts have found that it fails to meet Rule 701(b)'s helpfulness requirement because it is the jury's job to draw inferences from the facts in evidence.  *See, e.g. United States v. Hauert*, 40 F.3d 197, 200 (7th Cir. 1994) (holding it proper to allow lay witness testimony "about the context of their association and contact with the [defendant]," but excluding their opinions about "defendant's subjective sincerity, motivation, knowledge, or state of mind"); *United States v. Dashner*, 2015 WL 3660331, at *3 (N.D. Cal. June 2, 2015) (granting motion *in limine* to exclude lay testimony regarding defendant's good faith, and holding that "[i]n most instances, lay opinion testimony about someone else's sincerity would not be helpful").

Testimony regarding whether a witness believes Ustian's statements were inaccurate constitutes irrelevant and unhelpful lay opinion, and the Court should preclude Ustian from asking questions to elicit it.  Likewise, and for similar reasons, the Court should exclude any lay opinion regarding Ustian's state of mind — including his intentions, sincerity, good faith, and motivations.

36

**VII.    SEC Motion *In Limine* No. 7: Motion *In Limine* To Preclude Ustian From Introducing Evidence and Argument Regarding Unknown SCR Issues**

The SEC asks the Court to exclude evidence and argument regarding any issues involving the EPA's assessment of SCR technology and/or the technology itself where that evidence was not known to Ustian or Navistar at the time of the fraud at issue in this lawsuit. Ustian has sought, repeatedly, to use this case as an opportunity to re-litigate questions resolved years ago in multiple lawsuits Navistar filed against the EPA. Allowing him to present evidence at trial that neither he nor his employees knew at the time, on questions arguably central to those suits but *irrelevant to this one*, would unnecessarily prolong and complicate an already lengthy, complex case.

The SEC respectfully asks the Court to prevent Ustian from using this case to resurrect claims he and his company lost or resolved through settlement long ago with evidence to which he only recently gained access, thereby distracting the jury from the question actually before it. This is not a case about whether the EPA should have certified the SCR-equipped engines produced by Navistar's competitors; it is a case about whether Ustian misled investors by misrepresenting what *he knew at the time* about the status of Navistar's engine development and certification efforts. Any evidence he puts forth should be confined to that question, and information neither he nor his employees knew at the time will not help the jurors answer it.

**A.    Background**

During discovery in this case, Ustian elicited extensive testimony from EPA witnesses regarding the EPA's internal deliberations, and the agency's interactions with other companies, on: (1) SCR technology, (2) the performance of SCR engines on the road, and (3) regulatory

treatment of such engines. Such information was not available to Ustian or Navistar at the time of such deliberations.

For example, at the deposition of EPA Engineer Greg Orehowsky, Ustian's counsel asked about EPA internal notes of meetings with other engine manufacturers in 2008 in which SCR technology and certification was discussed, (*E.g.*, Ex, 20, Orehowsky Dep. at 55:15-70:4), about his communications with other manufacturers as the EPA was preparing to issue public guidance regarding SCR (*Id.* at 73:4-76:6), and about testing he did on SCR engines submitted for certification and conversations with Navistar's competitors on their certification applications (*Id.* at 90:3-93:9). Neither this testimony nor the exhibits concerned EPA interactions with Ustian or Navistar. Similarly, at the deposition of EPA official Allen Duncan, the majority of Ustian's questioning related to EPA testing data on SCR engines that purportedly "very intentionally has NOT been made public" (*E.g.*, Ex. 21, Duncan Dep. at 58:12-67:14, 93:3-99:22). Again, neither this testimony nor the exhibits discussed concerned interactions with Ustian or Navistar. At most, some of this evidence may have related to claims at issue in lawsuits Navistar filed against the EPA in 2009 and 2011.

In March 2009, Navistar filed two lawsuits against the EPA that were consolidated, alleging that by issuing guidance discussing the circumstances in which it would certify SCR-equipped engines (*i.e.*, when certain safeguards, or driver inducements, were in place to ensure the use of urea), the agency improperly reopened and relaxed its NOx emissions standard to allow for the use of a dangerous technology despite a previous finding that such safeguards were ineffective or unsafe. *See Navistar v. EPA*, Case No. 09-1113 (D.C. Cir.); *Navistar v. EPA*, Case No. 09-1114 (D.C. Cir.). Navistar argued in the suits that the EPA's guidance was improper because, in part, it assumed conditions, "*i.e.*, the DEF tank is filled with the correct urea solution,

the system has not been disconnected and the dosing process is functioning perfectly, it is not too cold, etc." that would not in fact apply to SCR-equipped engines in vehicles on the road. *See Navistar v. EPA*, Case No. 09-1113, 11/20/2009 Brief of Petitioner (Doc. No. 1216960, at 28). In August of 2010, Navistar voluntarily dismissed its claims after reaching a settlement with the EPA. *See Navistar v. EPA*, Case No. 09-1113, 8/16/201 Joint Stipulation of Dismissal Pursuant to F.R.A.P. 42(b) (Doc. No. 1260601).

In April 2011, Navistar filed suit against the EPA alleging that it improperly certified SCR-equipped engines produced by Navistar's competitors when those engines did not conform to the EPA's regulations when in use, despite EPA "driver inducements," because, for example, the engines allegedly were "programmed to run for certain periods without diesel exhaust fluid (the urea-based fluid necessary for the system to work, 'DEF'), with the wrong fluid (e.g., water), with frozen fluid, or with the SCR system disconnected (and thus, with zero SCR-control of oxides of nitrogen ('NOx') emissions during those disabled conditions)." *See Navistar v. Jackson and U.S. EPA*, No. 11-cv-00769 (Dist. D.C.) (Complaint, Doc. 1, ¶¶ 3, 5). In January 2012, the court granted summary judgment to the EPA and dismissed Navistar's complaint for failure to state a claim, refusing to allow it discovery, after finding that the EPA never determined that the SCR engines did not conform to the regulations. (*Navistar v. Jackson*, Dist. D.C. Case 11-cv-00769 1/17/2012 Opinion, Doc. No. 26, at 11-12, 14). Ustian appears to want to use the SEC's lawsuit as a vehicle to re-litigate these prior Navistar lawsuits directed at proving that SCR-equipped engines were deficient. The Court should prevent him from doing so.

### B.      SCR-related evidence unknown to Ustian and Navistar is irrelevant

Ustian has argued that evidence of the EPA's treatment of SCR engines and their performance on the road are relevant to his state of mind at the time, including his alleged belief that the EPA would eventually certify Navistar's EGR-only engines.  But it is commonsense that evidence of which a defendant was not aware at the time of his misstatements cannot be relevant to his state of mind at that time.  *See Apex Mortg. Corp. v. Great N. Ins. Co.*, No. 17-cv-3376, 2018 WL 318481, at *2 (N.D. Ill. Jan. 8, 2018) (holding irrelevant documents from a law firm that only began representing the plaintiff after the events at issue); *Loomis v. I-Flow, LLC*, No. 11-CV-10007, 2013 WL 12330077, at *4 (D.N.M. June 28, 2013) (holding confidential settlements signed months after a plaintiff's surgery irrelevant to his state of mind at the time of his surgery).

Ustian has argued that evidence related to internal EPA deliberations on SCR technology and EPA interactions with SCR-equipped engine manufacturers would corroborate his belief that if the EPA had applied the same test procedures to all technologies, it would have certified Navistar's EGR-only engines.  Yet, to the extent Ustian actually held such a belief at the time, it could not have been based on evidence of which he was unaware.  Similarly, to the extent it was based on his employees' statements to him (which the SEC is not moving to exclude), those statements could not have been based on information of which *they* were unaware.  Unless Ustian had access to information at the time, there is no rational basis for arguing that he pinned his alleged expectation of certification on it.  As courts have held in similar circumstances, evidence of others' behavior is generally not relevant to claims regarding the defendant's behavior.  *See, e.g., FTC v. Chemence, Inc.*, 209 F. Supp. 3d 981, 985-86 (N.D. Ohio 2016) (prohibiting discovery of competitors' documents that defendant claimed would show FTC

40

applied inconsistent standards as the case "concerns [defendant's] actions, not its competitors'"); *CFPB v. Navient Corp.*, No. 17-CV-101, 2018 WL 2088760, at *6 (M.D. Pa. May 4, 2018) (in action against lenders, court disallowed discovery of other entities' servicing loans, rejecting defendant's argument that its actions should be compared to others').

In denying Ustian's motion to compel Navistar's competitors' certification related documents (CBI), Judge Schenkier already rejected Ustian's argument that evidence of this nature is relevant to his state of mind:

> The defense argument that Mr. Ustian had a good faith, reasonable belief that the engines met EPA certification requirements and that EPA would certify them must be based on the information that Mr. Ustian had at the time he made the statements, not on information to which he was not privy. . . . Mr. Ustian asserts that the CBI is relevant because he speculates that it would corroborate the information that he did possess when he made the statements challenged by the SEC, but it seems to me that the good faith and reasonableness of Mr. Ustian's belief rises or falls based on the information he had before him at the time.

(Ex. 22, 8/15/18 Hearing Transcript (Doc. 198) at 12:7-12:25.) Judge Schenkier's ruling related to the more permissive standard for discovery of evidence; here, the calculus is even clearer. Such evidence is irrelevant and should be excluded at trial.

## C. Rule 403 also compels excluding SCR-Related evidence unavailable to Ustian

Moreover, even were such evidence relevant, admitting it would only confuse the jurors and waste their time. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, *confusing the issues*, *misleading the jury*, undue delay, *wasting time*, or needlessly presenting cumulative evidence.") (emphasis added). In a long, complicated trial like this one, jurors should not be asked to consider questions that were decided years ago just because the defendant wants to retread old ground on slightly different tires. The Court should streamline the case and focus the evidence on issues that are actually germane to this lawsuit.

41

## VIII.   SEC Motion *In Limine* No. 8: Motion *In Limine* To Exclude The Trial Testimony of EPA Official Allen Duncan

The SEC moves to exclude the testimony of EPA official Allen Duncan.  Ustian tried retaining Mr. Duncan as an expert witness in this case, but Mr. Duncan chose instead to return to the EPA.  Ustian had trouble taking "no" for an answer.  After Mr. Duncan declined to work with Ustian, Ustian issued a subpoena to the EPA for Mr. Duncan's testimony.  He did so even though Mr. Duncan is in no way, shape, or form a percipient witness in this case.  He had nothing whatsoever to do with Navistar's three certification applications that are the focus of this lawsuit.  Rather, Ustian sought Mr. Duncan's testimony – testimony he now wants the jury to hear – for the same reason he originally sought to hire Mr. Duncan as an expert:  for expert testimony about the certification process and the competing SCR technologies.  Designating Mr. Duncan as a witness now is a flagrant attempt to circumvent the clear disclosure requirements and *Daubert* standards for experts.  Accordingly, the Court should exclude Mr. Duncan's testimony.

### A.      Mr. Duncan has no testimony to offer regarding Navistar's applications and is therefore irrelevant

Mr. Duncan never worked on any of Navistar's certification applications at issue in this case in any capacity.  As he testified: "I was aware Navistar was a producer and seeking certification, but I was not involved in the certification processes in any way that I remember to be significant, if at all."  (Ex. 21, Duncan Dep. at 271:8-271:15).  He had no interaction with anyone at Navistar regarding their EGR development work in 2011 or 2012 and does not "recall being involved in those certification processes or application review processes at all."  (*Id.* at 272:20-274:20).  He also does not recall ever having any interaction with Ustian.  (*Id.* at 274:21-275:2).  While Mr. Duncan worked at the EPA during the 2010-2012 time period, he did not

work on anything related to Ustian and Navistar's certification or development efforts. Indeed, at his deposition, Ustian's counsel did not even ask about Navistar applications.

Instead, Ustian's deposition of Mr. Duncan demonstrates that if allowed to testify, he would offer either (1) irrelevant discussion of issues related to SCR technology of which Ustian was not aware at the time of his misstatements or (2) undisclosed expert testimony regarding engineering and pollution science concepts and/or EPA regulation interpretation.

At Mr. Duncan's deposition, counsel spent the majority of his time questioning him regarding EPA testing data on SCR engines, none of which was available to Ustian at the time of his misstatements. (*Id.* at 58:12-67:14, 93:3-99:22). In fact, Mr. Duncan stated that this data "very intentionally has NOT been made public." (*Id.* at 58:12-22).

The rest of Mr. Duncan's testimony consisted of his explanations of scientific phenomena and the EPA certification regulatory regime. For example, counsel elicited testimony regarding basic diesel engineering approaches:

> Q.   And, the -- tell me this: The process of combustion is such that the hotter the combustion is in the combustion chamber, the more NOx that can be produced. Is that fair to say?
>        [Objections]
>        THE WITNESS:  Yes.
> BY MR. LEVINE:
>    Q.   And, since you go back a ways, as do I, you may not know this, but I will ask you. The methodology for NOx control prior to the advent of after treatment devices and so forth in heavy-duty diesel engines was pretty much the timing of combustion. Isn't that right?
>        [Objections]
>        THE WITNESS:  Yes.
> BY MR. LEVINE:
>    Q.   And if you wanted to get lower NOx, you would have, you would retard the timing of combustion, correct?
>        [Objections]
>        THE WITNESS:  Yes.
> BY MR. LEVINE:

43

> Q.   And if you wanted to get better fuel economy, you would accelerate the timing of combustion, right?
>       [Objections]
>        THE WITNESS:  Yes.
> BY MR. LEVINE:
>      Q.   And the reason you would get fuel economy is because actually, by advancing the timing of combustion, you are more completely burning the fuel and in effect, in a lay sense, you go farther on the same amount of fuel. Correct?
>       [Objections]
>        THE WITNESS:  Yes.

(*Id.* at 44:22-47:2; *see also id.* at 72:12-79:17)  Counsel also elicited testimony regarding Mr.

Duncan's opinion on the impact of SCR engines on the environment in general:

> Q.   If SCR system isn't operating, there is a higher level of NOx pollution than when SCR is functioning.  Correct?
>       [Objection]
>        THE WITNESS:  Control systems are adaptive and function realtime.  So, engine operating parameters can be varied and engine out NOx can reflect that when SCR is not operating. But, in general, I agree with what you are saying, that SCR engines can operate and often do with engine out NOx values that are greater than those using total in-cylinder control.
> BY MR. LEVINE:
>      Q.   Okay.  And, by the way, from an environmental standpoint, given what you do for a living, I'm curious what your reaction is to this. If you had, from an environmental standpoint, an engine that had in-cylinder control and met all of the EPA requirements, assume that, and one that alternatively relied on after treatment in the form of selective catalytic reduction, which do you think is more environmentally friendly?
>       [Objections]
>        THE WITNESS:  Unfortunately, I think that is a very complicated question that has so many different boundary conditions that would need to be discussed.  I wouldn't be predisposed to an answer.
> BY MR. LEVINE:
>      Q.   Okay.  That is fair.  But would you agree with this, that one of the vexing problems of SCR is there are a variety of scenarios where there is no dosing of DEF which means no SCR NOx control?
>       [Objections]
>        THE WITNESS:  I would agree with that.

(*Id.* at 86:20-89:5)  Counsel further elicited testimony regarding the general certification process

at the EPA:

Q: Suppose there is an NTE test, there is a noncompliance, as you put it. What is the next step with EPA, do you know?

A.   Under the Part 86 heavy-duty in-use test rule, a manufacturer submits a set of results.  If there is an indication of noncompliance, a manufacturer is asked to move to Phase 2, which essentially means the submission of additional results.

Q.   Then what happens after that?

A.   If a pattern of noncompliance is detected, EPA and the manufacturer will engage in discussions to determine the root cause.

Q.   And then what happens?

A.   There are a number of possibilities, including voluntary defect and recall actions, involuntary recall actions, or even other.

Q.   One thing that doesn't happen is the EPA doesn't withdraw the certification for the engine.  Isn't that right?

[Objections]

THE WITNESS:  I can't, I am not aware of categorically the breadth of the authority on that.  Typically you are correct. I don't know the limits of action there.

(*Id.* at 51:1-52:8; *see also id.* at 172:16-176:3).  And finally, counsel attempted to elicit Mr.

Duncan's opinions on what the EPA's regulations require:

Q: Subparagraph (c)(1) says, "The objective of the procedures in this part is to produce emission measurements equivalent to those that would result from measuring the same engine configuration as installed in a vehicle, equipment, or a vessel." Do you see that?

A.   Yes.

Q.   What is your understanding of what the EPA is communicating to all of us that have to deal with this in that sentence?

A.   That the emissions measurements are intended to reflect real world operation.

Q.   Right.  And, to the -- given the fact that as we have discussed quite a bit today that SCR in various conditions, whether it be extended idle, low, low, low speed, empty tank of DEF, frozen DEF, doesn't dose, and SCR doesn't function, in the real world, EPA is not literally applying this sentence to SCR.  Isn't that right?

[Objections]

THE WITNESS:  So, vehicle operation encompasses an entire spectrum of speeds and loads, some of which -- and the time waiting and load waiting associated with those.

BY MR. LEVINE:

Q.   Let's put it this way.  If EPA were to literally apply, that is the literal language of this sentence, to SCR, SCR couldn't be certified?

[Objections]

THE WITNESS:  I can't really agree with that.

45

(*Id.* at 178:11-180:4).

*None* of this testimony had anything to do with the engines Navistar sought to certify or the EPA's assessment of Navistar's applications. Thus, even as context, it is unhelpful. Moreover, as neither Ustian nor Navistar had any interaction with Mr. Duncan on these issues at the time, his testimony is irrelevant and should be excluded. *See Coburn v. Potter*, 2008 WL 681000 at *3 (N.D. Ill. Mar. 7, 2008) (excluding witnesses from trial as irrelevant, cumulative, or both).

### B. Mr. Duncan's testimony is inadmissible opinion from an undisclosed expert

Because Mr. Duncan had no factual involvement in any of the applications at issue, he could testify on these topics only as an expert witness. Indeed, for a short period of time during the SEC's investigation that led to this litigation, Mr. Duncan was working in the private sector as an expert witness, and Ustian's counsel attempted to hire him for this case. (*Id.* at 16:10-20:11, 52:10-58:14, 138:22-139:3). At one point, Mr. Duncan and Ustian's counsel reached tentative agreement on an expert witness retention. (*Id.* at 155:7-156:17). Yet, in the end Ustian never successfully retained Mr. Duncan, who chose instead to return to the EPA. (*Id.* at 158:22-159:5).

Ustian never disclosed Mr. Duncan as a testifying expert or provided the required written report setting forth his opinions and the bases for them. The Court should exclude Mr. Duncan for that reason as well. *See* Fed. R. Civ. P. 26(a)(2) ("a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705" and must provide a "written report—prepared and signed by the witness" containing "a complete statement of all opinions the witness will express and the basis

46

for them"); *Elrod v. Yerke*, 890 F. Supp. 2d 995, 1003-04 (N.D. Ill. 2012) (holding that "[t]he Court was obligated to exclude" testimony from a medical examiner where the offering party failed to disclose him as an expert witness).

His testimony also does not meet the requirements of Rule 701, which provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Mr. Duncan's opinions, to the extent they are relevant at all, are based on scientific, technical and specialized knowledge. Ustian's attempt to offer Mr. Dunan as a lay witness is a blatant attempt to circumvent the disclosure requirements that govern testifying experts and should not be permitted.

Moreover, to the extent Mr. Duncan has relevant information to offer the jury regarding the science of EGR vs. SCR technology, he lacks the qualifications to serve as an expert witness on this topic.  As Mr. Duncan admitted in his deposition, he has only a "layman's familiarity with SCR," he "never worked on projects involving development or testing of selective catalytic reduction," and his understanding of the "difference between EGR technologies versus SCR technologies" was only "the basic. (*Id.* at 25:4-25:11; 269:6-269:22; 270:18-271:3).  If he has any relevant information regarding the EPA's certification regulatory regime, his testimony would be duplicative of that provided by the EPA officials who actually considered Navistar's applications (five of whom are on the parties' witness lists).

Ustian should not be allowed to confuse the jury and prolong this trial by offering such inadmissible testimony.  For all of these reasons, the Court should exclude Mr. Duncan's testimony in its entirety.

IX.     **SEC Motion *In Limine* No. 9: Motion *In Limine* To Preclude Ustian From Introducing Evidence And Argument Regarding Reliance On Counsel**

In SEC enforcement actions, a defendant who wants to argue to a jury that he reasonably relied on the advice of counsel must first do two things: First, during discovery he must waive attorney-client privilege and disclose to the SEC the attorney's advice on which he claims to have reasonably relied. Second, he must satisfy certain elements of such a defense – including that he made a complete disclosure to counsel and that he received advice that the proposed conduct was legal.

Ustian chose not to pursue such a defense. While he initially set forth in his answer an affirmative defense that he reasonably relied on unnamed professionals, when pressed for the identity of such professionals, he clarified that none of them were attorneys.

Having made what now appears to have been that strategic calculation during discovery, the Court should preclude Ustian from now arguing, offering evidence, or intimating to the jury that he reasonably relied on the advice of counsel.

Evidence of reasonable reliance on the advice of counsel may inform defendant's intent. *SEC v. Lek Securities Corp.*, 17cv1789, 2019 WL 5703944, at *3 (S.D.N.Y. Nov. 5, 2019). A court will charge a jury on advice-of-counsel only if there is sufficient evidence in the record supporting the defense, that is, that defendant "[1] made a complete disclosure to counsel, [2] sought advice as to the legality of his conduct, [3] received advice that his conduct was legal, and [4] relied on that advice in good faith." *Id.* (citation omitted).

Critically for present purposes, for a defendant seeking to assert a "reliance" argument, the attorney-client privilege "cannot at once be used as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991); *Lek,* 2019 WL 5703944 at *3. Which is to say,

48

defendants making a reliance argument must disclose all of the advice of counsel to which they claim to have relied. As Judge Easterbrook has explained, "It isn't possible to make out an advice-of-counsel defense without producing the actual advice from an actual lawyer." *SEC v. McNamee,* 481 F.3d 451, 456 (7th Cir. 2007). *See also Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill. 1993) ("Defendants cannot have it both ways; they cannot seek refuge in consultation with counsel as evidence of their good faith yet prevent Dorr–Oliver from discovering the contents of the communication.").

Ustian's answer to the SEC's complaint included the following "reliance on professionals" affirmative defense:

**FIFTEENTH AFFIRMATIVE DEFENSE**

Ustian relied upon the advice of experienced professionals and other subject-matter experts.

(Doc. 80, p. 96.) The SEC propounded an interrogatory asking Ustian to identify all professionals he was referencing in the affirmative defense and, for each, to describe the advice the professional imparted. In response, Ustian identified eight individuals, none of whom was an attorney. (*See* Ex. 23, Ustian's Amended Responses to Interrogatories 2 and 3.)

Having taken that position throughout discovery, the Court should preclude Ustian from presenting evidence at trial that, with respect to the disclosures at issue here, he relied on the advice of an attorney. Courts in SEC enforcement actions routinely grant the SEC such relief for defendants like Ustian who have expressly declined to jump through the necessary hoops for a reliance on counsel defense. *See Lek,* 2019 WL 5703944 (granting SEC's motion *in limine* and prohibiting defendant from presenting evidence of, or making any argument concerning, their reliance on any advice of counsel); *SEC v. Tourre,* 950 F. Supp. 2d 666, 684-85 (S.D.N.Y. 2013)

49

(granting SEC's motion *in limine* and precluding evidence highlighting an attorney's presence or involvement in relevant meetings); *SEC v. Kokesh,* No. 09-cv-1021, 2014 WL 11516545, at *3 (D.N.M. July 21, 2014) (granting SEC's motion *in limine* and barring defendant from introducing argument or evidence regarding attorneys without prior permission of the court).

The Court should order the same relief in this case, pursuant to Federal Rules of Evidence 401 and 403. As one court held in the course of granting such a motion: "The heart of the matter at bar is whether the danger of confusing the issues and misleading the jury outweighs the probative value of the evidence. The Court finds that, on balance, the danger does outweigh the probative value." *Kokesh,* 2014 WL 11516545, at *3.

So it is here. The fact of the presence of attorneys in any dialogue or meeting is of no relevance here, since Ustian chose not to assert a "reliance on counsel" defense. *See Tourre,* 950 F. Supp. 2d at 684 (evidence of counsel's involvement is "irrelevant, given [defendant's] intention not to present a reliance on counsel defense").

On the flip side of the coin, the SEC would be severely prejudiced if Ustian was permitted to introduce evidence of attorney involvement. For such evidence would afford Ustian all the benefits of a "reliance" defense without first having either disclosed the underlying legal advice to the SEC during discovery, or having to prove-up the aforementioned elements at trial. *Id.; Lek,* 2019 WL 5703944, at *4.

There's a reason why the SEC asked Ustian whether he intended to claim that he relied on the advice of counsel: Had he said "yes," the SEC would have taken targeted discovery designed to test the strength of such a defense. The SEC would have asked Ustian to disclose all the information he provided to the attorney, what advice he specifically sought from the attorney, and what advice the attorney ultimately gave him. The SEC would have asked for all underlying

50

emails relating to that give-and-take. After that it would have explored such communications and advice with the attorney, Ustian and any other participants during their depositions. Because Ustian lay in wait until the close of discovery before surfacing with a reliance on counsel defense, however, the SEC has been deprived the opportunity to take such discovery.[4]

As for jury confusion, a juror could easily misinterpret the presence of attorneys as tantamount to the attorneys' implicit or explicit "blessing" of the underlying disclosures at issue in this trial. *Tourre,* 950 F. Supp. 2d at 684; *Lek,* 2019 WL 5703944, at *4; *Kokesh,* 2014 WL 11516545, at *3. The dangers of such confusion and prejudice to the SEC far outweigh the (at best) marginal probative value of any such evidence.

The relief the SEC seeks here is the same narrowly-tailored, common sense relief imposed by the courts cited in this motion. First, the SEC asks the Court to preclude evidence relevant solely to show that lawyers attended meetings or participated in discussions – by email or otherwise. *Tourre,* 950 F. Supp. 2d at 684. Second, the Court should preclude Ustian from placing undue focus on the fact of a lawyer's presence at a meeting or as part of an email exchange, or that an attorney reviewed disclosures. *Id.* Third, Ustian should be precluded from introducing argument or evidence regarding attorneys, as such, without prior permission of the Court. *Kokesh,* 2014 WL 11516545, at *3. Fourth, Ustian should be precluded from arguing – or

---

[4] During the parties' meet-and-confer discussion, Ustian's counsel invoked the case of *SEC v. Ferrone*, 163 F. Supp. 3d 549 (N.D. Ill. 2016). However, the *Ferrone* case did not involve the issue here, which is the defendant's egregious failure to disclose his intent to claim he relied on a lawyer, either as an affirmative defense or as a claim of "good faith," in response to his adversary's pointed interrogatories explicitly directed as ferreting out whether the defendant intended to make such a claim. Unlike in *Ferrone*, the Court should address that issue and prevent Ustian from making this belated claim.

even insinuating – that he relied upon the advice of counsel. He should also be precluded from introducing evidence highlighting his consultation with, or involvement of, counsel.

X.  **SEC Motion *In Limine* No. 10: Motion *In Limine* To Exclude The Trial Testimony Of Former Navistar General Counsel Steven Covey**

Last week – ***seven months after the close of fact discovery*** – Ustian for the first time disclosed Steven Covey, Navistar's former general counsel, as a potential trial witness. According to Ustian, Covey may testify about "his communications with Ustian" regarding the "statements at issue in the case" and "Navistar's disclosure process."  In other words, Ustian intends to call Covey as an experienced professional on whom Ustian claims to have relied.  At the same time, Navistar is refusing to waive the attorney-client privilege. Therefore, if the Court allows Covey's testimony at trial, the SEC would face the same situation that the SEC faced when it took Covey's testimony during the SEC's pre-litigation investigation: Ustian's and Navistar's lawyers stonewalling the SEC by repeatedly invoking the attorney-client privilege when the SEC's attorneys asked questions about the events at issue.

That is not fair.  Ustian cannot now offer up Covey as a witness to argue or otherwise intimate to the jury that he gave Ustian advice and that Ustian reasonably relied on the advice or presence of counsel.  This is a quintessential example of Ustian improperly using the attorney-client privilege "as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). The SEC will be severely prejudiced, and the jury thoroughly confused, if Covey is permitted to testify about his role in certain disclosures at issue, while the SEC is forbidden from probing into these issues on cross-examination.

Moreover, as noted in the SEC's motion *in limine* regarding Ustian's purported reliance on counsel, in response to Ustian's 15th affirmative defense, the SEC asked Ustian to identify all "experienced professionals" on whom he allegedly relied.  In January 2018, Ustian identified eight people – all non-attorneys – and described the manner in which he relied upon each one.

53

Ustian's failure to disclose Covey in response to this interrogatory – while now listing him as a trial witness – constitutes a serious violation of the rules of discovery. The SEC propounded that interrogatory for a reason, that is, so it would have the opportunity to take discovery on Ustian's "reliance" affirmative defense. The SEC understandably did not pursue such discovery with respect to Covey because it had no reason to.

Nor did the SEC have any other reason to focus on Covey during discovery. He never appeared in Ustian's Rule 26(a)(1) disclosures. Ustian failed to disclose Covey in response to the SEC's interrogatory seeking the names of Ustian's potential trial witnesses. Thus, while the SEC had initially put Covey on its initial Rule 26 disclosures in June 2016, once it became clear that Ustian did not consider Covey to be a fact witness of import, the SEC omitted Covey from its list of witnesses in a subsequent interrogatory answer and from its list of persons with knowledge in its amended Rule 26 disclosures. At a minimum, once the SEC gave Ustian notice through its interrogatory answer and its amended Rule 26 disclosures that the SEC no longer considered Covey to be a person with discoverable information, it was incumbent on Ustian to supplement his disclosures to identify Covey as a defense witness during discovery if he hoped to call him at trial. Ustian's failure to do so mandates exclusion of Covey as a witness under Federal Rule of Civil Procedure 37.

### A. The Court should exclude Covey as a witness given Navistar's refusal to waive privilege

As discussed in the SEC's separate motion *in limine* regarding advice of counsel, for a defendant seeking to assert a "reliance" argument, the attorney-client privilege "cannot at once be used as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). Defendants making a reliance argument must disclose all of the advice of counsel to which they

claim to have relied. As Judge Easterbrook has explained, "It isn't possible to make out an advice-of-counsel defense without producing the actual advice from an actual lawyer." *SEC v. McNamee,* 481 F.3d 451, 456 (7th Cir. 2007).

Here, Ustian is planning to sandbag the SEC by using the attorney-client privilege as both a shield and a sword. Ustian – at the last minute and after the close of fact discovery – is now offering up Covey as a sword to testify about Navistar's disclosure committee, his role in the disclosures at issue, and his communications with Ustian regarding the same. (*See* Ex. 24 at 3). At the same time, he (through Navistar), will invoke the attorney-client privilege as a shield to prevent the SEC from probing into these issues on cross-examination.

In fact, this situation has already played itself out during the SEC's pre-litigation investigation. During the investigation, the SEC attempted to take the testimony of Covey. Covey and his attorneys – ***the same attorneys now representing Ustian*** – repeatedly invoked the attorney-privilege, limiting the testimony to an almost meaningless degree. Even when Covey was permitted to testify, his attorneys directed him to limit his answers to "yes," "no," or "I don't recall," without any substantive follow-up permitted. As the Court can see by just perusing the transcript, attached hereto as Exhibit 25, Covey and/or his attorneys repeatedly invoked the attorney-client privilege. And the invocation went beyond just the content of potentially privileged discussions. The SEC was prohibited into inquiring if Covey even had discussions about certain issues. The SEC was also prohibited from inquiring about whether Covey was aware of significant issues surrounding the disclosures, and his understanding of them. Here are just a few examples:

> Q   Did you participate in any discussions about whether Navistar should reference the concerns raised by the EPA with the January, 2012 submission in the Q1 2012 filing?

MR. PERLMAN: I'll have to stop you for a second. I'll have to confer. *I think that calls for a privilege communication. I direct you not to answer.* If you ask more generally about the topic, et cetera, et cetera. *But when you build in too much of the substance into your question, it makes me uncomfortable.*

MR. LEVINE: *Just try to eliminate the contents.*

Q    Did you participate in any discussions as to whether any potential disagreement between the EPA and Navistar about what testing is required to receive .2 certification should be disclosed in the Q1 2012 filing?

MR. PERLMAN: *The same objection.*

MR. LEVINE: *The same objection.*

MS. HARTMAN: *And just to be clear, instruction not to answer?*

MR. PERLMAN: *Yeah.*

MR. LEVINE: *Yeah. Instructing him not to answer, correct. Yeah.*

Q    Did you ever participate in any discussions about disclosing that the January, 2012 submission would be a bridge engine to be sold until a .2 engine with improved performance features will be ready to be released to the public?

MR. LEVINE: *I instruct you not to answer that, either.*

Exh. 25, Covey Inv. Testimony at 177:19-179:3 (emphasis added).

Q    My first question is do you have an understanding of why the risk factor was revised in this Q1 2012 filing?

A    Yes, I do.

Q    What was your understanding?

A    My understanding --

MR. LEVINE: Whoa, whoa, whoa. Hang on a second.

THE WITNESS: Okay.

MR. PERLMAN: *I don't think you can answer that.*

Q    Let me ask you this. What was your understanding based on, without going into the substance of the understanding?

MR. LEVINE: *That's the same problem, I think.*

MR. MAHLO: I object to form.

MR. LEVINE: *You better not answer that. We don't want to run the risk of a waiving.*

*Id*. at 181:14-182:8 (emphasis added).

56

Q   Did you ever become aware at any point that the EPA indicated to Navistar with respect to its January, 2012 submission for a .2 NOx in-cylinder engine that it would not certify the .2 engine as it was submitted in January, 2012?

MR. LEVINE:  *You can only answer that if you have information that is independent of any communication in the privilege context.*

THE WITNESS:  *Well, any information, that I have would have been -- would have been covered by the attorney-client privilege.  So no, I can't answer it.*

Q   Did you ever become aware that with respect to the January, 2012 submission for a .2 NOx certification, the EPA informed Navistar that it could not test FTP one way and then run the truck another way?

MR. LEVINE:  *The same instruction.  I'm sorry, you can answer that.  No, you can't answer that.  I mean, you could answer that if you know that independent of a privilege communication.*

THE WITNESS:  *I don't -- I don't so no, I can't answer it.*

*Id*. at 187:23-188:20 (emphasis added).

Q   And what were you told happened at the May 30, 2012 meeting with the EPA?

MR. LEVINE:  *That, I don't think you could answer, unless you know you can do it outside of the context of a privilege communication.*

THE WITNESS:  Yeah, I don't think -- *I don't think that I can.*

MR. LEVINE:  Okay.

THE WITNESS:  So I'm sorry, *I can't answer that.*

*Id.* at 202:24-203:8 (emphasis added).

Q   Did you tell anyone else that the EPA viewed Navistar's engine described in the May, 2012 application as having test results at .2 in the test cell but emissions at higher than that outside the test cell?
MR. PERLMAN:  Sorry, I didn't mean to cut you off, Anne.  I apologize.  I object and *I also think that's privilege.*  You're asking him -- sorry, I don't need to editorialize.  *I'm going to instruct you not to answer on grounds that will be privilege.*

*Id.* at 206:14-206:24 (emphasis added).

Q   Do you recall -- did you ever become aware that the EPA had said unequivocally no to the May, 2012 application?

MR. LEVINE:  Form.

MR. PERLMAN:  I object to form.

MR. LEVINE:  *Yeah, and privilege.*

57

Q   Did you ever become aware that the EPA indicated that the switching between Map A and Map B in the May, 2012 application violated its regulations?

MR. LEVINE:  The same problem, form and --

MR. PERLMAN:  Form.

MR. LEVINE:  *-- you can't answer I instruct you not to answer.*

Q   Did you ever become aware that the EPA indicated to Navistar that Navistar was in this position and it was its fault because it chose to go with in-cylinder technology?

MR. LEVINE:  Form.  *I instruct you not to answer.*

Q   And did you ever become aware that the EPA viewed Navistar's engine as described in the May, 2012 submission as a blatant attempt to circumvent the EPA's regulations?

MR. LEVINE:  Form, *I instruct you not to answer.*

*Id*. at 216:23-217:25 (emphasis added).

Q   And did you participate in any discussions about how to discuss the .2 certification status in Navistar's disclosures filed with the SEC based on the feedback received from Mr. Bunker in the e-mail at Exhibit 900?

MR. LEVINE:  Hang on a second.  *You can't answer that.*

THE WITNESS:  Yeah, that's what I would – *I can't answer that.*

MR. LEVINE:  We're all in alignment.

…

Q   In terms of the updates you have received regarding Navistar's May, 2012 submission and the feedback that the EPA had provided to Navistar on that submission, was there anything in Mr. Bunker's e-mail that was inconsistent with the feedback that you had received?

[DISCUSSION]

MR. LEVINE:  Yeah, *you can't answer that.*

…

Q   Do you recall telling any of the board members about -- well, let me ask more broadly.  Do you recall telling anyone about the content of the -- of Mr. Bunker's e-mail that was forwarded to you at Exhibit 900?

MR. LEVINE:  *I will instruct you not to answer that.*

THE WITNESS:  Okay.

MS. HARTMAN:  Just so I'm clear, *you're instructing him not to answer as to whether the fact he informed anyone about the content, not the substance of the content?*

58

MR. LEVINE: It was your former that I think -- this question was -- I may have misunderstood you.

MS. HARTMAN: Let me just repeat it.

MR. LEVINE: Okay.

Q   Did you tell anyone about the content from Mr. Bunker's e-mail as set forth at exhibit 900?

MR. LEVINE: Yeah, that's I thought you said. *And I think that is so reliant. So I instruct him not to answer, unless someone tells me they have a different view.*

*Id*. at 226:2-228:15 (emphasis added).

Q   Earlier you testified that around the time of this e-mail, Navistar was anticipating a yes or a no answer from the EPA. Based on your reading of Mr. Bunker's e-mail, could you understand that Mr. Bunker's e-mail represented a no response from the EPA?

MR. PERLMAN: *It calls for privilege and I instruct you not to answer.*

THE WITNESS: Okay.

Q   Did you discuss with anybody prior to the filing of the 10-Q whether Mr. Bunker's response needed to be disclosed in the 10-Q?

MR. LEVINE: *Same, instruct you not to answer.*

Q   Did you ever consider whether Mr. Bunker's response needed to be disclosed in the 10-Q?

MR. LEVINE: Consider, is that what you said?

MR. PHILLIPS: Right.

MR. LEVINE: *You can't answer that.*

MR. PERLMAN: I think that involves --

THE COURT REPORTER: I'm sorry, one more time.

MR. PERLMAN: Sorry. We'll try to -- I know you're having a hard time. We'll try to have just one of us. But we don't always know who's going to talk. *So the statement was that we consider that to be privilege and/or work product and will instruct the witness not to answer that particular question.*

Q   When you received Mr. Bunker's e-mail, did you understand his e-mail to relate to any litigation involving Navistar?

MR. PERLMAN: *The same instruction.*

*Id*. at 230:25-232:9 (emphasis added).

Q   The language in this [Form 10-Q filed on June 7, 2012] is the same as the draft that we looked at for Q2 that was on June 1, 2012. Between June 1, 2012 and the final version on June 7, 2012, did you participate in any discussions about whether this language

59

regarding the May, 2012 submission status should be revised following feedback from the EPA on the May, 2012 submission?

MR. PERLMAN: Sorry. I object --

THE WITNESS: Sorry.

MR. PERLMAN: Sorry, sorry. *I think that calls for privilege communications, and I instruct you not to answer.*

Q   Is the characterization of discussions with the EPA as being ongoing discussions relating to certification accurate in your opinion based on as of the June 7, 2012 filing date?

MR. LEVINE: *The same problem. You can't answer that.*

*Id.* at 238:7-238:25 (emphasis added).

Perhaps the most egregious example of Ustian's intent to invoke privilege as both a shield and sword was born out during summary judgment briefing. Covey testified during the investigation that he was "reasonably certain" he wrote two sentences at issue in this case in Navistar's Form 10-K for fiscal year 2011: "We plan to submit certification applications to both EPA and CARB in the near future. We believe their engines meet both agencies' certification requirements." (*See id.* at 156:8-157:5). Ustian relied upon this fact in his Motion for Summary Judgment in arguing that these statements were not false or misleading. (Docket No. 254 at 34; *see also* Docket No. 255, Joint Statement of Undisputed Material Facts ¶ 120). However, when the SEC attempted to question Covey during the investigation regarding why he believed he wrote those sentences and how he came to write them, he refused to answer on privileged grounds. (Exh. 25 at 156:17-157:9).

In support of summary judgment, Ustian also relied on Covey's testimony regarding purportedly positive internal Navistar discussion on December 17, 2011, immediately preceding

the filing of the above Form 10-K.[5]  (Docket No. 254 at 5, 20, 22, 34, 39; *see also* Docket No. 255 at ¶ 116).  These discussions followed a meeting in which the EPA told Navistar that its proposed engine did not appear to meet EPA's certification requirements, which directly contradicts what Covey purportedly wrote in the Form 10-K.  When the SEC asked Covey about the EPA meeting, his counsel repeatedly directed him not to answer on privilege grounds:

> Q   Were you aware that Navistar met with the EPA on December 16, 2011 to discuss additional issues on the emissions topic?
>
> MR. LEVINE:  *You could answer that as long as you don't answer it in the context of anything that was communicated to you in a privilege manner.*
>
> THE WITNESS:  You know, I was aware that a settlement conference took place with EPA in December, but I don't recall whether I was aware of it before it occurred or after it occurred.  I know I was aware of it after it occurred.
>
> …
>
> Q   And did you have any understanding of whether at this December, 2011 settlement meeting, as you referred to it, there was a discussion on a .2 NOx in-cylinder engine with the EPA during that meeting?
>
> MR. PERLMAN:  I'll have to check and confer with Mr. Levine a moment.  Can you read that back?
>
> MR. PERLMAN:  *On the record that you created for that particular question, I think that's a privilege.  He can't answer that without divulging privilege, so I'm going to instruct him not to answer.*
>
> Q   You reference that there was a settlement conference.  Did you have any understanding of what the purpose of that settlement conference was with the EPA on December, 2011?
>
> MR. LEVINE:  *The same problem*.
>
> MR. PERLMAN:  *Again, sorry, you can answer yes, no --*
>
> MR. LEVINE:  *Yes or no, I don't recall but no content*.
>
> THE WITNESS:  I apologize, but now I forgot my question.
>
> MR. LEVINE:  Yes or no.

---

[5] Not surprisingly, since these discussions appear to help Ustian's defense, Ustian's attorneys permitted Covey to testify regarding them at length without invoking any privilege.  (Exh. 25 at 148:23-151:25).

THE WITNESS:  The only -- *the only understanding I had from it was gained through the feedback I got from the people who were there, which, you know, I believe was communicated to me in a privilege manner.*

…

Q    What were you told happened at that December, 2011 EPA meeting?

MR. LEVINE:  *You can't answer that.  Objection and I instruct you not to answer.*

Exh 25 at 146:4-148:21 (emphasis added).

After the meeting, the EPA's Byron Bunker sent to Navistar's Patrick Charbonneau an email confirming what was discussed in the meeting: that "[T]the engine described by the Navistar team for certification in February does not appear to meet the EPA's certification requirements."  (Ex. 16, Deposition Exhibit 220). But the SEC was once again stonewalled when it asked Covey about this communication:

Q    When you received the e-mail from Mr. Charbonneau that forwarded Mr. Bunker's communication, did you have any opinion as to whether the information in that e-mail from Mr. Bunker was consistent with the updates you had received about what happened at the December 16, 2011 meeting with the EPA?

MR. LEVINE:  *You can't answer that.  You can't answer that.  It's privilege -- it's both a privilege issue and work product.*

*Id*. at 154:25-155:8 (emphasis added).

As the case law bears out, it is inherently unfair to permit Covey to testify about the purportedly positive December 17, 2011 meeting and his drafting of the pertinent language in the Form 10-K, but to prohibit the SEC from inquiring as to the circumstances leading up to and surrounding such testimony. And as to the other examples listed above, it would be manifestly unfair to permit Covey to testify regarding the disclosures at issue since Ustian's and Navistar's counsel time and time again thwarted the SEC's attempts to question Covey about such disclosures – including who those discussions were with, the substance of those discussions, and his understanding of important facts surrounding the disclosures.

62

Courts in SEC enforcement actions routinely prohibit such reliance testimony when the defendant has not formally raised his or her reliance on counsel as a defense, including when defendants claim that the participation of attorneys proves "good faith." *See, e.g., SEC v. Tourre,* 950 F. Supp. 2d 666, 684-85 (S.D.N.Y. 2013) (granting SEC's motion *in limine* and precluding evidence highlighting an attorney's presence or involvement in relevant meetings). As discussed in *Tourre*, if Ustian is raising the more nuanced "presence of counsel" defense, such evidence is equally inadmissible as being either irrelevant or confusing and unduly prejudicial. *Id.* ("[Defendant] argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury.").

The SEC would be prejudiced if Ustian was permitted to call Covey as a witness. Such evidence would afford Ustian all the benefits of a purported "reliance" defense without first having either disclosed the underlying legal advice to the SEC during discovery, or having to prove-up the necessary elements at trial. *Id.*; *SEC v. Lek Securities Corp.*, 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019). If Ustian had properly disclosed Covey as a witness and/or properly asserted a "reliance on counsel" defense, the SEC would have taken targeted discovery designed to test the strength of such a defense. Because Ustian lay in wait until the close of discovery before surfacing with such a defense, however, the SEC has been deprived the opportunity to take such discovery. The same holds true whether Ustian asserts a reliance on counsel defense or simply introduces evidence of Covey's involvement and presence as a purported way to rebut scienter or the falsity of certain statements.

In *Rao v. Rusch*, 2017 WL 4278541, at *1-2 (N.D. Ill. June 21, 2017), the court excluded the plaintiff's eleventh-hour disclosure of his former counsel. Not only did the late disclosure

63

violate the discovery rules, the Court found, but throughout the protracted discovery period, the

plaintiff repeatedly invoked the attorney-client privilege when asked questions about the former

counsel, which "effectively precluded discovery into many potentially relevant areas of [the

former counsel's] testimony." *Id.* The court found that "[t]he defense would be highly

prejudiced not having deposed [the former counsel] or seeking further documents pertaining to

his testimony – testimony that, until that eleventh hour, Defendants were lulled into thinking

would not be available to them based on privilege." *Id.*; *accord SEC v. Kokesh,* 2014 WL

11516545, at *3 (D.N.M. July 21, 2014) (granting SEC's motion *in limine* and barring defendant

from introducing argument or evidence regarding attorneys as such without prior permission of

the court).

Similarly, the SEC would be highly prejudiced not having deposed Covey or having

sought documents regarding his testimony. Ustian "sought to hide him behind the shield of the

attorney-client privilege only to reveal him last minute" while the SEC was led to believe Ustian

was not claiming that he relied on Covey. *Id.*[6]

**B.     Covey should be excluded as an undisclosed witness**

---

[6] As noted in the SEC's discussion of its ninth motion *in limine*, during the parties' meet-and-confer discussion, Ustian's counsel invoked the *Ferrone* case, 163 F. Supp. 3d 549. The *Ferrone* case does nothing to support Ustian's argument that he should be able to call Covey as a witness. *Ferrone* did not involve the issue of whether a defendant can call a lawyer as a witness. Instead, *Ferrone* involved the question of whether the Defendant could testify that "the participation of others, including lawyers and other professionals, in reviewing (and, according to Ferrone, approving) Immunosyn's public disclosures gave him comfort that they were not materially false or misleading." *Id.* at 568. *Ferrone* did not seek to have any lawyers testify in that case. *Id.* at 570.

Additionally, the Court should preclude Ustian from calling Covey as a witness on the separate ground that Ustian repeatedly failed to comply with his discovery obligations and should be sanctioned accordingly.

In his Answer to the Complaint, Ustian raised as an affirmative defense that he "relied upon the advice of experienced professionals and other subject-matter experts." (*See* Docket No. 76 at 82). In May 2017, the SEC propounded interrogatories asking Ustian for further information about the identity of such experienced professionals and documents and communications regarding the same. After initially refusing to answer the interrogatories, Ustian provided a response in January 2018, listing eight "'experts' and/or 'experienced professionals' employed by Navistar who directly communicated with Ustian in matters related to the subject matter of this action." (*See* attached Ex. 23 at 3-5). Ustian did not disclose Covey on this list.

Ustian also never disclosed Covey in his Rule 26 disclosures or other interrogatory responses. In June 2016, Ustian served his Rule 26 disclosures. (*See* attached Exh. 26). Ustian disclosed 16 "individuals … likely to have discoverable information that he may use to support his defenses," as called for by Rule of Civil Procedure 26(a). But Ustian did not disclose Covey as one of those individuals. Ustian never amended or supplemented these Rule 26 disclosures throughout the almost three years of discovery.

The SEC further propounded an interrogatory asking Ustian to identify witnesses whom he intends to call at trial. In response, Ustian listed eight individuals, but not Covey. (*See* attached Exh. 27 at 4-5). Ustian never amended or supplemented these interrogatories throughout the almost three years of discovery.

On November 15, 2019, Ustian provided the SEC with its proposed witness list for trial, which for the ***very first time*** identified Covey as a potential witness who may testify "about

65

Navistar's disclosure process, statements at issue in the case, and his communications with Ustian regarding the same." (*See* Exh. 24 at 3).

This Court has extended the fact discovery cutoff date in this case four times. (*See* Docket Nos. 109, 142, 222, and 233). In the Court's order granting the fourth fact discovery extension in response to Ustian's motion (Docket No. 231), the Court extended fact discovery through April 11, 2019 and stated: "The Court will not entertain any motions to extend the dates in this scheduling order." (*See* Docket Nos. 231, 233). And in the recent November 20, 2019 hearing, the Court indicated that the parties will not be permitted any more depositions.

Ustian's last-second disclosure of Covey as a trial witness completely undermines the affirmative disclosure requirements of the Federal Rules of Civil Procedure, which are designed to "encourage parties to try cases on the merits, not by surprise, and not by ambush." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014). Ustian had three affirmative chances to disclose Covey as a potential witness during discovery: first, in his initial disclosures; second, in response to the SEC's interrogatory regarding trial witnesses; and third, in response to the SEC's interrogatory regarding professionals that Ustian relied upon. Instead, he hid the ball each time in an attempt to ambush the SEC. And Ustian never amended any of the above responses to include Covey, despite having almost three years of discovery to do so. At the same time that Ustian was concealing his intent to use Covey as a witness at trial, his counsel, representing Navistar, fought to prevent disclosure of purportedly privileged information that might have informed the SEC about Covey's role at trial.

Federal Rule of Civil Procedure 37(c) specifically calls for exclusion of witnesses not disclosed as required by Rule 26, unless the failure was substantially justified or is harmless. *See Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 815 (N.D. Ill. 2010) (citing *In re Thomas*

66

*Consol. Indus., Inc.*, 456 F.3d 719, 726 (7th Cir. 2006)); *Rao*, 2017 WL 4278541, at *2. "The sanction of exclusion is ***automatic and mandatory*** unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (emphasis added). In determining whether to exclude evidence or witnesses, courts consider the following factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citing *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995) and *Spray-Rite Serv. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir. 1982)).

Courts in this district routinely exclude potential witnesses when they are not properly disclosed during discovery. *See, e.g., Rao*, 2017 WL 4278541, at *1-2 (excluding testimony of three witnesses disclosed on the last night of discovery); *Zingerman v. Freeman Decorating Co.*, 2003 WL 22057032, at *4 (N.D. Ill. Sept. 3, 2003) (excluding testimony of two witnesses disclosed in the last seven days of the discovery period); *LG Electronics v. Whirlpool Corp.*, 2010 WL 9506787, at *1-2 (N.D. Ill. Sept. 7, 2010) (excluding testimony of two witnesses disclosed on the final day of fact discovery); *Ty, Inc. v. Publications Intern., Ltd.*, 2004 WL 421984, at *1-4 (N.D. Ill. Feb. 17, 2004) (excluding testimony of 14 witnesses not previously disclosed in discovery); *Anglin v. Sears, Roebuck and Co.*, 179 F. Supp. 2d 836, 837 (N.D. Ill. 2001) (upholding magistrate ruling barring three undisclosed witnesses from testifying at trial).

Moreover, the SEC also expended significant resources, both before and after filing suit, challenging Navistar's privilege assertions in response to requests for production of documents. *See, e.g., SEC v. Navistar Int'l Corp.*, Case No. 14-cv-10163 (N.D. Ill.) (subpoena enforcement

67

action); Docket No. 104. The Court frequently overruled Navistar's improper privilege assertions and required production of previously withheld documents or portions thereof. *See, e.g., SEC v. Navistar Int'l Corp.*, Case No. 14-cv-10163 (N.D. Ill.) (Docket Nos. 38, 44, 62); Docket No. 134. However, given the vast amount of withheld documents, the SEC was only able to challenge, and obtain rulings on, a small subset of all withheld documents. Given that Ustian never disclosed Covey in discovery as a potential witness, the SEC never focused on challenging communications to or from Covey that Navistar withheld as privileged. Therefore, the SEC never obtained full discovery related to Covey's proposed testimony.

Under these circumstances, the Court should exclude Covey as a witness at trial. Ustian failed to disclose Covey as required by Rules 26 and 33.[7] Ustian also has no reasonable justification for his repeated failure to disclose Covey as a potential witness. Nothing about the SEC's case or theories of liability have changed since the filing of the Complaint. Certainly nothing about Covey's role in the case has changed. Any claimed "surprise" or "reaction" by Ustian is disingenuous.

---

[7] During the November 20, 2019 hearing, the Court expressed its general view that once either party identifies a person in its Rule 26 disclosures, both parties are on notice that the person could be a witness for either side. After considering the Court's comments, the SEC decided not to pursue two motions *in limine* it had planned to file regarding two witnesses that Ustian never disclosed during discovery. However, Covey is different from these two other witnesses. Because Covey is a lawyer, because Navistar is asserting the attorney-client privilege over his substantive communications with Ustian, and because the SEC propounded discovery specifically directed at identifying whether Ustian planned to assert that the relied on Covey's advice, the SEC would face severe prejudice if the Court allowed Covey to testify. Further, unlike for these other two witnesses, the SEC ceased disclosing Covey as of September 2017, putting Ustian on further notice of his obligation to disclose Covey if Ustian believed Covey had relevant information or if Ustian intended to call Covey as a trial witness.

The harm to the SEC is obvious. Fact discovery has now closed and the parties are now less than three months out from trial. The SEC cannot obtain the discovery necessary to prepare for Covey as a trial witness, especially given the attorney-client privilege issues discussed above. *See, e.g., Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (upholding exclusion of witnesses first disclosed in response to motion for summary judgment and after discovery had closed, preventing party from deposing them).

Ustian's late disclose of Covey as a potential witness undermines the SEC's ability to prepare effectively for trial and "reeks of unfair surprise." *Zingerman*, 2003 WL 22057032, at *4. He should be excluded from testifying.

Dated: November 21, 2019

<div style="margin-left:50%">

Respectfully submitted,

/s/ Eric M. Phillips

Eric M. Phillips
Jonathan S. Polish
Anne Graber Blazek
Timothy Stockwell
United States Securities and
Exchange Commission
175 West Jackson Boulevard, Suite
1450
Chicago, Illinois 60604
Telephone: (312) 353-7390

</div>

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on November 21, 2019, a copy of the foregoing Plaintiff Securities and Exchange Commission's Motions *In Limine* was served upon the following counsel by the Court's CM/ECF system:


Sean M. Berkowitz
Cary R. Perlman
Latham & Watkins LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
sean.berkowitz@lw.com
cary.perlman@lw.com

Laurence H. Levine
Law Offices of Laurence H. Levine
189 East Lake Shore Drive, 16th Floor
Chicago, IL 60611
laurence.levine@lhlevine.com


Attorneys for Defendant Daniel Ustian


/s/ Eric M. Phillips_____
Eric M. Phillips