**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 16 C 3885 |
| DANIEL C. USTIAN, | ) ) | Judge Sara L. Ellis |
| Defendant. | ) ) | |

**<u>OPINION AND ORDER</u>**

Navistar International Corporation ("Navistar"), whose stock is listed on the New York Stock Exchange (ticker symbol NAV), produces among many things, diesel engines regulated by the Environmental Protection Agency ("EPA"). The United States Securities and Exchange Commission ("SEC") alleges that Defendant Daniel C. Ustian, Navistar's former Chief Executive Officer ("CEO") and President, was so driven by a desire to produce an engine that the EPA would approve and customers would buy, that he engaged in securities fraud and misled investors to think that Navistar had such an engine despite knowing that Navistar could not produce an engine that could satisfy both the EPA and Navistar's customers. The SEC asserts the following claims: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count I); (2) aiding and abetting Navistar's violations of Section 10(b) and Rule 10b-5 (Count II); (3) violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) (Count III); (4) aiding and abetting Navistar's violations of Section 17(a) (Count IV); (5) false certifications under Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14 (Count VI); and (6) control person liability under Section 20(a) of the Exchange Act for Navistar's violations of

Section 10(b) and Rule 10b-5, 15 U.S.C. § 78t(a) (Count VII).[1]  Because the Court's examination reveals genuine disputes of material fact or the need for additional exposition of the issues as to all claims, the Court denies Ustian's motion for summary judgment.

**BACKGROUND**[2]

### I.      Background on Navistar and Ustian

Navistar manufactures and sells medium (class 5-7) and heavy duty (class 8) trucks, as well as engines and other parts.  In November 2010, Ustian represented that Navistar's "future really is in the growth that we've had in our Truck and Engine business," with a focus on producing its own engine for heavy duty trucks.  Doc. 255 ¶ 2.  As of mid-2011, Navistar's flagship engine for heavy duty trucks was its 13-liter engine, with those engines bearing the MaxxForce name.

Between 2003 and 2012, Ustian served as President and CEO of Navistar.  He worked for Navistar for almost forty years, including as the Vice President of Navistar's Engine Business and the Chief Operating Officer.  In 2002, Ustian joined Navistar's Board of Directors and became Chairman of the Board in 2003, a position he held until 2012.  Ustian has a bachelor's degree in commerce from DePaul University.  He has no training as an engineer or lawyer.

---

[1] At the pleadings stage, the Court dismissed the SEC's claim against Ustian for aiding and abetting Navistar's violations of § 13(a) and Rules 12-b20, 13a-1, 13a-11, and 13a-13 (Count V).  *See* Doc. 63 at 48.  The Court also dismissed any claim based on Ustian's February 2012 statements on an analyst conference call.  *Id.* at 39.

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts, SEC's Statement of Additional Facts, and the accompanying exhibits.  Because neither side has objected to the consideration of any facts on hearsay or other grounds at the summary judgment stage, the Court considers them admissible for purposes of resolving this motion.  The Court considers all facts in the light most favorable to the SEC, the non-movant.

2

## II.     The 0.2g NOx Emission Standard

Navistar's engines must meet EPA regulations, including regulations on engine emissions addressing the discharge of nitrogen oxide ("NOx").  In 2001, the EPA promulgated emission standards requiring new on-highway, heavy-duty diesel engines to reduce NOx discharge to 0.2 grams per brake horsepower hour by January 1, 2010 (the "0.2g NOx standard").  The EPA required annual certification for engines sold in the United States, an iterative process involving a back-and-forth between the EPA and manufacturer to address EPA concerns and make any additional required changes for the engines to meet emission standards.  The EPA has considerable discretion in making its decisions on whether to grant a certificate of conformity and when to do so.  The 0.2g NOx standard is performance-based, or technology neutral, meaning that the EPA applies the same certification testing procedures to all technologies and should not favor one technology over another.[3]

### A.     EGR and SCR Technology

To meet the EPA's tightening NOx standards, Navistar's competitors chose to use selective catalytic reduction ("SCR") in combination with exhaust gas recirculation ("EGR"). SCR technology relies on an after-treatment system to lower emissions after the NOx leaves the engine.  Navistar, on the other hand, decided to exclusively use EGR technology, a solution for engine emissions unique to the market.[4]  EGR reduces NOx emissions by capturing some of the

---

[3] Between 2009 and 2011, Navistar filed three lawsuits against the EPA, contending that the EPA had to match its test procedures to on-road emissions for heavy-duty diesel engines it certified.  These lawsuits either ended in voluntary dismissals by Navistar or judgment for the EPA.

[4] As of June 2008, another engine manufacturer, Cummins, Inc., planned to use EGR technology.  But in August 2008, Cummins announced that it would change paths to exclusively use SCR.  Cummins explained to Ustian and others at Navistar that it had determined it could provide better performance and fuel economy with SCR.  James Hebe, Navistar's Senior Vice President of Sales, also reported to Ustian that Cummins' CEO had told Hebe that Cummins did not believe it could technologically comply with the 0.2g NOx standard using EGR.

engine's exhaust, mixing it with fresh air, and then recirculating that air mixture back into the engine, which reduces the NOx before the pollutants leave the engine (hence EGR's other common name, "in-cylinder" technology).

Ustian made the decision that Navistar would use EGR technology. He believed that EGR technology had advantages for the environment and the customer in part because EGR engines were lighter than SCR engines and so allowed customers to haul more freight. Unlike EGR engines, SCR technology requires truck drivers to refill a dedicated tank with diesel exhaust fluid ("DEF").[5] SCR systems reduce NOx emissions only when they dose DEF into the exhaust stream. This means that situations exist where SCR engines do not control NOx emissions, such as when diesel engines operate at temperatures too cool to trigger DEF dosing and during extended idle, stop-and-go, low-load, and low-speed operation, when diesel engine exhaust temperatures are too low to cause the on-board computer to trigger DEF dosing. Additionally, the SCR system would not function if a user substituted water for DEF.[6]

### B.      Dual Mapping, Defeat Devices, and AECDs

During the relevant time period, onboard computers electronically controlled all heavy-duty on-highway engines and could change the way an engine runs based on speed, altitude, acceleration, and ambient and engine temperature. These different calibrations produce different torque maps, referred to as dual mapping. Some of the calibrations affect emissions, for which the manufacturer must identify the changes to the EPA as auxiliary emission control devices

---

[5] Typically, DEF dosing does not occur in SCR systems when a temperature sensor registers under 200 degrees centigrade (392 degrees Fahrenheit) and signals the onboard computer to stop DEF dosing, which disables the SCR emission control system. The exact temperature of dosing varies per manufacturer and system.

[6] The Clean Air Act makes tampering with an emission control system illegal. Although a 2009 EPA regulation prohibited using water in place of DEF in SCR trucks, some SCR trucks still allowed the substitution between 2010 and 2012.

4

("AECDs"). The EPA acknowledged that both SCR and EGR engine applications included AECDs.

A defeat device is an AECD that reduces the effectiveness of an emission control system under conditions reasonably expected to be encountered in normal vehicle operation and use. The defeat device definition in the Code of Federal Regulations provides four exceptions to when an AECD does not amount to a defeat device despite reducing the effectiveness of the emission control system, including: (1) "[s]uch conditions are substantially included in the Federal emission test procedure;" (2) "[t]he need for the AECD is justified in terms of protecting the vehicle against damage or accident;" and (3) "[t]he AECD does not go beyond the requirements of engine starting." 40 C.F.R. § 86.1803-01. The EPA may only certify an engine with a defeat device if it meets one of the four exceptions. Dr. Allen Duncan, the Director of EPA's Diesel Engine Compliance Center, acknowledged that having off-cycle emissions that are not substantially reflected in certification testing and are not required to protect the engine or for starting would possibly be an illegal defeat device.

### C.     EPA Certification Procedures

To measure compliance with the 0.2g NOx standard between 2010 and 2012, the EPA mainly used federal test procedure ("FTP") and supplemental emissions test ("SET") testing.[7] Testing occurred in a dynamometer, a laboratory test cell, and so did not simulate real-world road conditions. Because real-world driving conditions are more variable than the certification cycles involved in the EPA's certification tests, heavy-duty diesel engines certified at 0.2g NOx do not always operate at or below that standard.

---

[7] The parties interchangeably refer to SET and ramped modal cycle ("RMC").

As part of the certification process, the EPA also required a manufacturer to provide an attestation that the diesel engine would comply with the applicable not-to-exceed ("NTE") limits when operated under all reasonably expected conditions for normal vehicle operation and use. The EPA allowed manufacturers to use vehicle in-use emission data to support their NTE compliance statements but reserved the right to test the engines to determine whether they met the NTE limits. Manufacturers could perform the in-use test in a test cell, using a signal generator to create voltage that made the engine think the vehicle was driving. The EPA's NTE regulations allow up to three deficiencies per engine family, and the EPA may consider any relevant factors in determining whether to allow a deficiency.

Additionally, EPA certification applications require deterioration factor ("DF") information, which the EPA uses to assess whether emissions will remain under the standard throughout the engine's useful life. Full DF testing for an on-highway heavy-duty diesel engine is lengthy and expensive. The EPA can accept an application without new DF testing or with less burdensome alternatives to full DF testing. This could include carryover DF, which means carrying over the DF emission data from the prior year's application or from one category of an engine family to another.

Although a manufacturer had to meet many parameters for certification, between 2010 and 2012, the EPA did not require manufacturers to demonstrate a specific fuel economy rating. Similarly, the engine family's performance attributes did not affect certification, and a manufacturer did not have to demonstrate that it could sell the engine to obtain certification.

### D. The EPA's Consideration of SCR Certification Applications[8]

The EPA's adjustable parameter regulations provide that, where a vehicle operator can adjust a parameter of the emission control, the EPA can test all ranges to determine if the engine complies in all adjusted parameters. The EPA considered the DEF used in SCR engines an adjustable parameter. In March 2007 SCR guidance, the EPA indicated it could test SCR engines with water in place of DEF and would deny certification if the engines did not pass the emission standards when using water. Because SCR engines could not pass certification testing when adjusted with water instead of DEF, however, the EPA instead required SCR manufacturers to develop and install urea quality sensors to detect the presence of water in DEF's place. Manufacturers did not complete development of urea quality sensors by January 1, 2010, with the EPA then indicating it expected implementation no later than the 2016 engine model year. Dr. Duncan acknowledged that this meant that the EPA essentially gave SCR manufacturers a six-year extension of time (after 2010) to fully comply with the 0.2g NOx standard. In certifying SCR-controlled engines, the EPA also determined that, despite the possibility of no DEF dosing in these engines, they did not include any defeat devices.[9]

The EPA admitted in September 2011 that it had certified several SCR engine families without requiring testing of the engines without DEF. Dr. Duncan testified that, between 2010 and 2012, the EPA interpreted the 0.2g NOx standard to not require consideration of the real-

---

[8] The parties have not presented detailed information as to the SCR certification process. Ustian sought discovery of the information that SCR engine manufacturers shared with the EPA during certification and conformance activities. But Judge Schenkier denied Ustian's request, determining the documents were not relevant to any claim or defense because Ustian did not have this information at the time he made any of the alleged misstatements at issue in the case. The Court includes those facts the parties have provided that it deems relevant to an understanding of the claims in this case.

[9] The absence of DEF dosing does not meet any of the exceptions to the definition of a defeat device: it is not necessary for engine starting or to protect the engine from damage, and is not substantially reflected in certification testing.

7

world conditions in which SCR engines exceeded emission standards, claiming that the EPA understood at the time that an SCR-controlled engine could drive 1,000 miles without NOx control. But Byron Bunker, Compliance Division Director of the Office of Transport and Air Quality, testified that SCR engines did undergo DEF dosing in some low-load conditions.

Ustian, along with some Navistar engineers, knew that SCR-controlled engines emitted uncontrolled NOx under certain real-world conditions and that the EPA did not test for such conditions. They also knew that the EPA had certified SCR engines at 0.2g NOx even though these engines did not have the urea quality sensor, allowing the engines to use water in place of the DEF required for an SCR engine to function properly.

## II.    Navistar's Certification Applications

### A.    Overview

In 2011 and 2012, Navistar submitted three applications for certification of a 0.2g NOx EGR engine. While awaiting certification at the 0.2g NOx standard, Navistar certified its 13-liter engines at no more than 0.5g NOx and used emission credits and nonconformance penalties ("NCPs") to comply with the 0.2g NOx standard.

As previously noted, Ustian made the decision that Navistar would pursue EGR technology. And despite having no engineering background, in a February 19, 2012, email to two Navistar employees, Ustian bragged that he "know[s] more than anyone on .2 emissions." *Id.* ¶ 3. But Ustian did not directly communicate with anyone at the EPA regarding the technical details of Navistar's EGR applications. His three meetings with the EPA during the relevant time period instead touched on Navistar's remaining emission credits and the potential need for Navistar to pay NCPs. Ustian reported that between 2010 and 2012, he learned about engine development and Navistar's certification attempts primarily from the following team of senior

8

Navistar engineers: Steve Ostarello, Navistar's Vice President of Quality and Warranty; Gurminder Bedi, an Executive Advisor to Navistar and formerly a Vice President of Northern America Truck at Ford; Dee Kapur, the President of Navistar's Truck Group; Ramin Younessi, the Integrated Product Development Group Vice President; Russ Zukouski, Navistar's Director of Advanced Technologies and Global Innovation; Patrick Charbonneau, Vice President of Government Relations; and Tom Kramer, Chief Certification Engineer (collectively, the "Senior Engineering Group"). David Piech, Navistar's Director of Certification and Compliance for Global Powertrain and Vehicle Regulations, oversaw Navistar's efforts to obtain certificates of conformity for its engines for each model year. But Piech took a backseat role to Kramer with respect to certifying Navistar's 0.2g NOx engines and only met with Ustian three times regarding the certification applications at issue in this case and once with the EPA to discuss these applications.[10]

Some members of the Senior Engineering Group, including Younessi and Ostarello, as well as Titus Iwaszkiewicz, another Navistar engineer involved in the certification process, told Ustian orally and in writing that they believed Navistar could develop an EGR engine that the EPA would certify at the 0.2g NOx standard that also would have competitive performance features and fuel economy when integrated into a truck.[11] Members of the Senior Engineering Group also represented to Ustian that the EPA should approve Navistar's 0.2g NOx applications given the EPA's treatment of SCR engines. Ustian understood that the strategies Navistar

---

[10] Although Piech took a secondary role to Kramer, he remained involved in the process, supervising those working on the applications and working on responses to EPA's comments.

[11] A truck's fuel economy does not depend only on the engine, which makes up about twenty percent of the fuel economy attributes, but also on rolling resistance (tires, alternators) and aerodynamic grab (aerodynamics, skirting, trailer gap). For this reason, a manufacturer can make up the decrease in an engine's fuel economy through adjusting other parts of the truck.

9

engineers used to meet the EPA requirements did not differ from SCR turning off under real world conditions. According to Charbonneau, Navistar believed it was acting in a similar manner as the SCR manufacturers, but that its EGR technology actually led to lower emissions than SCR engines in the real world. During the relevant time period, no member of the Senior Engineering Group told Ustian that the EPA would not approve the then-pending applications.

But despite Navistar's professed confidence and claims of equivalence between its technology and SCR engines, Navistar never obtained certification of its EGR engines at the 0.2g NOx standard. The EPA never officially denied Navistar's applications for an EGR engine under the 0.2g NOx standard either. This may be due to the EPA's typical practice not to deny engine certification unless a party asks the EPA to do so and instead, to use language that it is not taking action to approve the application when it finds a submission deficient. Bunker did not know of any instance in which the EPA formally denied an application – a formal EPA action that a party can appeal. Ustian understood at all relevant times that the EPA had not denied any then-pending Navistar applications.

Securities analysts, who worked for financial institutions and reviewed and analyzed companies' expected earnings, published reports on Navistar to help their institutions' clients determine whether to invest in Navistar.[12] Stephen Volkmann, a Jefferies analyst, testified that investors were interested in the fuel economy and performance of Navistar's engines. Ann Duignan, a J.P. Morgan analyst, and Andy Casey, a Wells Fargo analyst, admitted to treating management reports with some skepticism but typically assumed that the information management conveyed was truthful and honest. Although calling governmental agencies to

---

[12] Similarly, mainstream and trade press also discussed Navistar and the certification process. These analyst and press reports comprise one source for determining publicly available information at the time of their publication.

obtain information fell in the normal scope of an investment analyst's work, Kristine Kubacki, an Avondale Partners analyst, Walter Liptak, a Barrington Research analyst, and Duignan did not recall trying to contact the EPA about Navistar's applications. In fact, some analysts, including Casey, Duignan, Kubacki, and Volkmann, considered the EPA certification process to be relatively secretive or a "black box."[13] Doc. 258 ¶ 6. Margo Oge, the director of the EPA's Office of Transportation and Air Quality in the Office of Air and Radiation, also testified that the certification process was not transparent to the public. But the EPA does make certain documents public by posting them on its public docket, and its website includes a list of engines that the EPA has certified at specific levels. The EPA did not make public its discussions with Navistar about certification, with Navistar claiming confidential business information status over its 2011 and 2012 certification applications, which prohibited the EPA from discussing them with other parties. And, according to Liptak, companies normally do not speak publicly about the EPA certification process. But in this case, Volkmann recalled the unusual amount of public discussion and details Navistar revealed about its certification submissions. Christopher Grundler, the Deputy Director of the EPA's Office of Transportation and Air Quality, also recalled that, with respect to Navistar's applications, the trade press had an "intense interest in . . . what ordinarily is an obscure EPA function." Doc. 255 ¶ 203.

### B. The First 13-Liter 0.2g NOx Prototype Engine

#### 1. The February 2011 Application

From the outset, Navistar's competitors, along with some press members and analysts, publicly questioned whether Navistar could develop and certify a 0.2g NOx EGR engine. For

---

[13] Kubacki testified that information about pending applications was not available from the EPA, while Casey acknowledged speaking with an EPA representative on one occasion about the delay in certification. And Volkmann recalled unsuccessfully reaching out to the EPA to determine the status of Navistar's applications.

example, in May 2009, Daimler Trucks North America's President expressed his belief that manufacturers had reached the limit of what they can accomplish using EGR technology. And on October 28, 2010, a Boenning & Scattergood report questioned whether it was technologically feasible to produce a 0.2g NOx EGR engine with competitive fuel economy.

Despite skepticism, Navistar continued its pursuit of a 0.2g NOx EGR engine. In a November 2008 presentation at the Gabelli & Co. Aftermarket Symposium, Ustian represented that Navistar's 11-liter and 13-liter EGR engines would have superior fuel usage and torque, in addition to the 13-liter's superior horsepower, to SCR engines. In another presentation to investors and analysts in January 2010, Navistar indicated that despite perceptions that its EGR engine would have increased heat and decreased fuel economy, it actually would have better performance and lower heat rejection. At the Gabelli & Co. Aftermarket Symposium in November 2010, Ustian represented that Navistar had improved fuel economy in its engines by 4.5%.

But internally, in September 2010, having evaluated Navistar's relative lack of progress in producing a commercially viable 0.2g NOx EGR engine, Piech presented Ustian and others with recommendations to give Navistar additional time to reach 0.2g NOx with EGR. These recommendations included paying NCPs and offsetting some production of EGR engines with SCR engines. Ustian responded that Navistar would not pay NCPs or use SCR, but rather would continue on with its EGR engines.

By mid-October 2010, Navistar engineers indicated that the EGR engine in development (the "first prototype engine," also referred to as the D-cert engine) could achieve 0.2g NOx while also delivering fuel economy improvements compared to Navistar's 2010 baseline engines. Bedi told Ustian on November 2 that he was "encouraged we can pull this off, in time and with

quality," with fuel economy having improved by five percent and no increase in heat. *Id.* ¶ 61. At that time, according to Ostarello, Navistar was operating on a sixty-day plan to submit the first prototype engine to the EPA while delaying any high-volume production for two or more years. Ustian knew of this plan. Later in November, Iwaszkiewicz reported to Ustian that a 0.2g NOx EGR demo drive was successful and produced "one of the cleanest demo vehicles . . . that both ran and sounded well." *Id.* ¶ 69.

On December 9, Kramer emailed the EPA's certification reviewer for Navistar and described Navistar's proposal for a 2011 13-liter 0.2g NOx engine to include "[l]imited volume, select customers," "[i]ntroduction to service Jan 2011," and "carryover DF of 2010 MaxxForce 13, HHDE." *Id.* ¶ 70. The proposal also noted Navistar sought "full certification," not just a "field trial," and described the engine as having the same "[d]rivability, acceleration, fuel economy as 2010." Doc. 255-3 at 232, 239 (Ex. 85). On January 27, 2011, Younessi emailed Ustian to reiterate that achieving 0.2g NOx certification with the first prototype engine was "doable." Doc. 255 ¶ 86. On February 11, Navistar learned that third-party laboratory testing at the Southwest Research Institute showed that the first prototype engine met 0.2g NOx in FTP and RMC dynamometer testing requirements. Zukouski informed Ustian of the results the following day.

But the first prototype engine could only run in a test lab. When a Navistar engineer asked other engineers "[w]ould this engine be driveable in a truck," he received "laughs in response." *Id.* ¶ 80. The engineer described the first prototype engine to Piech and Kramer as "a[n] underpowered 13 liter engine that is coughing, sputtering and wheezing like some terminal cancer patient on a respirator." *Id.* Piech understood the engineer's email to describe an engine with performance problems with which customers would not be happy. Ustian himself

13

acknowledged that the first prototype engine did not have a fuel economy number attached to it and that no one knew the fuel economy or performance for the engine because Navistar did not intend to sell it. David Foster, one of the SEC's experts, opined that a heavy-duty on-highway truck using the first prototype engine would have experienced poor performance, had difficulty accelerating and driving up an incline, and had worse fuel economy than Navistar's 13-liter engines then on the road.

In preparing the certification application, Navistar engineers discussed alternatives to new DF testing, which took time and was costly. Navistar had previously submitted applications to the EPA that did not include full DF testing, at which time the EPA agreed to use carryover DF or other alternatives. But, on February 18, 2011, Greg Orehowsky, who worked in the EPA's Compliance and Innovative Strategies Division of the Office of Transportation and Air Quality, informed Kramer that the EPA would not accept carryover DF for purposes of certifying the first prototype engine. Kramer sent Orehowsky's email to Piech, Ostarello, Iwaszkiewicz, Zukouski, and Ade Adekanmbi, stating "EPA has officially rejected NAV bid to use the 2010 MF13 durability DF for the D-cert 0.2g Nox in-cyl certification. Reasons . . . are exactly counter to our arguments in favor of carryover. From discussion with Dave, I will acknowledge receipt of EPA's reply and inform that NAV will submit the certification data test results as a formality to enter queue." Doc. 258 ¶ 17.

On February 21, 2011, Navistar submitted a certification application to the EPA for a 13-liter EGR engine that met the 0.2g NOx standard. As part of the application, Kramer certified that the first prototype engine was tested in compliance with applicable test procedures and so conformed to the certification requirements. The February 2011 application used DF results for its current, 0.5g NOx 2011 MaxxForce 13 engine.

Internally, on the day that Navistar submitted its certification application, Kramer wrote that the "[d]urability data and results from the current [0.5g NOx] engine were used in the submittal despite EPA disallowing that version of durability demonstration." Doc. 255 ¶ 85. He also "highly recommend[ed] that this application formality NOT be portrayed as Navistar has received certification or EPA approval." *Id.* Kramer testified that he expected that Navistar and the EPA would have a dialogue about DF alternatives after submitting the application, viewing full testing as a "waste of money." *Id.* ¶ 88(c). Younessi forwarded Kramer's email to Ustian that same day, stating that Ostarello would be "working on the DF that EPA has issues with." *Id.* ¶ 85. Ustian responded that "Kramers points are obvious." *Id.* Ustian understood that discussions with the EPA about DF were common and that Navistar had a history of the EPA granting its requests to use carryover DF. He relied on the Senior Engineering Group's belief that Navistar and the EPA would resolve any differences over DF testing. And despite the DF testing concerns, at the time Navistar submitted the application, Kramer and Ostarello both thought that the EPA would certify the engine. But Piech considered it unlikely that the EPA would approve the use of carryover DF in the February 2011 application. He shared this pessimism with Ustian in a slide presentation sent on February 21, which indicated that the use of carryover DF threatened certification.

In a March 1 email, a Navistar employee warned Navistar executives, including Iwaszkiewicz, Ostarello, and Zukouski, to be careful how they described the first prototype engine to a reporter because it was clear to him that "the D-Cert power curve is not drive-able or saleable." *Id.* ¶ 81. Ostarello forwarded the email to Younessi, suggesting that Younessi consult Ustian on the engine issues Waller identified. Younessi responded that Ustian "totally knows it"

15

and advised Ostarello to "[t]ell these guys to not worry about this sh[--] and not keep sending emails to each other." *Id.*

On March 18, Kramer emailed Piech, Ostarello, Charbonneau, and Iwaszkiewicz, reporting that the EPA provided "thoughtful insight and even suggestion of what Navistar might do, outside of technical dyno durability demonstration, to accomplish certification requirements for DF." *Id.* ¶ 88. Navistar continued to work on finding a solution to the DF testing requirement, but, on May 26, 2011, Kramer admitted to Charbonneau that Navistar had made "very little" progress with the EPA. *Id.* ¶ 100.

At some point in 2011, Navistar abandoned the February 2011 application. The EPA did not agree to Navistar's proposal to use carryover DF testing, and Navistar refused to perform the DF testing that the EPA was requiring. As a result, the EPA never approved the February 2011 application, although it also did not officially deny it. Navistar did not officially announce its abandonment of the February 2011 application, apparently causing some confusion about the status of the application even into 2012. For example, Nathan Kieffer, a buy-side analyst at Wellington Management Company, which had invested some of its clients' assets in Navistar, asked Navistar in January 2012 whether Navistar correctly indicated in its April 2011 press release that it had submitted its MaxxForce 13 engine at 0.2g NOx for certification.

### 2. Navistar Statements about the February 2012 Application and Reactions

#### a. The November 2010 Press Release

On November 3, 2010, Navistar issued a press release (the "November 2010 press release") stating that Navistar had submitted for EPA certification of a 15-liter 0.50 NOx

engine[14] and "plan[ned] to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required." *Id.* ¶ 58. Ustian reviewed and provided content and feedback for the press release.

The same day as the November 2010 press release, Ustian told reporters during a tour of Navistar's Huntsville, Alabama plant that Navistar would not produce an engine meeting the 0.2g NOx standard for another two years, with Navistar using that time to perfect fuel economy. Ustian testified that he discussed this two-year timeframe because he believed that Navistar had two years of emission credits remaining. Younessi also told the press that Navistar intended to wait until its credits expired to produce its 0.2g NOx engine but that it wanted to demonstrate through certification that Navistar had a working solution to put into practice when necessary. A Navistar employee sent some of the news articles covering the tour to Ustian the following day, noting the "overwhelmingly positive coverage." Doc. 255-3 at 81 (Ex. 70). Among these was a November 4 *Fleet Owner* article that quoted Younessi's representation that Navistar was on its way to 0.2g NOx but "in a clever way, and improving fuel economy." Doc. 255 ¶ 46. *Fleet Owner* also noted that Younessi indicated that Navistar was already testing trucks with these engines and projected improved fuel economy with the EGR engine. Later, on December 1, *Truck News* published an article about Navistar's plans to submit its 0.2g NOx certification application within months but wait several years before commercializing that engine. *Truck News* noted Ustian's explanation that the plan should give the industry "the peace of mind of knowing it is possible" while reducing customer disruption. *Id.* ¶ 75(a). It also reported on Navistar's claim to improve fuel economy by as much as five percent with the new engines.

---

[14] This 15-liter engine had competitive fuel economy and other performance features comparable to other 15-liter engines in the marketplace and so Navistar intended to and ultimately did sell that engine.

17

Analysts also reported on the press release and plant tour. Younessi forwarded an excerpt of an Avondale Partners report to Ustian on November 4. Avondale Partners reported raising its rating of Navistar to "Market Outperform," noting that Navistar's expected 0.2g NOx certification filing was "an ingenious PR move towards both customers and competitors." *Id.* ¶ 64. Avondale Partners also indicated it expected Navistar to "recoup some skepticism from fleets as it proves that its technology is not just an 'interim technology.'" *Id.* But the report acknowledged "concerns over NAV's ability to address all of our concerns around current supply chain issues, 13L durability and promised fuel economy (or fluid economy) benefits." *Id.* ¶ 66(a). Barclays Capital recognized Navistar's intended EPA certification application was intended to "dispel concerns that its EGR technology will not be able to reach the standard." *Id.* ¶ 65. Kieffer wrote an email to others at Wellington on November 11, reporting that Navistar's plans to submit for certification "would take away one of the key arguments of SCR advocates – that the EGR engine will be Beta to SCR's VHS once NAV's credits run out." *Id.* ¶ 68. He testified that he understood Navistar to have an economically viable product based on its announcement of the intended certification filing. But Boenning & Scattergood shared two industry experts' opinions that Navistar's EGR technology "cannot simultaneously achieve the EPA NOx criterion and customers' needs for fuel efficiency." *Id.* ¶ 66(b).

### b.      The December 2010 Analyst Call

As in prior years, Navistar disclosed in its 2010 10-K annual report the risk that its "technology solution to meet U.S. federal and state emissions standards may not be successful or may be more costly than planned."[15] *Id.* ¶ 44. It followed the filing with a conference call with securities analysts and the investing public on December 22, 2010 (the "December 2010 analyst

---

[15] The 2008 and 2009 10-Ks did not mention state emission requirements, speaking only about "U.S. federal 2010 emissions standards." Doc. 255 ¶ 44.

call"). David Leiker, a Baird analyst, asked about Navistar's timeline for certifying a 13-liter

0.2g NOx engine, and Ustian replied:

> . . . [Navistar] will submit that over the next couple of months I
> believe. We will show you that product, by the way in Melrose
> Park on the 25th. We will show you the modifications. It won't be
> a great drama to you because you won't be able to see anything
> other than -- we would be able to show you the data that it meets
> [the 0.2g NOx standard] and show you how we are able to meet it.
> But as far as the customers, he is not going to know the difference.
> Nothing looks any different.

Doc. 255-3 at 184 (Ex. 80). Asked by Duignan, the J.P. Morgan analyst, about the fuel

efficiency of Navistar's 13-liter 0.2g NOx engine versus a competitor-SCR engine, Ustian said,

"[t]he fuel economy of [Navistar's engine] will be better and there will be no change in heat

rejection at the same time. So this product will be even better." *Id.* at 190–91. Duignan also

asked whether Navistar's 13-liter 0.2g NOx engine would be better than a comparable SCR

engine, to which Ustian responded, "Well, our strategy has been we will be equal to any SCR --

the best of any SCR product that is out there. So we are assuming the SCR product gets a little

better too, and that is what we are going to be able to do with getting to 0.2." *Id.* at 191.

Ostarello and Iwaszkiewicz both testified that they believed Ustian's statements on the call were

true and not misleading, and did not know of any facts inconsistent with those statements.

Volkmann, the Jefferies analyst, participated in the December 2010 analyst call and

testified that he assumed at the time that Navistar had run comparisons of fuel economy between

its EGR engine and competing SCR engines. Avondale Partners' report the following day

reiterated its belief that "demonstration of meeting the full emission requirements with the

current technology is an important component of the company's longer term success." Doc. 255

¶ 76. Boenning & Scattergood noted that the "MaxxForce saga continues" in part because the

mileage issue "remains an unanswered question." *Id.* ¶ 78. *The Lockwood Report* published an

19

article that quoted an industry expert's opinion that an EGR engine could meet the 0.2g NOx standard but "perhaps with an intolerable fuel-economy penalty." *Id.*

In late December 2010, a Navistar attorney drafted answers to a newspaper reporter's questions that indicated Navistar expected to submit applications for 0.2g NOx certification without using credits in the coming months and that "those engines will also have great fuel efficiency and low green house gas emissions." *Id.* ¶ 77. Ustian indicated he was "directionally . . . okay" with the answer but that the executive to be quoted would need to "judge what to do with it." *Id.*

### c. The March 2011 Analyst Call

On March 9, 2011, Navistar executives, including Ustian, held a conference call with securities analysts (the "March 2011 analyst call"). Ustian spoke about the February 2011 application:

> Now let's talk about in-cylinder 0.2. One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder. Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over.
>
> We want to get in front of the 0.2 now, because we can anticipate there is a next one coming out that 0.2 can't be done. So what we did is we submitted to the EPA a certification of 0.2 to take that argument away. We don't plan on using this for a while, but we are going to have it out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well. So [t]hat's what we have done. When you hear about that, it's not that it's coming into production tomorrow. It's just to get it out there and take all that argument away.

*Id.* ¶ 93.[16] Liptak asked Ustian about the fuel economy of Navistar's 0.2g NOx engines, and he responded that Navistar was "exhibiting that fuel economy is stronger" than its competitors' engines and "in good shape on fuel economy." Doc. 258 ¶ 19. Both Ostarello and Iwaszkiewicz testified that they believed Ustian's statements were accurate.

Based in part on the March 2011 analyst call, Kubacki understood that the first prototype engine complied with EPA standards, was competitive in the market with respect to fuel economy and performance, and was capable of going into production after certification. She nonetheless had concerns that Navistar could produce such an engine because it had not yet delivered such a product. Volkmann testified that he thought that Navistar would sell the engine in Navistar's February 2011 application had the EPA certified it. Casey, the Wells Fargo analyst, expected the same, although he was skeptical that Navistar's EGR engine would have performance features that matched those of SCR engines based on information he gathered from other industry participants. And Gabelli & Co.'s March 10 report described the application as "primarily . . . a marketing tool to address critics of EGR." Doc. 255 ¶ 98(a).

### d. The April 2011 Press Release

On April 5, 2011, Navistar issued a statement (the "April 2011 press release"), which Ustian reviewed and approved. The press release had as its headline "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine at 0.39 NOx" and its sub-headline "With EPA and CARB [California Air Resources Board] Certification of MaxxForce 15, Submission of MaxxForce 13 at 0.2g NOx, Company Continues to Make Strides in its In-Cylinder Emissions Technology Path." *Id.* ¶ 93. The press release stated that Navistar submitted the first prototype engine for certification, "once again reiterating its prime technology path in

---

[16] Ustian testified that the transcript misattributes the statement "so that's what we have done" to him. Doc. 255 ¶ 94.

meeting the 0.20g NOx standard through in-cylinder technology," and indicated that Navistar "intend[ed] to phase-in its engines at progressively lower NOx emissions levels . . . in the years ahead in an effort to make emissions compliance as seamless as possible to its customers." *Id.* Both Ostarello and Iwaszkiewicz testified that they believed in the accuracy of the statements in the April 2011 press release.

A Morgan Stanley report that followed on April 11 described Navistar's February 2011 application as "more marketing than anything else to relieve NAV from EGR skepticism." *Id.* ¶ 99. And Avondale Partners reported on April 18 that "[e]ven though [Navistar] expects near-term approval of its current 13L engine at 0.2 gm NOx level, we don't expect the company to make any big announcements that it is going to be producing engines at that level." *Id.* ¶ 98(d). *Trucking Info* noted Navistar's intention to "phase-in" engines at lower emissions levels, while a Baird analyst report similarly reported Navistar's intention to continue using credits even after certification to "minimize degradation in fuel economy." *Id.* ¶ 99. And the *New York Times* published an article on April 5 noting the risks of Navistar's EGR-only strategy because fleet owners needed to see a clear advantage in operating costs and fuel efficiency.

### C. The Second 0.2g NOx 13-Liter Prototype Engine

#### 1. The January 2012 Application

Navistar had an engine program called 783.2, derivations of which it used in seeking EPA certification of a 0.2g NOx EGR engine in its January 2012 and May 2012 applications. For the second prototype engine that Navistar submitted in January 2012, Navistar used dual mapping to recalibrate its current production engine's software to reduce emissions to meet the 0.2g NOx standard in a testing lab only. Under "Map A," used when the second prototype engine was lab tested and when idle, the engine's emissions would meet the 0.2g NOx standard

but have severely reduced fuel economy and performance. Under "Map B," triggered when the second prototype engine moved the vehicle it powered more than 0.1 miles per hour—essentially once the vehicle was in motion—the engine engaged "Safe Operating Mode," meaning the fuel economy and performance would improve but the engine's emissions would exceed 0.2g NOx. Safe Operating Mode was active and operated in all climactic conditions, speeds, and loads other than idle. Navistar engineers knew of the regulations surrounding defeat devices. The Senior Engineering Group consistently told Ustian that the second prototype engine, even with dual mapping, followed the law and did not include a defeat device.

On December 16, Navistar's Iwaszkiewicz, Kramer, Zukouski, Charbonneau, Ostarello, and Jack Allen met with the EPA's Bunker, Grundler, Orehowsky, Justin Greuel, and Matt Brusstar. The parties discussed a forthcoming application for a 0.2g NOx EGR engine. Bunker reported that Navistar described an engine that would have high emissions outside of the test cell but would comply with the 0.2g NOx standard within the test cell. The EPA informed Navistar it would not accept such a solution. During the meeting, Ustian received an email from Allen reporting that the EPA was "[s]aying no because aecd at .6-.7 exceeds NTE limit of .3," although Navistar argued that the environmental impact of the second prototype engine did not differ from SCR. *Id.* ¶ 115. After the meeting ended, Ostarello sent Ustian emails that stated "[w]e failed," and "No go. Meeting over. Need to regroup." *Id.* But Ostarello also reported that Navistar continued speaking with Greuel, who understood that Navistar only needed NTE relief approximately 0.3g over the standard. After the meeting, Bunker sent Charbonneau and Allen an email indicating that the engine Navistar described for certification in February 2012 did not appear to meet the FTP, SET(RMC), and NTE requirements and that the EPA would not consider an NTE deficiency allowing emissions at a rate of 3.5 times the engine's family

23

emission limit that operates sixty to eighty percent of the time in-use to be a minor allowable deviation. Charbonneau forwarded Bunker's email to Ustian.

The next day, Navistar engineers met to discuss the EPA's concerns. Iwaszkiewicz summarized three options for 0.2g NOx certification developed in the meeting and shared them with Ostarello, Younessi, Kramer, and Zukouski. Navistar's engineers also presented multiple options to address the EPA's concerns to Ustian and Navistar's general counsel. No one informed Ustian after the December 16 EPA meeting that Navistar's engine did not meet emission standards, and Ustian believed Navistar could address the EPA's concerns.

Navistar continued moving forward with the second prototype engine. On January 20, Grundler sent Oge a Navistar press release that explained that Navistar would soon submit a 0.2g NOx engine for certification and that, at its February 1 analyst and investor day, Navistar would "walk investors through the company's path to bringing to market this .2 engine, which combines all of the convenience of an in-cylinder emissions solution with market leading vehicle performance and fluid economy." *Id.* ¶ 138. Oge remarked that the press release was "amazing" considering the fact that Navistar remained far from achieving a certified 0.2g NOx engine.

But on January 25, Zukouski informed Ustian that the second prototype engine met the certification testing requirements at Southwest Research Institute. Zukouski also indicated that, for NTE, the engine remained at 0.5g due to Navistar's desire "to keep the current fuel economy and performance." *Id.* ¶ 140. He noted that "[w]ithout hardware changes it will be very difficult to gain much ground lowering the NTE." *Id.* Nonetheless, the Senior Engineering Group continued to tell Ustian that the test results indicated that the engine met EPA certification requirements, with Ustian understanding that the Navistar engineers believed the EPA would certify the second prototype engine given the EPA's prior certification of SCR engines.

Subsequently, on January 31, 2012, Navistar submitted its second application to the EPA for a certificate of conformity for a 13-liter EGR engine with emissions meeting the 0.2g NOx standard.[17] Navistar requested an approval date of June 15, 2012. Adekanmbi signed the supporting certificate of compliance.

On February 6, Oge emailed Gina McCarthy, a senior EPA official who later became the EPA Administrator, noting "[j]ust how bad" the January 2012 application was, using as an example the fact that "[t]he engine defaults to .5 at any speed above 1MPH!!" *Id.* ¶ 145. Oge relayed the EPA's plan to send Navistar a formal letter identifying the "numerous problems" with Navistar's engine. *Id.* On February 15, Grundler sent Oge an email outlining his preliminary review of the application and its "numerous deficiencies," with the "most glaring" being "that the engine uses a control strategy (AECD) that causes the engine to exceed the applicable NOx standard 100% of the time the vehicle is moving," making it a defeat device. *Id.* ¶ 146. The EPA formalized its concerns in a February 17 email, with a five-page attachment, to Navistar. The EPA informed Navistar of its preliminary view that the January 2012 application "raises several serious concerns that would need to be discussed and resolved before a decision could be made to approve the application" and invited Navistar to provide supplemental information in writing and schedule a meeting after doing so. *Id.* ¶ 147. The EPA indicated that, because NTE deficiencies only allowed for minor deviations under limited conditions, the Safe Operating Mode AECD did not meet that scope. The EPA noted that, in any real-world driving, Safe Operating Mode would be active and switch to a high NOx calibration that exceeded the NTE limit over the entire engine operating map. Piech considered the written response atypical

---

[17] Navistar had two other 13-liter families, in addition to one 11-liter family and two 15-liter families in its heavy-heavy engine lines. It intended to submit certification applications for these other heavy-heavy engines once the EPA approved the January 2012 application.

because, in his experience, the EPA engaged in an informal back-and-forth process instead of a formal, point-by-point response.

Ustian knew of the EPA's February 17, 2012, response, but he did not recall receiving it and testified he would not have understood it if he had received it. After speaking with Ustian on February 23, Younessi relayed the message that everyone should focus "on the 0.2gNox solution and the fact that EPA has done us wrong." *Id.* ¶ 153. In spite of the negative response from the EPA, Ostarello and Iwaszkiewicz continued to believe that Navistar could achieve certification. But Ostarello also noted that Navistar was "getting nowhere with agencies" and that the EPA "keep[s] digging in even harder the harder we try." *Id.* ¶ 152. Younessi considered the EPA's response a "total bummer" and told Hebe that the EPA had rejected everything Navistar submitted and did not want to discuss the issue further. *Id.* Hebe understood from this that the EPA was "going backwards on what [Navistar] had assumed was ok." *Id.* By early March 2012, Piech did not believe it was likely that the EPA would certify the engine.

On February 27, Navistar responded to the EPA's letter. Navistar's response challenged the EPA's regulatory interpretations, explained that Navistar was following prior EPA guidance, and requested an NTE deficiency. Younessi sent Ustian a copy of the letter and indicated that Ostarello, Piech, Steve Covey, Navistar's general counsel, another in-house attorney, and outside counsel had reviewed the letter before it went out. Navistar also sought a meeting with the EPA. On March 1, Greuel responded, indicating that the EPA needed some time to digest Navistar's February 27 letter but would "work as quickly as possible to respond." *Id.* ¶ 156. Greuel also stated that the EPA would use information from Navistar's response "as an agenda for a fruitful meeting in the near future." *Id.* Iwaszkiewicz forwarded Greuel's message to Ustian. Despite Greuel's email, the EPA never sent a formal reply to Navistar's February 27 letter.

On March 16, Ustian expressed his frustration with the EPA to Charbonneau:

> Asks byron if this is different methodology.  Ask byron, given we
> cant ship 15L trucks, given, these are new measurements given, we
> agreed that we are not asking for new rules but live to ones already
> there, given they have new interpretation 2 years into 2010 regs,
> given the incredible perhaps not recoverable damage, etc etc
> . . . . what does he expect navistar to do?  This does sound like the
> epa lawyers are in court and they are the judge and jury.  What
> does he expect us to do?  We need his help.

Doc. 255-5 at 199 (Ex. 177).  On March 17, Ustian told Younessi "F [the EPA].  Give them

nothing."  Doc. 255 ¶ 191.  On March 26, Ustian remarked to Charbonneau that the EPA was in

"hurt Navistar mode."  *Id.* ¶ 192.

But Ustian appeared to change his tune during an April 16 meeting of the Executive

Committee of Navistar's Board of Directors.  According to Michael Hammes, Navistar's lead

director, at that meeting, Ustian, along with other management representatives, confirmed the

likelihood of EPA approval.  Hammes also informed Ustian that a UAW emission expert had

reviewed the January 2012 application and agreed with Navistar's engineers that the EPA would

likely approve the application.  Hammes ultimately agreed with that judgment and that Navistar

should stay the course.

The EPA's actions in April contradicted Navistar's positive assessment, however.

Navistar met with the EPA on April 5, after which Iwaszkiewicz remarked that the second

prototype engine was "FUBAR forget about it!"[18]  *Id.* ¶ 196.  And during an April 19 meeting

with Navistar, Bunker recounted that the EPA was "unequivocal that [Navistar] would not get a

certificate for the engine as configured."  *Id.* ¶ 199.  But Bunker also noted that the EPA offered

to meet with Navistar again and that Navistar did not have a final agency decision it could

appeal.  Younessi left the April 19 meeting with the impression that the EPA had suggested a

---

[18] FUBAR stood for "f***ed up beyond all recognition."  Doc. 255 ¶ 196.

viable methodology for Navistar to use to obtain certification. Despite this confidence, on April 23, Younessi commented to Ostarello and others that "thanks to the EPA, the probability of getting a 0.2gNox cert prior to the next analyst call is very low. We are trying like hell." *Id.* ¶ 197. Ultimately, Navistar withdrew the January 2012 application.

### 2. Pursuit of NCPs as a Stop-Gap Measure

In September 2011, Navistar internally projected that it would run out of emission credits for its 11-, 13-, and 15-liter engines by February 2012. If Navistar did not obtain EPA certification at 0.2g NOx by that time, and without another option, Navistar would not be able to sell certified engines. In response to an analyst question about timing and the status of its application in October 2011, Ustian indicated Navistar should respond by "dodg[ing] and tell[ing] them we have .2 solution ready and testing in field for electronics is what's left," with the change "modestly improv[ing] fuel economy" but requiring "miles and electronics to prove out." *Id.* ¶ 107.

On October 21, Ustian met with Oge to discuss Navistar's plans for compliance with the 0.2g NOx standard by using its credits and potentially NCPs. Charbonneau sent Ustian a background book before the meeting, noting under "meeting goals" that Navistar had "engines that meet the emissions goals and are fuel efficient" but needed "time to do the testing that meets [its] reliability objective and have [its] suppliers prepare for production." *Id.* ¶ 108. At the meeting, Ustian reported to Oge that Navistar had credits for three additional months. Several days later, Charbonneau reported a revised internal calculation of February 23, 2012, as the date on which Navistar would run out of emission credits.

The parties followed up the October meeting with one on December 9 that included Ustian and Charbonneau from Navistar and Oge, Bunker, and McCarthy from the EPA. Before

the meeting, Oge received suggested talking points that "Navistar is responsible for the bind they are now in" because they waited until October to inform the EPA that they would run out of credits in February 2012.[19] *Id.* ¶ 111. Charbonneau also provided Ustian with draft talking points, including the suggestion that Navistar obtain certification of its current products using an AECD and an NTE deficiency. After the meeting, on December 12, Oge emailed Ustian and Charbonneau, indicating that the EPA was "surprised, but of course pleased, to learn that your current 0.5 g NOx engine can be recalibrated to meet the 0.2 g NOx standard." *Id.* ¶ 114. Absent certification, Oge reiterated that the EPA would have to act quickly to implement an emergency rule allowing Navistar to pay NCPs on a per-engine basis.

On January 31, 2012, the EPA promulgated an interim final rule ("IFR") to allow Navistar to certify its engines at 0.5g NOx by paying NCPs. The same day, the EPA proposed a final NCP rule along those lines and sought public comment. These rulemaking proceedings became public when posted to the public docket. Because of the IFR, Navistar could comply with the 0.2g NOx standard by using its emission credits or paying NCPs for its 0.5g NOx engines, which the EPA had already certified at the 0.5g NOx standard. California and nine other states did not permit NCPs, so Navistar used its emission credits in those states and NCPs in the others. Piech testified that Navistar paid approximately $2,000 in NCPs per engine to the EPA, approximately double the amount Navistar had previously said would be a non-starter.

On a February 1, 2012 analyst call, Jeff Kauffman of Sterne Agee, asked about a Plan B if the EPA did not certify Navistar's 0.2g NOx engine in time. Ustian indicated that the EPA

---

[19] In their statement of facts, the parties include conflicting information about whether the EPA and Navistar were in settlement negotiations in November and December 2011, with some of the documents labeled as "settlement privileged" or similar. *See* Doc. 255 ¶¶ 111, 114. The parties have filed motions *in limine* to exclude such documents at trial. *See* Docs. 280, 283. But because the parties do not contest the admissibility of this information for purposes of summary judgment, the Court need not address the question of admissibility here.

was working on making NCP credits available to Navistar but that Navistar did not "have a plan on using Plan B, but that is Plan B and why it is out there, to take away the risk." Doc. 258 ¶ 30. Both Hebe and Allen noted that certification issues, including the need to pay NCPs, had contributed to bring Navistar's truck sales to a standstill by February 2012.

On February 7, 2012, Mack and Volvo, Navistar competitors, filed a petition for review challenging the IFR in the U.S. Court of Appeals for the D.C. Circuit, captioned *Mack Trucks Inc. and Volvo Group North America, LLC v. United States Environmental Protection Agency*, No. 12-1077 (D.C. Cir.) ("*Mack Trucks v. EPA* litigation"). Navistar moved to intervene in the litigation on February 28, stating that "[m]aking NCPs available through this Interim Final Rule is the only way to ensure that [Navistar's] depletion of its NOx credits will not force it to cease production of heavy heavy-duty engines this year." Doc. 255 ¶ 164.

In addition to the litigation in the D.C. Circuit, Mack and Volvo also asked the EPA for a stay of the IFR, contending that no evidence existed that Navistar could not comply based solely on technological, as opposed to economic, reasons, making NCPs inappropriate. On February 28, the EPA denied the request for a stay, highlighting its initial view that Navistar's January 2012 application had "several significant problems." *Id.* ¶ 165. Bunker provided Navistar with a copy of the letter on February 29. Although Bunker instructed EPA staffer Charles Moulis to place the letter on the public docket associated with the NCP rulemaking, the letter only posted to the public docket on April 16.

The EPA prepared a desk statement on its denial of the IFR stay request, providing its communication team with a standard response to anticipated public questions about the stay denial. The desk statement noted the EPA's substantial concerns with the January 2012 application and indicated that, despite its usual policy of not commenting on applications still

30

under EPA review, because the potential for certification formed a basis of the arguments for a stay, the "EPA felt compelled to describe its current assessment." *Id.* ¶ 176(a). The desk statement further noted that the EPA's assessment could change based on additional information or changes to the engine. Although the EPA did not publicly release the desk statement, Bunker testified that the EPA could share its contents with reporters and thus become public information.[20]

Navistar filed the EPA's February 28 letter in the *Mack Trucks v. EPA* litigation on March 1 as an attachment to its opposition to the petitioners' emergency motion for expedited review. On March 5, the D.C. Circuit granted Mack and Volvo's emergency motion. Navistar also submitted the EPA's February 28 letter as one of 346 attachments to its April 4 public comment on EPA's proposed NCP rulemaking and referred to the letter in the text of its comment. Navistar's comment also noted that the EPA had raised technical issues with Navistar's certification application and that Navistar was "undertaking yet more substantial work and implementing yet more technology advancements to achieve the remaining 0.30 g reduction in NOx emissions needed for the 0.20 NOx Standard." *Id.* ¶ 167.

Unless filed under seal, federal court documents are publicly available through the PACER service. To access PACER, an individual needs a user id and password and may view documents by paying a per-page fee. Casey testified that he did not have familiarity with PACER but agreed that he could look up court filings and read them. He testified that he monitored the *Mack Trucks v. EPA* litigation, with his associate pulling publicly filed documents for him to read, but he did not recall the EPA letter. Kieffer and Duignan testified that they accessed court filings if they knew about them or thought they were relevant. But Kieffer also

---

[20] The parties do not discuss whether the EPA actually shared the contents of this desk statement with anyone.

testified that he did not recall reviewing the EPA's February 28 letter, noting that "you can go awry trying to interpret legal documents as a nonlawyer and investor." *Id.* ¶ 174. Volkmann testified that he did not recall the EPA's February 28 letter or consider it public information because it was not available on the SEC website or any other place where Navistar put its filings, meaning it would have taken "some unusual digging . . . to find." *Id.* ¶ 173. Empyrean Capital Partners LP's investor representative, Steve Kawaja, also did not recall monitoring the *Mack Trucks v. EPA* litigation. And none of the reports issued by sell-side analysts in March 2012 mentioned the EPA's February 28 letter.

### 3. Lobbying Campaign for EPA Certification

The EPA's Grundler testified that it was unusual for an engine manufacturer to bring an EPA certification issue to the political level. But Navistar began pursuing a lobbying campaign in connection with seeking certification of the second prototype engine, a step Ustian could not recall Navistar taking in connection with any other certification.

On December 16, 2011, Charbonneau emailed Ustian that he had "set the stage" to discuss Navistar's perception that the EPA was treating it on an unlevel playing field with Bill Daley, President Obama's chief of staff at that time. Doc. 258 ¶ 25. In a followup email on December 20, Charbonneau forwarded a proposed presentation for a meeting with Daley to Ustian. Charbonneau reiterated that Bunker did not want to approve an NTE deficiency above 0.3g NOx or an AECD that was not on 100% of the time, stating "not that he can't, he doesn't want to." Doc. 255 ¶ 117. The presentation noted Navistar's discussions with the EPA about the need for a level playing field with SCR had been to no avail, the potential serious damage to Navistar arising from payment of NCPs, and the EPA's ability to fix the problem by certifying Navistar's engines at 0.2g NOx with an NTE deficiency.

32

Navistar continued its lobbying campaign in 2012, hiring Tyrone Fahner, a former Illinois Attorney General, to help with the certification process. Fahner understood that Navistar had a good product that several low-level EPA employees in Ann Arbor, Michigan were blocking from certification. Fahner called Valerie Jarrett, a special assistant to President Obama, about the EPA's refusal to certify Navistar's engine. Shortly after making this call, on January 23, 2012, Fahner, Ustian, and Charbonneau met with McCarthy and other EPA officials, where Fahner mentioned his call to Jarrett. Grundler prepared briefing notes for McCarthy, noting that "Navistar has proposed that we issue a certificate at 0.2 g for their 0.5 g engine design if it was rigged to meet 0.2 in the test cell while continuing the same as today on the road. We have told Navistar no to this proposal on numerous occasions. Navistar has re-raised it to us again and again described in different ways but always with essentially the same physical reality." *Id.* ¶ 137. Essentially, Grundler told McCarthy that Navistar wanted the EPA to either relax the 0.2g NOx standard or certify compliance despite failing to meet the standard. During the meeting, Ustian told McCarthy to order the EPA officials in Ann Arbor to issue the certificate, and McCarthy responded that she would not do so. Charbonneau later recalled that Navistar's "political pressure through Valerie Jarrett to EPA Administrator to Gina helped make [the January 23] conversation more positive." Doc. 258 ¶ 27.

Later, on March 9, Charbonneau presented Ustian with a draft presentation for an upcoming meeting with U.S. Senator Richard Durbin, which included a slide titled "EPA's Unfair Bias" that discussed the perceived unlevel playing field for Navistar in comparison to the SCR engines the EPA had certified. The presentation also noted that certification dialogue with the EPA regarding a 0.2g NOx engine had stopped, with the EPA requesting that all communication be in writing, and that the EPA refused to discuss SCR issues with Navistar. The

33

presentation also noted that the EPA ignored warnings that NCPs would devastate Navistar and

that the evidence after one month included dramatic order reductions, with fifty percent of

customers surveyed indicating they would not buy Navistar products because of NCPs. Navistar

planned to suggest to Senator Durbin that the solution was simply EPA certification of Navistar's

current engine. On March 28, in the meeting with Senator Durbin, Ustian relayed that Navistar

was at a stalemate with the EPA and had struggled to get its 0.2g NOx engine approved, in part

because the EPA had changed its interpretation of the regulations.

### 4. Navistar Statements about the January 2012 Application and Reactions

#### a. The December 2011 10-K

Navistar filed its 2011 10-K annual report on December 20, 2011 (the "December 2011

10-K"), writing that:

> We plan to submit certification applications to both EPA and
> CARB in the near future. We believe that our engines meet both
> agencies' certification requirements. We are engaged in ongoing
> discussions with officials from both EPA and CARB regarding
> potential regulatory solutions that would permit us to continue
> uninterrupted production of all of our engines. We cannot predict
> the outcome of these discussions nor the effect they may have on
> our business or financial condition, results of operation or cash
> flows.

Doc. 255 ¶ 118. As in prior years, Navistar included as a "Risk Factor" in the report that its

"solutions for meeting U.S. federal and state emissions requirements may not be successful or

may be more costly than planned." *Id.* The 10-K explained that, unlike most other truck and

engine manufacturers who used SCR systems to meet the 2010 emission standards, Navistar

chose an alternate solution, which allowed Navistar to accumulate emission credits that it

expected to use up some time in 2012. In connection with the expiration of these credits,

Navistar noted its "ongoing discussions with officials from both EPA and CARB regarding

potential regulatory solutions that would permit [it] to continue uninterrupted production of all of [its] engines." Doc. 255-4 at 148 (Ex. 133). Ustian reviewed and approved the December 2011 10-K before filing, and he signed and certified the report in his capacity as Navistar President and CEO. He testified that he believed the December 2011 10-K statements about the certification process were accurate based on Navistar engineers' professed ability to address the EPA's concerns and their plans to make design changes by January 31, 2012. Both Iwaszkiewicz and Ostarello testified that they considered the December 2011 10-K statements about certification accurate.

Navistar had the responsibility to ensure its public disclosures were accurate, with the EPA having no role in reviewing those disclosures.[21] Navistar used a disclosure committee to help prepare its SEC filings. The certification process for Navistar's disclosures started at the lower levels of the company to determine relevant issues for filing. This process also included consulting Navistar's ethics hotline, which provided information to the disclosure committee through an outside service. Navistar typically went through multiple drafts of the filings, including review by its general counsel and KPMG, before Ustian's sign off. Covey testified that approximately seven different Navistar lawyers contributed to the disclosure process related to Navistar's efforts to meet emission standards in the December 2011 10-K. Piech also reviewed Navistar's SEC filings related to emission requirements. Covey was "reasonably certain" that he wrote the sentences concerning Navistar's plan to submit certification applications and its belief that the engines met certification requirements in the December 2011

---

[21] Although the EPA had no responsibility for ensuring the accuracy of Navistar's securities filings, between 2010 and 2012, Bunker shared his concern about the accuracy of Navistar's public filings and statements with the EPA's Office of General Counsel. No one from the EPA took action or communicated the subject matter of these conversations to Navistar.

35

10-K. Doc. 255 ¶ 120. Ustian understood that the disclosure committee reviewed Navistar's SEC filings before filing.

After Navistar filed the December 2011 10-K, a Wells Fargo analyst report noted that Navistar would completely exhaust its emission credits in February 2012 and would need to either fully comply with the emission standards or find another way to continue selling trucks at that time. Casey testified that he believed Navistar's statements meant that Navistar was close to receiving EPA certification. He would have found it helpful to know at the end of 2011 that the EPA had serious concerns about Navistar's February 2011 application, testifying that information would have led Wells Fargo to place a different risk profile on Navistar. Wellington's Kieffer had a positive call with Ustian the day Navistar filed the December 2011 10-K, which he arranged through Navistar's investor relations department. Although Ustian would not specify a date in 2012 by which Navistar would run out of credits, Kieffer came away from the call thinking that it could be mid-2012 or later and that Ustian sounded confident in obtaining certification "with no fuel degradation and slightly higher pressure." *Id.* ¶ 129. Kieffer thought that a slight amount of fuel degradation would "not be the end of the world" and reported that Navistar "remain[ed] a risk but with the news out and at $39 [he was] going to take the high probability bet and assume they get approval." *Id.* ¶ 129.

#### b.       March 2012 Statements

On March 2, 2012, Ustian received a copy of Avondale Partners' report previewing Navistar's first quarter 2012 earnings report, which stated that "[i]t's all about the EPA certification." *Id.* ¶ 178. Avondale Partners indicated it expected Navistar to begin incurring fines on engines produced in March but that the fines were built into the stock price so that their impact would be confined to the next two quarters at most. The consensus estimate had Navistar

losing $0.17 per share, while Avondale Partners estimated a loss of $0.22. A March 2 Buckingham Research Group report noted a near-term risk with Navistar stock based on "the combination of the dispute with the EPA and competitors as well as the pending application of Navistar's 13 liter engine to meet the 2010 emission standards." *Id.* ¶ 172(c).

On March 6, Ustian learned from a dealer survey that dealers did not expect EPA certification until August. When asked for the company stance, Ustian responded that Navistar had "submitted to EPA for approval. That process takes 60 to 90 days normally but we hope for faster[.] We will be ready in June to have this ready for production. So approval maybe april, production June." *Id.* ¶ 180. That same day, Younessi confirmed to Ustian that Navistar internally expected to have production ready on June 1.

On March 8, Navistar filed its 10-Q quarterly report (the "March 2012 10-Q"), which Ustian reviewed and approved and then signed and certified as Navistar's President and CEO. The report stated that:

> We reached a number of key milestones during the quarter that we believe will contribute to our long-term, strategic profitability goals. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. We formally submitted our 0.2g NOx in-cylinder engine certification data for our 13L engine to the United States Environmental Protection Agency ("EPA") on January 31, 2012, and to the California Air Resources Board ("CARB") on February 17, 2012 (collectively, our "0.2g NOx Engine Submission"). These submissions are under review by EPA and CARB and we are engaged in ongoing discussions relating to our engine certification.

*Id.* ¶ 182. The March 2012 10-Q also disclosed that Navistar projected paying $25 million in NCPs for the remainder of 2012.

Navistar followed up the filing of the March 2012 10-Q with a press release (the "March 8 press release"), which Ustian reviewed and approved. The press release quoted Ustian as

37

saying that Navistar "[s]trategically . . . achieved a number of key milestones in the first quarter, including [its] submission of a 0.2 NOx engine for EPA certification." *Id.* Navistar also held a conference call with analysts and investors about the March 2012 10-Q on March 8 (the "March 2012 analyst call"). Ustian discussed the inclusion of $25 million in NCPs, acknowledging this number differed somewhat from what Navistar conveyed during the February 1 analyst day and explaining:

> There was a lot of noise out there about how long these NCPs would last. So what we did is in the ten states that require[ ] no NCPs, we're going to use credits for those, and the 40 states, we're going to use the NCPs. So that should take us through the year to try to quiet down the noise of the uncertainty that some have had out there about whether we can ship products. So we feel this is the best answer for us for this year, and we've included in here $0.5 million worth of cost in our guidance.

*Id.* ¶ 184. When asked by an analyst "how many months you are assuming the NCP payments continue for that $25 million hit," Ustian responded by saying:

> [H]ere's maybe a way to look at it. We have submitted for the $22 million[22] and that goes through a process of—typically, that's about three months, I think, is about the average of that. When we get the certification, it still takes some time for us to get to production on this. So what we are doing right now is getting ready to go to production, and it will be about June before we can get into production with that particular engine. So that kind of gives you a framework of where it would be. As for the preciseness of it, we can't tell you, but our objective is to be in production on that in June.

*Id.*

On March 22, 2012, Navistar issued a press release in connection with the Mid-America Trucking Show (the "March 22 press release"), stating:

---

[22] The Court reproduces this answer as it appears in the underlying transcript. Doc. 255-5 at 32 (Ex. 172). The first amended complaint inserted ".2" in place of "$22 million." Doc. 67 ¶ 125. The parties replicated this transcription error in the Joint Statement of Facts. Doc. 255 ¶ 184.

> Navistar recently submitted to the U.S. Environmental Protection Agency (EPA) for certification its 0.20g NOx MaxxForce 13 big bore diesel engine. Once certified, Navistar will be the only engine manufacturer in the world to achieve urea-free 0.20g NOx emissions through in-cylinder technologies. During the certification process, Navistar is making preparations for launch of that engine this summer.

*Id.* This press release also discussed Navistar's production of over 40,000 EPA2010 MaxxForce 13 engines, touting "true operational benefits through higher payload and improved fuel efficiencies without the added weight, complexity and need for urea present in competitors heavy-duty engines." *Id.* The press release quoted Ustian as saying:

> In a little more than three years since our MaxxForce big bore engines were first introduced to the market, we've challenged convention in this industry and proven to our customers the benefits of our lightweight, fuel efficient and urea-free MaxxForce 13—growing our share of the big bore market to more than 20 percent today. Upon certification from the EPA and our full launch of our urea-free MaxxForce 13 at 0.20g NOx, we will have achieved precisely what we set out to do—provide customers with a no-hassle solution that keeps responsibility for emissions compliance with the manufacturer—not the vehicle owner or driver.

*Id.* Ustian provided this quote, and he reviewed and approved the press release.

Younessi testified that Ustian did not inaccurately respond to the analysts' questions. Ostarello testified that the statements in the March 2012 10-Q, March 8 press release, and March 2012 analyst call were accurate and consistent with Navistar's internal documents. Iwaszkiewicz testified similarly. Piech testified that he did not believe Navistar would achieve certification in the June timeframe because of the EPA's concerns with the dual mapping Navistar used and the need for new DF testing. Piech could not recall whether he communicated that belief to anyone at Navistar and admitted that it might take three months for the EPA to certify a typical application that did not need additional DF testing.

39

On March 8, a Deutsche Bank analyst report indicated that Navistar's guidance "now incorporates the assumption that Navistar will pay $25MM" in NCPs for the remainder of the year, based in part on the assumption of certification in the next few months. The report noted that the "timeline is not without risk given the unknown timing of EPA certification (which is largely out of Navistar's control)." *Id.* ¶ 186. A Baird report on March 9 stated that "[t]his summer, Navistar expects to ship fully compliant, EPA-2010 engines," while noting the key downside risks of the timing of the certification and payment of NCPs in the meantime. Doc. 258 ¶ 33. Wells Fargo reported on March 9 that Navistar expected certification by May 1 and production on June 1, but acknowledged that "[i]f the certification is delayed or the EPA does not grant certification, then our estimates may be too high." *Id.*

J.P. Morgan's March 22 analyst report expressed "doubt" about Navistar's claim that the EPA was "dragging its feet on approving the 13L engine" because the "EPA has little to gain by allowing non-compliant engines [to] run in the field" and highlighting reports that "suggest that the issues may be more technical" and would cause the EPA approval process to "drag into the summer." Doc. 255 ¶ 186. RBC Capital Markets' March 22 analyst report also noted the "question marks" surrounding Navistar's engine certification. *Id.* Despite Navistar's stated confidence that certification remained imminent, Barrington Research reported that the "problem for investors . . . is that NAV's current strategy requires a belief that management will be successful getting 2010 engine certification in 2012. EPA certification should be a somewhat routine activity, but the company's maverick engine strategy, prior legal suits against the EPA and technical problems related to engine calibrations, could result in continued delays and near-term market share declines." *Id.* Barrington Research also noted that although production should begin in June 2012, it "could push to July or August should the EPA continue a 'slow

walk' with the certification process," making 2012 "a messy period due to uncertainty and delay in transition to EPA compliance" even though "EPA compliance should soon get resolved." Doc. 258 ¶ 34. A March 22 Sterne Agee report stated that Navistar maintained that it had submitted a complying application in January 2012, expecting the certification process to take three to four months, meaning until May or June 2012.

After analysts and investors met with Ustian in Boston in early April, Baird issued a report on April 10, indicating that the meeting "affirmed our view that the stock offers a very attractive risk-reward opportunity" based on Navistar's continued expectation of certification in June. Doc. 255 ¶ 198. Kieffer also recalled a conversation with Navistar's investor relations personnel in April 2012 during which he understood that Navistar expected certification by June.

### D. The Third 0.2g NOx 13-Liter Prototype Engine

#### 1. The May 2012 Application

After determining that the EPA would not approve the January 2012 application, Navistar engineers turned to developing a third prototype engine to submit for certification. On May 3, Younessi reported to Ustian that this third prototype engine was on track with only positive progress to report, and, on May 8, Iwaszkiewicz informed Ustian of positive results on the initial drive evaluation.

On May 9, Bunker met with Charbonneau and Kramer, at which time Navistar indicated that because it had concluded that the EPA would not certify the January 2012 application, Navistar would withdraw that application and instead submit a new application with the third prototype engine that it hoped to produce in July. Bunker relayed Navistar's description of the third prototype engine to Oge, explaining it would be based on the same physical hardware as the second prototype engine but would have different control software. Bunker noted that Navistar

41

expected the "product to have a substantial fuel economy hit" and "barely acceptable acceleration performance." Doc. 255-5 at 357 (Ex. 197). Based on Bunker's description, Oge remarked that it sounded like the new engine would not perform well. Bunker agreed that it sounded "like it will perform badly for fuel economy, acceleration and most likely durability." Doc. 255 ¶ 201.

Navistar officially withdrew the January 2012 application on May 10. That same day, Charbonneau emailed a team of outside consultants, including Fahner, about the "critical decision point" Navistar had reached and the need for help to convince the EPA to "do[ ] the right thing." *Id.* ¶ 204. Bob Dole, who at the time worked for Alston & Bird, which Navistar had hired to assist with certification, emailed Jarrett on May 11 about Navistar. He told Jarrett of the need for administration and EPA leadership involvement in the certification issue that weekend. Dole recounted that "[a]n adverse decision will have major effects on the company's national labor force, suppliers, and dealers at this fragile time in our economic recovery." *Id.* ¶ 205. Charbonneau reported that the White House had become involved on May 11 and that Illinois Governor Pat Quinn's office had learned from the EPA that it would not make a negative decision but instead would receive Navistar's new certification application and make a decision by the beginning of June. But that same day, in an internal email to Oge and Grundler, Bunker indicated that the EPA could not comment on the likelihood of certification of Navistar's forthcoming application but that typically review of a new engine took several months.

Navistar submitted its third application for certification of a 13-liter engine meeting the 0.2g NOx standard on May 21, 2012. Kramer certified that the third prototype engine complied with all certification requirements, and Navistar requested an approval date of June 15, 2012. On

May 24, Navistar submitted a letter to the EPA on the public rulemaking docket in which it reiterated the need for NCPs notwithstanding potential certification of the third prototype engine.

On May 20, Zukouski represented to Ustian that even though the third prototype engine was over the 0.3g mark for steady state NTE, the engine would still pass an in-use audit. He further included data showing NOx levels at 0.197g on the FTP test. On May 24, Younessi provided other Navistar employees with a slide presentation that he had reviewed with Ustian. One of the slides, titled "Performance & Emissions Results," showed that for the third prototype engine's Map A, NOx was 0.18g, but for Map B, the NOx was 0.471g. On May 26, Charbonneau emailed Ustian and others, indicating that under real world conditions, the third prototype engine operated just above 0.3g NOx. He also noted the EPA's continued position that the third prototype engine could not reach 0.2g NOx. Ustian responded with suggestions for a conversation with Bunker, asking that Charbonneau focus on the fact that Navistar's engine met the tests and the rules as written and reflected in past practices, that the EPA was favoring SCR over EGR despite the fact that SCR had difficulties that the EPA had overlooked, and that he ask Bunker to explain why Navistar's engine did not meet the 0.2g NOx standard as written in the rules as opposed to the way Bunker wanted to interpret the rules. On May 27, Charbonneau informed Ustian that the FTP and RMC tests resulted in 0.2g NOx and that the engine could pass an NTE in-use test at 0.2g. On June 2, Kramer told Ustian that the engine would run no higher than 0.48g overall and 0.41g NTE.

On May 28, Iwaszkiewicz reported that the engine was always in Map B in the vehicle but in Map A on the dynamometer. Although both maps had the same setpoints at idle, switching to Map A in the vehicle caused the EGR cooler and the diesel particulate filter to plug within minutes, which was problematic. Navistar created a presentation for a meeting with the

43

EPA on May 30, which included an emission summary using Map B only that indicated that, for the FTP combined test, the engine had NOx levels of 0.42-0.43g, for RMC/SET 0.32-0.36g, and for NTE in-use, 0.43g.  Younessi thought that the May 30 meeting with the EPA went well, that the EPA would certify the engine soon, and that, if not, "it will be most ridiculous thing in the history of the man-kind."  *Id.* ¶ 217.  Ostarello reported that the May 30 meeting was "one of the better ones" even though the EPA indicated that its answer to certification that day would be negative because it also suggested wanting additional time to figure out how to certify the engine.  *Id.* ¶ 218.

At a June 4 meeting, the EPA expressed continuing concerns about Navistar's application, based in part on the fact that Map B had FTP emissions of 0.42g and would remain active at all times except for when the vehicle was idle.  Bunker reported that Navistar left the meeting "understanding [the EPA] would not be able to issue a certificate for this engine, and that [the EPA] would be sharing a written list of [its] reasons as soon as possible."  *Id.* ¶ 223.  After attending the meeting, Iwaszkiewicz characterized the EPA's feedback as "unequivocally NO!" with no room left for discretion.  *Id.* ¶ 224.  Another Navistar employee, Longry Wang, responded to Iwaszkiewicz that Ustian "has accepted the fact that we won't get cert by analyst call," to which Iwaszkiewicz commented that Ustian "must have another 'surprise' to confuse the analysts . . . NG [natural gas] worked good last time."  *Id.*  Shortly thereafter, Iwaszkiewicz wrote to Lowry retracting his prior comments on the meeting, stating "Dan put the gag order on us.  We are only allowed to say 'the agency has heard everything and will reply with a written summary.'  Please disregard my previous communication."  *Id.*  Kramer's notes from the June 4 meeting indicate that, although Bunker recognized Navistar's accomplishment in reducing in-use emission to 0.44g, the EPA took the position that the third prototype engine did not meet the 0.2g

44

NOx standard and that Navistar could not obtain certification by complying solely in the test cell but not in a vehicle. Reporting on Ustian's reaction to the June 4 meeting, Younessi told Ostarello that Ustian "was just using F . . . ." *Id.* ¶ 226.

On June 5, Bunker followed up on the previous day's meeting in an email to Charbonneau:

> [B]ased on the information provided, I believe that your engine is unlikely to receive a certificate of conformity as it is currently designed. We intend to send you a more detailed written response delineating all of our concerns. One of the most important concerns is that the engine will typically operate over FTP conditions at 0.42 g/hp-hr in any vehicle with mass less than 140,000 pounds and that starts in any gear less than 5 gear. Since vehicles are rarely heavier than 80,000 lbs and since 140,00 pound vehicles never start in fourth gear or higher, this means that under all in-use circumstances, this engine will have FTP emissions of 0.42 g/hp-hr.

*Id.* ¶ 229. Charbonneau forwarded Bunker's email to Ustian. Bunker testified that the EPA's review of the May 2012 application felt like "ground hog day" because it essentially had the same issues the EPA had previously identified with respect to the January 2012 application, including the presence of a defeat device. Ostarello did not believe Bunker's email on June 5 meant that the engine would never be certified but rather only started the process to address the EPA's concerns. Piech did not believe the EPA would certify the May 2012 application because the engine operated one way in a test cell but as a 0.5g NOx engine on the highway. Piech recalled that, by summer 2012, Iwaszkiewicz had also shared that he did not believe that the EPA would certify the engine.

In anticipation of a Navistar announcement that the EPA had refused to approve a 0.2g NOx certificate and trade press questions, on June 5, Bunker internally circulated a proposed desk statement, reading:

> EPA received a new application from Navistar on May 21 and is still reviewing the application. However, EPA's initial view is that there are several significant problems with Navistar's application. EPA is not prepared to share publicly these problems at this time, because Navistar has claimed much of their information as confidential. While EPA has not taken final action regarding certification, and intends to continue discussions with Navistar, EPA has substantial concerns regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level.

*Id.* ¶ 222. But Bunker indicated the EPA would not share the desk statement unless Navistar first made a statement about the application, and, otherwise, EPA employees should respond only that the application was under review. Grundler did not recall whether the desk statement was approved or ever shared with anyone.

On June 6, Iwaszkiewicz emailed Ostarello, Kramer, and Piech, noting that they "were not able to generate any useful sound bytes for the agency or the politicians. Recalling the recent past, brought us to the conclusion that the agency allowed us to operate in the 'gray area' of the rules previously because we demonstrated compliance in good faith. They view 783.2 as a blatant attempt to circumvent the regulations." *Id.* ¶ 232. He attached passages from the Federal Register, highlighting statements that the "NTE is not intended to be the primary emission limit on an engine, but is intended as a 'no worse than this' requirement that puts an absolute high limit on emissions under most operating conditions. It is not supposed to supplant the continuing obligation of manufacturers to design their engines without defeat devices. Nor is it supposed to provide a cushion for manufacturers to meet a less stringent standard off the testing cycles." *Id.* That same day, in response to Allen's question of whether Navistar stock would react favorably if Ustian indicated Navistar might have to add SCR to its EGR system if the EPA would not approve the May 2012 application, Ustian responded that the EPA would approve the certification, "just not today." *Id.* ¶ 239.

Sometime in June, Navistar's Board of Directors assigned Troy Clarke, who that month became the President of Navistar's Truck and Engine Division and had not had any prior responsibility for certification issues, the exclusive responsibility of negotiating with the EPA and presenting a recommendation to the Board as to whether Navistar should move on from its EGR-only technology.[23] On June 15, Greuel sent an email to Charbonneau, Kramer, Piech, and Clarke, informing Navistar that, after a review of the May 2012 application, the EPA had serious concerns that would prevent Navistar from receiving a certificate of conformity for the third engine prototype. The EPA invited Navistar to present additional information and analysis to answer the EPA's objections and support Navistar's claim of compliance. When Navistar received the EPA's June 15 letter, Ostarello emailed Navistar engineers and noted that they should consider all the points raised and formulate a response.

After receiving the June 15 letter, Hammes again asked an emission expert to review the EPA's response. The emission expert responded that Navistar faced a long and difficult process to achieve 0.2g NOx certification. During the Navistar Board's June 18 and June 19 meetings, Clarke reported it was unlikely the EPA would certify the EGR-only submission but that the EPA appeared willing to work with Navistar if it adopted an alternative emission strategy.

### 2. Navistar Statements about the May 2012 Application and Reactions

After Navistar withdrew the January 2012 application but before it submitted the May 2012 application, Empyrean, an investment manager, began investing assets from two of its investment funds in Navistar stock based on its expectation of certification in June 2012.[24] On May 24, a Navistar investor relations employee sent Ustian an excerpt from a Wolfe Trahan

---

[23] Navistar named Clarke its CEO in April 2013.

[24] Empyrean received over $5 million as part of a Navistar class action settlement for its recognized losses.

analyst report, which commented that "Navistar was surprisingly upbeat about EPA certification,

ascribing the delay to a learning curve with EPA redefining duty cycle parameters for EGR from

SCR." *Id.* ¶ 210. On June 5, a Buckingham Research Group employee emailed Empyrean to

inform it that a Baird analyst had downgraded Navistar based on the evaluation that, although

full EPA certification "remain[ed] likely, near term visibility is limited." *Id.* ¶ 230. Wolfe

Trahan also issued an analyst report that day, explaining the logic behind its view that engine

certification remained possible. Ustian received the Wolfe Trahan analyst report.

On June 7, Navistar filed its 10-Q second fiscal quarter report (the "June 2012 10-Q"),

which Ustian reviewed, approved, signed, and certified. The June 10-Q stated, in relevant part:

> Truck and engine manufacturers continue to face significant
> governmental regulation of their products, especially in the areas
> of environment and safety. We have incurred, and will continue to
> incur, significant research, development, and tooling costs to
> design and produce our engine product lines to meet EPA and
> CARB on-highway HDD emission standards that have reduced the
> allowable levels of NOx to the current limit of 0.20g NOx and
> include the required onboard diagnostics. The regulations
> requiring on-board diagnostics began the initial phase-in during
> 2010 for truck engines and are a part of our product plans. These
> changes in emission standards have resulted in and will continue to
> result in a significant increase in the cost of our products to meet
> these emission standards.
>
> In 2011 and 2010, certain of our engines families met EPA and
> CARB certification requirements by using emission credits we
> earned by producing low-NOx engines earlier than was required by
> the EPA. We began using NCPs for trucks using certain of our
> heavy HDD engines in 2012. As described in more detail below,
> the need to use NCPs, any inability to continue to utilize NCPs and
> the rate at which we use our emission credits could materially and
> adversely affect our business, financial condition, results of
> operations, liquidity and capital resources, or cash flows.
>
> In January 2012, the EPA promulgated the Interim Final Rule
> establishing NCPs for heavy HDD engines. The D.C. Circuit has
> not yet ruled on the challenges to the Interim Final Rule and to our
> certificates that incorporate NCPs asserted by some of our
> competitors, but adverse rulings could materially affect our ability

48

to continue selling heavy HDD engines and our trucks that incorporate such engines. Also in January 2012, the EPA published a Notice of Proposed Rulemaking for a final NCP rule (the "Final Rule"), which would make NCPs available to manufacturers of heavy HDD engines and medium HDD engines in model years 2012 and later for emissions of NOx above 0.20g NOx and would supersede the Interim Final Rule. We cannot provide assurance that the Final Rule will be promulgated in the form currently proposed or when it will be promulgated.

Currently, CARB and the corresponding agencies of nine other states that have adopted California's emission standards do not make available engine certification using NCPs. Therefore, we continue to sell engines and trucks in these ten states using the NOx emission credits previously described. Under current conditions and at the current pace, however, our emission credits for heavy HDD engines will be consumed this year. Unless CARB (and the corresponding agencies of the nine other states) begin allowing NCPs for engine sales, or unless CARB certifies our HDD engines to the 0.20g NOx Standard, we will no longer be able to sell trucks with HDD engines in these ten states after our credits are consumed.

We submitted to the EPA an application for a 0.20g NOx engine certificate for one 13L engine family on January 31, 2012 and we submitted a similar application to CARB on February 17, 2012, but later withdrew both applications. In response to certain concerns raised by the EPA, on May 21, 2012, we submitted a revised application to the EPA and plan to submit a similar revised application to CARB. Certain issues raised by the revised application are under review by the EPA, and we are engaged in ongoing discussions relating to certification of this engine family at 0.20g NOx.

Our business, financial condition, results of operations, liquidity and capital resources or cash flows could be materially and adversely affected based on numerous factors relating to our continued use and development of engines using EGR, including, among others, the decisions from the EPA and CARB on our 0.20g NOx engine certificate applications (which include on-board diagnostics requirements), the outcome of the challenges to the Interim Final Rule and our certificates incorporating NCPs, and the timing of promulgation and content of the Final Rule. If our 0.20g NOx engine certificate applications are not approved, we will be required to use emission credits or NCPs to sell our 13L engines and trucks using such engines. If the Interim Final Rule is invalidated before the Final Rule is adopted, we may have to rely

49

> solely on emission credits to sell our heavy HDD engines and trucks. If the Final Rule is not promulgated in the form currently proposed or on the timeline currently expected, we may be required to stop selling medium and heavy HDD engines when our emission credits run out. If NCPs are unavailable to us in the future, we will not have sufficient emission credits to continue to sell our heavy HDD engines and trucks with such engines, and if NCPs are available to us, our liquidity and cash flows could be materially and adversely affected by the market impact of such NCPs and the cost of such NCPs as established by the Final Rule. Although the foregoing describes those scenarios which we can reasonably anticipate, we can offer no assurances that other outcomes will not occur or that the effects of the scenarios described above will not be more severe than we currently anticipate.

*Id.* ¶ 234. Navistar filed an earnings presentation in connection with the June 2012 10-Q, which disclosed that Navistar paid $10 million in NCPs in the three months ending April 30, 2012.

The same day, Ustian participated in a conference call with securities analysts and investors (the "June 2012 analyst call"). Before the questions began, Ustian talked about the May 2012 application, noting that Navistar was "continuing to work with EPA" on the application. He also stated:

> EPA . . . has an NCP rule that they are finalizing. Frankly, we don't want to use that. We want to get our 0.2 certification behind us and not use the NCP, but that is a backup that the EPA is working on. On the other hand, we are also getting ready as soon as that certification is approved [so that] we can go to instant production within 30 days. So, we have all the mechanisms in place to respond quickly once we get that certification approved.

*Id* ¶ 237. Later, Volkmann, the Jefferies analyst, asked Ustian the following about the May 2012 application: (1) "Do we have any idea what the difference [is] between what you submitted in February and what you submitted in May?" (2) "[W]hat are your views on when and if this thing gets approved?" and (3) "[H]ow much of that is built into your second-half forecast, which is just a massive sequential improvement." *Id.* Ustian responded:

50

> In working with the EPA, they asked us if there was some spots that they wanted us to modify, and so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. . . . [I]t's hard for us since it is somewhat out of our control to tell you exactly the timing of any of that so I hope you can appreciate that.

*Id.* When Volkmann then asked if the certification process would take the same "three to four months" that Navistar had predicted for approval of the January 2012 application, with the clock restarting in May, Ustian responded "[n]o, of course not" because "there is plenty of background out there now that it shouldn't take nearly as long. I could argue we should have been done with this, but we are not. So we have to go forward and get it done expeditiously. And we're all over the top of this every minute of every day, as you can imagine." *Id.* Although Volkmann understood that Ustian could not predict the timing of certification, Volkmann interpreted Ustian's response to mean that the certification would take less than three to four months.

Ostarello and Iwaszkiewicz testified that they did not know of anything inconsistent with Ustian's statements in the 10-Q or on the analyst call. At no point before June 7 did Ostarello, Younessi, or Iwaszkiewicz tell Ustian that Navistar should switch to SCR technology to comply with the 0.2g NOx standard. Nor did engineers suggest to Ustian that the timeline for producing the engines—previously stated to be thirty days after certification—had changed.[25] But upon receiving an excerpt from the June 7 analyst call touching on EPA engine certification, Oge commented, "That's amazing. Far from accurate." *Id.* ¶ 241. Oge also inquired whether the EPA should inform the Department of Justice, the FTC, or the SEC about her concerns with Ustian's truthfulness about Navistar's certification prospects.

---

[25] Because Navistar typically ships trucks with Navistar engines several months after engine production, a June production date would translate into an August ship-to-consumers date.

After the June 2012 10-Q and analyst call, a D.A. Davidson & Co. report noted the high uncertainty surrounding the timing of the EPA approval and its suspicion that Navistar would continue paying NCPs in the third quarter. CRT noted it did not see any evidence of progress toward EPA certification, and J.P. Morgan indicated that the Navistar Board of Directors had a "responsibility to shareholders to seriously review NAV's engine strategy and give serious consideration to alternative strategies." *Id.* ¶ 242. Wells Fargo noted that Navistar's resubmission in May suggested the EPA denied its prior application, and Reuters reported that Ustian could not predict the time it would take for the EPA to review its May 2012 application. Wolfe Trahan reported that "near term certification is more likely than not." Doc. 258 ¶ 38. Despite maintaining its outperform rating, Wolfe Trahan did not recommend that investors buy Navistar stock because of continued "high risks around NAV's engine strategy." *Id.* Barrington Research indicated on June 12 that the EPA compliance issue should be resolved soon but continued to consider 2012 a "messy period [for Navistar] due to uncertainty and delay in the transition to EPA compliance." Doc. 255-13 at 553 (Ex. A to Ex. 420).

On June 12, the D.C. Circuit invalidated the IFR that would have allowed Navistar to continue selling its non-certified engines by using NCPs. J.P. Morgan acknowledged the ruling amounted to a "near-term negative" for Navistar but noted it remained likely that Navistar would obtain EPA approval "in the very near term and shipping begins in 30+ days." Doc. 258 ¶ 38. The J.P. Morgan report raised the possibility of Navistar having to wait to produce engines until enactment of the NCP final rule if it did not get 0.2g NOx approval or of Navistar switching to other engine technology.

### III.    Navistar's Abandonment of EGR Technology

On July 3, Navistar announced a live webcast for July 6.  This prompted the *Wall Street Journal* to report that Navistar planned an engine change and would buy SCR components to install on Navistar's engines.  Wells Fargo also reported that it expected an engine strategy reversal.  These predictions came true, as, on July 6, Navistar announced that it would move away from EGR technology and instead use ICT+ technology, a version of SCR technology, to develop a 0.2g NOx engine.  Analysts indicated that the announcement was "expected."  Doc. 255 ¶ 248.  Navistar continued selling 13-liter engines through the use of emission credits through at least September 6, 2012.  Navistar asked Ustian to retire in August 2012.

### IV.    Ustian's Stock Sale

On April 4, 2011, Ustian's financial advisor, Robert Moriarty, recommended that Ustian exercise certain of his Navistar stock options.  The following morning, on April 5, the same day that Navistar issued the April 2011 press release, Moriarty sent an email to Curt Kramer, one of Navistar's in-house lawyers, stating Ustian's desire to exercise his options and sell shares.  Moriarty asked for confirmation that Ustian could do so at that time.  Kramer responded that he needed confirmation that Ustian "has met his ownership requirement and is not in possession of material non-public information."  Doc. 258 ¶ 21.  Ustian testified that he confirmed to Navistar that he did not possess any material non-public information at the time.

Ustian then sold Navistar stock on April 5, realizing a gross amount of $3,860,087.71.  At his deposition, Ustian could not recall why he sold the stock that day but testified that no connection existed between the stock sale and that day's press release.  Instead, he thought the sale was part of an effort to diversify his portfolio and could have been related to the dates his options expired.  Michael Mayer, one of the SEC's expert witnesses, conducted an event study,

53

opining that certain statements Ustian made or approved, including between November 2010 and April 2011, had a material impact on Navistar's stock price, which Mayer claims experienced an excess return.

An SEC accountant, Wilburn Saylor, Jr., reviewed Ustian's Form 4s, which officers and directors of public corporations must file with the SEC whenever they acquire or dispose of the corporation's securities. Saylor determined that, taking into account the cost basis of the shares Ustian sold, his net gain was $1,095,518.30. This April 5, 2011, sale was Ustian's only sale of Navistar common stock in the open market between November 2010 and August 2012, and Ustian did not purchase any Navistar common stock during this time. Between November 2010 and August 2012, Ustian was a net acquirer of Navistar shares, which he acquired only by exercising options granted to him by Navistar.

## V.    Expert Reports

Ustian's expert, Paul Gompers, has a Ph.D. in business economics and is a professor of business administration at Harvard. He conducted a review of publicly available information, including analyst reports from January 2010 to August 2012 and press reports from November 2010 to August 2012. Gompers opined that contemporaneous, publicly available information indicates that the allegedly omitted information was available to investors before the statements at issue in this case, meaning the information was already incorporated into Navistar's stock price and no economic basis exists to conclude that the allegedly omitted information impacted Navistar's stock price. He also opined that market commentary after the alleged omissions reflected awareness of the allegedly omitted information.[26]

---

[26] Ustian represents that Gompers' expert opinion is unrebutted, contending that Mayer, one of the SEC's experts, did not actually "rebut" Gompers' findings or conclusions in his rebuttal report because he did not undertake the same analysis as Gompers. But for summary judgment purposes, the Court considers

The SEC's expert, Mayer, has an MBA from Northwestern and is a Vice President at Charles River Associates. He agreed with Gompers that the omission of publicly available information would not affect a company's stock price. Mayer considered whether Navistar's July 6, 2012, announcement had a material effect on Navistar's stock price and whether the information in that announcement was publicly available before the announcement. Mayer searched public press and analyst reports regarding Navistar between July 6, 2011, and July 6, 2012, to do so. Although he did not conduct an analysis similar to Gompers of public press at the time of each alleged omission or misstatement, he testified he knew of the analyst reports surrounding each of the statements and considered the misstatements as a whole, instead of requiring each to stand in and of itself as an actionable violation.

Mayer also opined that, between 2009 and 2012, Navistar stock traded in a "sufficiently efficient" market, meaning "any news would be reflected in Navistar's stock price essentially within one day." Doc. 255 ¶ 171. According to Mayer, because stock prices reflect market expectations in an efficient market, to the extent the market expects an event that is subsequently realized, the stock price should not change. Mayer further opined that investors consider significant legal disputes to be important information, with it not unusual for analysts to follow actual case filings in certain circumstances. But Mayer also testified that analysts covering Navistar did not appear to follow the *Mack Trucks v. EPA* litigation closely and learned of events related to that litigation later than expected.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

---

Mayer's rebuttal report, leaving questions of admissibility of the experts' opinions for pre-trial proceedings.

To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

**I.     Violation of Section 10(b) of the Exchange Act and Rule 10b-5, Section 17(a) of the Securities Act, and Rule 13a-14**

The SEC alleges that Ustian's statements over the course of 2011 and 2012 misled investors in violation of § 10(b) of the Exchange Act and Rule 10b-5, and § 17(a) of the Securities Act. These claims have essentially the same elements, with the main distinction that "§ 10(b) and Rule 10b-5 apply to acts committed in connection with a *purchase or sale of* securities while § 17(a) applies to acts committed in connection with an *offer or sale* of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). To establish a violation under § 17(a)(1) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b-5, the SEC must establish that Ustian "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *McConville v. S.E.C.*, 465 F.3d 780,

56

786 (7th Cir. 2006); *Maio*, 51 F.3d at 631.  The elements of a claim under § 17(a)(2) and (3) are the same, except that the SEC need only establish Ustian's negligence, as opposed to demonstrating scienter.  *Aaron v. S.E.C.*, 446 U.S. 680, 701–02, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980); *S.E.C. v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982).  The SEC also alleges that Ustian wrongly signed and certified Navistar's 2012 quarterly 10-Q and 2011 annual 10-K filings because those filings contained materially false information in violation of Rule 13a-14.[27] Ustian argues that the SEC's claims fail because it cannot establish that (1) Ustian made any false or misleading statements or omissions, (2) any of the alleged misstatements or omissions were material, and (3) Ustian acted with the requisite state of mind.

### A.    False or Misleading Statements or Omissions

Ustian first argues that the SEC cannot establish that any of the alleged statements are false or misleading.  "An omission renders a statement materially misleading when it creates an 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Kelsey v. Allin*, No. 14 C 7837, 2016 WL 825236, at \*4 (N.D. Ill. Mar. 2, 2016) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  This is an objective inquiry,

---

[27] The parties do not separately address the Rule 13a-14 claim, instead addressing it in connection with the § 10(b), Rule 10b-5, and § 17 claims.  Ustian does note that, for the Rule 13a-14 claim, the SEC must demonstrate that the specific filings contained material misstatements, *see* Doc. 261 at 7 n.4, but neither side discusses the required mental state, if any.  The required mental state for a Rule 13a-14 claim remains an open question.  *Compare S.E.C. v. Jensen*, 835 F.3d 1100, 1113 n.6 (9th Cir. 2016) (declining to decide the required mental state for Rule 13a-14 violations while noting some authority suggesting that rules promulgated under § 13 do not include a scienter requirement); *S.E.C. v. Heart Tronics, Inc.*, No. SACV 11-1962 JVS (ANx), 2016 WL 9049642, at \*3 (C.D. Cal. Mar. 30, 2016) (noting the court did not instruct the jury as to a state of mind requirement for Rule 13a-14 violation), *aff'd*, *S.E.C. v. Gault*, 751 F. App'x 974 (9th Cir. 2018), *with Jensen*, 835 F.3d at 1117–18 (Bea, J., concurring) ("I would hold that liability for false certification under Rule 13a-14 may lie only where a CEO or CFO acts with knowledge or at least recklessness as to the falsity of a certification."); *S.E.C. v. Miller*, No. 2:17-cv-897-CBM (RAO), 2019 WL 1460615, at \*2 (C.D. Cal. Feb. 6, 2019) (following Judge Bea's concurrence in *Jensen* to require a showing of knowledge or recklessness for a Rule 13a-14 claim).  Because the parties did not brief the issue, the Court will not decide it at this time.  *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel").

considering whether a reasonable investor would have received a false impression from the statement given the context and manner in which Ustian presented the statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, --- U.S. ----, 135 S. Ct. 1318, 1327, 191 L. Ed. 2d 253 (2015); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Typically, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995), *superseded by statute on other grounds*. But where "the adequacy of the disclosure . . . is 'so obvious that reasonable minds [could] not differ,'" the Court may resolve the issue as a matter of law. *Id.* (alteration in original) (citations omitted).

### 1. The November 2010 Press Release

The SEC alleges that when Navistar issued the November 2010 press release, claiming that Navistar had "plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required," Doc. 255 ¶ 58, Navistar knew that it could not produce or sell the first prototype engine. Ustian disagrees with the SEC's interpretation of the statements, claiming that the press release created the impression that the first prototype engine was for demonstration purposes only and not for production and sale, with any description of performance attributes related to the product Navistar would release in several years.

In considering this same argument at the motion to dismiss stage, the Court determined that, in context, the SEC plausibly alleged that the press release misled investors into thinking that Navistar had a 0.2g NOx engine ready for the market. Doc. 63 at 30 (citing *Kelsey*, 2016 WL 825236, at *4). The evidentiary record does not compel a different conclusion. Considering all facts in the light most favorable to the SEC, the Court finds that a reasonable juror could read the statements to imply exactly what the SEC alleges, that Navistar's first prototype engine was

58

ready for market.  As even Ustian must acknowledge, he knew that this was not the case.  And while Ustian again argues that he told reporters that Navistar would not produce a 0.2g NOx engine for years, the press release plausibly suggests the present ability to commercially produce the first prototype engine and that Navistar was delaying production to use up its already-accumulated emission credits.  While some analysts expressed skepticism about Navistar's claims, the fact that at least some other analysts testified that they believed that Navistar's engine was capable of production in November 2010 further supports finding an issue of fact.[28] Therefore, the proper interpretation of the statements in the November 2010 press release remains a question for the jury.

### 2. The December 2010 Analyst Call

Next, the SEC alleges that the December 2010 analyst call was misleading because when Ustian promised that Navistar would soon ask the EPA to certify a 13-liter EGR engine that (1) met the 0.2g NOx Rule and (2) could compete with SCR engines, he implied that the first prototype engine could do both despite the fact that he knew, at the time he made the statements, that the first prototype engine could not.  Ustian argues that his statements could not create a misleading impression about the engine's performance characteristics because he did not say

---

[28] Ustian complains that the SEC cherry-picks analyst reports in arguing that the statements are misleading, but Ustian employs the same tactic.   Ustian also argues that the SEC cannot use the analyst reports to support a question of fact here because the fact that "a few analysts may have ignored the context in which [the] statements were made . . . does not make [the] statements misleading where the language and import of [the] statements are plain."  *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15 Civ. 5999 (PGG), 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017).  But here, even without considering the analyst reports, the Court finds a question exists as to whether the statements at issue are misleading.  Therefore, the analyst reports merely underscore the need to submit the question to the jury.  *See In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed.").  Even the *Plumbers & Steamfitters* court recognized this, distinguishing the facts of its case because the statements at issue were clear on their face.  2017 WL 4403314, at *14 n.7.

anything about performance.  He claims he expressed only his predictive opinion about a future

EGR engine that Navistar would put into production that would compete with SCR.

The Court previously rejected Ustian's argument when it addressed the allegedly

misleading nature of the statements at the motion to dismiss stage.  Doc. 63 at 31.  As the Court

recognized there, future hopes are generally not actionable if they are based on a genuine belief

or a good faith basis.  *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).  But "an opinion

that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which,

if made knowingly or recklessly, is culpable conduct actionable under [the securities laws]."

*S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 194 (3d Cir. 2000) (emphasis omitted) (citation

omitted).  Further, by affirmatively representing that a customer would not know the difference

between the first prototype engine and Navistar's already-certified engines, Ustian took on the

responsibility to disclose the entire truth, that the first prototype engine was not comparable or

even intended for production.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.

Ct. 1309, 179 L. Ed. 2d 398 (2011) (although "§ 10(b) and Rule 10b–5(b) do not create an

affirmative duty to disclose any and all material information," such a duty arises where

"necessary 'to make all statements made, in the light of the circumstances under which they were

made, not misleading'" (quoting 17 C.F.R. § 240.10b-5(b))).  Although Ostarello and

Iwaszkiewicz testified that Ustian's statements were true and not misleading, Ustian cannot

meaningfully dispute that the first prototype engine was not competitive, particularly with

respect to fuel economy and performance.  Therefore, the jury must consider whether Ustian's

statements on the December 2011 analyst call were materially misleading.[29]

---

[29] Ustian argues that the Court should follow its prior opinion in the Navistar class action case, where it
held that a portion of the December 2011 analyst call statement ("we'll be able to show you the data, that
it meets 0.2, and show you how we're able to meet it") was not actionable under the PSLRA based on the
Court's finding that no "reasonable investor could have understood Ustian to be saying that Navistar had

### 3.     The March 2011 Analyst Call

The SEC alleges that Ustian knew, but did not disclose on the March 2011 analyst call, that it was not possible to drive the first prototype engine submitted in the February 2011 application in the real world, misleading investors by stating that the engine met the 0.2g NOx standard and had all the necessary performance features for the market. Ustian first argues that his statements clearly noted the intended delay in production to improve fuel economy and so could not mislead an investor. Admittedly, Ustian did state that, in the short term, Navistar would not sell the first prototype engine upon certification. Doc. 255 ¶ 93 ("We don't plan on using this for a while[.]"). But the summary judgment record does not change the Court's prior conclusion that, drawing all inferences in the SEC's favor, one could reasonably read Ustian's statements to claim that the first prototype engine, already submitted to the EPA at the time of the statement, was currently salable and just needed certification ("we are going to have it out there on the shelf") and could produce 0.2g NOx emissions with competitive performance capabilities ("that says it can be done and we can meet the standards and get all of the performance features, as well" and "[w]e are exceeding what we had committed to in terms of performance and fuel economy and all that"). *Id.*; *see* Doc. 63 at 32–33. As previously discussed, Ustian cannot argue that Navistar had a salable and competitive engine at that time, instead acknowledging at his deposition that he did not even know the first prototype engine's fuel economy or performance attributes because Navistar never intended to sell it on the market.

---

commercially viable 0.2 NOx engines ready for production." *Constr. Workers Pension Fund-Lake County & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 650 (N.D. Ill. 2015). In addition to analyzing a narrower statement with different contextual allegations, the Court found that the plaintiff's allegations surrounding the statement failed to meet the pleading standards for the PSLRA because it was a forward-looking statement that could not violate the PSLRA. *See id.* at 646, 649–51. As the Court already noted in its opinion on the motion to dismiss, that prior decision does not bind the Court here. Doc. 63 at 32 n.9.

Ustian also argues that the March 2011 analyst call statements were not misleading as to the prospect of certification. The SEC argues that the EPA had told Navistar that it could not use carryover DF data to support the February 2011 application, but Ustian contends that, in reality, an EPA staffer had merely recommended to Navistar that, in his view, the DF data from the 0.5g NOx engine would be insufficient for the engine and, even then, was willing to discuss questions that Navistar had about that opinion. But a reasonable juror could conclude that Navistar understood this "mere recommendation" as fact. Kramer himself described Orehowsky's response as an "official[ ] reject[ion]," Doc. 258 ¶ 17, and explained at the time that Navistar submitted the carryover DF with its February 2011 application as a formality, knowing that the EPA would not accept it. Kramer even acknowledged this in the cover email to the application, stating that Navistar used the carryover DF data "for the time being" and that durability demonstration methods and protocol for the submitted engine would "need to be discussed separately at a mutually agreed upon time." Doc. 255-13 at 509 (Ex. 418). And Piech highlighted the fact that the EPA had rejected the use of carryover DF in a slide presentation to Ustian about the February 2011 application, indicating the issue threatened certification. Although Ustian and the Senior Engineering Group may have believed that Navistar could find an alternative to full DF testing, a jury could conclude that omitting the information about the rejection of the attempted use of carryover DF when discussing the February 2011 application painted an overly rosy picture about the prospects of certification to a reasonable investor. *See In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (plaintiffs sufficiently alleged a misrepresentation where the defendant knew that the regulatory body would require different data and therefore that there was a material risk that the regulatory review would fail but did not disclose that risk); *Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL

3360676, at *11 (C.D. Cal. June 9, 2016) (same, where plaintiff alleged that the defendant knew that the regulator would not approve the product); *cf. Gaines v. Guidant Corp.*, No. 1:03CV00892-SEB-WTL, 2004 WL 2538374, at *11 (S.D. Ind. Nov. 8, 2004) (no duty to disclose FDA regulation compliance problems where statements concerned the medical device's test results and acceptance in the clinical community and did not mention quality control standards, the FDA, or regulatory compliance so as to require additional clarification). The Court again acknowledges that some courts have found that a defendant need not disclose interim regulatory feedback where the facts do not suggest that the defendant did not honestly consider regulatory approval to be forthcoming. *See, e.g.*, *Kader v. Sarepta Therapeutics, Inc.*, No. 1:14-cv-14318-ADB, 2016 WL 1337256, at *17 (D. Mass. Apr. 5, 2016) (although the interim nature of FDA feedback undermined the need to disclose it, a "failure to disclose nearly-fatal criticism from the FDA might constitute an actionable omission"); *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (defendants' optimism about FDA approval was not misleading where plaintiffs did not "allege that the risks arising out of the FDA feedback were out of the ordinary, or presented a special challenge not of the kind normally confronted by pharmaceutical companies seeking FDA approval for their drugs"). But here, a question of fact exists as to whether Ustian's statements were misleading when they omitted the EPA's feedback, particularly given the EPA's stated practice not to deny a certification application unless requested. *See Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (reassuring investors that everything was going well with FDA approval when defendant knew FDA approval would never come was materially misleading); *In re Cryolife, Inc. Sec. Litig.*, No. 1:02-CV-1868-BBM, 2005 WL 8155579, at *18–19 (N.D. Ga.

63

June 17, 2005) (rejecting defendants' argument that a statement that the defendant complied with FDA regulatory requirements was not misleading because the FDA had not found a violation but rather just taken a preliminary step in an ongoing dialogue).

### 4. The April 2011 Press Release

Next, the SEC alleges that the April 2011 press release misled investors to think that Navistar was capable of producing and selling a 13-liter 0.2g NOx engine because the press release touted the February 2011 application simultaneously with the announcement of certification of two other engines. While Navistar did not explicitly state that the first prototype engine was ready for the market, it announced that it submitted the engine for EPA approval while also announcing the certification of two other engines. The press release explicitly tied Navistar's certified, higher-emission 0.39g NOx engine to the first prototype engine, suggesting that the certification showed that Navistar could build a 0.2g NOx engine with EGR technology. Doc. 255-3 at 488 (Ex. 99) ("This certification [of the 0.39g NOx engine] . . . demonstrates progress to achieving the 0.20g/bHpHr standard[.]"). A reasonable juror could conclude that, by combining the announcement of other certifications with the submission of the February 2011 application, Navistar had an engine that the EPA would certify at the 0.2g NOx standard. But, as discussed in connection with the March 2011 statements, a dispute of fact exists as to whether Navistar knew of a substantial risk that the EPA would reject the February 2011 application because it used carryover DF. Because Navistar did not make any such disclosure when discussing its certification application in the April 2011 press release, a reasonable juror could find the press release misleading on this ground. *See In re Nuvelo*, 668 F. Supp. 2d at 1230 (defendant's failure to acknowledge the material risk of regulatory disapproval was actionable because the defendant knew that its application would not meet the regulator's standard).

64

Additionally, a juror could conclude the April 2011 press release was misleading as to Navistar's present capability of producing and selling the first prototype engine. Ustian must admit that unlike the two certified engines, the first prototype engine could not run on its own outside a test lab and did not have market-competitive performance. But he argues that no reasonable investor would have understood the press release to say that Navistar was ready to sell the first prototype engine. The press release itself stated that Navistar "intends to phase-in its engines at progressively lower NOx emissions levels . . . in the years ahead in an effort to make emissions compliance as seamless as possible to its customers." Doc. 255 ¶ 93. Ustian claims that this statement "made clear that the 'period of years' was for Navistar to develop its engine technology." Doc. 261 at 29. The press release also mentioned the fact that Navistar had stockpiled credits to allow it to meet the emission standards and have some flexibility in developing engines that meet those standards. As Ustian points out, after the April 2011 press release, some analysts continued to interpret the application as a marketing move. But one could read the phase-in process as providing time for Navistar to further improve the engine instead of to make the engine salable. Therefore, the Court concludes that reasonable minds could differ on the potentially misleading nature of Navistar's statements in the April 2011 press release, requiring submission of the question to the jury.

### 5. The December 2011 10-K

The SEC alleges that the December 2011 10-K misled investors because, when Navistar wrote that it planned to submit a certification application for the revamped, second prototype engine and that Navistar believed the engine met certification requirements, Navistar knew that four days earlier the EPA indicated it would not certify such an engine. The SEC also argues that Navistar's risk factor disclosure, that its "solutions for meeting U.S. federal and state emission requirements may not be successful or may be more costly than planned," Doc. 255

¶ 118, mischaracterized the risk of non-certification because, at the time of filing, the risk had become a reality. Ustian counters that discovery reveals that he believed in the accuracy of the statements in the December 2011 10-K. He also contends that, as with earlier statements, he had no obligation to disclose the EPA's preliminary feedback.

The SEC argues liability exists because, by December 20, 2011, Navistar had not developed an engine that met the EPA's certification requirements. The SEC points out that Navistar had abandoned its February 2011 certification, having received indications it would not be certified, and continued to need an NTE deficiency to meet the 0.2g NOx standard with the second prototype engine. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay."). The SEC focuses specifically on Navistar's December 16 meeting with the EPA, at which the EPA informed Navistar it would not certify the second prototype engine as proposed. By taking the opposite position of the certifying agency in the December 2011 10-K, the SEC contends that Navistar's statements were misleading.[30] *See Omnicare*, 135 S. Ct. at 1328–29 ("[I]f the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain[.]).

Ustian responds that the SEC ignores events that occurred after the December 16 EPA meeting, which provided him with a basis to represent that the second prototype engine met the

---

[30] The SEC also relies on a December 20 email from Charbonneau to Ustian and others, discussing Bunker's certification positions. Ustian argues that this email has no bearing on the inquiry because Charbonneau sent it at 4:32 p.m., after the SEC accepted the December 2011 10-K for filing at 7:53 a.m. Given the timing, the Court questions the significance of the email to the present inquiry. To the extent the SEC can present evidence at trial demonstrating that Ustian knew of the information contained in the December 20 email prior to the filing of the December 2011 10-K, the Court would find such evidence relevant to the jury's consideration of whether the December 2011 10-K representations were misleading.

EPA's certification requirements. *See id.* at 1329 (an investor expects that a statement will "fairly align[ ] with the information in the issuer's possession at the time"). During the time between the December 16 meeting and the filing of the December 2011 10-K, Navistar engineers presented Ustian with several options to address the EPA's concerns, assuring Ustian that Navistar could devise a solution to obtain certification. But Ustian also knew that Navistar was pursuing lobbying efforts in an attempt to pressure the EPA to approve the application, which could give rise to an inference that Ustian did not actually have a basis to believe Navistar had a certifiable engine. *See S.E.C. v. Johnston*, 310 F. Supp. 3d 265, 272 (D. Mass. 2018) (finding defendant's argument about the uncertainty of the risk of non-approval undercut by the internal assessment of that risk).

But Ustian also argues that Navistar did not have to disclose the EPA's December 16 feedback because the EPA had not yet seen Navistar's certification application, meaning the feedback did not indicate that the EPA was unlikely to approve the upcoming application. But as discussed in connection with other statements, the failure to disclose the EPA's feedback or further couch the prospects of certification could have painted too rosy of a picture regarding certification so as to make the 10-K statements misleading. *See id.* (failure to include any specific warnings the company had received from the FDA could have misled instead of adequately informed investors about the prospects of FDA approval). And while Ustian attempts to rely on the EPA's position that it will not disclose pre-decisional dialogue about certification applications for fear of, among other things, causing public confusion as a reason not to find the statement misleading, the EPA's position does not help Ustian in this case because Navistar affirmatively engaged in public discussion about the certification process and so took on the obligation to avoid half-truths about that process. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935,

67

944 (7th Cir. 1989) ("The express language of 10b-5 only proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248–49 (5th Cir. 2009) ("Once the defendants engaged in public discussions concerning the benefits of Type II affiliation and the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading."); *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 3794769, at *9 (W.D. Tex. June 16, 2015) ("[B]y disclosing the stability issue, Defendants obligated themselves to disclose significant related facts, particularly those regarding compliance with FDA stability standards."). And Navistar's own actions in discussing the EPA's feedback with respect to the January and May 2012 applications in the June 2012 10-Q undercuts Ustian's argument that additional disclosure in the December 2011 10-K was not appropriate.

Ultimately, the parties' disagreement about the proper interpretation of the December 2011 10-K statements suggests the need for this question to proceed to a jury. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 921 n.23 (N.D. Ill. 2010) (fact that parties characterize the context of a question differently suggests an issue of fact as to whether the answer was misleading). The context of the statements, including the surrounding risk disclosures, remains an important consideration.[31] *See Omnicare*, 135 S. Ct. at 1330 ("[A]n investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.

---

[31] Although the Court has taken into account the broader context in which Navistar made the allegedly misleading statements to determine whether a question of fact exists here, the Court does not understand Ustian to argue at the summary judgment stage that the risk disclosures sufficed to "cure" any misleading statements, an argument that, from the Court's research, appears to arise most often in the context of whether the PSLRA's safe harbor protection applies. To the extent such an argument is appropriate, Ustian may further develop it at trial.

. . . So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."). The evidence suggests at least a question of fact as to whether the information Ustian and Navistar had about proposed solutions fairly aligned with Navistar's stated belief in the engine's compliance with certification regulations given the EPA's stated position and Navistar's previous difficulties in obtaining certification at 0.2g NOx. And a juror could find a conflict "between the [EPA's] interim, albeit repeated, concerns about methodology and [Ustian's] optimism about [EPA] approval" so as to require further disclosure. *Tongue*, 816 F.3d at 212 (finding lack of such a conflict fatal to plaintiffs' claim); *see In re Amylin Pharms., Inc. Sec. Litig.*, No. 01CV1455BTM(NLS), 2002 WL 31520051, at *5 (S.D. Cal. Oct. 10, 2002) (the FDA's statements during meeting that it would have difficulty evaluating company's data and recommending other options was allegedly "more than a mere recommendation, or simply part of a continuous dialogue" and so could support finding statements about having the data to prepare regulatory submissions, in conformance with FDA requirements, misleading). Finally, although the risk of failure may not have become a reality by the time of the December 2011 10-K, as the SEC argues, a question still exists as to whether Navistar's disclosures, even in light of the identified risk factors, mischaracterized that risk, given the EPA's feedback and the seemingly unusual treatment of Navistar's certification applications. *See S.E.C. v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 352–53 (S.D.N.Y. 2011) (statement could be misleading where cautionary language did not adequately convey the fact that "projections were entirely divorced from reality or reasonable expectations"); *In re Marion Merrell Dow, Inc.*, No. 92-0609-CV-W-6, 1993 WL 393810, at *8 (W.D. Mo. Oct. 4, 1993) (general cautionary language that addressed the risk that the FDA would not approve the sale of a prescription drug over the

69

counter was "a generic warning that [defendant] would provide for any drug for which it would seek OTC status" and did not suffice given the magnitude of the risk of FDA disapproval). Therefore, a jury must determine the misleading nature of the statements in the December 2011 10-K.

### 6. The March 2012 10-Q, March 8 and 22 Press Releases, and March 2012 Analyst Call

The SEC alleges that the March 2012 10-Q and March 2012 press releases deceived investors by trumpeting the January 2012 application because Navistar knew but did not disclose that (1) the January 2012 application faced serious obstacles that made its approval tenuous, and (2) the EPA certification was going to drag out much longer than the announcements suggested. The SEC also alleges that Ustian's statements during the March 2012 analyst call were misleading because while Ustian championed Navistar's planned production of a 13-liter 0.2g NOx engine in June 2012, he knew that the 13-liter certification would not meet that schedule.[32]

Ustian argues that the statements in March 2012 were not misleading because they only conveyed Navistar's objective to be in production by June while making clear that he could not predict with certainty that the EPA would grant certification in time to reach this goal. Ustian

---

[32] Ustian claims that the SEC's construction of the March 2012 analyst call "conflates two discrete answers to two discrete questions from two different analysts," denying that he stated that "Navistar was 'taking until June' to go to production of a 13-liter EGR-only engine that would be certified at the 0.20 NOx standard and aimed 'to be in production on that in June,' based on a 'typical' certification process timeline of 'about three months' from the date the certification application was submitted." Doc. 261 at 40 (citing Doc. 67 ¶ 128). In response to a question from Casey about NCPs, Ustian indicated that Navistar submitted for $22 million, presumably in NCPs, indicating that they would typically cover about three months. Doc. 255-5 at 32 (Ex. 172). Later on in the call, Ustian also responded to a question from Patrick Nolan, a Deutsche Bank analyst, by discussing "taking until June to go to production" with the 0.2g NOx engine, in line with the earlier answer to Casey's question about how long Navistar expected to need NCPs. *Id.* at 39. The SEC inserted ".2" in place of "$22 million" in the response to Casey's question in the first amended complaint, a mistake replicated in the Joint Statement of Facts. *Compare* Doc. 67 ¶ 125; Doc. 255 ¶ 184, *with* Doc. 255-5 at 32 (Ex. 172). But the Court does not find the transcription error materially changes Ustian's statement so as to defeat the SEC's claim, particularly given Ustian's later adoption of the three- to four-month timeline for certification and production purposes.

claims his statements clearly distinguished between certification, for which he said Navistar could not predict timing with "preciseness," and production, for which he stated the goal was June. The record does not reflect a clear differentiation between certification and production, however. As the Court noted in ruling on the motion to dismiss, the March 2012 statements described the concrete idea that Navistar's January 2012 application would secure certification and allow Navistar to stop paying NCPs in the process, with Ustian championing the certification application as a big milestone of the fiscal quarter and implying production and profitability would soon follow certification. Doc. 63 at 40–41.

Additionally, a reasonable juror could question whether the March 2012 statements fairly reflected the information available to Ustian at the time concerning the chances of certification. The EPA continued to question the use of dual mapping in the second prototype engine after the filing of the January 2012 application. And the EPA conveyed its "serious" concerns about the January 2012 application to Navistar in a February 17 letter, outlining additional issues with deterioration and adjustment factors, the engine's ability to comply with the NOx standard over the FTP and SET, and the need for an NTE deficiency. Doc. 255 ¶ 147. Navistar did submit a response to this letter in late February, expecting some further dialogue. But Navistar heard nothing in response from the EPA, even acknowledging in a March 9 draft presentation that all communication with the EPA had stopped. Thus, at least a question of fact exists as to whether the March 2012 statements were materially misleading by failing to disclose the pushback Navistar was receiving from the EPA and the effect that would have on Navistar's production process.

### 7. The June 2012 10-Q and June 2012 Analyst Call

Finally, the SEC alleges that Navistar's June 2012 10-Q and Ustian's statements on the June 2012 analyst call were materially misleading because they failed to adequately inform

investors about the threat of non-certification of the third prototype engine and because they misrepresented Navistar's ability to work with the EPA to approve the May 2012 application. Ustian attacks the SEC's allegations, arguing that he and Navistar only provided true statements that, if anything, painted a negative picture of the possibility of certification. The SEC responds that Ustian's statements remained deceptive given the EPA's feedback and Navistar's failure to address the EPA's oft-stated concerns.

While Ustian argues that what he said was technically true, a reasonable juror could find the statements misleading given Navistar's voluntary disclosure that it had resubmitted the application in light of the EPA's requirements and the interactions between the SEC and Navistar in the days before the June 2012 statements. *See Schlifke*, 866 F.2d at 944; *Caiola*, 295 F.3d at 331. After a June 4 meeting with the EPA, Bunker reported that "Navistar left . . . understanding [the EPA] would not be able to issue a certificate for this engine." Doc. 255 ¶ 223. Iwaszkiewicz reported the EPA's response that day was "unequivocally NO!," later indicating that Ustian had "put the gag order" on the team and to disregard his prior comment. *Id.* ¶ 224. Kramer's notes from the June 4 meeting indicate that Bunker repeated that the EPA would not certify an engine that was compliant in the test cell but not in the vehicle. And Bunker emailed Charbonneau on June 5, indicating that "based on the information provided, [he] believe[d] that [Navistar's] engine is unlikely to receive a certificate of conformity." *Id.* ¶ 229. The EPA also informed Navistar that the May 2012 application had the same issues as the January 2012 application, an application Navistar withdrew after determining it would not obtain EPA approval. Ustian counters that his senior engineering team continued to discuss the possibility of certification, with it being a matter of when, not if. He also points to the fact that the EPA's warnings were not final and that the EPA continued to invite additional information. The record

also reflects, however, that the EPA typically did not issue final denials, allowing the inference

that the EPA's strong statements in the days before Ustian made the June 2012 statements

effectively amounted to a denial. And analysts and investors viewed the June 2012 statements in

different ways, underscoring the fact that a dispute exists as to whether they were misleading.

*See In re Stec*, 2011 WL 2669217, at *8. Given the parties' differing perspectives on the

meaning of the June 2012 statements and the conflicting evidence surrounding the EPA's

feedback in the days before those statements, the Court finds a disputed issue of fact as to the

misleading nature of the June 2012 statements. And having found that disputes exist as to

whether all of the statements at issue were misleading, the Court turns to Ustian's argument that

none of the statements were material.

### B.     Materiality

Information is material if there is "a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered

the total mix of information made available."[33]  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32,

---

[33] In discussing materiality at the motion to dismiss stage, the Court indicated that "[a] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Doc. 63 at 28 (quoting *U.S. S.E.C. v. Staples*, 55 F. Supp. 3d 831, 838 n.6 (D.S.C. 2014)). Although this standard, which appears to have originated in *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999), continues to be cited favorably, Ustian contends that the two-part, disjunctive inquiry misstates the law because importance alone does not establish materiality. *See* Doc. 261 at 8 n.5. *But see Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616 (7th Cir. 2012) ("A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to buy or sell a security."); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) (using the disjunctive to describe the materiality standard), *vacated & remanded on other grounds*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Ustian's citations do not establish that the SEC cannot demonstrate materiality through importance alone. Rather, they only support the uncontested proposition that a material fact is not one that "a reasonable shareholder *might* consider important." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 396 (S.D.N.Y. 2018) (emphasis added) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *S.E.C. v. DiBella*, 587 F.3d 553, 565 (2d Cir. 2009) ("It is not sufficient to allege that the investor might have considered the misrepresentation or omission

108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quoting *TSC Indus.*, 426 U.S. 438, 449). Materiality is "an inherently fact-specific finding." *Matrixx Initiatives*, 563 U.S. at 39 (quoting *Basic*, 485 U.S. at 236); *TSC Indus.*, 426 U.S. at 450 (materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him"). Because materiality requires assessments of how a reasonable investor would interpret facts and the significance the investor would afford the inferences she reaches, assessing materiality is for the trier of fact and "rarely appropriate at the summary judgment stage." *S.E.C. v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *4–5 (N.D. Ill. May 25, 2004) (collecting cases); *see also TSC Indus.*, 426 U.S. at 450 (materiality questions are "peculiarly ones for the trier of fact").

Ustian argues that the SEC cannot establish materiality because the availability of the information elsewhere rendered any misleading statements or omissions immaterial. Ustian's materiality argument aligns with a truth on the market defense.[34] *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 301–02 (S.D.N.Y. 2010) ("Under the 'truth on the market' theory, 'a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.'" (quoting *Ganino*, 228 F.3d at 167)). But such a theory does not apply in an

---

important." (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). The disjunctive formulation reflects that materiality requires a *substantial* likelihood of importance. But because the SEC's response brief does not make clear whether it intends to establish materiality solely by showing the importance of any alleged misstatements, the Court will further address the issue if needed at or before trial.

[34] This is reflected in Gompers' expert report, where, in analyzing the public availability of the allegedly omitted information, Gompers found "publicly-available information that reflected allegedly omitted information prior to the date of the alleged omissions," which then was incorporated into Navistar's stock price, leading Gompers to find "no economic basis to conclude that this allegedly omitted information impacted Navistar's stock price as it was not new and unexpected." Doc. 255-13 at 170–71.

74

SEC enforcement action, with "omissions by corporate insiders . . . not rendered immaterial as a matter of law because the omitted facts were available to the public elsewhere." *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 WL 3656068, at *8–9 (C.D. Cal. Sept. 16, 2010).

Although an examination of the information already in the market comprises part of the materiality inquiry, *S.E.C. v. Bauer*, 723 F.3d 758, 773 (7th Cir. 2013), the inquiry does not end there, *see N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) ("Case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011))). Because not every piece of publicly available information necessarily forms a part of the "total mix" of information, the inquiry also takes into account "whether the information is so readily available that a reasonable investor would consider it as part of the total mix of information." *Mozilo*, 2010 WL 3656068, at *9; *see also N.J. Carpenters Health Fund*, 709 F.3d at 126–27 (existence of two news reports did not sufficiently clarify or contextualize the alleged misstatements). Additionally, "not all information that may cast some doubt on a representation's reliability will automatically preclude materiality." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1235–36 (7th Cir. 1988). Indeed, "[k]nowledge of a risk does not prevent recovery if the additional information would have been a significant increment to the total available knowledge." *Flamm v. Eberstadt*, 814 F.2d 1169, 1173 (7th Cir. 1987); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."). Further, the source and quality of the publicly available information matters, given that

75

"investors tend to discount information in newspaper articles and analyst reports when the author is unable to cite specific, attributable information from the company." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993). The Seventh Circuit recognized materiality's fact-intensive inquiry in *Bauer*, noting that "an assessment of the marginal impact that negative nonpublic information would have on an already highly pessimistic public forecast is 'peculiarly' one for the trier of fact." *Bauer*, 723 F.3d at 774.

Here, both sides have presented evidence to support their positions on materiality, citing expert reports, newspaper articles, analyst reports, and analyst and investor testimony. Having reviewed the record, the Court finds questions of fact exist as to the information available in the market at the time of each misstatement, whether that information should be considered to have formed part of the "total mix" of information available to a reasonable investor, whether the publicly available information adequately conveyed the allegedly omitted information, and the potential impact of the allegedly omitted information notwithstanding the already available information. *See S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."); *Mozilo*, 2010 WL 3656068, at *15 (finding question of fact as to whether omissions were material in light of defendant's disclosures in other documents and other facts known to the market). Therefore, the Court proceeds to Ustian's arguments about the state of mind requirement.

### C.   State of Mind

Ustian argues that the SEC cannot prove he acted with scienter for purposes of the § 10(b) and Rule 10(b)-5, and § 17(a)(1) claims, or negligently for the § 17(a)(2) and (3) claims. Scienter encompasses either a mental state embracing an "intent to deceive, manipulate or

defraud," *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 616 (N.D. Ill. 2011), or reckless acts that are "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it," *S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (quoting *Meadows v. S.E.C.*, 119 F.3d 1219, 1226 (5th Cir. 1997)). "Deliberate ignorance . . . is a form of knowledge." *S.E.C. v. Jakubowski*, 150 F.3d 675, 681–82 (7th Cir. 1998). The SEC can establish scienter through circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983); *S.E.C. v. Cook*, No. 1:13-cv-01312-SEB-MJD, 2015 WL 5022152, at \*20 (S.D. Ind. Aug. 24, 2015) ("An admission by Mr. Cook that he intended to deceive, manipulate, or defraud is not required; scienter can be inferred from the nature and timing of defendant's knowing misrepresentations."). As with the other elements of the SEC's claims, the question of scienter is not generally appropriate for resolution at summary judgment. *S.E.C. v. Sentinel Mgmt. Grp., Inc.*, No. 07 C 4684, 2012 WL 1079961, at \*9 (N.D. Ill. Mar. 30, 2012); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 968 (N.D. Ill. 2011).

### 1. Statements Concerning the February 2011 Application

Ustian contends that he believed all of the alleged misstatements surrounding the February 2011 application (the November 2010 press release, the December 2010 analyst call, the March 2011 analyst call, and the April 2011 press release) were true and not misleading, precluding a finding of scienter. He contends that his statements about the first prototype engine's performance characteristics had reasonable bases, given that members of the Senior Engineering Group and other Navistar engineers told him that Navistar could achieve a 0.2g

77

NOx EGR engine with improvements in fuel economy and that these individuals expected the February 2011 application to succeed.

Ustian argues that his reliance on experts makes summary judgment appropriate, where he "lacked the necessary expertise to perform meaningful independent review" and so was "entirely justified in depending on the opinions of others." *Donohoe v. Consol. Operating & Prod. Corp.*, 833 F. Supp. 719, 726 (N.D. Ill. 1993), *aff'd*, 30 F.3d 907 (7th Cir. 1994); *see also S.E.C. v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) ("Depending on others to ensure the accuracy of disclosures to purchasers and sellers of securities—even if inexcusably negligent—is not severely reckless conduct that is the functional equivalent of intentional securities fraud."). But the Court questions whether Ustian can hide behind others to escape liability here. Initially, evidence of reliance on others "does not conclusively establish his good faith, but is merely one factor to consider in making [the scienter] determination." *Sentinel Mgmt. Grp.*, 2012 WL 1079961, at *9; *Silverman*, 798 F. Supp. 2d at 969 (collecting cases). Moreover, a question of fact exists as to whether Ustian lacked the necessary expertise to undertake a meaningful independent review of the facts underlying his statements. Although Ustian was not an engineer, he had worked at Navistar for almost forty years, including as the Vice President of Navistar's engine business. And despite testifying at his deposition with the benefit of hindsight that he would not have understood the technical meaning of the EPA's February 17, 2012, response to Navistar's submission, he also bragged at that time that he "kn[e]w more than anyone on .2 emissions." Doc. 255 ¶ 3.

Additionally, evidence in the record contradicts Ustian's assertion that the Senior Engineering Group informed him that "nothing [was] wrong with the February 2011 Application." Doc. 261 at 32. The SEC highlights conflicting internal information as to

78

Navistar's ability to obtain certification of the first prototype engine and that engine's ability to compete on the market. For example, Younessi informed Ustian in February 2011 that the submission used durability data that the EPA disallowed and required further work on DF. Ustian received a similar message through a presentation that indicated that the EPA's rejection of the use of the carryover DF threatened the February 2011 application. Even Ustian acknowledged that the first prototype engine was not intended for sale and that Navistar did not know any of its performance parameters. A reasonable juror could infer scienter from the divergence between Ustian's public-facing statements and internal discussions, of which he was a part. *See Johnston*, 310 F. Supp. 3d at 273 (jury could infer intent to deceive where public-facing statements "diverged significantly from internal discussions"). Moreover, Ustian made these statements about certification despite the fact that engine manufacturers and the EPA typically did not comment on the certification process, giving rise to the inference that he knew his comments on Navistar's progress were of that much greater interest to investors. And a reasonable juror could infer from Ustian's receipt of analyst and media reports that he knew of the danger of misleading investors, where, for example, the November 2010 Avondale Partners report noted, in part, that the upcoming certification application would prove that EGR technology was "not just an 'interim technology.'" Doc. 255 ¶ 64.

For all of the statements at issue, Ustian harps on the fact that it is undisputed that he, along with other Navistar engineers, believed the statements to be true. Setting aside the fact that the record includes circumstantial evidence that could call this belief into question, "[e]ven if the facts themselves are not disputed, their implications are, and it is improper for the Court to determine at the summary judgment stage how these facts fit into the bigger picture without seeing all of the evidence." *S.E.C. v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 768 (S.D. Ind.

79

2018). Accepting Ustian's argument that he lacked scienter would require the Court to find his testimony, and that of members of the Senior Engineering Group, concerning their understanding of the allegedly misleading statements credible, which the Court cannot do at the summary judgment stage, particularly given the SEC's presentation of countervailing circumstantial evidence. *See S.E.C. v. Roszak*, 495 F. Supp. 2d 875, 890 (N.D. Ill. 2007) (defendant's argument concerning lack of knowledge "requires the Court to credit [his] account of events," a question that "turns on the Defendants' credibility [and] cannot be determined by the Court in the context of a summary judgment motion"); *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094–95 (9th Cir. 2010) (rejecting argument that defendant's subjective belief that statement was not misleading should preclude scienter finding, noting that "[i]f such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud"). Given the existence of circumstantial evidence from which a reasonable juror could conclude that Ustian knew of or acted in reckless disregard of the misleading nature of his statements, the Court leaves the scienter question for the trier of fact.

### 2. Statements Concerning the January 2012 Application

The Court's analysis of Ustian's state of mind with respect to the statements concerning the January 2012 application (the December 2011 10-K, the March 2012 10-Q, the March 8 and March 22 press releases, and the March 2012 analyst call) leads to the same conclusion. Ustian again focuses on the assurances he received from the Senior Engineering Group as to Navistar's ability to address the EPA's concerns, but, as above, this does not necessarily preclude a finding of scienter. *See Sentinel Mgmt. Grp.*, 2012 WL 1079961, at *10 ("[G]ood faith, without more, does not necessarily preclude a finding of recklessness." (quoting *Infinity Grp.*, 212 F.3d at 192)); *Silverman*, 798 F. Supp. 2d at 969 ("If Defendants knew that (or were reckless as to

whether) Motorola's disclosure or accounting was false or misleading, however, then the fact that the company employed substantial processes aimed at ensuring accurate accounting would not establish that Defendants lacked scienter.").

Ustian also relies on his stated belief that Navistar's dual-mapping strategy complied with EPA regulations based on his understanding of the EPA's treatment of SCR engines. But the evidence surrounding the EPA's certification of SCR engines cuts both ways. The fact that Ustian and Navistar decided to pursue a lobbying campaign for certification, which Ustian testified he had not done with respect to any other engine, could suggest that Ustian knew that Navistar had compliance problems and could not obtain certification on the merits of its technology alone. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) (finding defendants' response to the FDA's concerns, which involved hiring an expert to make the case for FDA approval, contributed to an inference of scienter). Although leaving the lines of communication open, the EPA had informed Navistar of its evaluation that the second prototype engine's dual mapping amounted to a defeat device, a development that made some internally pessimistic about Navistar's chances of certification. *See Johnston*, 310 F. Supp. 3d at 273. And Ustian acknowledged that he knew the EPA would not discuss how it treated SCR engines with Navistar and that he thought the EPA had a bias against Navistar, also calling into question whether he believed the accuracy of his statements or acted with reckless disregard to their accuracy. As with the February 2011 application statements, "[w]hether to accept Defendant's innocent version of events is a decision that must be left to the trier of fact." *Roszak*, 495 F. Supp. 2d at 890.

### 3. Statements Concerning the May 2012 Application

Finally, Ustian argues that the SEC cannot establish that he acted with scienter with respect to the alleged misstatements concerning the May 2012 application in the June 2010 10-Q and on the June 2012 analyst call. Ustian claims that he believed his statements about certification, having received information from the Senior Engineering Group that the application met certification requirements. A reasonable juror, however, could conclude that Ustian deliberately or recklessly ignored contradictory evidence when he made the June 2012 statements. Despite their representations that the third prototype engine met requirements, members of the Senior Engineering Group also presented Ustian with information indicating that this engine continued to use the same dual mapping that the EPA had previously determined was a defeat device and operated above the emission standards.

Additionally, although Ustian represents that he understood Bunker's June 5 feedback not to amount to a denial but rather only interim feedback, drawing all inferences in favor of the SEC, the circumstantial evidence suggests that Ustian knew the gravity of the situation but deliberately ignored it. Bunker reported that Navistar left the June 4 meeting understanding that the EPA would not certify the third prototype engine, with Ustian responding with profanity upon learning of the meeting's outcome. Finally, the record includes evidence that Ustian had both the motive and opportunity to mislead where he pursued a unique, make-or-break emissions strategy that defined his leadership, causing him to face the potentially devastating consequences of the failure to obtain certification with EGR technology, the heavy costs of NCPs, and the depletion of Navistar's emission credits. *See Silverman*, 798 F. Supp. 2d at 970–71 (evidence of motive and opportunity to mislead investors created genuine dispute as to scienter). As with the other statements, the question of Ustian's state of mind remains for the jury.

82

### 4. Negligence for § 17(a)(2) and (3) Claims

The parties devote little time to discussing whether Ustian acted with the requisite state of mind for the § 17a(2) and (3) claims, apparently lumping the discussion with whether the SEC has created a dispute as to scienter. Ustian does argue that the SEC has not established the applicable standard of care to show negligence, warranting judgment in his favor on the § 17(a)(2) and (3) claims. But he provides no citation for the proposition that the SEC must establish the standard of care, misleadingly citing to *Shanahan* for support. *See* Doc. 261 at 10. Although in *Shanahan*, the Eighth Circuit recounted the district court's reasoning for granting judgment on the § 17(a)(2) and (3) claims, which in part included the SEC's failure to present evidence of a duty of care, the Eighth Circuit noted that the defendant acknowledged a duty but nonetheless affirmed the judgment on the basis that the SEC failed to present evidence that the defendant *violated* the standard of care. 646 F.3d at 545–46 & n.6. Even assuming such a requirement, the SEC points to some evidence of an applicable standard of care. But the Court need not determine its sufficiency because, given the questions of fact as to whether Ustian acted with scienter, the SEC's claims based on the lower negligence standard may also proceed to trial.

## II. Scheme Liability (Counts I and III)

As part of its claims, the SEC seeks to hold Ustian liable under subparts (a) and (c) of Rule 10b-5 and subparts (1) and (3) of § 17(a) for engaging in a scheme to defraud. "A scheme is a plan or program of something to be done; an enterprise; a project; as, a business scheme, or a crafty, unethical project. The scheme, in other words, is the plan or design, not the ultimate result." *S.E.C. v. Familant*, 910 F. Supp. 2d 83, 94 (D.D.C. 2012) (quoting *Aaron*, 446 U.S. at 696 n.13) (internal quotation marks omitted). In ruling on the motion to dismiss, the Court indicated that the SEC could not premise its Rule 10b-5(a) and (c) claims and § 17(a)(1) and (3)

claims solely on Ustian's alleged misrepresentations or omissions that form the basis of its Rule 10b-5(b) claims, but that "the same set of facts may give rise to scheme allegations 'if [the SEC] alleges that [Ustian] undertook a deceptive scheme or course of conduct that went beyond the misrepresentations.'" Doc. 63 at 44 (quoting *S.E.C. v. Loomis*, 969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) (citation omitted)). The Court found the required conduct beyond misrepresentations in the SEC's allegations that Navistar filed the certification applications with the EPA for engines that Navistar knew it could not sell or knew the EPA would not certify. *Id.* at 45.

In seeking summary judgment, Ustian argues that the SEC does not have evidence of any acts beyond the alleged misrepresentations to support the existence of a scheme to defraud. The SEC responds that the Supreme Court's recent decision addressing the scheme liability provisions of Rule 10b-5 and § 17 in *Lorenzo v. S.E.C.*, --- U.S. ----, 139 S. Ct. 1094, 203 L. Ed. 2d 484 (2019), changes the calculus and removes the requirement that the SEC prove conduct separate and apart from misstatements for scheme liability to attach. In *Lorenzo*, the Supreme Court concluded that, where the individual is not a *maker* of statements as required for liability under Rule 10b-5(b), scheme liability extends to a person who disseminates false or misleading statements.[35] *Id.* at 1100–01; *see Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–44, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011) (discussing definition of "maker" for purposes for Rule 10b-5). The Supreme Court rejected the argument that scheme liability arises only "when conduct other than misstatements is involved," noting that the argument that "subsection (b), the making-false-statements provision, *exclusively* regulates conduct involving false or misleading statements would mean those who disseminate false statements with the intent to cheat investors might escape liability under the Rule altogether." *Lorenzo*, 139 S. Ct. at

---

[35] *Lorenzo* did not address § 17(a)(3), but because it is "virtually identical" to Rule 10b-5(c), the Court interprets it in the same way. *See Malouf v. S.E.C.*, 933 F.3d 1248, 1260 (10th Cir. 2019).

1101–03 (explaining that courts and the SEC "have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws"). Based on this acknowledgment of overlap between the subsections, the Court questions whether *Lorenzo* warrants an expansive reading to allow scheme liability based solely on the making of false or misleading statements, as the SEC advocates.[36] *See id.*

Although unacknowledged by the Court when ruling on Ustian's motion to dismiss, the requirements of proving scheme liability remained debatable even before *Lorenzo*. The Seventh Circuit has not considered the issue, although the majority of courts to have done so have required deceptive conduct beyond a mere misstatement or omission. *See ITT Educ. Servs.*, 303 F. Supp. 3d at 764–65 (collecting cases); *see also Public Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). The *ITT Educational Services* court noted that this view comports with a plain reading of Rule 10b-5, because "[i]t would render part (b) superfluous if the Court were to read parts (a) and (c) as not requiring anything more than misstatements or omissions." 303 F. Supp. 3d at 765. But *Lorenzo* rejected this argument, undercutting one of the bases for requiring more than a mere misstatement or omission for scheme liability. *See Lorenzo*, 139 S. Ct. at 1101–03. In administrative proceedings before *Lorenzo*, the SEC adopted the broader position it advocates

---

[36] In *Lorenzo*, the Court indicated it "granted review to resolve disagreement about whether someone who is not a "maker" of a misstatement under *Janus* can nevertheless be found to have violated the other subsections of Rule 10b–5 and related provisions of the securities laws, when the only conduct involved concerns a misstatement," comparing the D.C. Circuit's opinion in *Lorenzo* with *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057–58 (9th Cir. 2011). 139 S. Ct. at 1100. The D.C. Circuit had sustained the SEC's administrative finding that the defendant violated Rule 10b-5(a) and (c) where, although not a maker of the alleged misstatements, he knowingly disseminated the information. *Id. WPP Luxembourg* did not distinguish between a maker and non-maker in holding that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." 655 F.3d at 1057–58.

here, concluding that "primary liability under Rule 10b-5(a) and (c) also encompasses the 'making' of a fraudulent misstatement to investors, as well as the drafting or devising of such a misstatement." *In re Flannery*, Release No. 3981, 2014 WL 7145625, at \*12 (Dec. 15, 2014), *vacated on other grounds*, *Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015).[37] And before *Lorenzo*, the Supreme Court appeared amenable to this expansive view, stating that Rule 10b-5 "forbids the use of any 'device, scheme, or artifice to defraud' (*including* the making of 'any untrue statement of a material fact' or any similar 'omi[ssion]') 'in connection with the purchase or sale of any security.'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 381, 134 S. Ct. 1058, 188 L. Ed. 2d 88 (2014) (emphasis added) (quoting 17 C.F.R. § 240.10b-5).

No courts since *Lorenzo* have directly addressed the question. Although the SEC argues that the court in *S.E.C. v. SeeThruEquity, LLC* allowed a complaint alleging scheme liability to proceed with only allegations of misstatements, the court there also noted that the complaint "alleges that the defendants' entire business model, beyond any misstatements or omissions, is deceptive." No. 18 Civ. 10374 (LLS), 2019 WL 1998027, at \*5 (S.D.N.Y. Apr. 26, 2019). Having reviewed the parties' briefing on the issue, the Court declines to make a definitive ruling on the required showing for scheme liability after *Lorenzo* at this time. Although Ustian has not argued that he did not make the statements at issue so as to preclude liability under Rule 10b-5(b) on summary judgment,[38] the SEC has also advanced as an alternative basis for liability under Rule 10b-5(a) and (c) and § 17(a) and (c) that Ustian disseminated the statements at issue.

---

[37] Ustian appears to recognize that the decisions in SEC administrative proceedings have persuasive authority, citing to *In re Flannery* in support of other propositions of law. *See* Doc. 261 at 11, 12, 49; Doc. 268 at 25, 27.

[38] As the SEC notes, the question of whether the CEO of a company is considered the maker of press releases and company statements is "an inherently fact-bound inquiry." Doc. 260 at 19 n.2 (quoting *Glickenhaus Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015)).

Under *Lorenzo*, such action would suffice to establish scheme liability absent any additional conduct. *See Lorenzo*, 139 S. Ct. at 1103; Doc. 261 at 47 (acknowledging *Lorenzo*'s holding that disseminating a fraudulent statement amounts to deceptive conduct). Given this alternative basis for liability, the Court defers determination of the viability of the SEC's scheme liability claims with respect to statements for which Ustian is the maker to trial.[39]

### III.    Section 17(a)(2) Claim (Count III)

Section 17(a)(2) prohibits obtaining money or property, directly or indirectly, by means of material misstatements or omissions. 15 U.S.C. § 77q(a)(2). As the Court previously noted, there is no rule that a defendant cannot be liable if he obtains money in "a highly roundabout manner." *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 639 (S.D.N.Y. 2013). But there still must be money obtained by the defendant, not just lost by the investor or gained by the defendant's employer. *See id.* at 638–40 (rejecting the SEC's theories that defendants obtained money or property through misrepresentations that inflated their employer's stock offerings because there was no allegation that defendants themselves benefitted because of the stock offerings); *see also ITT Educ. Servs.*, 303 F. Supp. 3d at 776–77 (noting the Seventh Circuit had not addressed the issue but "sid[ing] with the majority of courts" to find that "the Defendants must themselves obtain money or property, and that it is not enough if ITT obtains money or property from Defendants' actions"). The SEC contends that Ustian obtained money through his stock sale on April 5, 2011. But Ustian argues that the Court should grant summary judgment on the SEC's

---

[39] To assist the Court at trial, the Court requests that the parties provide it with a more extensive analysis of whether *Lorenzo* extends to makers of misstatements so that the SEC need not prove conduct beyond the statements for scheme liability. Additionally, given the SEC's suggestion that the record reflects evidence of a scheme, which could moot the question raised by *Lorenzo*, the Court requests that the SEC provide the Court and Ustian with a more detailed legal and factual presentation if it intends to pursue such a theory as well. This submission should go beyond the string cite to statements of fact that the SEC provided in its response brief. *See* Doc. 260 at 47.

§ 17(a)(2) claim because no evidence demonstrates a causal connection between any alleged misstatement and Ustian's stock sale.

Considering the facts in the light most favorable to the SEC, a reasonable juror could find that the evidence supports the inference that, when Ustian sold his Navistar stock in April 2011, he believed that Navistar would be unable to produce the 13-liter 0.2g NOx engine that he had promised. Ustian points to evidence that his financial advisor advised him to make the sale and his testimony that the sale could have been part of an overall diversification strategy or based on his options' expiration date. Ustian also notes that, during the relevant time period, he was a net acquirer of Navistar stock, which in his view undermines an argument that he sought to profit from the allegedly inflated stock price. On the other hand, the SEC highlights Ustian's deposition testimony that he did not know why he made the April 2011 stock sale and evidence that, in order for the stock sale to go through, he had to confirm to Navistar that he did not possess any material, non-public information when making the sale.[40] The fact that this was Ustian's only stock sale during the relevant period could cut either way. And Mayer, one of the SEC's expert witnesses, opined that the statements at issue between November 2010 and April 2011 had a material impact on Navistar's stock price so as to suggest that, by championing the first prototype engine despite knowing of its problems, Ustian obtained excessive returns when he sold stock on April 5, 2011.[41] Even assuming that Ustian executed the sale at his financial

---

[40] The SEC also seeks to rely on suspicious timing between the stock sale and the April 2011 press release issued later that day. Ustian denies any such relationship, and the Court questions whether the timing cuts against the SEC's argument given that the SEC also contends that the April 2011 press release included materially misleading information. The SEC does not present evidence as to the reaction of the stock market immediately after the press release, although the Court's review of Mayer's expert report indicates that Navistar's stock price dropped by approximately $1.00 per share from April 5 to April 6, 2011. *See* Doc. 255-7 at 378 (Ex. 268).

[41] Ustian questions the significance of Mayer's expert report. Although Ustian has filed a *Daubert* motion to exclude Mayer's testimony at trial, *see* Doc. 285, Ustian did not seek to disqualify Mayer for purposes

advisor's suggestion, because questions remain as to Ustian's knowledge leading up to the stock sale and the proper interpretation of the alleged misstatements, the Court also finds a question as to whether a causal connection exists between the misstatements before April 5, 2011, and his stock sale on that day. *See S.E.C. v. Van Wagner*, No. 97 C 6826, 1999 WL 691836, at *4 ("Innocent explanations offered by the defendants are limited by the inferences that must be drawn against them on their motions for summary judgment."). But because the SEC does not point to any instances where Ustian obtained money or property after the April 5, 2011, stock sale, the SEC may only proceed on the § 17(a)(2) claim with respect to the alleged misstatements occurring before that sale, i.e. the November 2010 press release, the December 2010 analyst call, and the March 2011 analyst call.

## IV. Aiding and Abetting and Control Person Liability Claims (Counts II, IV, and VII)

Finally, the SEC alleges that Ustian aided and abetted Navistar's own securities violations and acted as a control person.[42] "Aider and abettor liability requires that: (1) there is a primary violation of securities law; (2) the aider and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted in the primary violation." *S.E.C. v. Nutmeg Grp., LLC*, No. 09 C 1775, 2011 WL 5042094, at *2 (N.D. Ill. Oct. 19, 2011) (citing *Monetta Fin. Serv., Inc. v. S.E.C.*, 390 F.3d 952, 956 (7th Cir. 2004), and 15 U.S.C. § 78t(e)); *S.E.C. v. Benger*, 931 F.

---

of summary judgment, and so the Court considers this an issue going to the weight of Mayer's opinion for the jury to consider at this stage. And given Mayer's opinion that, as a whole, the statements at issue were material to Navistar's stock price, the Court finds Ustian's citation to *S.E.C. v. Forman*, a case in which no evidence existed of an increase in share price given the alleged misstatements, distinguishable. No. 07-11151-RWZ, 2010 WL 2367372, at *8 (D. Mass. June 9, 2010).

[42] The SEC did not file suit against Navistar, but the same day the SEC filed suit against Ustian, it announced charges against and a settlement with Navistar for securities violations. *See* Press Release, "SEC: Navistar International and Former CEO Misled Investors About Advanced Technology Engine," (Mar. 31, 2016), *available at* https://www.sec.gov/news/pressrelease/2016-62.html.

Supp. 2d 908, 910 (N.D. Ill. 2013). For its control person claim under § 20(a), the SEC must establish: (1) a primary securities violation; (2) that Ustian exercised general control over Navistar's operations; and (3) that Ustian "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). A defendant is not liable under § 20(a) if he acted in good faith and did not directly or indirectly induce the primary securities violation, an affirmative defense on which Ustian carries the burden. *Donohoe*, 30 F.3d at 912.

Although Ustian moves for summary judgment on these claims, both parties give short shrift to them, each spending approximately a page discussing their positions.[43] To the extent Ustian's arguments depend on a finding in his favor on other issues addressed in this opinion, the same analysis applies here. To the extent Ustian seeks judgment on any other basis, the Court finds those undeveloped arguments waived for purposes of summary judgment. *See United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived."); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407–08 (7th Cir. 2007) (incorporating by reference well-developed retaliation argument into undeveloped discrimination argument is not enough to develop discrimination argument even with overlaps in proofs between two claims); *Curtis v. Wilks*, 704 F. Supp. 2d 771, 786–87 (N.D. Ill. 2010) (deeming argument waived where "defendants fail[ed] to apply the law to the facts in any meaningful fashion"). As such, the Court will allow these claims to proceed to trial and expects the parties to fully address them then.

---

[43] In the legal standards section of its memorandum, Ustian discusses the standard for control person liability but not for aiding and abetting liability. Doc. 261 at 12.

90

## CONCLUSION

For the above stated reasons, the Court denies Ustian's motion for summary judgment [253], except to the extent that the Court limits the SEC's § 17(a)(2) claim to alleged misstatements made prior to April 5, 2011.

Dated: December 13, 2019

_____
SARA L. ELLIS
United States District Judge

91