**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 16 C 3885 |
| v. | ) ) | Judge Sara L. Ellis |
| DANIEL C. USTIAN, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In preparation for trial, both the SEC and Navistar have filed motions to exclude the other

party's proposed expert testimony pursuant to Federal Rule of Evidence 702. Specifically, the

SEC has moved to exclude the entirety of Michael Easter's testimony and portions of Paul

Gompers' opinions and testimony. Ustian has moved to exclude the testimony of the SEC's

retained experts, David Foster and Michael Mayer. The Court assumes the reader's familiarity

with the background facts of this case, which the Court's summary judgment opinion more fully

recounts. *See* Doc. 303. After considering the parties' arguments, the Court concludes that each

expert may testify at trial, with the arguments raised in favor of exclusion more appropriately

going to the weight the jury should accord the expert testimony instead of its admissibility.

## LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993), govern the admissibility of expert opinion testimony. *See Bielskis v. Louisville*

*Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that a witness qualified as an

expert by knowledge, skill, experience, training, or education may testify in the form of opinion

or otherwise provided that "(a) the expert's scientific, technical, or otherwise specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. To admit expert testimony under this rule, the Court must determine that (1) the witness is qualified, (2) the witness' methodology is reliable, and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The Rule 702 inquiry "is a flexible one," however. *Daubert*, 509 U.S. at 594. "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The proponent of testimony bears the burden of proving that the proffered testimony meets these requirements, and the Seventh Circuit grants the district court "wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894.

## ANALYSIS

I.      **The SEC's Motion to Exclude Certain Opinions and Testimony of Ustian's Expert Paul Gompers [274]**

Ustian intends to present the testimony of Paul Gompers, a financial economist with a Ph.D. in business economics and a professor of business administration at Harvard. In addition to an event study,[1] Gompers conducted a review of publicly available information, including analyst reports from January 2010 to August 2012 and press reports from November 2010 to

---

[1] Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014); *see also* Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J.L. Bus. & Fin. 183, 190 (2009) ("An event study is a statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price." (citation omitted) (internal quotation marks omitted)).

August 2012.  He opined that contemporaneous, publicly available information indicates that the allegedly omitted information was available to investors before the statements at issue in this case so that the Navistar stock price already incorporated the information.  He also opined that market commentary after the alleged omissions reflected awareness of the allegedly omitted information.

The SEC does not challenge the admissibility of Gompers' event study and his conclusion from that event study that the allegedly omitted information did not inflate Navistar's stock price (Section VIII of Gompers' Report).  But the SEC challenges Gompers' opinions about what analysts, investors, and the market knew or believed and his conclusions from his review of publicly available information that Ustian's failure to disclose the allegedly omitted information had no impact on the stock price (Sections VI and VII of Gompers' Report).  The SEC also challenges Gompers' specific opinion that certain filings in the *Mack Trucks v. EPA* litigation were publicly available.  The Court first generally addresses the admissibility of Gompers' non-event study opinions and then considers the SEC's specific objections to the *Mack Trucks v. EPA* testimony.

### A. Gompers' Qualifications

For his testimony to be admissible, Gompers must be qualified as an expert to opine on the subject matter of his testimony.  *Gayton*, 593 F.3d at 616 ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990))).  The SEC argues that Gompers has no training or knowledge to determine "what issues the market was 'attentive to." Doc. 274 at 1.

The SEC characterizes Gompers' opinions as going to analysts', investors', and the market's state of mind. But this misrepresents Gompers' analysis in an attempt to fit it into the line of cases precluding experts from testifying about a defendant's motive.[2] *See, e.g.*, *United States v. Northrop Grumman Sys. Corp.*, No. 09 CV 7306, 2015 WL 5916871, at *5 (N.D. Ill. Oct. 8, 2015) (finding expert's opinion on contracting parties' mental states inadmissible); *Fife v. mPhase Techs., Inc.*, No. 12 C 9647, 2014 WL 2514565, at *5 (N.D. Ill. June 4, 2014) (precluding expert from opining on the defendant's state of mind because the expert provided no foundation for opinions about what the defendant did or did not know); *S.E.C. v. Am. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2019 WL 1772509, at *1 (S.D.N.Y. Apr. 23, 2019) (excluding expert's proposed testimony in securities fraud case about defendants' state of mind, including whether they had the requisite intent to defraud). Gompers' opinion does not touch on Ustian's state of mind or suggest that the market's knowledge has any bearing on the state of mind element here.[3] Instead, Gompers engages in an analysis of the information available in the market to demonstrate whether the allegedly omitted information had already reached the market and so could not have affected Navistar's stock price. The SEC cannot meaningfully challenge Gompers' qualifications to perform this analysis, with its arguments about the propriety of such an analysis more appropriately considered under the other two *Daubert* considerations. Among other things, Gompers is a Harvard Business School professor who has taught classes in the valuation of companies and the behavior of institutional investors. He has served as an expert

---

[2] In seeking to exclude this aspect of Gompers' testimony by arguing that Gompers impermissibly delves into state of mind evidence, the SEC ignores that its own expert, Mayer, also discusses what information analysts and the market knew.

[3] At trial, if Gompers or any other expert witness presents testimony opining on Ustian's state of mind, the opposing party may make an appropriate objection. *See In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 6302287, at *8 n.5 (S.D. Ill. Dec. 16, 2011) (disposing of argument about whether expert was testifying about someone's state of mind by indicating that a party could object to such testimony if elicited at trial).

witness in over 100 matters, including with respect to the valuation of public and private companies and factors that affect public company securities prices. This provides a sufficient basis to find Gomers qualified to opine on the market's reaction to Navistar statements during the relevant time period.

### B. Reliability

Next, the SEC attacks the reliability of Gompers' opinions, arguing that his review of analyst and media reports lacks a testable, reliable methodology. Although "the district court's admissibility determination is not intended to supplant the adversarial process," proposed testimony must be "based on sufficient facts or data," use "reliable principles and methods," and "reliably apply the principles and methods to the facts of the case." Fed. R. Evid. 702. To evaluate reliability, *Daubert* provides a non-exhaustive list of criteria to consider: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community."[4] *Gayton*, 593 F.3d at 616 (citing *Daubert*, 509 U.S. at 593–94). The Court may also consider the expert's experience and training in the subject area. *Id.*

"Courts routinely allow expert testimony regarding whether undisclosed information, or information that was later disclosed, was material," including testimony as to whether the information the defendant failed to disclose "would have been the type of information investors would have wanted to know." *S.E.C. v. ITT Educ. Servs., Inc.*, 311 F. Supp. 3d 977, 995 (S.D. Ind. 2018). Here, Gompers seeks to provide an opinion as to another potentially relevant

---

[4] While *Daubert* initially was framed as applying only to scientific evidence, it applies more broadly to all "testimony based on 'technical' and 'other specialized' knowledge," with *Daubert*'s reliability factors applying flexibly depending on the specific issues presented by the testimony under consideration. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also id.* at 150 ("[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.").

materiality factor: whether publicly available information already reflected the allegedly omitted information. *See S.E.C. v. Bauer*, 723 F.3d 758, 773 (7th Cir. 2013) ("[I]t is impossible to determine the extent to which nonpublic information may alter the 'total mix' without first examining the information that was already in the market."). The SEC contends that Gompers' opinions on this factor, which he reached by conducting a survey of research reports and other publicly available sources of information to determine whether the allegedly omitted information existed in the market prior to each statement at issue, are unsupported by an event study or any other methodology and therefore inadmissible. But the Court has not located any support in the Seventh Circuit that requires statistical analysis or an event study to show market awareness.[5] *Cf. S.E.C. v. Goldstone*, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *46–47 (D.N.M. May 10, 2016) (discussing different Circuits' requirements concerning event studies to show stock price movement). The SEC appears to acknowledge as much when it defends Mayer's materiality analysis by arguing that Mayer may testify as to "other factors, both qualitative and quantitative, that inform materiality." Doc. 291 at 1. The Court therefore does not find this criticism persuasive, particularly where Gompers' analysis of publicly available information is accompanied by an event study.

The SEC also argues that Gompers' analysis is "nothing but a cobbled together, results-oriented narrative of seemingly random information masquerading as expert analysis." Doc. 274 at 8. The parties present competing caselaw as to whether an expert may provide summary testimony as to the voluminous materials that Gompers considered to determine whether the

---

[5] The SEC cites to *Glickenhaus & Co. v. Household International, Inc.*, a case in which the Seventh Circuit overturned a jury verdict on loss causation based on its conclusion that the expert's model did not sufficiently control for "firm-specific, nonfraud factors that affected the stock price." 787 F.3d 408, 421 (7th Cir. 2015). But *Glickenhaus* involved a securities fraud claim brought by a private plaintiff, which requires the plaintiff to prove loss causation. *Id.* at 414. The Seventh Circuit's analysis of the sufficiency of the expert's model in that case says nothing about the admissibility of expert evidence more generally on the issue of materiality in a securities fraud enforcement action.

information Ustian allegedly omitted was already in the market. *Compare S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology."), *with In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2017 WL 1836443, at *15 (N.D. Ill. May 8, 2017) ("[T]o the extent he is summarizing voluminous records and materials, as appears to be the case, this aspect of his testimony is properly admitted under Federal Rule of Evidence 1006 as well as Rule 702 in the sense that he is identifying what he, given his background and expertise, considers to be the most salient aspects of those voluminous materials.").

Having reviewed the caselaw and Gompers' proposed testimony, the Court does not find Gompers' expected testimony amounts solely to expert narration of the facts so as to warrant exclusion. Instead, Gompers' opinion goes to how the market evaluated information about Navistar, explaining the voluminous documentation concerning the market's knowledge in light of his expertise. *See Baker v. SeaWorld Entm't, Inc.*, No. 14cv2129-MMA (AGS), 2019 WL 6118448, at *9 (S.D. Cal. Nov. 18, 2019) ("Contrary to Defendants' assertion that Coffman simply lists and summarizes these reports and articles, Coffman's opinion of *how* the market interpreted SeaWorld's statements from the August 13, 2014 press release will assist the trier of fact in determining loss causation."); *In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 (AWT), 2009 WL 8556135, at *3 (D. Conn. Apr. 22, 2009) (rejecting argument that Gompers' opinion about prior releases of public information was lay opinion "because it was arrived at simply by reading news reports, public filings, and other information"). Indeed, Ustian represents that Gompers is not just providing a narration but rather that he analyzed the analyst reports and other publicly available information in light of the following established economic principles:

(1) information in the market affects stock prices; and (2) in order to evaluate whether an alleged omission affected a stock price, one must determine the already publicly available material. "[A]nalyzing market data based on their expertise is what economic experts do," and, in the context of event studies, courts have recognized that the analysis of publicly available is "guided by economic principles, literature, and the experience of the researcher." *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2016 WL 374132, at *2 (N.D. Ill. Feb. 1, 2016) (citation omitted). The Court has not located any support for the exclusion of such an analysis merely because it stands on its own, unaccompanied by detailed information about the stock's movement on each specific date. *Cf. In re Xerox*, 2009 WL 8556135, at *4 (allowing Gompers to testify as to review of mix of information available where he did not conduct an event study but identified public information to rebut event study performed by competing expert). Therefore, the Court does not find it appropriate to summarily exclude any of Gompers' so-called narrative testimony. *In re Yasmin*, 2011 WL 6302287, at *8, 13, 19 (refusing to summarily exclude narrative testimony by expert given the court's discretion to allow testimony in summary format). The SEC will have "a full and fair opportunity to address any claims of incompleteness or undue emphasis during cross-examination and presentation of contrary evidence." *In re Testosterone Replacement Therapy*, 2017 WL 1836443, at *15.

### C.     Assistance to the Trier of Fact

Finally, the SEC argues that Gompers' opinion has no bearing on any of the questions the jury will be asked to determine and so cannot assist the jury. Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance." *Daubert*, 509 U.S. at 591 (citation omitted); *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014).

The SEC argues that Gompers misapplied the standard for materiality in reaching his conclusions, with the potential that this misapplication could spread to the jury through his testimony. As the Court noted in its December 13, 2019 summary judgment opinion, materiality is a fact-intensive inquiry, with one aspect of that inquiry an examination of the information already in the market. Doc. 303 at 75. The Court will instruct the jury as to the standard for determining materiality, and Gompers or any other witness should not testify as to the legal standard for materiality. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("[A]llowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance."); *S.E.C. v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *9 (N.D. Cal. July 29, 2010) (allowing expert to explain materiality from an accounting perspective but precluding opinions about legal materiality). The SEC can effectively bring out that Gompers' opinion addresses only one aspect of the materiality inquiry in argument. Ustian should also ensure that Gompers' testimony does not deviate from the applicable legal standard.

### D. *Mack Trucks v. EPA* Testimony

Separately, the SEC asks that the Court exclude Gompers' assertion that Navistar's March 1, 2012 filings in the *Mack Trucks v. EPA* litigation were publicly available as of the date of Ustian's March 2012 statements. The SEC first complains that Gompers is not qualified to determine the availability of litigation filings, but even the SEC's expert, Mayer, acknowledges that investors typically consider legal disputes when making investments and that analysts may follow case filings. The Court also questions whether Gompers' assertion even amounts to an opinion, given that such documents are considered publicly available unless filed under seal. *See, e.g.*, *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("[M]ost documents filed in

court are presumptively open to the public[.]").  The SEC cites to a bankruptcy court case, *In re Matthys*, in which the court considered whether debtors in that action had a claim for invasion of privacy based on a creditor's failure to redact their social security numbers in some bankruptcy court filings.  No. 09-16585-AJM-13, 2010 WL 2176086, at *3 (S.D. Ind. May 26, 2010).  Although the court there noted the affirmative steps required to access the PACER system, the court's analysis appears limited to its conclusion that the "mere electronic filing of a document containing personal information viewable in the PACER system does not rise to the level of 'publicity' needed to establish an invasion of privacy claim."  *Id.*  The SEC's dispute about the public nature of the filing appears to go more to whether the filing was readily available so to allow its publication to negate the materiality of any information contained therein that the SEC contends Ustian failed to disclose.

The Court refuses to exclude Gompers' assertion regarding public availability of the *Mack Trucks v. EPA* filing.  Any issues the SEC has with Gompers' consideration of the *Mack Trucks v. EPA* filing as public information goes to the weight, not the admissibility, of his opinion.  Given the materiality standard applicable to this case as discussed in the Court's December 13, 2019 summary judgment opinion, Doc. 303 at 73–76, the SEC can explore the extent to which the filing should be treated as part of the total mix of information regardless of the assertion of its public availability.  This can include evidence and argument concerning whether analysts covering Navistar knew of the EPA's letter at the time of the March 2012 statements.[6]

The Court therefore allows Gompers to testify as to the entirety of the opinions in his report.

---

[6] To avoid the SEC's concern about a mini-trial as to the public availability of PACER filings, the Court encourages the parties to reach a stipulation setting forth basic information about the PACER system to the extent the parties deem such evidence necessary.

## II.    The SEC's Motion to Exclude Ustian's Expert Michael Easter [276]

Ustian has also retained Michael Easter to testify about SCR engines' performance under real-world conditions.  Easter has a bachelor's degree in environmental toxicology and a law degree.  He has over twenty years of experience in regulatory compliance, risk assessment, and toxicology support, working for California EnSIGHT, Inc.  He has conducted a number of engine emission studies, including testing commissioned by Navistar in 2010 and 2011 to study the emissions of SCR-equipped on-highway trucks.

Easter opines that, under the EPA's guidance documents for SCR engines, through the end of 2011, SCR engines certified by the EPA operated for lengthy periods of time without diesel emission fluid ("DEF"), with the wrong fluid in the DEF tank, or with disconnected electrical connections to SCR components.  He intends to testify that EPA-certified SCR systems operated in real-world conditions with NOx emissions above the 0.2g NOx standard.  Easter bases his opinions on the EnSIGHT 2010 and 2011 testing he oversaw for Navistar, as well as his knowledge, prior experience, and industry and research publications.

The EnSIGHT August 20, 2010 study involved testing three heavy-duty diesel trucks with three different manufacturers' SCR-equipped engines certified by the EPA at the 0.2g NOx standard.  Navistar retained EnSIGHT to test these engines to address two questions: (1) "can an SCR-equipped vehicle operate in a manner acceptable for typical driving without DEF or in any of the four SCR-disabled states," and (2) "in the event an SCR-equipped vehicle is able to run for some period of time in an SCR-disabled state, is there a corresponding, measurable increase in NOx emissions."  Doc. 295-1 at 37.  EnSIGHT performed its testing in California and Fort Wayne, Indiana, on routes identified to provide both urban and highway driving.  EnSIGHT's 2011 study tested five vehicles with 2011 model year SCR-equipped engines certified at the 0.2g

NOx standard.[7]  EnSIGHT represented its testing objectives as: (1) "[e]valuate vehicles equipped with 2011 Model Year engines to determine if inducements prevent driving without SCR-NOx control;" (2) "[m]easure actual emissions during on-road operation under a variety of driving and operating conditions, including evaluation of NTE events and compliance;" and (3) "[e]valuate operation and emissions of an SCR-equipped heavy-duty diesel engine under various operating conditions on an engine dynamometer, including cycles used in the certification process (FTP and RMC)."  *Id.* at 236.  EnSIGHT conducted on-road testing of four vehicles in California and tested the fifth vehicle using a dynamometer.

The SEC challenges Easter's anticipated testimony on relevance and reliability grounds. The SEC does not take issue with Easter's qualifications to testify as an expert, and the Court agrees that Easter is well-qualified to provide the opinions at issue.  Therefore, the Court proceeds to address whether his opinions are relevant and based on a reliable methodology, allowing for their admission.

A.      Relevance

Initially, the SEC argues that Easter's opinions have no relevance to the issues in the case because his opinions relate only to SCR engines manufactured by Navistar's competitors.  The SEC correctly notes that Easter has no opinion on whether the EPA should have certified the SCR engines, an issue the Court has repeatedly made clear has no relevance to the case.  But, as even the SEC has recognized elsewhere, Ustian argues that the EPA's treatment of SCR engines and their actual performance influenced his state of mind and belief that the EPA would certify Navistar's EGR engines at the 0.2g NOx standard.  Ustian claims he based this belief in part on the 2010 and 2011 studies EnSIGHT conducted at Navistar's request.  Therefore, to the extent

---

[7] Although the testing for the 2011 study occurred in 2011, it appears that EnSIGHT only finalized the report submitted as Appendix C to Easter's expert report in April 2019.

Easter's testimony relates to what Ustian and Navistar knew about the EPA's treatment of SCR technology and how SCR operated in the real world during the relevant time period, Easter may testify as to this information. Given the Court's resolution of the SEC's motion *in limine* no. 7 excluding evidence related to SCR technology of which Ustian did not know at the time of the statements at issue, Ustian should curtail Easter's testimony to the two EnSIGHT studies and any accompanying documentation on which Ustian claims to have relied.

### B. Reliability

The SEC also argues that Easter used a flawed methodology in conducting the 2010 and 2011 testing of SCR-equipped vehicles. Specifically, the SEC takes issue with the small sample size EnSIGHT used in performing its tests and Easter's failure to determine if the testing sample was representative of the entire population of SCR-equipped vehicles. Similarly, the SEC argues that Easter did not establish that the testing locations were representative of the United States.

These criticisms of Easter's methodology go to the weight, not the admissibility, of his opinions. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether Sullivan selected the best data set to use, however, is a question for the jury, not the judge. Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."). This is particularly so given that Easter opines on testing provided to Navistar and on which Ustian relied. The SEC can raise issues with the structure of the studies and the relevance of the results, but the Court will not exclude this evidence based on reliability concerns where the report's results could be admitted for their effect on Ustian's state of mind, regardless of how the testing occurred. Because these tests had a limited purpose, Easter testified that they did not necessarily require a determination of whether the engines studied were

representative of all SCR engines at the time. And although the SEC questions the sample size, Easter testified that the results from the tested engines appeared consistent with other observations on non-tested SCR engines. Easter has also provided several studies on which he relied to confirm this conclusion. The jury must determine whether Ustian could rely in good faith on the information he received from these tests and whether questions of the tests' methodology undermine any such good faith belief, but this again goes to the weight the jury should place on Easter's opinions and the EnSIGHT testing, not on their admissibility.

Therefore, the Court will allow Easter to testify as to his opinions to the extent Ustian had knowledge of this SCR information.

## III. Ustian's Motion to Exclude the SEC's Expert David Foster [281]

The SEC seeks to present David Foster as an expert in engine emissions. Foster has a Ph.D. in mechanical engineering, with his thesis entitled "The Control of NOx from the Combustion of Fuels with a High Nitrogen Content." He worked as a research engineer and professor of mechanical engineering at the University of Wisconsin-Madison. He also was a co-founder and director of the Engine Research Center ("ERC") at the University of Wisconsin-Madison and a founding co-director of the General Motors Collaborative Research Laboratory housed within the ERC. Foster also has consulted on engine development with several engine manufacturers.

Foster intends to provide background information regarding: (1) the science behind the design and operation of diesel engines, (2) the methods engineers use to reduce NOx emissions and the impact of these methods on engine performance, (3) the methods Navistar's engineers used to control NOx emissions in the engines described in the certification applications, and (4) the performance attributes of those engines. He also opines that: (1) the challenges Navistar

experienced in its attempts to achieve very low NOx emissions through EGR technology were to be expected and (2) the engines Navistar was developing to meet the 0.2g NOx standard were likely to have performed poorly. Ustian argues that Foster's opinions do not meet the *Daubert* requirements for admissibility.

## A. Qualifications

First, Ustian challenges Foster's qualifications to opine on Ustian's belief that Navistar's applications met EPA certification requirements given Foster's acknowledgment that he is not an expert in EPA regulations. But Ustian misconstrues the purpose of Foster's testimony and so his arguments as to Foster's qualifications are misplaced. As Foster readily admitted in his deposition, he does not intend to testify about EPA certification of heavy-duty diesel trucks and does not have experience with EPA certification procedures. Instead, Foster's testimony is intended to provide the jury with a better understanding of the mechanics behind diesel engines and emission controls. The SEC represents that Foster will testify "about the inherent difficulties in using EGR-only technology to develop a 0.2g NOx engine while also maintaining fuel economy and performance, and how, in Dr. Foster's opinion, Navistar was unable to overcome those difficulties for any of the three engines at issue in this case." Doc. 292 at 1. Given Foster's background in mechanical engineering and specifically engine and truck engineering, the Court finds Foster qualified to render the limited opinions he provides. Ustian may bring out the fact that Foster cannot testify about EPA certification procedures or compliance with EPA regulations on cross-examination and in argument.

## B. Assistance to the Trier of Fact

Ustian also argues that Foster's opinions are not relevant or helpful to the jury. The SEC claims that Foster's testimony will aid the jury in determining whether the statements at issue—

concerning Navistar's development of a 0.2g NOx engine with competitive fuel economy and performance—were materially false and misleading.  Ustian cannot meaningfully argue that information concerning the mechanics behind diesel engines, emission controls, and the tradeoffs between NOx emissions and fuel economy and performance have no relevance to this case.  Instead, Ustian resorts to arguing that such information is unhelpful to the jury because it is common knowledge.  For example, he argues that Foster's background discussion of the science behind diesel engines would distract the jury because he "relays the non-expert common knowledge that diesel engines operate by igniting fuel and spark-ignited engines work by igniting a mix of fuel and air with a spark plug."  Doc. 281 at 7.  But Ustian provides no support for treating this as common knowledge, and the Court finds this distinction between the types of engines, intended to set the stage for discussions about the mechanics of the engines at issue here, would be helpful to the jury.  Fed. R. Evid. 702 advisory committee note to 2000 amendment ("[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.  For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case.").  Similarly, Foster's discussion of SCR technology would help a juror understand the differences between EGR and SCR technology, engineering concepts the Court expects the parties to repeatedly reference throughout the trial.

Ustian also challenges Foster's opinion that Navistar experienced expected challenges in attempting to achieve very low NOx emissions through EGR technology on the same basis, claiming that the conclusion is obvious.  The Court does not agree with Ustian's

oversimplification of Foster's opinion amounting to testimony that "tough targets are tough to meet." Doc. 281 at 5; *cf. Taylor v. Ill. Central R.R. Co.*, 8 F.3d 584, 585–86 (7th Cir. 1993) (excluding expert testimony regarding the question of "whether a pile of large rocks is harder to stand on than a pile of smaller rocks," finding that information was within the common understanding of jurors). Expert testimony concerning the tradeoffs between NOx emissions and fuel economy and performance, something not within the common understanding of jurors, may indeed help the jury better understand whether Ustian's statements concerning Navistar's progress in developing a 0.2g NOx EGR engine were misleading and whether any misleading statements were material. Ustian is free to argue that the jury should disregard Foster's testimony, but at this time, the Court does not find it wholly irrelevant.

C.     Reliability

Finally, Ustian challenges the basis for Foster's opinions, specifically challenging his discussion of two pieces of information: (1) two studies by P.F. Flynn from 1999 and 2000 concerning NOx emissions, and (2) SWRI data. Foster considered the Flynn studies in describing the tradeoff between NOx emissions and fuel consumption. Ustian contends that the Flynn studies rely on "a discredited theory that in-cylinder NOx emissions cannot be lowered to less than 1.5g NOx without unacceptable fuel consumption," claiming that Navistar's certificates of conformity proved that theory "dead wrong" by 2008. Doc. 281 at 8. The Court finds this argument goes to the weight Foster attributed to the Flynn studies as opposed to the methodology underlying Foster's opinions so as to require exclusion. "As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005). Instead of completely ignoring the fact that the Flynn studies used a

2000 research engine, Foster addresses this in his report by noting that the numbers may depend on the "level of technology used in the engine" and explaining why, in his opinion, use of that research engine as a model remains appropriate. *Cf. Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) (although an expert may not "simply ignore evidence that is contrary to her opinion," "failing to account for supposedly contradictory information often is a question going to weight of the evidence rather than its admissibility"). Ustian may question Foster about his reasoning for relying on Flynn's studies on cross-examination.

Ustian also argues that Foster's opinions ultimately boil down to *ipse dixit*, with Foster only offering speculation as to the Navistar engines' performance and admitting they are his "personal opinion[s] based on [his] expert experience and exposure." Doc. 281-1 at 121–24. Although not explicitly argued, Ustian appears to fault Foster for failing to test the Navistar engines involved in this case. Some courts have excluded opinions where the expert has not conducted any hands-on testing and has not explained the scientific principles on which they relied. *See, e.g.*, *Cates*, 2017 WL 1862640, at *15 (collecting cases). But Foster need not have based his opinion on "direct evidence or a personal observation," such as through testing of the engines Navistar submitted for certification. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000); *Hasan v. Cottrell, Inc.*, No. 10 C 5534, 2014 WL 4124254, at * 4–5 (N.D. Ill. Aug. 21, 2014) ("While it is true that testing is one factor that may bolster the reliability of an expert's opinion, testing is not required in every case."); *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 708 (N.D. Ill. 2001) (rejecting argument that expert's opinions should be excluded because he did not inspect the items involved in an accident, noting that an "expert is not always required to personally perceive the subject of his

analysis"). Although Ustian has cherry-picked parts of Foster's deposition testimony to suggest that Foster did not rely on any scientific principles, Foster sufficiently provided a basis by which he came to his conclusions, reviewing Navistar internal documents concerning engine development, data from SWRI, Navistar engineer deposition testimony, and academic papers and then applying his training and experience to this information. *See Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-cv-03770, 2015 WL 10818831, at *10 (N.D. Ill. Nov. 1, 2015) (rejecting argument that expert did not provide any benchmark and concluding that comparison of defendant's process to the "process that, in his experience and according to his research, is the standard for developing coupler-like products" sufficed to provide a benchmark); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology.").

Ustian also complains about Foster's treatment of the SWRI test reports based on Foster's admission that he set many of these reports aside or did not understand them. But Foster also explained his reasoning for segregating the SWRI reports, and the Court cannot find that he completely ignored them so as to make his opinions ripe for exclusion. Ustian also complains that Foster copy and pasted Navistar documents into his report without any analysis of them, but this ignores the explanations Foster provides that precede or follow the portions of these documents. Ustian may explore on cross-examination any evidence that Foster claims he ignored that suggests that Navistar's engines had acceptable performance. *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *6 (N.D. Ill. Aug. 24, 2010) ("If the factual underpinnings of Dr. Rao's expert testimony . . . are weak that is a matter not for exclusion, but as the Supreme Court stressed in *Daubert* for '[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof[.]'" (alteration in original) (quoting *Daubert*, 509 U.S. at 596)).

Therefore, the Court finds Foster's opinions admissible.

## IV. Ustian's Motion to Exclude the SEC's Expert Michael Mayer [285]

Finally, the SEC seeks to introduce evidence concerning materiality through Michael Mayer. Mayer has an MBA from Northwestern and is a Vice President at Charles River Associates. His consulting experience includes trading activity analysis for securities fraud cases.

Mayer conducted an event study to analyze whether Navistar's July 6, 2012 announcement had a material effect on Navistar's stock price and whether the information in that announcement was publicly available before the announcement. Mayer searched public press and analyst reports regarding Navistar between July 6, 2011 and July 6, 2012 to do so. Although he did not conduct an analysis similar to Gompers of public press at the time of each alleged omission or misstatement, he testified he knew of the analyst reports surrounding each of the statements and considered the misstatements as a whole, instead of requiring each to stand in and of itself as an actionable violation. Mayer also opines that investors considered the statements at issue important information (the "Importance Opinion"). In reaching this opinion, Mayer reviewed how investors and analysts evaluate companies, as well as how the market treated information about Navistar during the relevant time period.

Ustian argues that the Court should exclude the entirety of Mayer's expert opinions. He does not challenge Mayer's qualifications, and the Court finds him qualified to render the opinions at issue here. The Court thus proceeds to consider Ustian's challenges to the reliability

and relevance of Mayer's opinions, addressing these factors as they relate to Mayer's event study and his Importance Opinion.

## A.    Event Study

First, Ustian challenges Mayer's opinion that the alleged misstatements had a material impact on Navistar's stock price based on the event study he conducted.  As Mayer explains, he used an event study "to test whether the disclosure of Navistar's change in emission strategy from a planned 0.20 NOx 13L EGR-only strategy to one using SCR [announced on July 6, 2012] affected the market price of Navistar's stock in a statistically significant way."  Doc. 291-1 at 14. Ustian contends that Mayer's event study is unreliable because: (1) Mayer based his study on "an unfounded and inaccurate assumption;" (2) Mayer failed to analyze information known to the market at the time of each statement at issue; (3) Mayer did not analyze the market's expectations for the July 6, 2012 announcement; and (4) Mayer did not assess confounding information in the July 6, 2012 announcement.  Doc. 285 at 1.

Ustian does not challenge the general admissibility of event studies, given that his own expert, Gompers, also used such an analysis to support his opinions.  *See Goldstone*, 2016 WL 3135651, at *45 ("In a securities fraud case like this one, event studies can help the trier of fact to determine what a reasonable investor would consider material.").  But Ustian argues that the Court should exclude Mayer's event study because he did not evaluate each statement at issue individually but instead assumed that each statement "essentially continued a theme of near-term successful achievement of penalty free EPA compliance with the planned 0.20 NOx 13L EGR-only engine."  Doc. 291-1 at 14 n.63.  Mayer acknowledged the possibility of using an event study to determine whether each statement affected Navistar's stock price in a statistically significant way, but determined he did not need to do so.  *Id.*; *see also In re Vivendi Sec. Litig.*,

838 F.3d 223, 256, 260 (2d Cir. 2016) (noting that expert did not examine each individual statement by design and that experts commonly measure actual inflation of a stock price "without reference to the timing or nature of a defendant's alleged misstatements"). Although Ustian argues that Mayer's assumption has no basis in the facts of the case, Ustian ignores the fact that the SEC alleges that Ustian engaged in an overarching scheme to defraud that fell apart on July 6, 2012, when Navistar announced it would abandon EGR technology. *See City of Cape Cod Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 690 (D. Md. June 8, 2018) ("[I]f a company persists in withholding material information for a given time, thus artificially inflating the stock price, it would be reasonable to conclude that a significant change in price would only occur when the truth was revealed and not necessarily when additional misrepresentations are made.").

Although an expert's testimony must be based on "sufficient facts or data," Fed. R. Evid. 702, it is the jury's role to determine the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis," *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Any dispute with the reasonableness of Mayer's assumption and decision not to examine each statement individually is fodder for cross-examination and argument, not wholesale exclusion of his opinion. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (criticisms of the quality of an expert's opinion go to the appropriate weight to be accorded to the evidence and not to its admissibility). The Court's conclusion aligns with how other courts have treated challenges to event studies and market

efficiency. *See, e.g.*, *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, No. 1:17-CV-00241-WMR, 2019 WL 2482399, at *5 (N.D. Ga. June 12, 2019) ("This Court recognizes, as other courts throughout the country have recognized, that different experts may approach the determination of whether a market is efficient using different methods, focusing on different elements. The disagreement over the appropriate method goes to the weight of the evidence and can be more properly explored through cross examination at trial."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (refusing to exclude event study, concluding that arguments as to the construct of the event study "go to the weight, not the sufficiency of the evidence"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. Aug. 15, 2014) (in finding concerns about event study went to weight, not admissibility, noting that "an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis").

Similarly, Ustian's other challenges to Mayer's opinion do not warrant exclusion. All of these challenges go to the weight the jury should give to Mayer's opinion. *See Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887–90 (E.D. Wis. 2010) ("There is a fine line between a court finding that proffered expert testimony is 'unpersuasive' (and capable of being submitted to a jury) and when a court concludes that evidence is wholly 'unreliable' (and properly excludable under *Daubert*)."). For example, Ustian argues that because an "event study methodology can only measure the impact of new and unexpected information on stock prices," *United States v. Schiff*, 538 F. Supp. 2d 818, 839 (D.N.J. 2008), Mayer's event study methodology fails because he assumed that Navistar had not disclosed the allegedly omitted information prior to the July 6, 2012 announcement. But Mayer did consider whether "any other

Navistar related news beyond the contents of the July 6, 2012 Announcement" could have affected Navistar's stock price on that day so as to explain the stock price movement. Doc. 291-1 at 14. And, given the operation of an efficient market, his analysis suggests that the statistically significant price change after the announcement reflects the fact that the market had not previously appreciated that news. Ustian may cross-examine Mayer on this point and present rebuttal evidence as to why his conclusions are incorrect. And while Ustian follows his expert's lead in segmenting Navistar's July 6, 2012 announcement into three parts related to the timing, cost, and sourcing of SCR technology, this is only one way to interpret the announcement. Further, Mayer did not wholly ignore the possibility of confounding information but instead determined that the information Gompers treats as confounding was not actually so. This disagreement provides an area for cross-examination and argument but does not require exclusion. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors 'must be considered unacceptable as evidence of discrimination.' Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." (citation omitted)); *Manpower*, 732 F.3d at 808 ("[T]he selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility."); *Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 963 (N.D. Ill. 2015) ("[O]bjections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility."). Therefore, the Court finds Mayer's event study opinions admissible.

**B.      Importance Opinion**

Separately, Ustian seeks the exclusion of Mayer's opinions that the alleged misstatements amount to important information to investors.  In many ways mirroring the arguments made in support of the SEC's motion to exclude Gompers' opinions, Ustian contends that Mayer has not tied this opinion to any established methodology and instead relies on circular analysis.  Expert testimony may not "be based on subjective belief or speculation," and the expert must "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line." *Metavante Corp.*, 619 F.3d at 761.  As already discussed, however, "[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806.

Ustian faults Mayer for failing to connect his Importance Opinion to established economic principles, contending that no evidence exists that such a determination, absent an event study, is generally accepted in the economic community.  A materiality analysis may involve both quantitative and qualitative considerations, however.  *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) ("Courts must also consider qualitative factors, which can turn a quantitatively immaterial statement into a material misstatement."); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).  In fact, Ustian's expert, Gompers, conducted a similar qualitative analysis of materiality in opining on the information available to the market prior to each alleged statement.  Another consideration for materiality purposes is whether a reasonable investor would consider the information important, the topic on which Mayer seeks to opine.

Although Mayer's opinion may not meet all of the admissibility factors listed in *Daubert*, these factors are not exclusive or dispositive. *Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."). Ustian appears to ignore Mayer's reliance on information provided by the Chartered Financial Analyst Institute, FINRA, and the American Association of Individual Investors. Moreover, Mayer bases his conclusions of importance not only on qualitative factors accepted by the industry but also on his own experience. *See* Fed. R. Evid. 702 advisory committee note to 2000 Amendments ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Indeed, as the Court noted with respect to Gompers' opinion, "analyzing market data based on their expertise is what economic experts do." *See Lawrence E. Jaffe Pension Plan*, 2016 WL 374132, at *2. Because Mayer sufficiently ties the industry standards and his experience to the conclusions he reaches, the Court finds his Importance Opinion admissible, with Ustian able to explore any areas of weakness on cross-examination. *See Leslie*, 2010 WL 2991038, at *8 (allowing expert to testify "on whether the information was sufficiently important from an accounting perspective"); Fed. R. Evid. 702 advisory committee note to 2000 Amendments ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

Therefore, the Court finds Mayer's Importance Opinion admissible. But, as discussed in connection with Gompers' testimony, Mayer cannot opine on the legal definition of materiality, *see Naeem*, 444 F.3d at 610, or Navistar's state of mind, *see Fife*, 2014 WL 2514565, at *5. The

Court will entertain specific objections to Mayer's testimony, as well as that of any other expert, at trial.

## CONCLUSION

For the foregoing reasons, the Court denies the SEC's and Ustian's motions to exclude expert testimony [274, 276, 281, 285].


Dated: January 26, 2020

SARA L. ELLIS
United States District Judge